## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CARBONLITE HOLDINGS LLC, *et al.*,[1] | Case No. 21-10527 (JTD) |
| Debtors. | Jointly Administered |
| BAHRAM NOUR-OMID, an individual, and LEARNICON LLC, a Delaware limited liability company, | |
| Plaintiffs, | |
| v. | |
| CARBONLITE HOLDINGS LLC, a Delaware limited liability company, LF INVESTMENT HOLDINGS, LLC, a Delaware limited liability company, LEON FARAHNIK, an individual, KIM JEFFERY, an individual, FARAMARZ YOUSEFZADEH, an individual, ORION ENERGY CREDIT OPPORTUNITIES FUND II, L.P., a Delaware limited partnership, ORION ENERGY CREDIT OPPORTUNITIES FUND II PV, L.P., a Delaware limited partnership, ORION ENERGY CREDIT OPPORTUNITIES FUND II GPFA, L.P., a Delaware limited partnership, FORCE TEN PARTNERS, LLC, a Delaware limited liability company, BRIAN WEISS, an individual, and DOES 1 through 50, inclusive, | Adv. No. 21-50317 (JTD) |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF ORION ENERGY CREDIT OPPORTUNITIES FUND II, L.P., ORION ENERGY CREDIT OPPORTUNITIES FUND II PV, L.P., AND ORION ENERGY CREDIT OPPORTUNITIES FUND II GPFA, L.P.'S MOTION TO DISMISS THE COMPLAINT

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: CarbonLite Holdings LLC (8957); CarbonLite Industries LLC (3596); CarbonLite P Holdings, LLC (8957); CarbonLite P, LLC (5453); CarbonLite PI Holdings, LLC (8957); CarbonLite Pinnpack, LLC (8957); CarbonLite Recycling Holdings LLC (8957); CarbonLite Recycling LLC (3727); CarbonLite Sub-Holdings, LLC (8957); Pinnpack P, LLC (8322); and Pinnpack Packaging, LLC (9948). The address of the Debtors' corporate headquarters is 10250 Constellation Blvd., Los Angeles, CA 90067.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND...................................................................................................3

ARGUMENT ...................................................................................................................13

I.      THE GENERAL RELEASE BARS EACH OF PLAINTIFFS' CLAIMS
        AGAINST THE ORION FUNDS (COUNTS 4-8). ...........................................15

II.     THE COMPLAINT FAILS TO STATE A CLAIM AGAINST THE ORION
        FUNDS FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES
        (COUNT IV)..................................................................................................18

III.    PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF THE IMPLIED
        COVENANT OF GOOD FAITH AND FAIR DEALING (COUNT V). .........................21

IV.     THE COMPLAINT FAILS TO STATE A CLAIM FOR TORTIOUS
        INTERFERENCE WITH CONTRACT (COUNT VI). .....................................................22

V.      THE COMPLAINT FAILS TO STATE A CLAIM  FOR TORTIOUS
        INTERFERENCE WITH ECONOMIC RELATIONS (COUNT VII)............................25

VI.     THE COMPLAINT FAILS TO STATE A CLAIM FOR DECLARATORY
        RELIEF, WHICH IS NOT AN INDEPENDENT CAUSE OF ACTION (COUNT
        VIII). ..................................................................................................................26

CONCLUSION...................................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ace Arts, LLC v. Sony/ATV Music Pub., LLC,*
  56 F. Supp. 3d 436 (S.D.N.Y. 2014) ...................................................................................25

*Ali v. Rumsfeld,*
  649 F.3d 762 (D.C. Cir. 2011) .............................................................................................27

*Argen v. Kessler,*
  No. 18-963 (KM)(JBC), 2019 WL 2067639 (D.N.J. May 10, 2019) ...................................27

*In re Asbestos Prods. Liab. Litig. (No. VI),*
  822 F.3d 125 (3d Cir. 2016) .................................................................................................14

*In re Basic Food Grp., LLC,*
  No. 15-10892 (JLG), 2018 WL 5805943 (Bankr. S.D.N.Y. Oct. 31, 2018) ..........................20

*Beninati v. F.D.I.C.,*
  55 F. Supp. 2d 141 (E.D.N.Y. 1999) ....................................................................................20

*Bose v. Interclick, Inc.,*
  No. 10 CIV. 9183 DAB, 2011 WL 4343517 (S.D.N.Y. Aug. 17, 2011) ...............................22

*In re CarbonLite Holdings LLC, et al.,*
  Case No. 21-10527 (JTD) (Bankr. D. Del.) ..........................................................................13

*Dorset Indus., Inc. v. Unified Grocers, Inc.,*
  893 F. Supp. 2d 395 (E.D.N.Y. 2012) ..................................................................................20

*In re DSI Renal Holdings, LLC,*
  No. 11-11722 (KBO), 2020 WL 7054390 (Bankr. D. Del. Dec. 2, 2020) ............................18

*In re Fedders N. Am., Inc.,*
  405 B.R. 527 (Bankr. D. Del. 2009) .....................................................................................15

*Four Winds of Saratoga Inc. v. Blue Cross & Blue Shield of Cent. New York Inc.,*
  241 A.D.2d 906 (3d Dep't 1997) ..........................................................................................21

*Galanova v TKR Prop. Servs., Inc.*
  2016 NY Slip Op 51022(U) (N.Y. Sup. Ct. 2016) ...............................................................21

*In re Greenfield Energy Servs., Inc.,*
  585 B.R. 89 (Bankr. D. Del. 2018) .......................................................................................15

*Iacono v. Pilavas*,
   125 A.D.3d 811 (2d Dep't 2015) ...........................................................................21

*Inter-Reco, Inc. v. Lake Park 175 Froehlich Farm, LLC*,
   106 A.D.3d 955 (2d Dep't 2013) ...........................................................................15

*Jack L. Inselman & Co., Inc. v. FNB Fin. Co.*,
   364 N.E.2d 1119 (N.Y. 1977)...............................................................................22

*LeMay v. H.W. Keeney, Inc.*,
   124 A.D.2d 1026 (N.Y. App. Div. 1986) ..............................................................15

*Macklowe v. 42nd Street Dev. Corp.*,
   170 A.D.2d 388 (1st Dep't 1991) ..........................................................................23

*Malpiede v. Townson*,
   780 A.2d 1075 (Del. 2001) ...................................................................................18

*Mears v. Montgomery*,
   No. 02 CIV. 0407 (MHD), 2006 WL 1084347 (S.D.N.Y. Apr. 24, 2006)..............24

*In re Mercer*,
   141 A.D.3d 594 (2d Dep't 2016) ...........................................................................16

*Middle E. Banking Co. v. State St. Bank Int'l*,
   821 F.2d 897 (2d Cir. 1987)..................................................................................16

*One Step Up, Ltd. v. Webster Bus. Credit Corp.*,
   87 A.D.3d 1 (1st Dep't 2011) ................................................................................21

*Penn Mart Realty Co. v. Becker*,
   298 A.2d 349 (Del. Ch. 1972)...............................................................................18

*Plasticware, LLC v. Flint Hills Res., LP*,
   852 F. Supp. 2d 398 (S.D.N.Y. 2012)....................................................................22

*In re Premier Int'l Holdings, Inc.*,
   443 B.R. 320 (Bankr. D. Del. 2010) ...................................................................4, 14

*Primo Const., Inc. v. Swig Weiler & Arnow Mgmt. Co.*,
   160 A.D.2d 379 (1st Dep't 1990) ..........................................................................24

*RBC Cap. Mkts., LLC v. Jervis*,
   129 A.3d 816 (Del. 2015) .....................................................................................18

*Schilling v. Rogers*,
   363 U.S. 666 (1960)..........................................................................................26, 27

28155512.1

*Shared Commc'ns Servs. of ESR, Inc. v. Goldman Sachs & Co.*,
    23 A.D.3d 162 (1st Dep't 2005) .........................................................26

*In re Sols. Liquidation LLC*,
    608 B.R. 384 (Bankr. D. Del. 2019) .................................................14

*Stratford Materials Corp. v. Jones*,
    118 A.D.2d 559 (2d Dep't 1986) ......................................................23

*Tucker v. Wyckoff Heights Med. Ctr.*,
    52 F. Supp. 3d 583 (S.D.N.Y. 2014) ...........................................24, 25

*Vinas v. Chubb Corp.*,
    499 F. Supp. 2d 427 (S.D.N.Y. 2007) ..............................................25

*In re Welded Constr., L.P.*,
    623 B.R. 100 (Bankr. D. Del. 2020) .................................................13

## STATUTES

28 U.S.C. § 2201(a) ..................................................................................26

## RULES

Fed. R. Bankr. P. 7012(b) .....................................................................1, 13

Fed. R. Civ. P. 12(b)(6)........................................................................1, 13

## TREATISES

*Successor*, Black's Law Dictionary (11th Ed. 2019) ...................................17

Defendants Orion Energy Credit Opportunities Fund II, L.P., Orion Energy Credit Opportunities Fund II PV, L.P., and Orion Energy Credit Opportunities Fund II GPFA, L.P. (the "Orion Funds"), by and through their counsel, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, as made applicable by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, hereby file this memorandum of law in support of their motion to dismiss the Complaint filed by Plaintiffs Bahram Nour-Omid ("Nour-Omid") and Learnicon LLC ("Learnicon," and together with Nour-Omid, "Plaintiffs").

## PRELIMINARY STATEMENT

This dispute has nothing to do with the Orion Funds. Plaintiffs complain that they acquired a tranche of CarbonLite Holdings, LLC ("CarbonLite") loans from defendants Leon Farahnik and his company, LF Investment Holdings, LLC ("LF Investment"), and that Farahnik and LF Investment concealed the fact that the loans were subordinate to a different tranche of CarbonLite loans held by the Orion Funds. That is a matter between Plaintiffs, on the one hand, and Farahnik and LF Investment, on the other; the Orion Funds are not involved. Indeed, the Orion Funds are not parties to any of the agreements between Plaintiffs and Farahnik, never reviewed or approved any of these agreements, and are not alleged to have made any representations to Plaintiffs in connection with these agreements. Thus, it is no surprise that Plaintiffs are unable to state a valid cause of action against the Orion Funds.

The over-arching problem with all of Plaintiffs' claims against the Orion Funds is that they have already been released. The Orion Funds have issued a series of loans to CarbonLite pursuant to a Credit Agreement, which has been amended a number of times in response to CarbonLite's various defaults. In one such amendment, CarbonLite executed a "General Release" in favor of the Orion Funds that is binding on CarbonLite as well as "its agents, representatives, officers, directors, advisors, employees, subsidiaries, affiliates, successors and assigns" and releases any

and all claims "based in whole or in part on facts, … that relate to, arise out of or otherwise are in connection with" the Credit Agreement or its amendments. Both Plaintiffs Nour-Omid and Learnicon are bound by the General Release—Nour-Omid because he was a CarbonLite director, and Learnicon because it is the successor to a CarbonLite affiliate. Because all of Plaintiffs' claims arise out of or relate to the Credit Agreement and its amendments, all of Plaintiffs' claims are barred by the General Release.

Even putting aside the General Release, each of Plaintiffs' claims against the Orion Funds suffers from a number of pleading defects that independently warrant dismissal. Plaintiffs' claim for aiding and abetting breach of fiduciary duties fails because there is no allegation that the Orion Funds knowingly participated in any underlying breach of fiduciary duties by the CarbonLite directors. Plaintiffs allege that the CarbonLite directors (other than Nour-Omid) breached their fiduciary duties by entering into an amendment to the Credit Agreement through which Learnicon's loans were subordinated to loans held by the Orion Funds and concealing the subordination from Nour-Omid. To the extent this was a breach of fiduciary duty (which seems unlikely given that the CarbonLite board, including Nour-Omid, authorized this amendment), the Orion Funds did not knowingly participate in it. To the contrary, CarbonLite expressly represented to the Orion Funds that it was fully authorized to enter into the amendment, and LF Investment specifically consented to the amendment in writing.

Plaintiffs' remaining claims are equally meritless. Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing fails for the simple reason that there is no contractual relationship between Plaintiffs, on the one hand, and the Orion Funds, on the other, and thus there is no implied covenant to breach. Plaintiffs' claim for tortious interference with existing contracts fails because there is no allegation that the Orion Funds did anything to procure

a breach of any agreement between Plaintiffs and Farahnik or LF Investment; in fact, there is no allegation that Farahnik or LF Investment even breached an agreement with Plaintiffs. Plaintiffs' claim for tortious interference with prospective contracts fails because Plaintiffs never identify any prospective contract with which the Orion Funds supposedly interfered; this case is about an existing contract, not a prospective one. Nor is there any allegation that the Orion Funds acted out of malice or through improper means; to the contrary, as Plaintiffs' allegations show, the Orion Funds simply loaned money to CarbonLite to provide liquidity when it was in financial distress, and nothing more. And Plaintiffs' claim for declaratory relief fails because there is no such claim—declaratory relief is a remedy, not a stand-alone cause of action.

It is not hard to see what happened here—Plaintiffs are now unhappy with the terms of their agreements with Farahnik and LF Investment, and are groping for any theory to fundamentally alter CarbonLite's capital structure. This does not work. Pursuant to the clear terms of the Credit Agreement and various amendments that were expressly authorized by the CarbonLite board, the Orion Funds' CarbonLite loans are senior in priority to the loans held by Plaintiffs. If Plaintiffs believe Farahnik misled them about CarbonLite's capital structure, that is an issue between Plaintiffs and Farahnik, not the Orion Funds. The claims against the Orion Funds should be dismissed with prejudice.

## FACTUAL BACKGROUND

On August 2, 2019, the Orion Funds and CarbonLite entered into the Credit Agreement, which was subsequently amended six times. (Compl. ¶ 21.) All told, and as discussed below, the Orion Funds have extended over $90 million in loans to CarbonLite, consisting of (A) $80 million in principal amount of Tranche A Loans, (B) $5,250,000 in an aggregate principal amount of Tranche B Loans, and (C) $5,484,035.34 in an aggregate principal amount of Tranche C Loans, in each case, plus accrued and unpaid interest thereon. (*See* Compl. ¶ 22.)

The $80 million in Tranche A Loans issued under the original Credit Agreement carried an interest rate of 14.85%, to be paid quarterly, with 10% of interest to be paid by cash and the remaining 4.85% allowed to be added to the principal balance.  (*See* Ex. 1,[2] Credit Agreement, at Definitions, *Interest Rate* ("'Interest Rate' means 14.85% per annum"); *id.* at § 2.07 (Interest); *id.* at § 9 (Duration of Agreement)[3]; *see also* Compl. ¶ 21-22 (referring to "the Credit Agreement" of Aug. 2, 2019, and "$80,000,000" in "Tranche A Loans")).

By September 9, 2020, CarbonLite was "requesting the commitment and funding of a new tranche of loans in an aggregate principal amount of $5,250,000 (the 'Tranche B [Loans]') by one or more of the" Orion Funds.  (Ex. 3, Amendment No. 2 to Credit Agreement (Sept. 9, 2020) ("Second Amendment"), Second Whereas Clause.[4])  The Orion Funds agreed to a second amendment to the Credit Agreement, "subject to" certain conditions, one of which was CarbonLite's commitment to pay a "Minimum Return" on the Tranche B Loans, calculated under tiers of certain repayment conditions, unless "[t]he Tranche B [Loans] are repaid in full in cash with Additional Equity Raise Amounts" within forty-five days of the "Amendment No. 2 Effective Date".  (*Id.* at Ex. A, Annex III; *see also id.* at § 4 (providing conditions precedent to "Amendment No. 2 Effective Date"); *id.* at Ex. A, Definitions, *Tranche B Minimum Return*; *id.* at Ex. A, Definitions, *Tranche B Obligations*; *id.* at Ex. A, § 2.07(g) ("Tranche B Minimum Return").)  At

---

[2] References to "Ex. [ ]" refer to the exhibits attached to the Declaration of Mateo de la Torre In Support of Orion Energy Credit Opportunities Fund II, L.P., Orion Energy Credit Opportunities Fund II PV, L.P., and Orion Energy Credit Opportunities Fund II GPFA, L.P.'s Motion to Dismiss the Complaint, submitted in support of the instant motion.

[3] As discussed *infra*, because the Complaint explicitly relies upon the Credit Agreement, each of its Amendments, and the other documents discussed more fully in this Factual Background, the Court may properly consider them in ruling on the instant motion.

[4] Paragraph 22 of the Complaint incorrectly states that "[t]he Tranche B Loans" were "issued under Amendment No. 3," but correctly states that they "consisted of $5,250,000."  *See In re Premier Int'l Holdings, Inc.*, 443 B.R. 320, 329 n.47 (Bankr. D. Del. 2010)  ("If the allegations of the complaint are contradicted by documents made a part thereof, the document controls and the Court need not accept as true the allegations of the complaint." (citations and internal alterations omitted)).

the first tier of the "Minimum Return," if CarbonLite failed to repay the loan within the 45-day grace period, it would owe the Orion Funds an "[a]dditional return" of "20% (which equals $1,050,000 divided by the aggregate Tranche B Commitments)," plus warrants for 2% of CarbonLite's equity unless certain conditions were met. (*Id.* at Annex III; *see also id.* at Definitions, *Tranche B Optional Warrants*.) If CarbonLite failed to repay the Tranche B Loans by various time intervals, the "Minimum Return" would then increase by additional amounts. *Id.* at Annex III.

In their Complaint, Plaintiffs correctly acknowledge that "[t]he Tranche B Loans would be personally guaranteed by Leon Farahnik." (Compl. ¶¶ 28; *see also* Second Amendment, Ex. A at Definitions, *Unconditional Guaranty* ("'Unconditional Guaranty' means that certain Unconditional Continuing Guaranty of all Tranche B Obligations … by Leon Fara[h]nik in favor of the Collateral Agent for the benefit of the Tranche B Lenders").) Elsewhere, however, Plaintiffs allege that the "additional security and assurance" was provided by "defendant Leon Farahnik through his entity LF Investment." (*Id.*) That is incorrect. Under the Second Amendment, the Tranche B Loans were guaranteed solely by Mr. Farahnik; LF Investment is never once mentioned in the Second Amendment.

In relation to the Tranche A Loans, the Tranche B Loans would have priority with respect to proceeds from (i) Leon Farahnik's personal guaranty, and (ii) an equity raise by CarbonLite; in all other circumstances (including any "collection, sale or other realization of all or any part of the Collateral"), the Tranche A Loans would have priority over the Tranche B Loans. (*See* Second Amendment, Ex. A at § 7.02 ("Application of Proceeds"); *id.* at § 2.05(b)(vi) ("Incurrence of Equity"); *id.* at 2.05(c)(i) ("Terms of All Prepayments").) Again, Plaintiffs admit that they understood that the Tranche B Loans would be "first out" only with respect to limited, specific

circumstances, including "proceeds from an equity raise," and that the Tranche A Loans would be "first out" as to proceeds from "liquidation, company sale, and other scenarios." (Compl. ¶ 28.)

Just a day shy of the end of the 45-day grace period for the Tranche B Loans – Farahnik, CarbonLite's CEO, indicated that he wanted to acquire the $5,250,000 worth of outstanding Tranche B Loans. (*Id.* at ¶ 25.) To carry out the transaction, Farahnik created a company called LF Investment, of which he is the "principal and sole decision-maker." (*Id.*) According to Plaintiffs, "CarbonLite was the initial member of LF Investment." (*Id.*)

On or about October 23, 2020, CarbonLite, the Orion Funds, Farahnik, and LF Investment entered into a series of agreements to effectuate the sale of the Tranche B Loans to LF Investment. *Id.* ¶ 24. The first such agreement, dated October 23, 2020, was the Participation Agreement for Par/Near Par Trades (the "Participation Agreement") between the Orion Funds and LF Investment. (*See* Ex. 6, Participation Agreement for Par/Near Par Trades – Transaction Specific Terms (Oct. 23, 2020) ("Participation Agreement").) Pursuant to the Participation Agreement, LF Investment agreed to purchase the $5,250,000 in Tranche B Loans.

In conjunction with the Participation Agreement, the Orion Funds and CarbonLite entered into the Third Amendment to the Credit Agreement, which reduced the rate of interest applicable to the Tranche B Loans and substantially lowered the "Minimum Return" required to repay the Tranche B Loans. (*See* Ex. 4, Amendment No. 3 to Credit Agreement (Oct. 23, 2020) ("Third Amendment"), at § 4(b).) The Third Amendment also added that the Tranche B Loans would also have priority over the Tranche A Loans as to any proceeds from a "Qualified PinnPack Sale," meaning "a direct or indirect sale of [CarbonLite's] Pinnpack Facility in accordance with and upon terms approved in writing by Orion Energy Partners Investment Agent, LLC" (the "Orion Investment Agent") "in its sole and absolute discretion), including as to process, valuation, amount

and form of consideration and application of proceeds; provided that, without limiting the generality of the foregoing, the [Orion Investment Agent] shall not be required to consider or approve any proposed sale of the Pinnpack Facility that yields proceeds (net of any fees, expenses and amounts proposed to be retained by the Loan Parties) of less than $25,000,000." (*Id.* at § 2(a); *see id.* at § 2(e) ("Any partial prepayments of the Loans … relating to a Qualified PinnPack Sale … shall be applied (1) first, on a *pro rata* basis to the Tranche B Obligations of each Tranche B Lender and (2) *second*, on a *pro rata* basis to the Tranche A Obligations of each Lender … .").) In any "collection, sale or other realization" of the "Collateral" (including the PinnPack Facility), the Tranche A Loans continued to have priority over the Tranche B Loans. (*See* Second Amendment, Ex. A at § 7.02 (unchanged by Third Amendment).)

In the Complaint, Plaintiffs allege that "[s]imultaneously with the execution of the Participation Agreement, LF investment issued a promissory note to Learnicon (the 'Note') and entered into a Note Purchase Agreement dated October 23, 2020 (the 'Note Purchase Agreement') to sell the Note to Learnicon for $5,250,000." (Compl. ¶ 26.) According to Plaintiffs, "[t]he Note was secured by LF Investment's participation interest in the Participation Agreement, pursuant to a Security Agreement between Learnicon, as the Secured Party, and LF Investment, as the Debtor, with the security interest being recorded in Delaware … ." (*Id.*; *see also id.* at ¶ 30 (describing terms of "UCC-1 Financing Statement naming LF Investment as the Debtor and Learnicon as the Secured Party").) The Complaint, accurately, does not allege that the Orion Funds were party to any of these agreements.

Despite the Orion Funds' ongoing lending to CarbonLite, in December 2020, CarbonLite needed to borrow additional funds from a separate creditor, Bank Leumi USA, and the Orion Funds thus agreed to amend the Credit Agreement yet again. (*See generally* Ex. 7, Amendment No. 4

and Waiver to Credit Agreement (Dec. 10, 2020) ("Fourth Amendment").) Specifically, the Fourth Amendment to the Credit Agreement provided in relevant part that CarbonLite PI Holdings, LLC (a subsidiary of CarbonLite) would be permitted to enter into revolving credit facilities with Bank Leumi USA of an amount up to $20,000,000 (increased from the prior $10,000,000 cap). (*Id.* at § 2(b).)

Three months later, in February 2021, CarbonLite was again in default under the Credit Agreement and in need of additional liquidity. (Compl. ¶ 32.) On February 2, 2021, CarbonLite held a special meeting of the board of directors, which at the time still included Plaintiff Nour-Omid.[5] (*Id.*) During that board meeting, Farahnik informed the CarbonLite board that he "had been negotiating with Orion to obtain a forbearance agreement as well as additional funding of working capital." (*Id.*) The CarbonLite board, including Nour-Omid, voted to delegate to the Finance Committee (comprised of Kim Jeffery and Faramarz Yousefzadeh) "the authority to negotiate and finalize the forbearance agreement with Orion and to authorize Mr. Farahnik to execute and deliver the forbearance agreement on CarbonLite's behalf." (*Id.* ¶ 33.)

On or about February 8, 2021, when Nour-Omid was still a member of the CarbonLite board, CarbonLite and the Orion Funds entered into the Forbearance Agreement and Amendment No. 5 to the Credit Agreement (the "Forbearance Agreement"). (Compl. ¶ 34.) Pursuant to the Forbearance Agreement, the Orion Funds agreed to issue a new tranche of loans (Tranche C) to CarbonLite in the amount of $2,800,000. (*Id.* ¶ 35.) The Tranche C Loans were structured to be senior to the Tranche A and B Loans. (*See* Ex. 8, Forbearance Agreement, Ex. A (showing amendments to Credit Agreement) at § 7.02.) In addition, the Forbearance Agreement removed

---

[5] According to the Complaint, Nour-Omid did not resign from his director position until February 12, 2021. Compl. p. 6, n.3.

the concept of a "Qualified PinnPack Sale" (as such a transaction, by definition, was no longer possible). (*See id.* at 45.) In any "collection, sale or other realization" of the "Collateral" (including the PinnPack Facility), the Tranche A Loans remained senior to the Tranche B Loans. (*Id.* at § 7.02(c)-(h).)

Crucially, when the Forbearance Agreement was executed, LF Investment was a party to the Participation Agreement and The Forbearance Agreement specifically required LF Investment, as a participant in the Tranche B Loans, to approve the Forbearance Agreement. (Forbearance Agreement § 6(e).) Accordingly, Farahnik signed a written statement "certify[ing] on behalf [of] LF Investment Holdings LLC, that [he] ha[d] reviewed and approve[d] of" "the Forbearance Agreement and Amendment No. 5 to the Credit Agreement." (Ex. 9, LF Investments Consent Form (undated).) As Plaintiffs concede, at the time Farahnik approved the Forbearance Agreement, LF Investment "still owned the participation interest from the Participation Agreement with [the Orion Funds] relating to the Tranche B Loans." (Compl. ¶ 36.) And although Plaintiffs contend that "Nour-Omid never saw the Forbearance Agreement before it was executed," (*id.* at ¶ 38), Plaintiffs do not allege any contractual provision entitling Nour-Omid or Learnicon to a consent right with respect to the Forbearance Agreement or, for that matter, any other amendment to the Credit Agreement.

While Plaintiffs claim to have not seen the Forbearance Agreement, the existence of that Agreement was certainly not a secret to Plaintiffs. As Plaintiffs concede, on February 10, 2021, while Nour-Omid was still a member of the CarbonLite board, there was another special meeting of the CarbonLite board. (Compl. ¶ 39.) During that meeting, one of the directors, Mr. Yousefzadeh, "reported to the board that the Forbearance Agreement with Orion had been executed and that Orion had already advanced $2,500,000 to CarbonLite." (*Id.*) Mr. Yousefzadeh

also "summarized the key elements of the Forbearance Agreement, which included a number of stringent limitations on the Company's [CarbonLite's] financial operations, and further required the Company to begin marketing the Company for sale, as well as to prepare for a potential Chapter 11 filing in March … ." (*Id.*) There is no allegation that Nour-Omid ever asked to see a copy of the Forbearance Agreement or that any such request was refused by the CarbonLite board.

Furthermore, Section 7 of the Forbearance Agreement includes a broad "General Release" from CarbonLite "on behalf of itself and its agents, representatives, officers, ***directors***, advisors, employees, subsidiaries, ***affiliates***, ***successors*** and assigns (collectively, 'Releasors') … ." Forbearance Agreement at § 7(a) (emphasis added). The General Release runs in favor of the "Releasees," which are broadly defined to include "the Administrative Agent [Orion Energy Partners Investment Agent, LLC] or any Lender in any capacity and their affiliates, subsidiaries, shareholders and 'controlling persons' …. ." (*Id.*) Pursuant to the General Release, each of the Releasors

> forever agrees and covenants not to sue or prosecute against any Releasee (as hereinafter defined) and hereby forever waives, releases and discharges, to the fullest extent permitted by law, each Releasee from any and all claims (including, without limitation, crossclaims, counterclaims, rights of set-off and recoupment), actions, causes of action, suits, debts, accounts, interests, liens, promises, warranties, damages and consequential damages, demands, agreements, bonds, bills, specialties, covenants, controversies, variances, trespasses, judgments, executions, costs, expenses or claims whatsoever, that such Releasor now has or hereafter may have, of whatsoever nature and kind, whether known or unknown, whether now existing or hereafter arising, whether arising at law or in equity (collectively, the "Claims") . . . .

(*Id.*) The General Release encompasses any "Claims" that are

> based in whole or in part on facts, whether or not now known, existing on or before the Forbearance Effective Date, that relate to, arise out of or otherwise are in connection with: (i) any or all of the Financing Documents[6] or transactions

---

[6] The Credit Agreement, as amended, defines "Financing Documents" to mean "(a) this Agreement, (b) each Note (if requested by a Lender), (c) the Loan Discount Letters, (d) the Agent Reimbursement Letter, (e) the Security Documents, (f) the Subordination Agreements, (g) the Side Letter, (h) the Unconditional Guaranty and (i) each

contemplated thereby or any actions or omissions in connection therewith, (ii) any aspect of the dealings or relationships between or among [CarbonLite] and the other Loan Parties, on the one hand, and any or all of [the Orion Investment Agent] or any Lender [including the Orion Funds], on the other hand, relating to any or all of the documents, transactions, actions or omissions referenced in clause (i) hereof, or (iii) any aspect of the dealings or relationships between or among any or all of Loan Party, on the one hand, and [the Orion Investment Agent] or any Lender [including the Orion Funds], on the other hand, but only to the extent such dealings or relationships relate to any or all of the documents, transactions, actions or omissions referenced in clause (i) hereof.

(*Id.*.)

The second subsection of the General Release includes an indemnity provision, providing

that CarbonLite and its guarantors

each hereby agrees that it shall be, jointly and severally, obligated to indemnify and hold the Releasees harmless with respect to any and all liabilities, obligations, losses, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by the Releasees, or any of them, whether direct, indirect or consequential, as a result of or arising from or relating to any proceeding by or on behalf of any Person, including, without limitation, the respective officers, directors, agents, trustees, creditors, partners or shareholders of Borrower, any other Loan Party, or any of their respective Subsidiaries, whether threatened or initiated, in respect of any claim for legal or equitable remedy under any statue, regulation or common law principle arising from or in connection with the negotiation, preparation, execution, delivery, performance, administration and enforcement of the Amended Credit Agreement, the other Financing Documents, this Agreement or any other document executed and/or delivered in connection herewith or therewith … .

(*Id.* at § 7(b).)

Finally, the Forbearance Agreement provides that the Orion Funds are entitled to remedies

for any violation of the General Release, including "damages" and "attorneys' fees and costs" as

follows:

Each of [CarbonLite] and other Loan Parties, *on behalf of itself and its successors, assigns*, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with and in favor of each Releasee that it will not

---

certificate, agreement, instrument, waiver, consent or document executed by a Loan Party and delivered to Agent or any Lender in connection with or pursuant to any of the foregoing and designated as a 'Financing Document'." (Fifth Amendment, Ex. A, at Definitions, *Financing Documents*.)

sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Claim released, remised and discharged by Borrower or any other Loan Party pursuant to Section 7(a) hereof. If Borrower, any other Loan Party or any of its successors, assigns or other legal representatives violates the foregoing covenant, Borrower and other Loan Parties, each for itself and its successors, assigns and legal representatives, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

(*Id.* at § 7(c) (emphasis added).)

According to the Complaint, on or about February 16, 2021—more than a week after CarbonLite and the Orion Funds signed the Forbearance Agreement and six days after the CarbonLite board meeting discussing that Agreement—LF Investment and Learnicon executed a three-page contract titled, "ASSIGNMENT AND ASSUMPTION" (the "Assignment Contract"). (Ex. 10, Assignment and Assumption (Feb. 17, 2021).) Plaintiffs allege that under the Assignment Contract, "LF Investment sold its interest in the Participation Agreement with Orion (and all rights to the Tranche B Loans) directly to Learnicon." (Compl. ¶ 40.)[7] The Assignment Contract provides:

> Assignor hereby sells, transfers and assigns to Purchaser, FULLY WITHOUT RECOURSE, all of Seller's[8] right, title and interest (i) under that certain Participation Agreement, dated as of October 23, 2020, by and between Assignor, as Buyer, and the Tranche B Lenders named therein as Sellers, including the LSTA Standard Terms and Conditions dated March 16, 2020 incorporated therein (hereinafter, the "Participation Agreement") and (ii) any and all rights and interest in and to the Tranche B Loan by virtue of the Participation Agreement (collectively, the "Participation").

(Assignment Contract at 1.)

---

[7] Plaintiffs refer to this agreement as the "Membership Interest Purchase Agreement" even though that term appears nowhere in the document, and state that it was executed "[o]n or about February 16, 2021," (Compl. ¶ 40), even though the document expressly states that it was "made and entered into as of February 17, 2021," Assignment Contract 1.

[8] "Seller" is not a defined term in the Assignment and Assumption.

Notably, the third page of the Assignment Contract consists of a signature page titled, "CONSENT," which includes signature blocks for each of the three Orion Funds. Each one of the signature blocks is blank; none of the Orion Funds ever signed the Assignment Contract.

On March 1, 2021, the Orion Funds executed a Sixth Amendment to the Credit Agreement, thereby agreeing "to increase the aggregate Tranche C Commitments by an aggregate amount equal to $2,684,035.34." (Ex. 11, Amendment No. 6 to Credit Agreement (Mar. 1, 2021) ("Sixth Amendment"), Second Whereas Clause.) In doing so, the Orion Funds and CarbonLite each represented that they had all requisite "powers, authority and legal right to enter into, deliver and perform its respective obligations" under the Sixth Amendment; had "taken all necessary … action to authorize the execution, delivery and performance by it of the Amendment"; and agreed that the Sixth Amendment "is in full force and effect and constitutes a legal, valid and binding obligation of" each party. (*Id.* at § 7(a), (b).) Plaintiffs allege that "[t]hey did not know about, consent to, or approve in any way Amendment No. 6," (Compl. ¶ 43), but they again fail to allege any such consent right with respect to a Credit Agreement to which they are not, and have never been, a party.

A week after the Sixth Amendment to the Credit Agreement was executed, on March 8, 2021, CarbonLite filed its Chapter 11 Bankruptcy Petition. *See In re CarbonLite Holdings LLC, et al.*, Case No. 21-10527 (JTD) (Bankr. D. Del.), Dkt. No. 1. On April 12, 2021, Plaintiffs filed this adversary proceeding. *See id.* at Dkt. No. 277. The instant motion followed.

## ARGUMENT

"A motion to dismiss under Federal Rules of Civil Procedure 12(b)(6)—made applicable in bankruptcy adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7012(b)— challenges the sufficiency of the factual allegations in the complaint." *In re Welded Constr., L.P.*, 623 B.R. 100, 106 (Bankr. D. Del. 2020). In "reviewing the sufficiency of a complaint," a court

"must: (1) identify the elements of a claim, (2) identify conclusory allegations, and (3) accept factual allegations as true and 'view them and reasonable inferences drawn on them in the light most favorable to the plaintiff to decide whether they plausibly give rise to an entitlement to relief." *Id.* (internal citations and alterations omitted).

In ruling on a motion under Rule 12(b)(6), however, "courts may consider 'documents integral to or explicitly relied upon in the complaint, or any 'undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'" *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 134 n. 7 (3d Cir. 2016) (internal citations and alterations omitted); *see e.g.*, *In re Sols. Liquidation LLC*, 608 B.R. 384, 391 n.15 (Bankr. D. Del. 2019) (granting motion to dismiss in part and considering, as "integral to the complaint," contract defendants allegedly violated). Further, "[i]f the allegations of the complaint are contradicted by documents made a part thereof, the document controls and the Court need not accept as true the allegations of the complaint." *In re Premier Int'l Holdings, Inc.*, 443 B.R. 320, 329 n.47 (Bankr. D. Del. 2010) (citations and internal alterations omitted).

Although not attached as exhibits to the Complaint, Plaintiffs' claims explicitly rely upon the Credit Agreement, each of its Amendments, the Participation Agreement, and the Assignment Contract. *See, e.g.*, Comp. ¶¶ 21-22, 26-27, 72-73. Thus, in ruling on the instant motion, the Court may properly consider these documents, and where they contradict Plaintiffs' allegations, the Court "need not accept" those allegations "as true." *In re Premier*, 443 B.R. at 329 n.47.

Before examining the deficiencies in Plaintiffs' claims, it is worth briefly addressing what law governs. Nearly all of Plaintiffs' alleged claims are governed by New York law. That is because the Credit Agreement and all of its amendments, including the Forbearance Agreement, contain a New York choice-of-law provision. *See* Sixth Amendment at § 8 (capitalization

removed); Ex. 8, Fifth Amendment at § 10; Fourth Amendment at § 8; Third Amendment at § 7;

Second Amendment at § 8; Ex. 2, First Amendment at § 6.  The Forbearance Agreement contains

a particularly broad choice-of-law provision, which states:

> THIS AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE
> PARTIES UNDER THIS AMENDMENT (INCLUDING ANY CLAIM OR
> CONTROVERSY ARISING OUT OF OR RELATING TO THIS AMENDMENT
> WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE)
> SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN
> ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK
> WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES THAT WOULD
> RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF
> THE STATE OF NEW YORK.

(Forbearance Agreement § 10; *see In re Greenfield Energy Servs., Inc.*, 585 B.R. 89, 110-11, 113

(Bankr. D. Del. 2018) (applying New York law to contract and tortious interference claims because

"the contract expressly states New York law governs, and the causes of action arise out of the

rights, duties, and obligations created by the Agreement").)

The only claim not governed by New York law is the claim for aiding and abetting breach

of fiduciary duty.  This claim is governed by Delaware law because, under the internal affairs

doctrine, "the state under which the corporation in question is chartered" "has the authority to

regulate a corporation's internal affairs—matters peculiar to the relationships among or between

the corporation and its current officers, directors, and shareholders."  *In re Fedders N. Am., Inc.*,

405 B.R. 527, 539 (Bankr. D. Del. 2009) (applying Delaware law to aiding and abetting breach of

fiduciary duty claims).

## I. THE GENERAL RELEASE BARS EACH OF PLAINTIFFS' CLAIMS AGAINST THE ORION FUNDS (COUNTS 4-8).

The Forbearance Agreement contains a General Release that, like the rest of the

Forbearance Agreement, is governed by New York Law.  According to New York law, the

interpretation of a release is for the court to undertake as a matter of law, and therefore is

appropriate for disposition on a motion to dismiss.  *See LeMay v. H.W. Keeney, Inc.*, 124 A.D.2d 1026, 1026-27 (4th Dep't 1986).

A "release is governed by principles of contract law," and one "that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms."  *Inter-Reco, Inc. v. Lake Park 175 Froehlich Farm, LLC*, 106 A.D.3d 955, 955–56 (2d Dep't 2013) (citations and quotations omitted).  Where "as here, a release is signed in a commercial context by parties in a roughly equivalent bargaining position and with ready access to counsel, the general rule is that, if the language of the release is clear, the intent of the parties is indicated by the language employed."  *Middle E. Banking Co. v. State St. Bank Int'l*, 821 F.2d 897, 907 (2d Cir. 1987) (internal quotation marks, alterations, and citations omitted).  Moreover, "[w]hen the words of the release are of a general effect the release is to be construed most strongly against the releaser, and the burden is on the releaser to establish that the release should be limited."  *Id.* (internal citations and quotation marks omitted).  Furthermore, a release may bar future claims by non-signatories to the release where its plain terms make it binding on such non-parties.  *See In re Mercer*, 141 A.D.3d 594, 597 (2d Dep't 2016) (barring claims by infant beneficiaries although their guardian was not signatory to release in settlement, where they took an interest in estate through signatories to settlement, which was "binding upon the parties [t]hereto, and upon their respective heirs, executors, administrators, successors, assigns, trustees and legal representatives").

The General Release bars each of Plaintiffs' claims against the Orion Funds.  Pursuant to the General Release, CarbonLite agreed – "on behalf of itself and its agents, representatives, officers, directors, advisors, employees, subsidiaries, affiliates, successors and assigns" – to release the Orion Funds from "any and all claims … whether known or unknown, whether now existing

or hereafter arising" that are "based in whole or in part on facts, whether or not now known, existing on or before the Forbearance Effective date, that relate to, arise out of or otherwise are in connection with" the Credit Agreement and any of its amendments, including the Forbearance Agreement.  (Forbearance Agreement § 7(a).)  There is no question that each of the claims against the Orion Funds "relate[s] to" or "arise[s] out of" the Credit Agreement and its amendments.  More specifically, each of Plaintiffs' claims relates to or arises out of the Forbearance Agreement and the Fifth Amendment to the Credit Agreement.  (*See* Compl. ¶ 68 (Orion Funds allegedly aided and abetted breach of fiduciary duties "in negotiating and executing the Forbearance Agreement (and later Amendment No. 6)"; *id.* ¶ 73 (Orion Funds allegedly breached the implied covenant "by issuing a new series of loans (the Tranche C Loans) that would get priority over the Tranche B Loans"); *id.* ¶ 84 (Orion Funds allegedly tortiously interfered with Plaintiffs' contractual relations when "they knowingly negotiated the Forbearance Agreement"); *id.* ¶ 92 (Orion Funds allegedly tortiously interfered with Plaintiffs' economic relations when "they knowingly negotiated the Forbearance Agreement").)

Nor is there any question that both Plaintiffs, Nour-Omid and Learnicon, fall within the scope of Releasors under the General Release.  As to Nour-Omid, the General Release specifically applies to CarbonLite and its "directors," and it is undisputed that Nour-Omid was a CarbonLite director at the time the Forbearance Agreement (containing the General Release) was executed. Compl. ¶ 23 (Nour-Omid was "a CarbonLite director at the time").  As to Learnicon, it is a Releasor by virtue of the fact that the General Release applies to CarbonLite, its "affiliates," and its "successors."  As Plaintiffs concede, "CarbonLite was the initial member of LF Investment," Compl. ¶ 25, thus making LF Investment an "affiliate" of CarbonLite for purposes of the General Release.  And when LF Investment assigned its interest in the Tranche B Loans to Learnicon,

Learnicon became LF Investment's, and thus CarbonLite's, "successor" for purposes of the General Release. *See Successor*, Black's Law Dictionary (11th Ed. 2019) (defining "successor" as a "corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation").

Under the plain language of the General Release in the Forbearance Agreement, two things are evident: (1) each of Plaintiffs' claims is a released "Claim," and (2) each of the Plaintiffs is a "Releasor." Thus, the General Release bars each of Plaintiffs' claims against the Orion Funds, and for this reason alone, these claims should be dismissed. Moreover, as discussed below, each of Plaintiffs' claims suffers from additional defects that further compel their dismissal.

## II. THE COMPLAINT FAILS TO STATE A CLAIM AGAINST THE ORION FUNDS FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES (COUNT IV).

In Count IV of the Complaint, Nour-Omid attempts to state a claim against the Orion Funds for aiding and abetting an alleged breach of fiduciary duties by Nour-Omid's co-directors at CarbonLite. Under Delaware law, a claim for aiding and abetting a breach of fiduciary duty requires proof of "'(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, … (3) knowing participation in that breach by the defendants,' and (4) damages proximately caused by the breach." *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (quoting *Penn Mart Realty Co. v. Becker*, 298 A.2d 349, 351 (Del. Ch. 1972)). To show a defendant's knowing participation, a plaintiff must prove that the defendant acted "with the knowledge that the conduct advocated or assisted constitutes such a breach." *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 861-62 (Del. 2015). This standard requires a plaintiff to prove that the defendant

> had actual or constructive knowledge of, and provided substantial assistance in, the fiduciary breach. Actual knowledge requires that the alleged aider and abettor act "knowingly, intentionally, or with reckless indifference … that is, with an illicit state of mind," whereas constructive knowledge may be found "only if a fiduciary breaches its duty in an inherently wrongful manner" by engaging in conduct "so

egregious" so as to put a third party on notice of a breach.  Substantial assistance, "by definition, implies active participation or affirmative action."

*In re DSI Renal Holdings, LLC*, No. 11-11722 (KBO), 2020 WL 7054390, at *6 (Bankr. D. Del. Dec. 2, 2020) (citations omitted).

Nour-Omid contends that his co-directors at CarbonLite (Farahnik, Kim Jeffery, and Faramarz Yousefzadeh), along with CarbonLite Chief Restructuring Officer Brian Weiss, "owed a fiduciary duty" to Nour-Omid "by virtue of their position and relationship with CarbonLite and each other."  (Compl. ¶ 60.)  He claims further that they "breached their fiduciary duty to" him

> by taking advantage of his commitment to finance the Tranche B Loans to CarbonLite, by negotiating and executing the Forbearance Agreement without regard for and to the severe detriment of his rights and interests, by subordinating the Tranche B Loans without his knowledge or consent, and by later negotiating and executing Amendment No. 6 to the Credit Agreement which even further subordinated the Tranche B Loans, all while knowing that CarbonLite would be imminently filing for Chapter 11 bankruptcy and that it would be extremely unlikely that the Tranche B Loans would ever be repaid.

*Id.* at ¶ 61.

Even if Nour-Omid could establish a predicate breach of fiduciary duties by the other CarbonLite directors, which seems dubious, at best, he has not come close to alleging facts suggesting that the Orion Funds knowingly participated in any such breach.  The only allegation as to the Orion Funds' involvement in the CarbonLite directors' alleged breach of fiduciary duty is that the Orion Funds were "aware that plaintiff Nour-Omid had financed the purchase of the Tranche B Loans and, in negotiating and executing the Forbearance Agreement (and later Amendment No. 6), knowingly harmed his interests therein."  (Compl. ¶ 68.)  The problem is that the Complaint fails to allege any facts establishing that the Orion Funds would have any reason to believe that the CarbonLite directors breached their fiduciary duties to Nour-Omid by entering into the Forbearance Agreement.  Instead, the Complaint's allegations, and the Forbearance Agreement itself, show just the opposite.

28155512.1

19

The Complaint concedes that the CarbonLite directors were specifically authorized to negotiate and enter into the Forbearance Agreement. As Plaintiffs allege, "the CarbonLite board voted to delegate to the Finance Committee the authority to negotiate and finalize the forbearance agreement with [the Orion Funds] and to authorize Mr. Farahnik to execute and deliver the forbearance agreement on CarbonLite's behalf." (Compl. ¶ 33.) And in the Forbearance Agreement, CarbonLite repeatedly and expressly represented to the Orion Funds that it was acting within its corporate authority in executing the Credit Agreement and its amendments, including when executing both the Fifth and Sixth Amendments. (*See, e.g.*, Credit Agreement § 3.02 (CarbonLite representing that it had "full … organizational powers, authority and legal right to enter into, deliver and perform its respective obligations … to consummate each of the transactions contemplated herein and therein, and has taken all necessary … organizational action to authorize the execution, delivery and performance by it"); Forbearance Agreement § 9(a) (same); Sixth Amendment at § 7(a) (same).) On these allegations and this record, Nour-Omid cannot establish that knowing participation in any breach by the Orion Funds.

Nour-Omid also alleges that Farahnik, Jeffery, Yousefzadeh, and Weill failed to "inform the board (including Dr. Nour-Omid) that the executed Forbearance Agreement subordinated the Tranche B Loans to the … Tranche C Loans." (Compl. ¶ 29.) But Nour-Omid fails to allege any facts so much as suggesting that the Orion Funds would have any reason to know what was or was not disclosed to Nour-Omid during CarbonLite board meetings. Absent such factual allegations, Nour-Omid has failed adequately to allege that the Orion Funds knowingly participated in the CarbonLite directors' alleged breach of their fiduciary duties.

### III. PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (COUNT V).

Under New York law, "[t]o establish a claim for breach of the implied covenant, the plaintiff must demonstrate that the defendant *was a party to a contract* and that the defendant sought to prevent performance of the contract or to withhold benefits under the contract from the plaintiff." *In re Basic Food Grp., LLC*, No. 15-10892 (JLG), 2018 WL 5805943, at *7 (Bankr. S.D.N.Y. Oct. 31, 2018) (emphasis added). That is because "a claim for breach of an implied duty of good faith and fair dealing is a 'breach of the underlying contract,' not a tort claim." *Beninati v. F.D.I.C.*, 55 F. Supp. 2d 141, 146 (E.D.N.Y. 1999); *see also Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 405 (E.D.N.Y. 2012) ("[A] claim for breach of an implied covenant of good faith and fair dealing does not provide a cause of action separate from a breach of contract claim.").

Here, the Complaint fails to refer to any contract between the Orion Funds and either Learnicon or Nour-Omid, and indeed, no such contractual relationship exists. Because Plaintiffs do not allege the existence of a contractual relationship, the claim for breach of the implied covenant fails as a matter of law. *See One Step Up, Ltd. v. Webster Bus. Credit Corp.*, 87 A.D.3d 1, at *13–14 (1st Dep't 2011) ("The claim for breach of the covenant of good faith and fair dealing is not viable because defendant" who had no contractual relationship with plaintiff, "did not deprive plaintiff of the benefits of any contract to which plaintiff was a party"); *Four Winds of Saratoga Inc. v. Blue Cross & Blue Shield of Cent. New York Inc.*, 241 A.D.2d 906, 907 (3d Dep't 1997) ("There being no contractual relationship, neither can there be any 'covenant of good faith and fair dealing' implied which itself is based on the existence of a legal contractual obligation."); *Galanova v TKR Prop. Servs., Inc.* 2016 NY Slip Op 51022(U), at *4 (N.Y. Sup. Ct. 2016) ("The

movants cannot be held liable for any breach of implied covenant of good faith and fair dealing when there is no contract between plaintiff and movants.").

IV. **THE COMPLAINT FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT (COUNT VI).**

"The elements of a cause of action for tortious interference with contract are (1) a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procurement of the third party's breach of that contract; and (4) damages." *Iacono v. Pilavas*, 125 A.D.3d 811, 812 (2d Dep't 2015).

This claim fails in the first instance because Plaintiffs fail to allege that the Orion Funds did anything to procure a breach of any of the agreements between Farahnik and LF Investment, on the one hand, and Plaintiffs, on the other. Plaintiffs allege that they "had multiple contracts with defendants LF Investment and Farahnik, including the Note Purchase Agreement and Membership Interest Purchase Agreement," and that the Orion Funds "prevented performance by Defendants LF Investment and Farahnik of those contracts or, at the very least, made such performance virtually impossible." (Compl. ¶¶ 81, 83.) But Plaintiffs do not allege a single fact suggesting that the Orion Funds did anything to procure a breach of any of these contracts. The only thing the Orion Funds did was enter into the Forbearance Agreement with CarbonLite, and there is no allegation that the Forbearance Agreement somehow triggered a breach under any of Plaintiffs' alleged contracts with Farahnik or LF Investment.

Even more fundamentally, there is no allegation that Farahnik or LF Investment actually breached any of their alleged contracts with Plaintiffs. To show the requisite intentional procurement of a third party's breach of contract, "it is axiomatic that" a plaintiff must allege "a breach of that contract by the other party." *Jack L. Inselman & Co., Inc. v. FNB Fin. Co.*, 364 N.E.2d 1119, 1120 (N.Y. 1977). This element requires a plaintiff to allege "adequate details about

a specific contract between [themselves] and a third party" that was allegedly breached. *Plasticware, LLC v. Flint Hills Res., LP*, 852 F. Supp. 2d 398, 404 (S.D.N.Y. 2012) (dismissing claim for tortious interference where plaintiff "merely … alleged that it has 'agreements' with its customers" without further detail of how such agreements were breached); *see also Bose v. Interclick, Inc.*, No. 10 CIV. 9183 DAB, 2011 WL 4343517, at *10 (S.D.N.Y. Aug. 17, 2011) (dismissing tortious interference with contract claim where plaintiff failed to "specify any individual contract that was breached").

Here, there is no allegation indicating that LF Investment or Farahnik failed to perform under any of their alleged contracts with Plaintiffs. To the contrary, Plaintiffs readily admit that as a precondition to "wir[ing] $5,250,000 directly to Orion" so that LF Investment could "purchase the Tranche B Loans," "LF Investment issued a promissory note to Learnicon … and entered into a Note Purchase Agreement … to sell the Note to Learnicon for $5,25,000," while "[t]he Note was secured by LF Investment's participation interest in the Participation Agreement[.]" (Compl. ¶ 26.) Plaintiffs allege further that their "security interest" in the Participation Agreement was duly recorded. (*Id.* at ¶¶ 26, 30.) Thus, Plaintiffs fail to allege that the Orion Funds intentionally procured the breach of any contract to which Plaintiffs were a party.

Plaintiffs' claim for tortious interference fails for the additional reason that Plaintiffs never allege that the Orion Funds' alleged interference was somehow improper or unjustified. It is settled that "a defendant will be liable for tortious interference with contract rights only in those cases where the interference is improper and without reasonable justification," which turns on "the nature of the rights interfered with, the relationship between the defendant and the parties to the contract, the interest which the defendant seeks to protect and the social interests involved." *Stratford Materials Corp. v. Jones*, 118 A.D.2d 559, 560 (2d Dep't 1986). New York courts

readily dismiss claims for tortious interference "where the defendant's rights are equal to those of the plaintiff, the interference is by lawful means, and is not committed solely for the purpose of injuring the plaintiff." *Id.* at 560-61; *see also, e.g.*, *Macklowe v. 42nd Street Dev. Corp.*, 170 A.D.2d 388, 390 (1st Dep't 1991) (dismissing tortious interference with contract claim where defendant did not "improperly and without reasonable justification interfere[] with the contract between plaintiff and [third party"]).

Here, Plaintiffs fail to allege that in subordinating the Tranche B Loans to the Tranche C Loans, the Orion Funds acted "improper[ly] and without reasonable justification." *Jones*, 118 A.D.2d at 560. To the contrary, Plaintiffs admit that "the Carbonlite Board" – including Nour-Omid – voted "to authorize Mr. Farahnik to execute and deliver the forbearance agreement on CarbonLite's behalf." (Compl. ¶ 33.) Moreover, both when the Orion Funds initially agreed to issue the Tranche C Loans, and when they agreed to increase those loans, CarbonLite represented to the Orion Funds that it was authorized to do so, and no provision in any of the agreements at issue – including those to which Plaintiff Learnicon is a party – suggests otherwise. (*See* Sixth Amendment at § 7(a); Fifth Amendment at § 9(a).) Plaintiffs cannot allege that the Orion Funds acted improperly and without reasonable justification merely by entering into agreements that were specifically authorized by the CarbonLite board. *See Mears v. Montgomery*, No. 02 CIV. 0407 (MHD), 2006 WL 1084347, at *15 (S.D.N.Y. Apr. 24, 2006) (holding that defendant was not liable for tortious interference with contract where defendant induced third party to breach contract with plaintiff based on rights under "fraudulently obtained trademark registration"); *see also, e.g.*, *Primo Const., Inc. v. Swig Weiler & Arnow Mgmt. Co.*, 160 A.D.2d 379, 380 (1st Dep't 1990) (dismissing tortious interference with contract claim by removing plaintiff contractor from list of approved contractors because defendant had contractual right to do so).

## V.  THE COMPLAINT FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS (COUNT VII).

To state a claim for tortious interference with economic relations, a plaintiff must allege that that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Tucker v. Wyckoff Heights Med. Ctr.*, 52 F. Supp. 3d 583, 598 (S.D.N.Y. 2014). As to the element requiring the defendant to have acted out of malice, New York courts have explained that as compared to tortious interference with *contract*, tortious interference with *economic relations* requires "a plaintiff [to] make a higher showing—i.e., that the third party's interference was 'either malicious or involved conduct rising to the level of criminality or fraud.'" *Vinas v. Chubb Corp.*, 499 F. Supp. 2d 427, 431 (S.D.N.Y. 2007) (citation omitted).

The most obvious defect with Plaintiffs' tortious interference claim is that this case does not involve a prospective business relationship.  To the contrary, Plaintiffs allege that the Orion Funds tortiously interfered with a contract already in existence, namely, the Assignment Contract. There is no allegation by Plaintiffs of any contemplated future business relationships, much less that the Orion Funds interfered with such relationships, and for this reason alone, Plaintiffs' claim for tortious interference with economic relations must fail.

In addition, the Complaint contains no factual allegations supporting an inference that the Orion Funds acted "solely out of malice or used dishonest, unfair, or improper means." *Tucker*, 52 F. Supp. 3d at 598.  In lieu of factual allegations, Plaintiffs offer only the conclusory allegation that the Orion Funds "acted in bad faith, breached (or aided and abetted the breach of) fiduciary duties, and defrauded Plaintiffs by knowingly subordinating the Tranche B Loans in disregard of Plaintiffs' rights and interests therein."  (Compl. ¶ 91.)  That is not nearly enough.  *See Ace Arts,*

*LLC v. Sony/ATV Music Pub., LLC*, 56 F. Supp. 3d 436, 453 (S.D.N.Y. 2014) (dismissing claim for tortious interference with economic relations for failure to plead that defendant acted "solely out of malice, or used dishonest, unfair or improper means"; "Plaintiff's pleadings in this respect consist entirely of legal conclusions couched as factual allegations—the Amended Complaint merely asserts that 'Defendant acted with malice and improper means without any legitimate business justification'"). In truth, Plaintiffs' factual allegations negate any inference that the Orion Funds' entry into the Forbearance Agreement was somehow motivated by malice toward Plaintiffs. As Plaintiffs acknowledge, the reason for the Forbearance Agreement was that CarbonLite had again defaulted under the Credit Agreement, prompting CarbonLite to approach the Orion Funds "to obtain a forbearance agreement as well as additional funding of working capital." (Compl. ¶ 32.) Thus, Plaintiffs' own allegations make clear that the Forbearance Agreement had nothing to do with malice toward Plaintiffs, and everything to do with CarbonLite's need for additional funding of working capital. *See Shared Commc'ns Servs. of ESR, Inc. v. Goldman Sachs & Co.*, 23 A.D.3d 162, 163 (1st Dep't 2005) (dismissing claim for tortious interference with economic relations where the complaint "fail[s] to include the necessary allegation that defendant's conduct was motivated solely by malice or to inflict injury by unlawful means, beyond mere self-interest or other economic considerations"). For this reason alone, Plaintiffs' claim against the Orion Funds for tortious interference with economic relations fails as a matter of law.

## VI.   THE COMPLAINT FAILS TO STATE A CLAIM FOR DECLARATORY RELIEF, WHICH IS NOT AN INDEPENDENT CAUSE OF ACTION (COUNT VIII).

Count VIII of Plaintiffs' Complaint purports to assert a claim for declaratory relief seeking a "judicial declaration that the Tranche B Loans (and Plaintiffs' rights and interests therein) maintain their priority over the Tranche C Loans." (Compl. ¶ 101.) The problem for Plaintiffs is that a claim for a declaratory judgment is not an independent cause of action; rather, declaratory

relief is a remedy that must be derivative of an underlying claim. Here, all of Plaintiffs' underlying claims fail, leaving no basis for declaratory relief.

The Declaratory Judgment Act bestows the courts with jurisdiction, "[i]n a case of actual controversy within its jurisdiction" and "upon the filing of an appropriate pleading," to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Declaratory Judgment Act, however, "presupposes the existence of a judicially remediable right." *Schilling v. Rogers*, 363 U.S. 666, 677 (1960). In other words, the Declaratory Judgment Act does not create a cause of action. *See Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011) ("Nor does the Declaratory Judgment Act (DJA) provide a cause of action. It is a 'well-established rule that the Declaratory Judgment Act is not an independent source of federal jurisdiction.' Rather, 'the availability of [declaratory] relief presupposes the existence of a judicially remediable right.'" (citation omitted)). As one court succinctly stated, "there is no such thing as a claim for declaratory relief untethered to some underlying cause of action." *Argen v. Kessler*, No. 18-963 (KM)(JBC), 2019 WL 2067639, at *4 (D.N.J. May 10, 2019).

As discussed, Plaintiffs have failed to state a valid cause of action against the Orion Funds. Because Plaintiffs have not established "the existence of a judicially remediable right," *Schilling*, 363 U.S. at 677, Plaintiffs have no legal basis for declaratory relief, and Count VIII of the Complaint should be dismissed as against the Orion Funds.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' claims against the Orion Funds in their entirety and with prejudice.

Dated: May 21, 2021

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

/s/ *Kara Hammond Coyle*
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Kara Hammond Coyle (No. 4410)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Email: rbrady@ycst.com
       eharron@ycst.com
       kcoyle@ycst.com

*-and-*

LATHAM & WATKINS

Eric Leon (admitted *pro hac vice*)
Mateo de la Torre (*pro hac vice* pending)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: eric.leon@lw.com
       mateo.delatorre@lw.com

*Counsel to Defendants Orion Energy Credit
Opportunities Fund II, L.P., Orion Energy
Credit Opportunities Fund II PV, L.P., and
Orion Energy Credit Opportunities Fund II
GPFA, L.P.*