EXHIBIT 2

*Execution Version*

## AMENDMENT NO. 1 TO
## CREDIT AGREEMENT AND WAIVER

THIS AMENDMENT NO. 1 TO CREDIT AGREEMENT AND WAIVER (this "Amendment"), effective as of March 30, 2020, is among CarbonLite Holdings, LLC (the "Borrower"), certain Subsidiaries of the Borrower as guarantors (the "Guarantors"), the existing lenders party hereto (the "Existing Lenders"), Orion Energy Partners Investment Agent, LLC, as Administrative Agent ("Administrative Agent") and Orion Energy Partners Investment Agent, LLC, as Collateral Agent ("Collateral Agent") and relates to that certain Credit Agreement, dated as of August 2, 2019, (as amended, restated, supplemented and restated, supplemented or otherwise modified prior to the date hereof, the "Existing Credit Agreement"; and as amended hereby, the "Credit Agreement"), among the Borrower, the Guarantors, the Lenders, Administrative Agent, Collateral Agent and the other persons party thereto.

### W I T N E S S E T H

WHEREAS, the Borrower has issued senior subordinated promissory notes in an aggregate principal amount of $6,000,000 the ("Subordinated Notes") to Windmill Realty Advisors, Inc. ("Windmill Realty"), KRT Trust ("KRT") and Emil Halimi, an individual ("Halimi"), as holders of the Subordinated Notes (each, together with their successors and assigns in such capacity, the "Subordinated Creditors" and collectively, the "Subordinated Creditors") pursuant to that (i) Promissory Note, dated February 6, 2020, by and between the Borrower and Windmill Realty, in an aggregate principal amount of $1,000,000 (ii) Promissory Note, dated February 6, 2020, by and between the Borrower and KRT, in an aggregate principal amount of $2,000,000 and (iii) Promissory Note, dated February 6, 2020, by and between the Borrower and Halimi, in an aggregate principal amount of $3,000,000;

WHEREAS, on January 23, 2020 CL P formed Pinnpack P, LLC, a Delaware limited liability company ("Pinnpack P"), as a wholly owned Subsidiary of CL P, which CL P and Borrower desire to be treated as a Non-Guarantor Subsidiary;

WHEREAS, Borrower caused approximately $2,500,000 of the proceeds received from issuance of the Subordinated Notes to be contributed as equity to Borrower's wholly owned subsidiary CarbonLite Sub-Holdings, LLC which, in turn, contributed such amount to CarbonLite Recycling Holdings LLC (the "Investment")

WHEREAS, the Events of Default have occurred (or will occur following the expiration of applicable cure periods) pursuant to (i) Section 7.01(e) of the Existing Credit Agreement as a result of the issuance of the Additional Subordinated Notes without compliance with Section 6.02 of the Existing Credit Agreement, (ii) Section 7.01(e) of the Existing Credit Agreement as a result of the formation of Pinnpack P without compliance with Section 6.01 of the Existing Credit Agreement and, (iii) Section 7.01(d) of the Existing Credit Agreement as a result of Borrower's failure to comply with Section 5.11(j) of the Existing Credit Agreement with respect to the foregoing Events of Default, (iv) Section 7.01(e) of the Existing Credit Agreement as a result of the Borrower's (and CarbonLite Sub-Holdings LLC's) making of the Investment in a manner inconsistent with Section 6.04 of the Existing Credit Agreement (collectively, the "Specified Events of Default"); and

WHEREAS, pursuant to and in accordance with Section 10.02(b) of the Existing Credit Agreement, and, subject to the satisfaction of the conditions set forth herein, the Administrative Agent and the Lenders signatory hereto have agreed to make certain amendments to the Existing Credit Agreement.

NOW, THEREFORE, in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

Section 1.        *Definitions*.  Unless otherwise defined in this Amendment, each capitalized term used in this Amendment has the meaning assigned to such term in the Credit Agreement.

Section 2.        *Amendments to the Credit Agreement*.  Effective as of the Amendment No. 1 Effective Date (as defined below), each of the Administrative Agent, the Lenders and the Borrower hereby agree to amend or waive the Existing Credit Agreement as follows:

(a)        Section 1.01 of the Existing Credit Agreement is hereby amended by amending and restating the following definitions:

"Additional Equity Raise Amount" means the net cash proceeds received by the Loan Parties in connection with (a) the issuance of additional shares of Capital Stock in the Borrower and/or (b) subordinated notes of the Loan Parties permitted to be incurred under this Agreement and which are subordinated pursuant to agreements reasonably satisfactory to the Administrative Agent (provided that any subordination agreement having terms similar to the Additional Subordinated Note Subordination Agreement is satisfactory to the Administrative Agent).

"Financing Documents" means (a) this Agreement, (b) each Note (if requested by a Lender), (c) the Loan Discount Letter, (d) the Agent Reimbursement Letter, (e) the Security Documents, (f) the Subordination Agreements, (g) the Side Letter and (e) each certificate, agreement, instrument, waiver, consent or document executed by a Loan Party and delivered to Agent or any Lender in connection with or pursuant to any of the foregoing and designated as a "Financing Document".

"Non-Guarantor Subsidiaries" means, collectively, (i) the Pennsylvania Facility Group, (ii) the Texas Facility Group. (iii) Pinnpack P, and (iv) any other Person approved in writing by Administrative Agent as a Non-Guarantor Subsidiary (not to be unreasonably withheld, conditioned or delayed in the case of Subsidiaries to be subject to Indebtedness permitted in reliance on Section 6.02(m)).

"Shareholder Notes" means, collectively, the 7% Notes, the 10% Notes, the Additional Subordinated Notes.

"Subordination Agreements" means, individually and collectively, (i) the 7% Shareholder Note Subordination Agreement, (ii) the 10% Shareholder Note

Subordination Agreement, (iii) the Additional Subordinated Note Subordination Agreement and (iv) any other subordination agreements under which Additional Subordinated Notes are subordinated with respect to the Obligations.

(b)     Section 1.01 of the Existing Credit Agreement is hereby amended by inserting in appropriate alphabetical order the following new definitions:

"Additional Subordinated Notes" means those certain Subordinated Notes in an original aggregate principal amount of $6,000,000, issued by the Borrower in connection with (i) that Promissory Note, dated February 6, 2020, by and between the Borrower and Windmill Realty Advisors, Inc., in an aggregate principal amount of $1,000,000 as disclosed on Schedule 1.01(c) (ii) Promissory Note, dated February 6, 2020, by and between the Borrower and KRT Trust, in an aggregate principal amount of $2,000,000 as disclosed on Schedule 1.01(c), (iii) Promissory Note, dated February 6, 2020, by and between the Borrower and Emil Halimi, in an aggregate principal amount of $3,000,000 as disclosed on Schedule 1.01(c) and (iv) any other subordinated notes issued by the Borrower on or following the First Amendment Effective Date; provided that such notes (1) are subordinated to the Obligations on terms reasonably satisfactory to the Administrative Agent (provided that any subordination agreement having terms similar to the Additional Subordinated Note Subordination Agreement is satisfactory to the Administrative Agent), (2) do not exceed an aggregate principal amount of $6,000,000 and (3) the proceeds for such other subordinated notes are used solely to repay in their entirety the notes in clause (iii) of this definition.

"Additional Subordinated Note Subordination Agreement" means that certain Subordination Agreement, dated March 30, 2020, by and among the Administrative Agent, the Collateral Agent, the Subordinated Creditors (as defined therein), the Obligors (as defined therein) and the Borrower, which agreement shall be substantially in the form of Exhibit G.

"First Amendment Effective Date" means March 30, 2020.

"Pinnpack P" means Pinnpack P, LLC, a Delaware limited liability company.

"Side Letter" means that certain Side Letter, dated March 30, 2020, by and between Mr. Leon Farahnik and Agent.

(c)     Section 2.07(e) of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

(e) Payment in Kind. On each Quarterly Payment Date, the Borrower shall pay all of the accrued interest on each Loan at the Interest Rate in full in cash; provided that the Borrower may, in its sole discretion by sending written notice to the Administrative Agent no later than the applicable Quarterly Payment Date, without penalty, pay a portion of the accrued interest due and payable on each Loan equal to up to (i) 4.85% per annum or (ii) in the case of the fiscal quarter ending March 31, 2020, 14.85% per annum, in each case, of the outstanding principal amount of such Loan (including any Accrued Interest previously added

3

to principal on a prior Quarterly Payment Date) in kind; provided further, that the Borrower shall pay all of the accrued interest on each Loan at the Interest Rate in cash following the Initial Funding and through the end of the fiscal quarter ending December 31, 2019, pro-rated for any partial quarterly period for the applicable Quarterly Payment Date based on the number of days in such period, without the option of making any such payment of interest in kind.  The aggregate outstanding principal amount of the Loans shall be automatically increased on each such Quarterly Payment Date by the amount of such interest paid in kind (and such increased principal shall bear interest at a rate per annum equal to the Interest Rate).

(d)    Section 5.18(c)(ii)(C) of the Existing Credit Agreement is hereby deleted in its entirety and replaced with the following text: "[Reserved]."

(e)    Section 6.02(l) of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

(l)    (i) in the case of the Non-Guarantor Subsidiaries, Indebtedness of a Non-Guarantor Subsidiary under the Bond Documents to which it is a party as of the date hereof, (ii) in the case of the Non-Guarantor Subsidiaries, additional industrial revenue bond transactions of a nature similar to those subject to the Bond Documents following the date hereof so long as (1) the aggregate outstanding principal amount of the Indebtedness under the foregoing clauses (i) and (ii) does not exceed $140,000,000, (2) neither Borrower nor any Guarantor has any direct liability therefor and (3) the Administrative Agent has approved (in its sole discretion) the documentation related thereto in writing (it being acknowledged that the forms attached hereto as Exhibit L shall be pre-approved) and (iii) additional industrial revenue bond transactions of a nature similar to those subject to the Bond Documents not involving any of the Borrower Group Members in existence as of the Closing Date; and

(f)    Section 6.06(e) of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

(e)    the Loan Parties may make payments on (i) the Shareholder Notes, so long as (A) the amount of such payments under Shareholder Notes (other than any DSR Released Funds and any Additional Equity Raise Amounts) do not exceed $200,000 per year, (B) except in the case of any DSR Released Funds or any Additional Equity Raise Amounts, such amounts are paid quarterly, (C) except in the case of any DSR Released Funds or any Additional Equity Raise Amounts, such payment amounts do not exceed 25% of the annual interest outstanding on such Indebtedness, (D) except in the case of any DSR Released Funds or any Additional Equity Raise Amounts, the full amount of the Interest Rate payable hereunder that is payable in cash (subject to the Borrower's rights to pay in kind in Section 2.07) has been paid in cash through the date of such payment and (E)  no Default, Event of Default or Material Adverse Effect has occurred and is continuing or would result from such Restricted Payment (provided, that the foregoing shall not restrict payment on

4

any Shareholder Notes (including Additional Shareholder Notes) using Additional Equity Raise Amounts), and (ii) the Loan Parties may make payments on the Pennsylvania Intercompany Indebtedness and the Texas Intercompany Indebtedness from Additional Equity Raise Amounts, so long as no Default, Event of Default or Material Adverse Effect has occurred and is continuing or would result from such Restricted Payment;

(g)    The Existing Credit Agreement is hereby amended by adding the exhibit attached hereto as <u>Exhibit A</u> as new Exhibit L to the Existing Credit Agreement.

(h)    Schedule 1.01(c) of the Existing Credit Agreement is hereby amended by deleting such Schedule in its entirety and replacing it with the Schedule attached hereto as <u>Schedule 1</u>.

Section 3.    *Waiver*.  The Existing Lenders, the Collateral Agent and the Administrative Agent hereby waive the Specified Events of Default for all purposes under the Credit Agreement and each other

Section 4.    *Effectiveness of Amendment*.  This Amendment shall become effective on the date (the "<u>Amendment No. 1 Effective Date</u>") on which each of the following conditions is satisfied:

(a)    the Administrative Agent shall have received counterparts of this Amendment executed by the Administrative Agent, the Borrower and each Lender; and

(b)    the Administrative Agent, the Lenders and their counsel shall have been paid or reimbursed by the Borrower for all reasonable and documented out-of-pocket costs and expenses associated with the preparation, negotiation and execution of this Agreement and the other instruments and documents to be delivered hereunder and the transactions contemplated hereby.

Section 5.    *Ratification of Obligations*.  Each of the Borrower and Guarantors each hereby (a) ratifies and confirms all of their respective Obligations under the Credit Agreement and the other Financing Documents related thereto, (b) affirms that, after giving effect to this Amendment, all of its pledges, grants of security interests and Liens and other obligations under the Security Documents are reaffirmed and remain in full force and effect on a continuous basis, (c) reaffirms each Lien granted by it to the Collateral Agent and (d) acknowledges and agrees that the grants of security interests and Liens by it contained in the Security Documents are, and shall remain, in full force and effect on and after the Amendment No. 1 Effective Date.

Section 6.    *Governing Law*.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT (INCLUDING ANY CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AGREEMENT WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

Section 7.        *Miscellaneous*.

        (a)        On and after the Amendment No. 1 Effective Date, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof" or words of like import, referring to the Credit Agreement, and each reference in each other Financing Document to "the Credit Agreement", "thereunder", "thereof" or words of like import referring to the Credit Agreement, shall mean and be a reference to the Credit Agreement as amended or otherwise modified by this Amendment.  This Amendment shall constitute a Financing Document for purposes of the Credit Agreement.

        (b)        The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any default of the Borrower or any right, power or remedy of the Administrative Agent or the Lenders under any of the Financing Documents, nor constitute a waiver of any provision of any of the Financing Documents.

Section 8.        *Severability*.   Any provisions of this Amendment held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Amendment and the effect thereof shall be confined to the provisions so held to be invalid.

Section 9.        *Successors and Assigns*.   This Amendment is binding upon and shall inure to the benefit of the Administrative Agent, the Lenders and the Borrower and their respective successors and permitted assigns.

Section 10.        *Counterparts*.   This Amendment may be executed by one or more of the parties to this Amendment on any number of separate counterparts (including by facsimile or other electronic transmission, *i.e.* a "pdf" or a "tif"), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  A set of the copies of this Amendment signed by all parties shall be lodged with the Borrower and the Administrative Agent.

Section 11.        *Headings*.   The headings, captions and arrangements used in this Amendment are for convenience only and shall not affect the interpretation of this Amendment or any other Financing Document.

Section 12.        *Integration*.   This Amendment represents the agreement of the Borrower, the Administrative Agent and the Lenders with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by the Borrower, any Agent nor any Lender relative to subject matter hereof not expressly set forth or referred to herein.

*[Signature Pages Follow]*

6

IN WITNESS WHEREOF, each of the parties hereto has caused this Amendment to be executed by its officer(s) thereunto duly authorized as of the date first above written.

CarbonLite Holdings, LLC

By _____

Leon Farahnik
Chief Executive Officer


CarbonLite Sub-Holdings, LLC
    By CarbonLite Holdings, LLC, its sole member

    By _____

    Leon Farahnik
    Chief Executive Officer


CarbonLITE PI Holdings, LLC
    By CarbonLite Sub-Holdings, LLC, its sole
    Member
        By CarbonLite Holdings, LLC, its sole
        member

        By _____

        Leon Farahnik
        Chief Executive Officer


CarbonLite Industries LLC
    By CarbonLITE PI Holdings LLC, its sole
    Member
        By CarbonLite Sub-Holdings, LLC, its sole
        Member
        By CarbonLite Holdings, LLC, its sole
        member

        By _____

        Leon Farahnik
        Chief Executive Officer


[CarbonLite – Third Amendment to Credit Agreement]

CarbonLite Pinnpack, LLC
    By CarbonLITE PI Holdings, LLC, its sole Member
        By CarbonLite Sub-Holdings, LLC, its sole Member
            By CarbonLite Holdings, LLC, its sole member

            By _____
              Leon Farahnik
              Chief Executive Officer


PinnPack Packaging, LLC
    By CarbonLITE Pinnpack, LLC, its Managing Member
        By CarbonLITE PI Holdings, LLC, its sole Member
            By CarbonLite Sub-Holdings, LLC, its sole Member
                By CarbonLite Holdings, LLC, its sole member

              By _____
                Leon Farahnik
                Chief Executive Officer

ORION ENERGY PARTNERS INVESTMENT
AGENT, LLC,
as Administrative Agent and Collateral Agent

By: _____
     Name:  Gerrit J. Nicholas
     Title:   Managing Partner


ORION ENERGY CREDIT OPPORTUNITIES
FUND II, L.P.,
as a Lender

By: Orion Energy Credit Opportunities Fund II GP,
L.P.
Its: General Partner

By: Orion Energy Credit Opportunities Fund II
Holdings, LLC
Its: General Partner

By: _____
     Name:  Gerrit J. Nicholas
     Title:   Managing Partner


ORION ENERGY CREDIT OPPORTUNITIES
FUND II PV, L.P.,
as a Lender

By: Orion Energy Credit Opportunities Fund II GP,
L.P.
Its: General Partner

By: Orion Energy Credit Opportunities Fund II
Holdings, LLC
Its: General Partner

By: _____
     Name:  Gerrit J. Nicholas
     Title:   Managing Partner


[CarbonLite – First Amendment to Credit Agreement]

ORION ENERGY CREDIT OPPORTUNITIES
FUND II GPFA, L.P.,
as a Lender

By: Orion Energy Credit Opportunities Fund II GP,
L.P.
Its: General Partner

By: Orion Energy Credit Opportunities Fund II
Holdings, LLC
Its: General Partner

By: _____

    Name:  Gerrit J. Nicholas
    Title:   Managing Partner


ORION ENERGY CREDIT OPPORTUNITIES
CARBONLITE CO-INVEST, L.P.,
as a Lender

By: Orion Energy Credit Opportunities Fund II GP,
L.P.
Its: General Partner

By: Orion Energy Credit Opportunities Fund II
Holdings, LLC
Its: General Partner

By: _____

    Name:  Gerrit J. Nicholas
    Title:   Managing Partner

[CarbonLite – First Amendment to Credit Agreement]

# EXHIBIT A

**NEW EXHIBIT J**

**EXHIBIT J**
**TO**
**CREDIT AGREEMENT**


[*Form of Approved Bond Documents*]

REED SMITH DRAFT 3/20/20

FIRST AMENDMENT TO LOAN AGREEMENT

between

PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY

and

CARBONLITE P, LLC

Dated as of [_____] 1, 2020

RELATING TO

$[_____]
PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY
SOLID WASTE DISPOSAL REVENUE BONDS
(CARBONLITE P, LLC PROJECT)
SERIES 2020

# TABLE OF CONTENTS

**Page**

ARTICLE 1 CONFIRMATION OF ORIGINAL LOAN AGREEMENT; AMENDMENT TO ORIGINAL LOAN AGREEMENT ........................................................................... 2

    **Section 1.1.**   Confirmation of Original Loan Agreement ................................................ 2

    **Section 1.2.**   Amendments to Original Loan Agreement ................................................ 3

ARTICLE 2 SERIES 2020 LOAN AND SERIES 2020 NOTE ................................................. 3

    **Section 2.1.**   Series 2020 Loan and Series 2020 Note ................................................... 3

    **Section 2.2.**   Agreement to Issue the Series 2020 Bonds; Application of Proceeds ................................................................................................................... 4

ARTICLE 3 MISCELLANEOUS ........................................................................................... 4

    **Section 3.1.**   Successors and Assigns ............................................................................ 4

    **Section 3.2.**   Severability .............................................................................................. 4

    **Section 3.3.**   Applicable Law ........................................................................................ 4

    **Section 3.4.**   Counterparts ............................................................................................. 4

Exhibit A – Revised Description of the Project

Exhibit B – Form of Note

THIS FIRST AMENDMENT TO LOAN AGREEMENT, dated as of [_____] 1, 2020, by and between PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY (the "Issuer"), a public instrumentality of the Commonwealth of Pennsylvania (the "Commonwealth") and a public body corporate and politic organized and existing under the Pennsylvania Economic Development Financing Law, as amended (as defined herein, the "Act"), and CarbonLite P, LLC, a Delaware limited liability company (the "Borrower").

W I T N E S S E T H:

WHEREAS, the Issuer is empowered by the provisions of the Act to enter into agreements providing for the financing of the acquisition, construction and equipping of industrial, commercial and specialized enterprises for the public for purposes of alleviating unemployment, maintaining employment at a high level and encouraging economic development in the Commonwealth within the meaning of the Act, including solid waste disposal and recycling facilities; and

WHEREAS, in furtherance of its purposes under the Act, the Issuer issued, on July 10, 2019, its Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2019 in the aggregate principal amount of $61,800,000 (the "Series 2019 Bonds") pursuant to an Indenture of Trust dated as of June 1, 2019 (the "Original Indenture") between the Issuer and UMB Bank, N.A. (the "Trustee"), to (i) finance all or a portion of the cost of acquiring, constructing, rehabilitating, renovating, installing, improving and/or equipping of certain solid waste disposal and recycling facilities (the "Initial Project"), as more particularly described in <u>Exhibit A</u> to the Loan Agreement (defined below) as amended hereby; (ii) fund capitalized interest on the Series 2019 Bonds; (iii) fund a reserve fund for the Series 2019 Bonds; and (iv) pay a portion of the costs of issuance of the Series 2019 Bonds; and

WHEREAS, the Issuer loaned the proceeds of the Series 2019 Bonds to the Borrower pursuant to a Loan Agreement dated as of June 1, 2019 (the "Original Loan Agreement") between the Issuer and the Borrower; and

WHEREAS, pursuant to the Original Loan Agreement, the Borrower delivered to the Issuer a promissory note corresponding to the Series 2019 Bonds (the "Series 2019 Note"), dated July 10, 2019, evidencing its obligation to pay all amounts due under the Original Loan Agreement; and

WHEREAS, at the request of the Borrower, the Issuer has determined to issue $[_____] aggregate principal amount of its Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020 (the "Series 2020 Bonds") for the purpose of (i) financing a portion of the costs of the Initial Project, as expanded, through the reimbursement to the Borrower of certain costs of the Project previously funded with the Borrower's equity; (ii) financing a portion of the costs to be incurred by Borrower's wholly owned subsidiary, Pinnpack P, LLC, a Delaware limited liability company ("Pinnpack"), in developing a plastics thermoforming facility (the "Thermoforming Facility") which will utilize a portion of the post-consumer resin output of the Initial Project to produce food grade containers for use by businesses in various food industries (the "Pinnpack Project" and together with the Initial Project, collectively, the "Project"); (iii) funding capitalized interest on the Series 2020 Bonds; (iv) funding a deposit to an account within

the Debt Service Reserve Fund relating to the Series 2020 Bonds; and (v) paying a portion of the costs of issuance of the Series 2020 Bonds, such Series 2020 Bonds to be issued as "Additional Bonds" pursuant to the Original Indenture, as amended and supplemented by a First Supplemental Indenture of even date herewith (the "First Supplemental Indenture," and together with the Original Indenture and as further amended and supplemented from time to time, the "Indenture"), between the Issuer and the Trustee; and

WHEREAS, the Issuer has agreed to loan the proceeds of the Series 2020 Bonds to the Borrower under the Original Loan Agreement, as amended by this First Amendment to Loan Agreement (the "First Amendment to Loan Agreement," and together with the Original Loan Agreement and as further amended and supplemented from time to time, the "Loan Agreement"); and

WHEREAS, in connection with the issuance of the Series 2020 Bonds, the parties hereto desire to supplement the Original Loan Agreement, by entering into this First Amendment to Loan Agreement for the purpose of providing for the issuance of Additional Bonds in accordance with the terms of the Indenture and certain other matters in connection therewith; and

WHEREAS, the Borrower proposes to deliver to the Issuer a supplemental promissory note in the form of Exhibit B hereto dated as of [_____], 2020 (the "Series 2020 Note"), evidencing its obligation to pay all amounts due under the Loan Agreement with respect to the Series 2020 Bonds; and

WHEREAS, the Issuer, as security for the Series 2020 Bonds, intends to assign to the Trustee the Series 2020 Note;

NOW, THEREFORE, THIS FIRST AMENDMENT TO LOAN AGREEMENT WITNESSETH:

That the parties hereto, intending to be legally bound hereby and in consideration of the mutual covenants herein contained, DO HEREBY AGREE as follows.

## ARTICLE 1
## CONFIRMATION OF ORIGINAL LOAN AGREEMENT;
## AMENDMENT TO ORIGINAL LOAN AGREEMENT

1.      **Confirmation of Original Loan Agreement.**      Except as amended and supplemented hereby, the Original Loan Agreement are hereby confirmed and reaffirmed in all particulars.  The Original Loan Agreement and this First Amendment to Loan Agreement shall be read, taken and construed as one and the same instrument, notwithstanding the date and time of execution and delivery of each such instrument.  Without limiting the generality of the foregoing, all representations, covenants, agreements, obligations and rights contained in the Original Loan Agreement (unless modified hereby or contained herein and all security for the same are and shall be for the equal and ratable benefit and security of the Owners of all Bonds (including the Series 2019 Bonds and the Series 2020 Bonds) issued and Outstanding under the Indenture.  Anything in the Original Loan Agreement or herein to the contrary notwithstanding, all recitals, definitions and provisions contained in this First Amendment to Loan Agreement shall take precedence over the recitals, definitions and provisions of the Original Loan Agreement to the extent of any conflict.

2.      **Amendments to Original Loan Agreement**.

(a)      All references to the "Bonds" in the Original Loan Agreement shall hereinafter be deemed to mean, collectively and each as a separate Series of Bonds, the Series 2019 Bonds, the Series 2020 Bonds and any Additional Bonds.

(b)      All references to the "Note" in the Original Loan Agreement shall hereinafter be deemed to mean, collectively, the Series 2019 Note, the Series 2020 Note and any other promissory note issued pursuant to the Loan Agreement in connection with any Additional Bonds.

(c)      All references to the "Project" shall mean the "Project" as described on Exhibit A attached to this First Amendment, which shall supersede in full the Exhibit A attached to the Original Loan Agreement;

(d)      The definition of Gross Revenues" shall include all revenues derived by Pinnpack from the operation of the Thermoforming Facility;

(e)      All of the negative covenants contained in Article V of the Original Loan Agreement shall apply to Pinnpack in the same manner as they apply to Borrower.

(f)      The financial covenants contained in Section 5.18 of the Original Loan Agreement shall be calculated and determined on a consolidated basis so as to include Pinnpack as well as Borrower.

(g)      The covenants contained in Section 5.18(c) of the Original Loan Agreement shall not prohibit any cash contributions or advances from Borrower to Pinnpack, nor the repayment of any such advances or distributions made by Pinnpack to Borrower.

(h)      The form of Note attached as Exhibit B to the Original Loan Agreement is hereby amended and restated and shall be replaced in its entirety with the form of Note attached hereto as Exhibit B.  Any references in the Original Loan Agreement to such form of Note or Exhibit B to Loan Agreement shall mean the form of Note attached hereto as Exhibit B.

(i)      Upon deposit with the Trustee of the amounts required to redeem [ %] of the then outstanding principal amount of the 2020 Bonds, as provided in Section 2.03(c) of the First Supplemental Indenture, (x) all of the covenants and restrictions contained in the Loan Agreement that were theretofore applicable to Pinnpack, shall cease to be applicable to Pinnpack, (y) Borrower may dispose of any or all of its ownership interests in Pinnpack, and (z) Borrower may make a distribution to Guarantor or any affiliate of Guarantor in an amount equal to the net proceeds derived from the sale or other disposition of Pinnpack.

## ARTICLE 2
## SERIES 2020 LOAN AND SERIES 2020 NOTE

3.      **Series 2020 Loan and Series 2020 Note.**

(a)      The Issuer hereby agrees to lend to the Borrower, and the Borrower hereby agrees to borrow from the Issuer, the proceeds of the sale of the Series 2020 Bonds for the purposes of (i)

reimbursing the Borrower for the funding from equity of the Borrower certain Costs of the Project, (ii) financing in part the cost of developing the Thermoforming Facility and (iii) paying the Costs of Issuance of the 2020 Bonds.  The deposit of the proceeds of the sale of the Series 2020 Bonds as provided in Section 3.02 of the First Supplemental Indenture shall constitute the loan of such proceeds from the Issuer to the Borrower.  Such proceeds shall be applied as provided in Section 3.02 of the First Supplemental Indenture.  The Borrower hereby agrees to repay such loan as provided in the Original Loan Agreement, as amended by this First Amendment to Loan Agreement.

(b)      The Borrower's obligation to repay the loan hereunder, together with premium, if any, and interest thereon, which is more fully described in Section 4.1 of the Loan Agreement shall be evidenced by the Series 2020 Note, which the Issuer will endorse to the order of the Trustee.

4.      **Agreement to Issue the Series 2020 Bonds; Application of Proceeds.**

In order to provide funds for the purposes stated above, the Issuer agrees that it will issue under the Indenture, sell and cause to be delivered to the purchaser or purchasers thereof, the Series 2020 Bonds.  The Issuer shall thereupon apply the proceeds of the sale of the Series 2020 Bonds in accordance with the provisions of Section 3.02 of the First Supplemental Indenture.

## ARTICLE 3
## MISCELLANEOUS

5.      **Successors and Assigns**.  This First Amendment to Loan Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns.  No assignment by the Borrower shall relieve the Borrower of its obligations hereunder.

6.      **Severability**.  If any provision of this First Amendment to Loan Agreement shall be held invalid by any court of competent jurisdiction, such holding shall not invalidate any other provision hereof.

7.      **Applicable Law**.  This First Amendment to Loan Agreement shall be construed in accordance with and governed by the Constitution and the laws of the Commonwealth applicable to contracts made and performed in the Commonwealth.

8.      **Counterparts**.  This First Amendment to Loan Agreement may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument; provided, however, that for purposes of perfecting a security interest in this Loan Agreement by the Trustee under Uniform Commercial Code of the Commonwealth, only the counterpart delivered, pledged, and assigned to the Trustee shall be deemed the original.

[Remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the Pennsylvania Economic Development Financing Authority has caused this First Amendment to Loan Agreement to be executed in its name and its seal to be hereunto affixed by its duly authorized representatives, and the Borrower has caused this First Amendment to Loan Agreement to be executed in its name all as of the date first above written.

PENNSYLVANIA ECONOMIC
DEVELOPMENT FINANCING AUTHORITY


By_____
      Executive Director


ATTEST:


By: _____
      (Assistant) Secretary

[Signature Page to First Amendment to Loan Agreement]

CARBONLITE P, LLC,
a Delaware Limited Liability Company


By _____
    Leon Farahnik
    Chief Executive Officer

The Trustee hereby consents to the foregoing First Amendment to Loan Agreement as of the date first written above.

UMB BANK, N.A., as Trustee


By: _____
       Authorized Officer

**EXHIBIT A**

**FORM OF NOTE**

$[_____]                                                        [_____, 20__]

FOR VALUE RECEIVED, CARBONLITE P, LLC, a limited liability company organized and existing under the laws of the State of Delaware (the "Borrower"), does hereby promise to pay to the order of the PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY (the "Issuer") at the corporate trust office of UMB BANK, N.A. (the "Trustee"), located in Minneapolis, Minnesota, or any successor trustee acting as such under that certain Indenture, dated as of June 1, 2019, between the Issuer and the Trustee, as amended and supplemented from time to time (the "Indenture"), in lawful money of the United States of America, the principal sum of _____ DOLLARS ($[_____]), and to pay interest on the unpaid principal amount hereof, in like money, at such office on the dates, in the amounts and at the rates determined in accordance with Sections 4.1 and 4.2 of the Loan Agreement hereinafter referenced.

ALL SUMS paid hereon shall be applied first to the satisfaction of accrued interest and the balance to the unpaid principal.

THE PRINCIPAL AMOUNT of this Note is due and payable on the dates and in the amounts determined in accordance with Sections 4.1 and 4.2 of the Loan Agreement.

THIS NOTE constitutes the Note referred to in that certain Loan Agreement, dated as of June 1, 2019, between the Borrower and the Issuer, as amended and supplemented from time to time (the "Loan Agreement"), and is subject to, and is executed in accordance with, all of the terms, conditions and provisions thereof, including those respecting prepayment and is further subject to all of the terms, conditions and provisions of the Indenture, all as provided in the Loan Agreement.

THIS NOTE is a contract made under and shall be construed in accordance with and governed by the laws of the United States of America and the Commonwealth.

CARBONLITE P, LLC


By:  _____
Name:  Leon Farahnik
Title:    Chief Executive Officer

FORM OF ENDORSEMENT

(To be set forth on back of Note)

Pay to the order of UMB Bank, N.A., Trustee, without recourse or warranty, except warranty of good title, warranty that the Issuer has not assigned this Note to a Person other than the Trustee and warranty that the original principal amount hereof remains unpaid.

PENNSYLVANIA ECONOMIC
DEVELOPMENT FINANCING AUTHORITY


By _____
       Executive Director

OH&S DRAFT 02/13/20

**$25,000,000**
**PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY**
**SOLID WASTE DISPOSAL REVENUE BONDS**
**(CARBONLITE P, LLC PROJECT)**
**SERIES 2020**

**BOND PURCHASE CONTRACT**

THIS BOND PURCHASE CONTRACT, dated [PRICING DATE] (this *"Bond Purchase Contract"*), is made and entered into by and among the PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY (the *"Issuer"*), WESTHOFF, CONE & HOLMSTEDT, as underwriter (the *"Underwriter"*), CARBONLITE P, LLC (the *"Company"*), CARBONLITE P HOLDINGS, LLC (the *"Original Guarantor"*) and PINNPACK P, LLC (*"PinnPack P"* and, together with the Original Guarantor, the "*Guarantor*").

*Section 1.  Description of Bonds.*  The Issuer proposes to issue Pennsylvania Economic Development Financing Authority Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020 in the aggregate principal amount of $25,000,000 (the *"Bonds"*).  The Bonds will mature on the date and will bear interest at the rate as set forth in *Schedule I* attached hereto and will be subject to redemption as set forth in the Indenture of Trust, dated as of June 1, 2019 (the *"Original Indenture"*), as amended and supplemented by the First Supplemental Indenture of Trust, dated as of [CLOSING MONTH] 1, 2020 (the "*First Supplemental Indenture*" and, together with the Original Indenture, the "*Indenture*"), each between the Issuer and UMB Bank, N.A., as trustee (the *"Trustee"*).

The Bonds are being issued by the Issuer for the purpose of  (i) financing or refinancing the costs of the [acquisition, construction, installation, improvement and/or equipping of a post-consumer polyethylene terephthalate (*"pcrPET"*) plastic beverage container processing facility] (the *"Facility"*) located in the City of Reading, in the Commonwealth of Pennsylvania (the *"Commonwealth"*), [including the installation of equipment and the upgrade of utilities of the Facility] (collectively, the *"Project"*), [(ii) funding capitalized interest on the Bonds, (iii) funding the Debt Service Reserve Fund (as defined in the Indenture),] and (iv) paying a portion of the costs associated with the issuance of the Bonds.  The Facility is located at the Project Site, which is to be leased to the Company pursuant to a Lease Agreement, dated as of _____, 20__ (the "Lease"), between _____ (the "Landlord") and the Company.  The Facility is owned by the Company and will be operated by the Company or one of its direct or indirect wholly-owned subsidiaries.  Pursuant to the Loan Agreement, dated as of June 1, 2019 (the *"Original Loan Agreement"*), as amended by the First Amendment to Loan Agreement, dated as of [CLOSING MONTH] 1, 2020 (the "*First Amendment to Loan Agreement*" and, together with the Original Loan Agreement, the "*Loan Agreement*"), each between the Company and the Issuer, the Company has covenanted with the Issuer to make loan repayments equal to the principal of, premium, if any, and interest, coming due on the Bonds, and pursuant to the Indenture, the Issuer has pledged and assigned to the Trustee all of the Issuer's right, title and interest in and to the Loan Agreement (with certain specified

exceptions) and the Note (as defined below).  The Company will execute a promissory note, dated [CLOSING DATE] (the *"Note"*), as evidence of its obligations under the Loan Agreement.  The payment of the principal of, premium, if any, and interest on, the Bonds will be guaranteed pursuant to a Guaranty Agreement, dated as of June 1, 2019 (the "*Original Guaranty*"), between the Trustee and the Original Guarantor, as amended and restated by the Amended and Restated Guaranty Agreement, dated as of [CLOSING MONTH] 1, 2020 (the "*Amended and Restated Guaranty*" and, together with the Original Guaranty, the *"Guaranty"*), by the Guarantor in favor of the Trustee.

[As security for its obligations under the Loan Agreement and the Note, the Company will enter into a First Amendment to Open-End Leasehold Mortgage, Security Agreement and Assignment of Rents and Leases, and Fixture Filing dated as of [CLOSING MONTH] 1, 2020, (the "*Company Mortgage*"), amending that certain Open-End Leasehold Mortgage, Security Agreement and Assignment of Rents and Leases, and Fixture Filing dated as of June 1, 2019, in favor of the Trustee.  As security for its obligations under the Guaranty, PinnPack P will enter into an Open-End Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases, and Fixture Filing (the "*PinnPack P Mortgage*" and, together with the Company Mortgage, the "*Mortgage*").  The Company [and PinnPack P] will further execute an Amended and Restated Pledge and Security Agreement (the *"Pledge and Security Agreement"*), as additional security for its obligations under the Loan Agreement and the Note, pursuant to which the Company [and PinnPack P] will grant to the Trustee a security interest in all right, title and interest of the Company [and PinnPack P, respectively,] to the Collateral (as defined in the Pledge and Security Agreement), which includes but is not limited to the funds and accounts held under the Indenture.  In addition, the Company will enter into a First Amendment to Deposit Account Control Agreement (the *"Company Account Control Agreement"*), amending that certain Deposit Account Control Agreement dated as of June 1, 2019, with the Trustee and Pacific Western Bank, as depository bank, in order to perfect the security interested granted to the Trustee under the Loan Agreement.  PinnPack P will also enter into a Deposit Account Control Agreement (the *"PinnPack P Account Control Agreement*" and, together with the Company Account Control Agreement, the "*Account Control Agreement*") with the Trustee and _____, as depository bank.]

[The Company will execute a First Amendment to Non-Disturbance and Access Agreement dated as of [CLOSING MONTH] 1, 2020, amending that certain Non-Disturbance and Access Agreement dated as of June 1, 2019 (as amended, the "*Company NDA*") with the Trustee and the Landlord pursuant to which the Landlord will agree to certain limitations on the Landlord's ability to terminate the Lease in the event of a Mortgage foreclosure or a transfer in lieu of foreclosure, and which grants to the Trustee certain cure rights in the event of a breach of the Lease by the Company.  In the event that the Landlord grants a mortgage lien on its fee ownership of the real property on which the Facility will be located (the "*New Mortgage*"), the Landlord  will enter into a First Amendment to Subordination, Non-Disturbance and Attornment Agreement (as amended, the *"Company SNDA"*), among the Company, the lender providing the New Mortgage loan to the Landlord ("*Lender*") and the Landlord pursuant to which Company will confirm the subordination of the Lease to the lien of the New Mortgage and the Lender will agree not to disturb the Company's tenancy under the Lease and consent to the lien of the Mortgage on the terms set forth in the SNDA.]

[PinnPack P is will execute a Non-Disturbance and Access Agreement (the "*PinnPack P NDA*" and, together with the Company NDA, the "*NDA*") with the Trustee and the Landlord. PinnPack P will also execute a Subordination, Non-Disturbance and Attornment Agreement (the "*PinnPack P SNDA*" and, together with the Company SNDA, the "*SNDA*") with the Landlord and the Trustee,]

The Issuer and the Company will enter into the Tax Exemption Certificate and Agreement, dated as of the hereinafter defined Closing Date (the *"Tax Agreement"*).

The Indenture, the Loan Agreement, the Note, the Mortgage, the Pledge and Security Agreement, the Account Control Agreement, the NDA and this Bond Purchase Contract are collectively referred to herein as the "*Financing Agreements.*"

Section 2.   *Purchase, Sales Fees and Closing*.   (a)   Subject to the provisions of this Bond Purchase Contract and the Limited Offering Memorandum dated [PRICING DATE], with respect to the Bonds (the *"Limited Offering Memorandum"*), the Underwriter hereby agrees to purchase from the Issuer, and the Issuer will sell to the Underwriter, all of the Bonds, at a purchase price of $_____ (representing the principal amount of the Bonds less an underwriter's discount in the amount of $_____), payable in immediately available funds to the order of the Trustee.

(b)   The Company shall pay to the Underwriter all reasonable out-of-pocket costs and expenses of the Underwriter incurred in connection with the successful issuance and sale of the Bonds.  In addition, the Company shall also pay all other reasonable fees and expenses incurred in connection with the issuance and sale of the Bonds and the preparation, execution, delivery and enforcement of any document that may be delivered in connection therewith, including, but not limited to, (i) all reasonable and customary fees and out-of-pocket expenses of Co-Bond Counsel, counsel for the Trustee, special counsel to the Company, counsel for the Purchaser, counsel to the Underwriter and counsel for the Issuer, (ii) all reasonable and customary fees and out-of-pocket expenses of the Issuer and the Trustee, and (iii) the cost of printing, photocopying and delivering the Bonds, the Preliminary Limited Offering Memorandum (as defined herein) and the Limited Offering Memorandum.  The fees and expenses described in the preceding sentence shall be paid by the Company whether or not the Bonds are issued or sold, unless the Underwriter is in default in its obligation to purchase the Bonds hereunder, in which case the Company shall have no obligation to pay the fees and expenses of the Underwriter.  All fees and expenses described in this Section, to the extent they are reasonable, identifiable and billed, shall be paid on the Closing Date (as defined below), and the remainder shall be paid promptly upon receipt of statements therefor.  The obligations of the Company under this Section survive the issuance and maturity of the Bonds and any termination of this Bond Purchase Contract.  Whether or not the sale of the Bonds by the Issuer to the Underwriter is consummated, the Underwriter shall be under no obligation to pay any costs or expenses incident to the performance of the obligations of the Issuer or the Company hereunder.

The closing will be held via telephone conference at [8:00] a.m. PDT on [CLOSING DATE], or such other date, time or place as may be agreed upon by the parties hereto.  The hour and date of such closing are herein called the *"Closing Date."*  The Bonds will be in registered form as a single Bond, will be registered in the name of Cede & Co., as nominee of

The Depository Trust Company (*"DTC"*) under DTC's book-entry-only system, and will be made available for inspection by DTC or the Trustee, as its agent, at least one day prior to the Closing Date. The Issuer has heretofore provided DTC with a blanket letter of representations, in form satisfactory to DTC, relating to eligibility of the Bonds for deposit into the DTC book-entry-only system. On the Closing Date, the Company will enter into an agreement to provide certain information on an annual basis as further set forth in the Continuing Disclosure Agreement dated the Closing Date (the *"Continuing Disclosure Agreement"*) in form set forth on Appendix D to the Limited Offering Memorandum.

In the event that for any reason (other than the Underwriter's negligence or willful misconduct), the Issuer fails to deliver the Bonds as provided herein by 11:00 a.m. prevailing local time on the Closing Date, the Company will pay to the Underwriter any losses resulting from the Underwriter being required to hold the Bonds prior to delivery to the ultimate purchasers thereof. The preceding sentence shall not be construed as a waiver of any conditions to the Underwriter's obligations under this Bond Purchase Contract or a waiver by the Company of its claims or rights against another party to this transaction if its negligence, willful misconduct or wrongful act causes the Company to make such a payment to the Underwriter.

*Section 3.    Representations and Warranties of the Company*. The Company represents and warrants to, and agrees with, the Underwriter and the Issuer that:

(a)    The Company has taken all necessary action to authorize, execute and deliver the Financing Agreements to which it is a party, the Lease, the Continuing Disclosure Agreement, the Tax Agreement and all other documents executed and delivered (or to be executed and delivered) in connection with the issuance of the Bonds and the other transactions contemplated hereby and thereby to which the Company is or is to be a party (collectively, the *"Company Documents"*), and this Bond Purchase Contract has been duly executed and delivered and, assuming the due authorization, execution and delivery by the other parties thereto, constitutes, and the other Company Documents when duly executed and delivered by the Company, assuming the due authorization, execution and delivery by the other parties thereto, will constitute, the legal, valid and binding obligations of the Company enforceable against the Company in accordance with their respective terms, except as may be limited by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and other similar laws or equitable principles affecting creditors' rights or remedies generally; (ii) the application of equitable principles and the exercise of judicial discretion in appropriate cases; (iii) principles of public policy concerning, affecting or limiting the enforcement of rights or remedies against governmental entities such as the Issuer; and (iv) common law and statutes affecting the enforceability of contractual obligations generally.

(b)    Other than as disclosed in the Limited Offering Memorandum and any documents incorporated by reference therein, the Company has not and will not have at the Closing Date any material litigation pending of a character which would materially and adversely affect the operation of the Project, the Company's ability to perform its obligations under the Company Documents or the tax-exempt status of interest on the Bonds.

(c)     The execution, delivery and performance by the Company of the Company Documents are within the powers of the Company and do not and will not conflict with or violate (i) the articles of formation or its limited liability company agreement of the Company or (ii) any order, injunction, ruling or decree by which the Company or its property is bound, and do not and will not constitute a breach of or default under any agreement, indenture, mortgage, lease, note or other obligation, instrument or material arrangement to which the Company is a party or by which the Company or any of its property is bound, or contravene or constitute a violation of any federal or state constitutional or statutory provision, rule or regulation to which the Company or any of its property is subject, the breach, default, contravention or violation of which could have a material adverse effect on the business or financial condition of the Company and its subsidiaries taken as a whole, and no approval, consent or other action by, or filing or registration with, any governmental authority or agency is required in connection therewith that has not been obtained or accomplished or will not be obtained or accomplished by the Closing Date.

(d)     The Company will not voluntarily take or omit to take any action, which action or omission would in any way result in the inclusion of interest on the Bonds in the gross income of the owners thereof for federal income tax purposes.

(e)     The Company agrees to make available or cause to be made available to the Underwriter, without cost, sufficient copies of any documents pertaining to the Company which are relevant to the transaction described in this Bond Purchase Contract, as the Underwriter may require from time to time for the prompt and efficient performance by the Underwriter of their obligations under this Bond Purchase Contract, *provided, however*, that nothing in this Section 3(e) shall require the Company to disclose any protected or confidential information.

(f)     The Company is a limited liability company duly organized and validly existing in good standing under the laws of the State of Delaware and qualified to do business in the Commonwealth with full power, authority and legal capacity to own and operate its properties relating to the Project and to conduct the business now being and proposed to be conducted by it under the Company Documents, and has full power, authority and legal capacity to execute, deliver, carry out and perform its obligations under the Company Documents.

(g)     Since the respective most recent dates as of which information is given in the Limited Offering Memorandum, there has not been any material adverse change in the business, properties or financial condition of the Company, other than changes reflected in or contemplated by the Limited Offering Memorandum.

(h)     As of the date of the Limited Offering Memorandum and as of the Closing Date, the information in the Limited Offering Memorandum (except with respect to the information contained under the captions "THE ISSUER," "THE BONDS," "LEGAL MATTERS," "TAX MATTERS," "UNDERWRITING," APPENDIX C – "PROPOSED FORM OF OPINION OF CO-BOND COUNSEL" and APPENDIX E – "BOOK-ENTRY SYSTEM" as to which no representation is made), including information incorporated by reference in the Limited Offering Memorandum

5

or otherwise supplied by the Company in writing for inclusion therein, including, without limitation, any appendices thereto, does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. The Company has authorized the delivery of the Limited Offering Memorandum and approves of the use and distribution of the Limited Offering Memorandum by the Underwriter in connection with the initial sale and distribution of the Bonds.  The Company approves the use and distribution of the Limited Offering Memorandum by the Underwriter in connection with the initial sale of the Bonds, substantially in the form of the Preliminary Limited Offering Memorandum dated [POS DATE] (the *"Preliminary Limited Offering Memorandum"*) and has ratified and approved the use and distribution of copies of such Preliminary Limited Offering Memorandum in connection with the initial sale of the Bonds.  The Company hereby confirms that the Preliminary Limited Offering Memorandum is hereby deemed "final" (except for permitted omissions) as of its date by the Company for purposes of paragraph (b)(1) of Rule 15c2-12 (the "*Rule*") promulgated by the Commission under the Exchange Act of 1934.

(i)     Other than the Continuing Disclosure Agreement, dated as of June 1, 2019, by and among the Company, CarbonLite P Holdings, LLC and UMB Bank, N.A., as dissemination agent, in connection with the Pennsylvania Economic Development Financing Authority Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2019, the Company has not previously undertaken any continuing disclosure undertakings pursuant to the Rule.

(j)     Each officer of the Company executing the Company Documents and approving the Indenture and the Limited Offering Memorandum is duly and properly authorized to approve, execute, and deliver the same on behalf of the Company.

(k)     No consent or approval of any trustee or holder of any indebtedness of the Company, and no consent, permission, authorization, order or license of, or filing or registration with, any governmental authority (except in connection with "blue sky" laws) is required to be obtained or made by the Company in connection with (i) the execution and delivery of this Bond Purchase Contract; (ii) the execution and delivery of the Company Documents at the Closing; (iii) the approval of the Indenture and the Limited Offering Memorandum; or (iv)  the consummation of any transaction contemplated in the Company Documents, except as have been obtained or made and as are in full force and effect (or, in case of the Loan Agreement, will be obtained or made and will be in full force and effect at the Closing).

(l)     The Company has obtained the necessary governmental agency approvals (including without limitation, all required air and water discharge permits), all variances from applicable zoning ordinances and all building permits and easements or licenses required to date for the completion and equipping of the Project, to the extent and as such Project is described in the Limited Offering Memorandum, and such governmental agency approvals, variances, permits, easements and licenses constitute all approvals required to complete the Project, except as provided in the Limited Offering Memorandum and excepting certain building permits, inspections and

6

approvals which the Company anticipates obtaining in due course. The Project should not be subject to change by any administrative or judicial body so as to materially affect such completion.

(m) There will be on the Closing Date no persons with any rights granted by the Company or any manager or member of the Company to purchase any equity interest in or debt security of the Company. There are no direct and indirect subsidiaries of the Company.

(n) Any certificate signed by any authorized officer of the Company on the Closing Date in connection with the Bond financing shall be deemed a representation and warranty by the Company to the Issuer, Co-Bond Counsel to the Issuer and the Underwriter as to the truth of the statements therein as of the Closing Date.

*Section 4. Representations and Warranties of the Guarantor.* The Guarantor represents and warrants to, and agrees with, the Underwriter and the Issuer that:

(a) The Guarantor has taken all necessary action to authorize, execute and deliver the Guaranty, the Continuing Disclosure Agreement, this Bond Purchase Contract, and all other documents executed and delivered (or to be executed and delivered) in connection with the issuance of the Bonds and the other transactions contemplated hereby and thereby to which the Guarantor is or is to be a party (collectively, the "Guarantor Documents"), and this Bond Purchase Contract has been duly executed and delivered and, assuming the due authorization, execution and delivery by the other parties thereto, constitutes, and the other Guarantor Documents when duly executed and delivered by the Guarantor, assuming the due authorization, execution and delivery by the other parties thereto, will constitute, the legal, valid and binding obligations of the Guarantor enforceable against the Guarantor in accordance with their respective terms, except as may be limited by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and other similar laws or equitable principles affecting creditors' rights or remedies generally; (ii) the application of equitable principles and the exercise of judicial discretion in appropriate cases; (iii) principles of public policy concerning, affecting or limiting the enforcement of rights or remedies against governmental entities such as the Issuer; and (iv) common law and statutes affecting the enforceability of contractual obligations generally.

(b) Other than as disclosed in the Limited Offering Memorandum and any documents incorporated by reference therein, the Guarantor has not and will not have at the Closing Date any material litigation pending of a character which would materially and adversely affect the operation of the Project, the Guarantor's ability to perform its obligations under the Guarantor Documents or the tax-exempt status of interest on the Bonds.

(c) The execution, delivery and performance by the Guarantor of the Guarantor Documents are within the powers of the Guarantor and do not and will not conflict with or violate (i) the articles of formation or the limited liability company agreement of the Guarantor or (ii) any order, injunction, ruling or decree by which the Guarantor or its property is bound, and do not and will not constitute a breach of or default under any agreement, indenture, mortgage, lease, note or other obligation, instrument or material arrangement to which the Guarantor is a party or by which the Guarantor or any of its property is bound, or contravene or

constitute a violation of any federal or state constitutional or statutory provision, rule or regulation to which the Guarantor or any of its property is subject, the breach, default, contravention or violation of which could have a material adverse effect on the business or financial condition of the Guarantor and its subsidiaries taken as a whole, and no approval, consent or other action by, or filing or registration with, any governmental authority or agency is required in connection therewith that has not been obtained or accomplished or will not be obtained or accomplished by the Closing Date.

(d)     The Guarantor is a limited liability company duly organized and validly existing in good standing under the laws of the State of Delaware and qualified to do business in the Commonwealth with full power, authority and legal capacity to conduct the business now being and proposed to be conducted by it under the Guarantor Documents, and has full power, authority and legal capacity to execute, deliver, carry out and perform its obligations under the Guarantor Documents.

(e)     Since the respective most recent dates as of which information is given in the Limited Offering Memorandum, there has not been any material adverse change in the business, properties or financial condition of the Guarantor, other than changes reflected in or contemplated by the Limited Offering Memorandum.

(f)     Other than the Continuing Disclosure Agreement, dated as of June 1, 2019, by and among the Company, CarbonLite P Holdings, LLC and UMB Bank, N.A., as dissemination agent, in connection with the Pennsylvania Economic Development Financing Authority Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2019, the Original Guarantor has not previously undertaken any continuing disclosure undertakings pursuant to the Rule. PinnPack P has not previously undertaken any continuing disclosure undertakings pursuant to the Rule.

(g)     Each officer of the Guarantor executing the Guarantor Documents is duly and properly authorized to approve, execute, and deliver the same on behalf of the Guarantor.

(h)     No consent or approval of any trustee or holder of any indebtedness of the Guarantor, and no consent, permission, authorization, order or license of, or filing or registration with, any governmental authority (except in connection with "blue sky" laws) is required to be obtained or made by the Guarantor in connection with (i) the execution and delivery of this Bond Purchase Contract; (ii) the execution and delivery of the Guarantor Documents at the Closing; or (iii) the consummation of any transaction contemplated in the Guarantor Documents, except as have been obtained or made and as are in full force and effect.

(i)     There will be on the Closing Date no persons with any rights granted by the Guarantor or any manager or member of the Guarantor to purchase any equity interest in or debt security of the Guarantor. There are no direct and indirect subsidiaries of the Original Guarantor other than the Company. There are no direct and indirect subsidiaries of PinnPack P.

(j)     Any certificate signed by any authorized officer of the Guarantor on the Closing Date in connection with the Bond financing shall be deemed a representation and warranty by

the Guarantor to the Issuer, Co-Bond Counsel to the Issuer and the Underwriter as to the truth of the statements therein as of the Closing Date.

Section 5.    *Representations and Warranties of the Issuer*.  The Issuer represents and warrants to the Underwriter, the Guarantor and the Company that:

(a)    The Issuer has duly authorized the issuance of the Bonds and the execution and delivery of, and the performance of its obligations under, this Bond Purchase Contract, the Loan Agreement, the Tax Agreement and the Indenture; the Issuer has duly authorized, executed and delivered this Bond Purchase Contract which (assuming the due authorization, execution and delivery by the other parties hereto) constitutes a valid, binding and enforceable agreement of the Issuer, except as may be limited by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and other similar laws or equitable principles affecting creditors' rights or remedies generally; (ii) the application of equitable principles and the exercise of judicial discretion in appropriate cases; (iii) principles of public policy concerning, affecting or limiting the enforcement of rights or remedies against governmental entities such as the Issuer; and (iv) common law and statutes affecting the enforceability of contractual obligations generally. By official action of the Issuer prior to or concurrently with the acceptance hereof, the Issuer has authorized the distribution of the Preliminary Limited Offering Memorandum and the Limited Offering Memorandum and authorized and approved the execution and delivery of the Bonds, the Indenture, the Loan Agreement, this Bond Purchase Contract, the Tax Agreement or any other document executed and delivered (or to be executed and delivered) in connection with the issuance of the Bonds and the other transactions contemplated hereby and thereby, to which the Issuer is or is to be a party (collectively, the "Issuer Documents") and the consummation by the Issuer of the transactions contemplated thereby.

(b)    There is no action, suit or proceeding or, to the best knowledge of the Issuer, investigation, at law or in equity, before or by any court, board or body or other governmental authority, pending or, to the best knowledge of the Issuer, threatened against or affecting the Issuer, or any basis therefor, to restrain or enjoin the issuance or delivery of any of the Bonds or the collection, application or pledge of revenues pledged under the Indenture or in any way contesting or affecting the authority for the issuance of the Bonds or the validity or enforceability of the Issuer Documents, or the power of the Issuer to execute and deliver such documents or to consummate the transactions contemplated therein or the existence or powers of the Issuer or the titles of its officers to their respective offices, or wherein an unfavorable decision, ruling or finding would adversely affect the transactions contemplated hereby and in the Indenture or the Loan Agreement, or which would adversely affect the validity of the Bonds, the Indenture, the resolutions adopted in connection with the issuance of the Bonds, the Loan Agreement, the Tax Agreement or this Bond Purchase Contract.

(c)    To the best knowledge of the Issuer, the execution, delivery and performance by the Issuer of the Issuer Documents do not violate any order, injunction, ruling or decree by which the Issuer is bound, or contravene or constitute a material violation of the Pennsylvania Economic Development Financing Law (Act of August 23, 1967 P.L. 251, No. 102), as amended, 73 P.S. § 371 et seq. (the "Act"), and no approval, consent or other action by, or filing or registration with, any governmental authority or agency is required in connection therewith that has not been obtained or accomplished or will not be obtained or accomplished

9

by the Closing Date, except for post-closing filings with the Commonwealth and the Internal Revenue Service and provided no representation is made as to compliance with any federal or state securities or "Blue Sky" laws.

(d)     The Issuer will not take or omit to take any action requested by the Company, the Guarantor or the Underwriter, which action or omission might in any way result in the inclusion of the interest on the Bonds in the gross income of the owners thereof for federal income tax purposes, provided the Company, the Guarantor or the Underwriter, as the case may be, provides indemnification satisfactory to the Issuer against any and all liabilities, damages, costs, fees and expenses (including fees of Co-Bond Counsel and the Issuer's counsel) which may be incurred by the Issuer in connection with any action (or failure to act) requested by the Company, the Guarantor or the Underwriter, as the case may be.

(e)     The statements and information contained in the Preliminary Limited Offering Memorandum, as of its date and at the time of the Issuer's acceptance hereof, and the statements and the information contained in the Limited Offering Memorandum as of its date and at all times subsequent to its date up to and including the Closing Date, in each case under the captions "THE ISSUER" and "LITIGATION" (with respect to the Issuer) were true and correct in all material respects, and the information contained under the captions "THE ISSUER" and "LITIGATION" (with respect to the Issuer) in the Limited Offering Memorandum does not contain an untrue statement of a material fact or omit any statement or information concerning the Issuer which is necessary to make such statements and information therein, in the light of the circumstances under which they were made, not misleading. The Issuer has authorized the delivery of the Limited Offering Memorandum and approves of the use and distribution of the Limited Offering Memorandum by the Underwriter in connection with the initial sale and distribution of the Bonds.

(f)     The execution and delivery by the Issuer of the Issuer Documents and compliance with the provisions on the Issuer's part contained therein will not conflict with or constitute a material breach of or default under any law, administrative regulation, judgment, decree, loan agreement, indenture, bond, note, resolution, agreement or other instrument to which the Issuer is a party or is otherwise subject, nor will any such execution, delivery, adoption or compliance result in the creation or imposition of any lien, charge or other security interest or encumbrance of any nature whatsoever upon any of the properties or assets of the Issuer under the terms of any such law, administrative regulation, judgment, decree, loan agreement, indenture, bond, note, resolution, agreement or other instrument, except as provided by the Issuer Documents.

Section 6. *Underwriter's Representations.*     The Underwriter represents and warrants to and agrees with the Issuer, the Company and the Guarantor that:

(a)     The Underwriter is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and is authorized to take any action under this Bond Purchase Contract required to be taken by it;

(b)     This Bond Purchase Contract has been duly authorized, executed and delivered by the Underwriter and, assuming the due authorization, execution and delivery by the Issuer and the Company, is the legal, valid and binding obligation of the Underwriter enforceable in

10

accordance with its terms, except as may be limited by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and other similar laws or equitable principles affecting creditors' rights and remedies generally; (ii) the application of equitable principles and the exercise of judicial discretion in appropriate cases; (iii) principles of public policy concerning, affecting or limiting the enforcement of rights or remedies against governmental entities such as the Issuer; and (iv) common law and statutes affecting the enforceability of contractual obligations generally.

(c)     The Underwriter is licensed by and registered with (i) the Financial Industry Regulatory Authority as a broker-dealer and (ii) the MSRB as a municipal securities dealer.

(d)     The Underwriter also represents that all information in the Limited Offering Memorandum under the heading "UNDERWRITING" was as of its date and is as of the date hereof true, accurate and correct.

*Section 7.    Covenants of the Issuer and the Company.*    (a)    The Issuer and the Company agree to cooperate with the Underwriter, at the expense of the Company, in taking all necessary action for the qualification of the Bonds for offer and sale, and the determination of the eligibility of the Bonds for investment, under the laws of such jurisdictions as the Underwriter designates and the continuation of such qualification in effect so long as required for distribution of the Bonds; *provided, however*, that neither the Issuer nor the Company shall be required to register as a dealer or broker in any jurisdiction, to qualify as a foreign corporation or entity in any jurisdiction, or to file a general consent to suit or to service of process in any jurisdiction.

(b)    If, during such period (not to exceed twenty-five days after the "end of the underwriting period," as defined for purposes of paragraph (b)(4) of the Rule), as in the judgment of the Underwriter and the Issuer, delivery of the Limited Offering Memorandum as the same may be amended or supplemented as necessary or desirable in connection with sales of the Bonds by the Underwriter or any dealer or as otherwise may be required by applicable law or regulation, any event shall occur as a result of which, in the reasonable judgment of the Underwriter and the Issuer, it is necessary to amend or supplement the Limited Offering Memorandum in order to make the statements therein, in light of the circumstances when the Limited Offering Memorandum is delivered to the Underwriter or a "potential customer" (as defined for purposes of paragraph (b)(4) of the Rule), not misleading in any material respect, the Company will prepare and furnish, or cause to be prepared and furnished, at the Company's expense, including any and all reasonable costs of the Issuer and professionals retained by the Issuer, to the Underwriter and to any dealers to whom the Underwriter may have sold Bonds either amendments or supplements to the Limited Offering Memorandum so that the statements in the Limited Offering Memorandum as so amended or supplemented will not, in the light of the circumstances when the Limited Offering Memorandum as so amended or supplemented is delivered to the Underwriter or "potential customer," be misleading in any material respect.

*Section 8.    Conditions of Underwriter's Obligation.*    The obligation of the Underwriter to purchase and pay for the Bonds shall be subject to the accuracy of, and compliance with, the representations and warranties of the Issuer and the Company contained herein, to the performance by the Issuer and the Company of their obligations to be performed hereunder at and prior to the Closing Date, and to the following conditions:

(a)     On and as of the Closing Date:

(i)     The Note, the Tax Agreement, the Lease, the Financing Agreements and the Continuing Disclosure Agreement shall be in full force and effect, this Bond Purchase Contract shall not have been amended, modified or supplemented (except as may have been agreed to in writing by the Underwriter), and the Tax Agreement, the Financing Agreements, the Continuing Disclosure Agreement and the Note shall have been duly authorized, executed and delivered in the respective forms heretofore approved by the Underwriter, except as otherwise approved by the Underwriter, *provided* that the acceptance of delivery of the Bonds by the Underwriter on the Closing Date shall be deemed to constitute such approval.

(ii)    The Bonds shall have been duly authorized, executed and authenticated in accordance with the provisions of this Bond Purchase Contract, the Indenture, the Loan Agreement and the resolution of the Issuer described in clause (iv) below, and shall have been delivered through the facilities of DTC or its agent.

(iii)   Each of the representations, warranties and covenants of the Issuer and the Company contained herein and in the Financing Agreements and the Tax Agreement to which each is a party shall be true, complete and correct in all material respects as if then made.

(iv)    The Issuer shall have duly adopted, and there shall be in full force and effect, such resolutions as shall be necessary to consummate the transactions contemplated by this Bond Purchase Contract.

(v)     No order, decree or injunction of any court of competent jurisdiction shall have been issued, or proceedings therefor shall have been commenced, nor shall any order, ruling, regulation or official statement by any governmental official, body or board have been issued, nor shall any legislation have been enacted, with the purpose or effect of prohibiting or limiting the issuance, offering or sale of the Bonds, as contemplated herein or in the Limited Offering Memorandum, or the performance of the Financing Agreements, the Note, the Tax Agreement or the Continuing Disclosure Agreement in accordance with their respective terms.

(b)     On the Closing Date, the Underwriter shall receive executed or counterpart copies of the following documents, certificates, opinions and letters, in form and substance satisfactory to the Underwriter:

(i)     Executed copies of the Tax Agreement, the Note, the Financing Agreements and the Continuing Disclosure Agreement; and a certified copy of the resolution pursuant to which the issuance of the Bonds was authorized and all proceedings of the Issuer relating thereto.

12

(ii)     Opinions, dated the Closing Date, of: (A) Ballard Spahr LLP and Turner Law, P.C., Co-Bond Counsel, in substantially the form attached to the Limited Offering Memorandum as Appendix C thereto and in substantially the form attached hereto as *Exhibit A* (with such changes or variations between the two as permitted by the Issuer, the Trustee and the Underwriter), together with a reliance letter addressed to the Issuer; (B) Reed Smith LLP, special counsel to the Company, in substantially the form attached hereto as *Exhibit B* (with such changes as agreed to by the Issuer, the Trustee and the Underwriter), and (C) the Office of Chief Counsel, Pennsylvania Department of Community and Economic Development ("DCED"), counsel to the Issuer, in substantially the form attached hereto as *Exhibit C*.

(iii)    A certificate of the Issuer, signed by an authorized officer of the Issuer, dated the Closing Date, to the effect that each of the representations of the Issuer set forth herein is true, accurate and complete in all material respects at and as of the Closing Date and that each of the obligations of the Issuer hereunder to be performed at or prior to the Closing Date has been performed.

(iv)     A certificate, dated the Closing Date, signed by an authorized officer of the Company satisfactory to the Underwriter and the Issuer, to the effect that:   (1) the representations and warranties of the Company set forth herein are true, accurate and complete in all material respects at and as of the Closing Date, (2) each of the obligations of the Company under this Bond Purchase Contract to be performed at or prior to the Closing Date has been performed, and (3) since the most recent dates as of which information is given in the Limited Offering Memorandum, as it may have been amended or supplemented (including amendments or supplements resulting from the filing of documents incorporated by reference), and up to the Closing Date, there has been no material adverse change in the business, properties or financial condition of the Company and its subsidiaries taken as a whole, except as reflected in or contemplated by the Limited Offering Memorandum, as it may have been so amended or supplemented.

(v)     An executed copy of IRS Form 8038 to be filed with the Internal Revenue Service.

(vi)     An opinion of counsel to the Trustee addressed to the Issuer and the Underwriter, dated the date of Closing, to the effect that: (i) the Trustee is a national banking association with trust powers, duly organized and validly existing and in good standing under the laws of the United States of America, having the legal authority to exercise trust powers in the Commonwealth; (ii) the Trustee has full legal power and corporate authority to accept the duties and obligations imposed on it by the Account Control Agreement, the NDA and the Indenture and to authenticate the Bonds and the full legal power and authority to own its properties and to carry on its business; (iii) the Bonds have been duly authenticated by the Trustee; (iv) no consent, approval, authorization or order of any court, regulatory authority or governmental body is required for the valid authorization, execution and delivery of the Indenture and the authentication of

the Bonds by the Trustee or the consummation by the Trustee of the transactions contemplated in the Indenture except such as have been obtained and except such as may be required under the state securities or Blue Sky laws in connection with the purchase and distribution of the Bonds by the Underwriter; and (v) the acceptance of its duties under the Account Control Agreement and the Indenture and the authentication of the Bonds by the Trustee and performance by the Trustee of its obligations thereunder, will not conflict with or result in a breach of any of the terms, conditions or provisions of its Articles of Organization or any other agreement or instrument to which the Trustee is a party or by which it is bound or any other existing law, regulation, court order or consent decree to which the Trustee is subject or constitute a default thereunder.

(vii)    A certificate of the Trustee, dated the date of the Closing, to the effect that: (i) it is a national banking association existing under the laws of the United States of America, and has full power and is qualified to accept and comply with the terms of the Indenture, the NDA and the Account Control Agreement, as applicable, and to perform its obligations stated therein; (ii) the Trustee has accepted the duties and obligations imposed on it by the Indenture, the NDA and the Account Control Agreement; (iii) no consent, approval, authorization or other action by any governmental or regulatory authority having jurisdiction over the Trustee that has not been obtained is or will be required for the consummation by the Trustee of the transactions contemplated by the Indenture, the NDA and the Account Control Agreement, respectively, to be undertaken by the Trustee; (iv) compliance with the terms of the Indenture, the NDA and the Account Control Agreement will not conflict with, or result in a violation or breach of, or constitute a default under, any loan agreement, indenture, bond, note, resolution or any other agreement or instrument to which the Trustee is a party or by which it is bound, or, to the best knowledge of the Trustee, after reasonable investigation, any law, rule, regulation, order or decree of any court or governmental agency or body having jurisdiction over the Trustee or any of its activities or properties (except that no representation, warranty or agreement is made by the Trustee with respect to any Federal or state securities or Blue Sky laws or regulations); and (v) to the best knowledge of the Trustee, there is no action, suit, proceeding, inquiry or investigation, at law or in equity, before or by any court or governmental agency, public board or body served on or threatened against or affecting the existence of the Trustee, or contesting the powers of the Trustee or its authority to enter into and perform its obligations under the Indenture, the NDA, the Account Control Agreement or the Bonds, wherein an unfavorable decision, ruling or finding would adversely affect the validity of the Bonds, the Account Control Agreement, the NDA or the Indenture.

(viii)    Evidence that the Company has obtained all insurance required to be obtained by the Company Documents.

(ix)     A letter executed by each purchaser, addressed to the Issuer, dated the Closing Date, in substantially the form attached hereto as Exhibit D.

(x)      Approval of Governor of the Commonwealth of Pennsylvania.

(xi)     Approval of the Office of General Counsel.

(xii)    Approval of the Office of Attorney General.

(xiii)   an opinion of Orrick, Herrington & Sutcliffe LLP, Underwriter's Counsel, dated the Closing Date, in form and substance satisfactory to the Underwriter.

(xiv)   Such additional certifications and opinions as the Underwriter or Co-Bond Counsel may reasonably require.

In case any of the conditions specified above in this Section 8 shall not have been fulfilled, or if the obligations of the Underwriter are terminated by the Underwriter for any reason permitted by this Bond Purchase Contract, this Bond Purchase Contract may be terminated by the Underwriter upon written notice thereof to the Issuer and the Company.  Any such termination shall be without liability of any party to any other party; except that the obligations of the Company and the Underwriter to pay fees and expenses as provided in Section 2 hereof shall continue in full force and effect to the extent set forth therein.  The Underwriter may, in its discretion, waive any one or more of the conditions imposed by this Bond Purchase Contract and proceed with the purchase of the Bonds on the Closing Date.

*Section 9.    Underwriter's Right to Terminate.*  The Underwriter shall have the right to terminate its obligation to purchase and accept delivery of the Bonds hereunder by notifying the Issuer and the Company in writing of its election to do so between the date hereof and the Closing Date if, on or after the date hereof and on or prior to the Closing Date:

(a)      legislation shall be enacted or be actively considered for enactment by the Congress, or recommended to the Congress for passage by the President of the United States of America, or favorably reported for passage to either chamber of the Congress by a committee of such chamber to which such legislation has been referred for consideration, a decision by a court of the United States of America or the United States Tax Court shall be rendered, or a ruling, regulation or official statement (including a press release) by or on behalf of the Treasury Department of the United States of America, the Internal Revenue Service or other governmental agency shall be made or proposed to be made with respect to federal taxation upon revenues or other income of the general character to be derived by the Issuer under the Indenture and the Loan Agreement or by any similar body, or upon interest on obligations of the general character of the Bonds, or other action or events shall have transpired which have the purpose or effect, directly or indirectly, of changing the federal income tax consequences of any of the transactions contemplated in connection herewith, which, in the reasonable judgment of the Underwriter, materially and adversely affects the marketability of the Bonds or the market price generally of obligations of the general character of the Bonds; or

15

(b)      legislation or a rule or regulation shall have been enacted or favorably reported for passage by any governmental body, department or agency of the Commonwealth, or any decision shall have been rendered by any court of competent jurisdiction in the Commonwealth, which would materially and adversely affect or change the exemptions (if any) from Commonwealth taxation of the Bonds or the interest thereon or the exemption (if any) from taxation in or by the Commonwealth of the revenues derived or income of the character to be derived by the Issuer under the Indenture or the Loan Agreement; or

(c)      a stop order, ruling, regulation or official statement by or on behalf of the Commission shall be issued or made to the effect that the issuance, offering or sale of the Bonds or of obligations of the general character of the Bonds as contemplated hereby or the Bonds are subject to registration or qualification under the Securities Act, or the Indenture is required to be qualified under the Trust Indenture Act of 1939, as amended (the *"TIA"*), or either the Bonds or the Indenture is in violation of any applicable provision of either of such acts or other federal securities laws or applicable regulations promulgated thereunder; or

(d)      any event shall have occurred or condition shall exist which, in the reasonable judgment of the Underwriter, either (i) makes untrue or incorrect in any material respect any statement or information contained in the Limited Offering Memorandum, or (ii) is not reflected in the Limited Offering Memorandum and should be reflected therein in order to comply with any rulings or regulations of the Commission or other governmental agency or to make the statements and information contained therein not misleading in any material respect; or

(e)      there shall have occurred any outbreak of hostilities or escalation thereof or other national or international calamity or crisis or a financial crisis, the effect of such outbreak, calamity or crisis on the financial markets of the United States of America being such as, in the reasonable opinion of the Underwriter, would affect materially and adversely the ability of the Underwriter to market the Bonds; or

(f)      trading shall be suspended, or new or additional trading or loan restrictions shall be imposed by the New York Stock Exchange or other national securities exchange or governmental authority with respect to obligations of the general character of the Bonds or a general banking moratorium shall be declared by federal, State or New York authorities or a material disruption in commercial banking activities or securities settlement or clearance services shall have occurred; or

(g)      any litigation shall be instituted, pending or threatened to restrain or enjoin the issuance or sale of the Bonds or in any way protesting or affecting any authority for or the validity of the Bonds, the Indenture, the Loan Agreement, the Tax Agreement, the Continuing Disclosure Agreement or this Bond Purchase Contract or the existence or powers of the Issuer and the Company; or

(h)      there shall have occurred any change in the financial condition of the Company and its subsidiaries taken as a whole from those set forth in the Limited Offering Memorandum that makes the Bonds, in the reasonable judgment of the

16

Underwriter, impracticable to market on the terms and in the manner contemplated in the Limited Offering Memorandum.

Any termination of this Bond Purchase Contract pursuant to this Section 9 shall be without liability of any party to any other party, except as described in Sections 2 and 8 above.

Section 10.    Indemnification.

(a)    The Company agrees to indemnify and hold harmless the Underwriter and the Issuer and any partner, member, officer, director, employee or agent of the Underwriter or the Issuer and each person, if any, who controls the Underwriter or the Issuer within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "Indemnified Party") against any and all losses, costs, claims, damages, liabilities or expenses whatsoever which any of them may incur, become subject or suffer (including all such losses, costs, claims, damages, liabilities or expenses as a result of settlement consented to by the Company or any judgment which any of them may incur, become subject or suffer), and to reimburse each of them for any reasonable and customary legal fees or other out-of-pocket expenses (including, to the extent hereinafter provided, reasonable counsel fees and other costs of investigation) reasonably incurred by them in connection with investigating any such losses, claims, damages or liabilities or in connection with defending any actions (together hereinafter referred to as a "Loss" or "Losses"), insofar as such Losses arise out of or are based upon (i) the failure to register any security under the Securities Act or to qualify the Indenture under the TIA in connection with the offering of the Bonds; (ii) any untrue statement or alleged untrue statement of a material fact (whether or not made with scienter) contained in the Limited Offering Memorandum, including any documents incorporated therein by reference, as amended or supplemented (if any amendments or supplements thereto, including documents incorporated by reference, shall have been furnished in accordance with the provisions of this Bond Purchase Contract), or the omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading in any material respect; provided that the indemnity agreement contained in clause (ii) above of this Section 10 shall not apply to (A) the Underwriter (or any person controlling the Underwriter) on account of any such untrue statement or alleged untrue statement, or any such omission or alleged omission, under the caption "UNDERWRITING" in the Limited Offering Memorandum or (B) the Issuer on account of any such untrue statement or alleged untrue statement, or any such omission or alleged omission, under the caption "THE ISSUER" or "LITIGATION" (with respect to the Issuer); or (iii) a breach of any of the representations, warranties or covenants of the Issuer or the Company, as applicable, included in this Bond Purchase Contract; and provided further, however, that the Company shall not be liable to the Underwriter for any such Losses (A) if the person asserting the Loss purchased Bonds from the Underwriter, if delivery to such person of the Limited Offering Memorandum, as then amended or supplemented, would have been a valid defense to the action from which such Loss arose, and copies of an Limited Offering Memorandum, as then so amended or supplemented, were made available to the Underwriter and a copy was not delivered to such person by or on behalf of the Underwriter or (B) to the extent caused

17

by the gross negligence, willful misconduct or bad faith of the person seeking indemnity (other than the Issuer).

(b)      Each Indemnified Party agrees that, upon the receipt of notice of the commencement of any action against it, in respect of which indemnity may be sought hereunder, it will promptly give written notice of the commencement thereof to the Company, but the failure so to notify the Company of any such action shall not relieve the Company from any liability which it may have to the Indemnified Party under this Section 10 unless such failure restricts or limits the Company's ability to defend such action.  In case such notice of any action shall be so given, the Company shall be entitled to participate at its own expense in the defense thereof or, if it elects, with the consent of each Indemnified Party, to assume (in conjunction with any other Indemnifying Party) the defense of such action, in which event such defense shall be conducted by counsel chosen by the Company reasonably satisfactory to the Indemnified Party who shall be defendant or defendants in such action, and such defendant or defendants shall bear the fees and expense of any additional counsel retained by them; provided, that if the Company shall elect not to assume the defense of such action, the Company will reimburse such Indemnified Party for the reasonable and customary legal fees and out-of-pocket expenses of any counsel retained by such Indemnified Party; provided, further that, if the defendants in any such action include one or more of the Indemnified Party and the Company, and counsel for any Indemnified Party shall have reasonably concluded that there may be a conflict of interest involved in the representation by such counsel of both the Company and any one or more of the Indemnified Party, the Indemnified Party shall have the right to select separate counsel, including local counsel to participate in the defense of such action on behalf of such Indemnified Party and the Company shall be liable for the reasonable and customary expenses of separate counsel representing such Indemnified Party who is a party to such action.

(c)      The obligations under this Section 10 shall remain operative and in force and effect regardless of any investigation made by or on behalf of the Issuer or the Underwriter, and shall survive the issuance and the maturity of the Bonds and any termination of this Bond Purchase Contract.

Section 11.      *Establishment of Issue Price.*

(a)      The Underwriter agrees to assist the Issuer in establishing the issue price of the Bonds and shall execute and deliver to the Issuer on the Closing Date an "issue price" or similar certificate, substantially in the form attached hereto as Exhibit E, together with the supporting pricing wires or equivalent communications, with such modifications as may be deemed appropriate or necessary, in the reasonable judgment of the Underwriter, the Issuer and Co-Bond Counsel, to accurately reflect, as applicable, the sales price or prices or the initial offering price or prices to the public of the Bonds.

(b)      [Except as otherwise set forth in Section __ attached hereto, t]he Issuer represents that it will treat the first price at which 10% of each maturity of the Bonds (the "10% test") is sold to the public as the issue price of that maturity (if different

interest rates apply within a maturity, each separate CUSIP number within that maturity will be subject to the 10% test).

(c)    The Underwriter confirms that any selling group agreement and any retail distribution agreement relating to the initial sale of the Bonds to the public, together with the related pricing wires, contains or will contain language obligating each dealer who is a member of the selling group and each broker-dealer that is a party to such retail distribution agreement, as applicable, to (A) report the prices at which it sells to the public the unsold Bonds of each maturity allotted to it until it is notified by the Underwriter that either the 10% test has been satisfied as to the Bonds of that maturity or all Bonds of that maturity have been sold to the public and (B) comply with the hold-the-offering-price rule, if applicable, in each case if and for so long as directed by the Underwriter.  The Issuer acknowledges that, in making the representation set forth in this subsection, the Underwriter will rely on (i) in the event a selling group has been created in connection with the initial sale of the Bonds to the public, the agreement of each dealer who is a member of the selling group to comply with the hold-the-offering-price rule, if applicable, as set forth in a selling group agreement and the related pricing wires, and (ii) in the event that a retail distribution agreement was employed in connection with the initial sale of the Bonds to the public, the agreement of each broker-dealer that is a party to such agreement to comply with the hold-the-offering-price rule, if applicable, as set forth in the retail distribution agreement and the related pricing wires.  The Issuer further acknowledges that the Underwriter shall not be liable for the failure of any dealer who is a member of a selling group, or of any broker-dealer that is a party to a retail distribution agreement, to comply with its corresponding agreement regarding the hold-the-offering-price rule as applicable to the Bonds.

(d)    The Underwriter acknowledges that sales of any Bonds to any person that is a related party to the Underwriter shall not constitute sales to the public for purposes of this section.  Further, for purposes of this section:

(i)    "public" means any person other than an underwriter or a related party to an underwriter,

(ii)    "underwriter" means (A) any person that agrees pursuant to a written contract with the Issuer (or with the lead underwriter to form an underwriting syndicate) to participate in the initial sale of the Bonds to the public and (B) any person that agrees pursuant to a written contract directly or indirectly with a person described in clause (A) to participate in the initial sale of the Bonds to the public (including a member of a selling group or a party to a retail distribution agreement participating in the initial sale of the Bonds to the public),

(iii)    a purchaser of any of the Bonds is a "related party" to an underwriter if the underwriter and the purchaser are subject, directly or indirectly, to (i) at least 50% common ownership of the voting power or the total value of their stock, if both entities are corporations (including direct ownership by one corporation of another), (ii) more than 50% common ownership of their capital interests or profits interests, if both entities are

19

partnerships (including direct ownership by one partnership of another), or (iii) more than 50% common ownership of the value of the outstanding stock of the corporation or the capital interests or profit interests of the partnership, as applicable, if one entity is a corporation and the other entity is a partnership (including direct ownership of the applicable stock or interests by one entity of the other), and

(iv)    "sale date" means the date of execution of this Bond Purchase Contract by all parties.]

*Section 12. Miscellaneous*.    The validity and interpretation of this Bond Purchase Contract shall be governed by the laws of the Commonwealth of Pennsylvania, without regard to conflict of laws provisions.  This Bond Purchase Contract shall inure to the benefit of the Issuer, the Underwriter, the Company, and their respective successors and assigns and to the persons described in Section 10.  Except as provided in Section 10, nothing in this Bond Purchase Contract is intended or shall be construed to give to any other person, firm or corporation any legal or equitable right, remedy or claim under or in respect of this Bond Purchase Contract or any provision contained herein.  The terms "successors" and "assigns" as used in this Bond Purchase Contract shall not include any purchaser, as such purchaser, of any Bonds from or through the Underwriter.  This Bond Purchase Contract may be executed by any one or more of the parties hereto in any number of counterparts, each of which shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.  If any provision of this Bond Purchase Contract shall be determined to be unenforceable, that shall not affect any other provision of this Bond Purchase Contract.  Capitalized terms used herein to the extent not otherwise defined herein, are intended to have the meaning given to them in the Indenture.

The representations and warranties of the Company, the Guarantor and the Issuer contained in Sections 3, 4 and 5 hereof, respectively, shall remain operative and in full force and effect, regardless of any investigation made by or on behalf of the Underwriter, and shall survive the delivery of the Bonds.

*Section 13. Notices and other Actions*.    All notices, demands and formal actions hereunder will be in writing mailed, telecopied or delivered to:

| | |
|---|---|
| The Issuer: | Pennsylvania Economic Development Financing Authority |
| | Commonwealth Keystone Building |
| | 400 North Street, 4th Floor |
| | Harrisburg, PA  17120-0225 |
| | Attn:  Executive Director |
| | Facsimile: (717) 787-0879 |
| | |
| The Company: | CarbonLite P, LLC |
| | c/o HPC Industries LLC |
| | 10250 Constellation Blvd. Suite 2820 |
| | Los Angeles, CA  90067 |
| | Attention: Leon Farahnik |
| | Facsimile Number: (310) 473-9592 |

20

The Underwriter:          Westhoff, Cone & Holmstedt
                          1777 Botelho Drive, Suite 345
                          Walnut Creek, CA 94596
                          Attention:  Principal

Notices given by facsimile transmission shall be followed promptly by copies sent by first class mail to the notice address.

The Issuer shall receive a copy of any notice, consent, certificate or other document or communication given by any party to any party hereunder.

Section 14.    *No Advisory or Fiduciary Role*.   Each of the Issuer and the Company acknowledges and agrees that (i) the purchase and sale of the Bonds pursuant to this Bond Purchase Contract is an arm's-length commercial transaction among the Issuer, the Company and the Underwriter, (ii) in connection therewith and with the discussions, undertakings and procedures leading up to the consummation of such transaction, the Underwriter is and has been acting solely as principal and is not acting as the agent or fiduciary of either the Issuer or the Company, (iii) the Underwriter has not assumed an advisory or fiduciary responsibility in favor of the either the Company or the Issuer with respect to the offering contemplated hereby or the discussions, undertakings and procedures leading thereto (irrespective of whether the Underwriter has provided other services or is currently providing other services to the Company or the Issuer on other matters) and the Underwriter has no obligation to either the Issuer or the Company with respect to the offering contemplated hereby except the obligations expressly set forth in this Bond Purchase Contract and (iv) the Company and Issuer have consulted their own legal, financial and other advisors to the extent each has deemed appropriate.

Section 15.    *Acknowledgment by Company of Distribution Agreement between Piper Jaffray & Co. and Underwriter*.   The Company acknowledges that the Underwriter and Piper Jaffray & Co. ("Piper Jaffray") have entered into a distribution agreement for the marketing and distribution of the Bonds.  The Company agrees that the representations and warranties set forth in Section 3 hereof and the indemnifications set forth in Section 10 hereof shall be deemed representations, warranties and indemnifications by the Company and the Guarantor (as applicable) to Piper Jaffray, the Underwriter and the Issuer.  In addition, any certificate signed by any authorized officer of the Company or the Guarantor on the Closing Date shall be deemed a representation and warranty by the Company or the Guarantor (as applicable) to Piper Jaffray as to the truth of the statements therein as of the Closing Date.

21

IN WITNESS WHEREOF, the parties hereto, in consideration of the mutual covenants set forth herein and intending to be legally bound, have caused this Bond Purchase Contract to be executed and delivered as of the date first written above.

**PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY**

By:_____
    Name: Stephen M. Drizos
    Title:   Executive Director

**WESTHOFF, CONE & HOLMSTEDT**

By:_____
    Name:  Mark A. Holmstedt
    Title:   Principal

**CARBONLITE P, LLC**

By:_____
    Name:  Leon Farahnik
    Title:   Chief Executive Officer

**CARBONLITE P HOLDINGS, LLC**

By:_____
    Name:  Leon Farahnik
    Title:   Chief Executive Officer

**PINNPACK P, LLC**

By:_____
    Name:  Leon Farahnik
    Title:   Chief Executive Officer

**Schedule I**

**Maturity Schedule**

$25,000,000 ___% Term Bond due December 1, 2036 - Price 100.00%

**Redemption**

*Sinking Fund Redemption*.  The Bonds maturing on June 1, 20__ shall be subject to semi-annual mandatory sinking fund redemption on each mandatory sinking fund redemption date and in the respective principal amounts as set forth in the following schedule, at a redemption price equal to 100% of the principal amount thereof to be redeemed (without premium), together with interest accrued thereon to the date fixed for redemption:

| Redemption Date | Principal Amount |
| --- | --- |
| | |

†
_____

† Final maturity.

The Bonds maturing on June 1, 20__ shall be subject to semi-annual mandatory sinking fund redemption on each mandatory sinking fund redemption date and in the respective principal amounts as set forth in the following schedule, at a redemption price equal to 100% of the principal amount thereof to be redeemed (without premium), together with interest accrued thereon to the date fixed for redemption:

| Redemption Date | Principal Amount |
| --- | --- |
| | |

†
_____

† Final maturity.

**Optional Redemption**.  On any date on and after _____ 1, 20__, the Bonds may be redeemed in whole or in part, at a redemption price expressed as a percentage of the principal amount of the Bonds to be redeemed, plus accrued interest thereon to the date of redemption, as follows:

| Redemption Date | Redemption Price |
| --- | --- |
| [_____, 20__] through [_____, 20__] | [___]% |
| [_____, 20__]  through [_____, 20__] | [___]% |
| [_____, 20__]  through [_____, 20__] | [___]% |
| [_____, 20__]  and thereafter | [100]% |

24

**Exhibit A**

**[Form of Supplemental Co-Bond Counsel Opinion]**

[To be updated]

[CLOSING DATE]

Westhoff, Cone & Holmstedt
1777 Botelho Drive
Suite 345
Walnut Creek, CA 94596

Re:   $25,000,000 Pennsylvania Economic Development Financing Authority Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project), Series 2020

Ladies and Gentlemen:

We have acted as co-bond counsel to the Pennsylvania Economic Development Financing Authority (the "Issuer") in connection with the issuance by the Issuer of $25,000,000 aggregate principal amount of its Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project), Series 2020 (the "Bonds"). The Bonds are being issued pursuant to (i) the Pennsylvania Economic Development Financing Law, Act of August 23, 1967, P.L. 251, as amended (the "Act"), (ii) an Indenture of Trust, dated as of June 1, 2019 (the "Original Indenture"), as amended and supplemented by the First Supplemental Indenture of Trust, dated as of [CLOSING MONTH] 1, 2020 (the "First Supplemental Indenture" and, together with the Original Indenture, the "Indenture"), each between the Issuer and UMB Bank, N.A., as trustee (the "Trustee"), and (iii) a Resolution of the Issuer's Board of Directors adopted on [POS DATE] (the "Resolution").

Proceeds of the Bonds will be loaned by the Issuer to CarbonLite P, LLC, a Delaware limited liability company (together, the "Borrower") pursuant to the terms of a Loan Agreement, dated as of June 1, 2019 (the "Original Loan Agreement"), as amended by the First Amendment to Loan Agreement, dated as of [CLOSING MONTH] 1, 2020 (the "First Amendment to Loan Agreement" and, together with the Original Loan Agreement, the "Loan Agreement"), each between the Issuer and the Borrower. Payment of the principal of and interest on the Bonds when due will be guaranteed by CarbonLite P Holdings LLC, a Delaware limited liability company and the sole member of the Borrower, as guarantor (the "Original Guarantor") and PinnPack P, LLC, a Delaware limited liability company and wholly-owned subsidiary of the Borrower ("PinnPack P" and, together with the Original Guarantor, the "Guarantor"), pursuant to the Guaranty Agreement, dated as of June 1, 2019 (the "Original Guaranty"), between the Trustee and Original Guarantor, as amended and restated by the Amended and Restated Guaranty Agreement, dated as of [CLOSING MONTH] 1, 2020 (the "Amended and Restated Guaranty" and, together with the Original Guaranty, the "Guaranty"), by and between the Guarantor and the Trustee.

The Bonds are being purchased on the date hereof by Westhoff, Cone & Holmstedt (the "Underwriter") pursuant to a Bond Purchase Contract dated [PRICING DATE] (the "Bond Purchase Contract") among the Underwriter, the Issuer, the Borrower and the Guarantor.

In our capacity as co-bond counsel, we have examined such documents, records of the Issuer and other instruments as we deemed necessary to enable us to express the opinions set forth below, including the

A-1

Preliminary Limited Offering Memorandum dated [POS DATE] (the "Preliminary Limited Offering Memorandum") and the Limited Offering Memorandum dated [PRICING DATE] (the "Limited Offering Memorandum") distributed in connection with the limited offering and sale of the Bonds, as well as originals or copies of such other agreements, documents, records, certificates and other materials, and have satisfied ourselves as to such matters, as we have considered relevant or necessary as a basis for such opinion.  In such review, we have assumed the accuracy and completeness of all agreements, documents, records, certificates and other materials submitted to us, the conformity with the originals of all such materials submitted to us as copies (whether or not certified and including facsimiles), the authenticity of the originals of such materials and all materials submitted to us as originals, the genuineness of all signatures, and the legal capacity of all natural persons.  We have also assumed (i) that each party (other than the Issuer) to each of the documents referred to above is validly existing and in good standing under the laws of its state of incorporation or formation, and (ii) the due authorization, execution and delivery of each document referred to above by each of the parties thereto (other than the Issuer), and the validity, binding nature and enforceability of each document referred to above against each of the parties thereto (other than the Issuer).  As to various questions of fact relevant to such opinion, we have relied, without independent investigation, upon certifications of public officials, certificates of officers of the Borrower and the Guarantor and representations and warranties of the Borrowers and the Guarantor contained in the documents referred to above.

Based on the foregoing, we are of the opinion that:

1.   The Bond Purchase Contract constitutes the legal, valid and binding obligation of the Issuer, enforceable against it in accordance with its terms, except as enforcement thereof may be limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, fraudulent transfer, marshalling or similar laws affecting creditors' rights and remedies generally; (b) the rights of account debtors, claims and defenses of account debtors and the terms of agreements with account debtors; (c) general principles of equity, including without limitation, concepts of materiality, reasonableness, good faith and fair dealing (regardless of whether such enforceability is considered in a proceeding in equity or at law); and (d) limitations on enforceability of rights to indemnification or contribution by federal or state securities laws or regulations or by public policy.

2.   No registration of the Bonds under the Securities Act of 1933, as amended, or qualification of the Indenture under the Trust Indenture Act of 1939, as amended, is required in connection with the limited offering and sale of the Bonds.

3.   The statements contained in the Preliminary Limited Offering Memorandum and the Limited Offering Memorandum under the captions "THE BONDS," "SECURITY FOR THE BONDS" (but excluding the information set forth under the subheadings "– Pledge and Security Agreement," "– Lease Agreement," "– Leasehold Mortgage," "– Non-Disturbance and Access Agreement" and "– Subordination, Non-Disturbance and Attornment Agreement") and "FINANCIAL COVENANTS" and in Appendix B – SELECTED DEFINITIONS AND SUMMARY OF PRINICIPAL LEGAL DOCUMENTS", insofar as such statements purport to summarize certain provisions of the Bonds, the Indenture, the Loan Agreement and the Guaranty Agreement, accurately summarize the provisions purported to be summarized therein, and the statements contained in the Preliminary Limited Offering Memorandum and the Limited Offering Memorandum under the caption "TAX MATTERS," in APPENDIX C – PROPOSED FORM OF OPINION OF CO-BOND COUNSEL," and on the covers of the Preliminary Limited Offering Memorandum and the Limited Offering Memorandum relating to tax matters accurately reflect our opinion as to the federal and Pennsylvania tax exemptions applicable to the Bonds.

Our Opinion in item (1) above is subject to the following exceptions, limitations and qualifications:

(a)      We express no opinion as to the application or requirements of federal or state securities, patent, trademark, copyright, antitrust and unfair competition, pension or employee benefit, labor, environmental, health and safety, tax, trade regulation laws, insolvency or fraudulent transfer laws, antifraud laws, margin regulations, laws and regulations relating to commodities trading, derivatives, futures and swaps, the rules of any stock exchange, clearing organization, designated contract market or other regulated entity for trading, processing, clearing or reporting transactions in securities, commodities, futures or swaps, export control, anti-money laundering or anti-terrorism laws in respect of the transactions contemplated by or referred to in the Bond Purchase Contract.

(b)      We express no opinion as to the validity or enforceability of any provision of the Bond Purchase Contract which (i) purports to be a waiver of the right to a jury trial, a waiver of any right to object to jurisdiction or venue, a waiver of any right to claim damages or to service of process, or a waiver of any other rights or benefits bestowed by operation of law or the waiver of which is limited by applicable law; (ii) purports to exculpate any party from its own negligent acts or limit any party from certain liabilities; (iii) purports to require the payment of attorneys' fees to the extent such fees exceed reasonable attorneys' fees; (iv) provides the remedy of specific performance or injunctive relief; or (v) incorporates by reference the terms of any document, instrument or agreement.

(c)      We express no opinion as to the enforceability of forum selection clauses upon the courts in the forum selected.

(d)      We express no opinion as to the law of any jurisdiction other than the Commonwealth of Pennsylvania and the federal laws of the United States of America.

This letter is furnished to you by us as co-bond counsel to the Issuer.  No attorney-client relationship has existed or exists between our firm and you in connection with the Bonds or by virtue of this letter. We disclaim any obligation to update this letter.  This letter is delivered to you solely for your benefit in connection with the limited offering and sale of the Bonds and may not, without our express written consent, be relied upon by any other person or for any other purpose.  This letter is not to be used, circulated, quoted or otherwise referred to or relied upon for any other purpose or by the owners of the Bonds or by any party to whom it is not addressed.

Very truly yours,

A-3

**Exhibit B**

**[Form of Opinion of Special Counsel to the Company]**

[To be updated]

[CLOSING DATE]

Pennsylvania Economic Development
Financing Authority
Commonwealth Keystone Building
400 North Street
Harrisburg, PA  19120-0225

UMB Bank, N.A., Trustee
Corporate Trust & Escrow Services
120 South Sixth Street, Suite 1400
Minneapolis, MN 55402
Attn:  Katie Carlson

Westhoff, Cone & Holmstedt
1777 Botelho Drive, Suite 345
Walnut Creek, CA 94596

Re:    $25,000,000 Pennsylvania Economic Development Financing Authority Solid Waste Disposal
       Revenue Bonds (CarbonLite P, LLC Project) Series 2020 (the "Bonds")

Ladies and Gentlemen:

We have acted as special counsel to CarbonLite P, LLC, a Delaware limited liability company (the "Borrower"), and to CarbonLite P Holdings, LLC, a Delaware limited liability company (the "Guarantor"), in connection with (i) the Loan Agreement, dated as of June 1, 2019 (the "Original Loan Agreement"), as amended by the First Amendment to Loan Agreement, dated as of [CLOSING MONTH] 1, 2020 (the "First Amendment to Loan Agreement" and, together with the Original Loan Agreement, the "Loan Agreement") between the Borrower and the Pennsylvania Economic Development Financing Authority (the "Issuer"), (ii) the Bond Purchase Contract, dated as of June 1, 2019 (the "Bond Purchase Contract"), among the Issuer, the Borrower, the Guarantor and the underwriter therein named and (iii) the various other Transaction Documents (as defined below). This opinion letter is being furnished to you at the request of the Borrower pursuant to Section 8(b)(ii)(B) of the Bond Purchase Contract.  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

In connection with this letter, we have examined and relied upon originals or copies, certified or otherwise identified to our satisfaction, of the following documents:

a)        [the Loan Agreement;

b)      the promissory note, dated as of [CLOSING MONTH] 1, 2020, to be issued by the Borrower to the Issuer (the "<u>Note</u>");

c)      the Pledge and Security Agreement, dated as of June 1, 2019, amended and restated by the Amended and Restated Pledge and Security Agreement, dated as of [CLOSING MONTH] 1, 2020, by the Borrower in favor of UMB Bank, N.A., as trustee (the "<u>Trustee</u>") (the "<u>Pledge and Security Agreement</u>");

d)      the Open Ended Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of June 1, 2019, but with an effective date of  June 1, 2019, as amended by the First Amendment to Open-End Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases, and Fixture Filing, dated as of [CLOSING MONTH] 1, 2020, between the Borrower, as grantor, the Trustee, as trustee, and the Trustee, as bond trustee (the "<u>Borrower Leasehold Mortgage</u>");

e)      Open Ended Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of [CLOSING MONTH] 1, 2020, between PinnPack P, as grantor, the Trustee, as trustee, and the Trustee, as bond trustee (the "<u>PinnPack P Leasehold Mortgage</u>" and, together with the Borrower Leasehold Mortgage, the "<u>Leasehold Mortgage</u>");

f)      the Guaranty Agreement, dated as of June 1, 2019, as amended and restated by the Amended and Restated Guaranty Agreement, dated as of [CLOSING MONTH] 1, 2020, by the Guarantor for the benefit of the Trustee (the "<u>Guaranty</u>");

g)      the Deposit Account Control Agreement, dated as of June 1, 2019, as amended by that certain First Amendment to Deposit Account Control Agreement, dated as of _____, 2020, among the Borrower, Pacific Western Bank (the "<u>Depository Bank</u>") and the Trustee (as amended, the "<u>Borrower Account Control Agreement</u>");

h)      the Deposit Account Control Agreement, dated as of _____, 2020, among PinnPack P, the Trustee and _____ (the "<u>PinnPack P Account Control Agreement</u>" and, together with the Borrower Account Control Agreement, the "<u>Account Control Agreement</u>")

i)      the Bond Purchase Contract;

j)      the Continuing Disclosure Agreement, dated as of [CLOSING MONTH] 1, 2020, among the Borrower, the Guarantor and the Trustee;

k)      the Tax Certificate and Agreement, dated as of June 1, 2019, between the Issuer and the Borrower (the "<u>Tax Certificate and Agreement</u>");

l)      the Uniform Commercial Code financing statement naming the Borrower, as debtor, and the Trustee, as secured party, prepared for filing with the Secretary of State of the State of Delaware (the "Filing Office"), a copy of which is attached hereto as Exhibit A (the "Borrower Financing Statement") and the Uniform Commercial Code financing statement naming the Guarantor, as debtor, and the Trustee, as secured party, prepared for filing with the Filing Office, a copy of which is attached hereto as Exhibit B (the "Guarantor Financing Statement", and together with the Borrower Financing Statement, the "Financing Statements") ;

m)      the Indenture of Trust, dated as of June 1, 2019, as amended and supplemented by the First Amendment to Indenture of Trust, dated as of [CLOSING MONTH] 1, 2020, between the Issuer and the Trustee;

n)      the Preliminary Limited Offering Memorandum, dated [POS DATE], relating to the Bonds (the "Preliminary Offering Memorandum");

o)      the Limited Offering Memorandum, dated [PRICING DATE], relating to the Bonds (the "Final Offering Memorandum" and, together with the Preliminary Offering Memorandum, the "Offering Memoranda");

p)      the Industrial Lease, dated as of _____, 20__, between _____, a _____, as landlord and Borrower, as tenant ("Lease");

q)      the Non-Disturbance and Access Agreement dated as of June 1, 2019, as amended by the First Amendment to Non-Disturbance and Access Agreement, dated as of [CLOSING MONTH] 1, 2020, among the Borrower, the Trustee and the Landlord (the "Borrower NDA");

r)      the Non-Disturbance and Access Agreement dated as of [CLOSING MONTH] 1, 2020, among PinnPack P, the Trustee and the Landlord (the "Borrower NDA");

s)      such other certificates, agreements, instruments and documents as we have deemed relevant or necessary as the basis for the opinions hereinafter expressed.

As used in this letter: "Transaction Documents" shall mean the documents listed in clauses (a) through (i) above; "Transaction" means the financing transaction being effectuated pursuant to the Transaction Documents; "Applicable Laws" shall mean the DLLCA (as defined below) and those Pennsylvania State, California State or United States federal laws which in our experience, without having made any investigation, are normally applicable to transactions of the type contemplated by the Transaction Documents, provided, that the term "Applicable Laws" shall not include federal or state securities or blue sky laws (including, without limitation, the Securities Act of 1933, as amended, the

Securities Exchange Act of 1934, as amended, the Trust Indenture Act of 1939, as amended or the Investment Company Act of 1940, as amended), antifraud laws, fraudulent conveyance or fraudulent transfer laws, the Dodd-Frank Wall Street Reform and Consumer Protection Act, federal, state or local laws relating to the issuance of tax exempt or otherwise government sponsored or supported bonds or indebtedness (including any laws relating to activities of an economic development authority under Pennsylvania law), federal, state or local tax laws, laws relating to zoning, construction, land use or similar matters, any other laws relating to the leasing, renovation, equipping or operation of the Facility or the production or sale of products produced by the Facility, or labor laws, or in each case any rules or regulations thereunder; "Governmental Approval" shall mean any consent, approval, authorization or other order of any Governmental Authority. "Governmental Authority" shall mean any federal regulatory body, federal administrative agency or other federal governmental body of the United States of America or any state regulatory body, state administrative agency or other state governmental body of the Commonwealth of Pennsylvania or the State of California pursuant to Applicable Laws; "DLLCA" shall mean the Limited Liability Company Act as in effect in the State of Delaware as in effect on the date hereof; "PA-UCC" shall mean the Uniform Commercial Code as in effect on the date hereof in the Commonwealth of Pennsylvania; "CA-UCC" shall mean the Uniform Commercial Code as in effect on the date hereof in the State of California; "DE-UCC" shall mean the Uniform Commercial Code as in effect in the State of Delaware; "Article 9 Collateral" shall mean that portion of the Collateral (as defined in the Pledge and Security Agreement), which is of a type in which a security interest can be created pursuant to Article 9 of the PA-UCC; and "Opinion Parties" shall mean the Borrower and the Guarantor.

In our examination referred to above, we have assumed the legal capacity of all natural persons, the genuineness of all signatures, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as certified or photostatic copies or by facsimile or other means of electronic transmission, and the authenticity of the originals of such latter documents. As to facts and certain other matters and the consequences thereof relevant to the opinions expressed herein and the other statements made herein, we have with your permission relied without independent investigation or verification upon, and assumed the accuracy and completeness of, (a) certificates, letters and written statements and representations of public officials, officers and other representatives of the Opinion Parties, and others, and (b) the representations and warranties in the Transaction Documents. We have also assumed, with your permission and without independent investigation or verification, that:

    i.  each party to the Transaction Documents was duly organized or formed, as the case may be, and was at all relevant times and is validly existing and in good standing under the laws of its jurisdiction of organization or formation, as the case may be, and had at all relevant times and has full right, power and authority to conduct its business and to execute, deliver and perform its obligations under each of the Transaction Documents to which it is a party (except that no such assumptions are made with respect to the Opinion Parties to the extent matters assumed by this clause (i) are expressly addressed in Paragraph 1 below);

ii.        the execution, delivery and performance of each Transaction Document by each party thereto have been duly authorized by all necessary corporate or other appropriate actions and proceedings on the part of each such party (except that no such assumption is made with respect to the Opinion Parties to the extent matters assumed by this clause (ii) are expressly addressed in Paragraph 2 below);

iii.       each Transaction Document has been duly executed and delivered by each party thereto (except that no such assumptions are made with respect to the Opinion Parties to the extent matters assumed by this clause (iii) are expressly addressed in Paragraph 3 below);

iv.        the Applicable Laws of the Commonwealth of Pennsylvania are the governing law of the Tax Certificate and Agreement, and (b) each Transaction Document constitutes the legal, valid and binding obligation of each party thereto, enforceable against each such party in accordance with its terms (except that no such assumptions are made with respect to the Opinion Parties to the extent matters assumed by this clause (iv) are expressly addressed in Paragraph 3 below);

v.         none of the execution, delivery or performance of any of the Transaction Documents by any party thereto does or will (a) contravene or violate any provision of any law, rule or regulation (except that no such assumption is made with respect to the Opinion Parties to the extent matters assumed by this clause (v) are expressly addressed in Paragraph 4 below), (b) contravene or violate any charter or bylaws, certificate of formation or operating agreement, or other organizational documents of any such party (except that no such assumption is made with respect to the Opinion Parties to the extent matters assumed by this clause (v) are expressly addressed in Paragraph 4 below) or (c) conflict or be inconsistent with, or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under or in respect of, or result in the creation or imposition of (or the obligation to create or impose) any lien or security interest (other than the liens and security interests created or required under the Transaction Documents) upon any of the property or assets of such party under or in respect of, any indenture, mortgage, deed of trust, credit agreement, loan agreement or other agreement, contract or instrument to which such party is a party or by which it or any of its properties or assets are bound or to which it or any of its properties or assets may otherwise be subject;

vi.        no consent, approval, license, authorization or order of, or filing, recording, registration or qualification of or with, any governmental authority is required for the execution, delivery or performance of any Transaction Document by any party thereto or for the granting, creation, maintenance or continuation of any lien (including, without limitation, any mortgage or other lien arising under or pursuant to the Leasehold Mortgage) or security interests under any Transaction

Document (except that no such assumption is made with respect to the Opinion Parties with respect to any Governmental Approval to the extent matters assumed by this clause (vi) are expressly addressed in Paragraph 5 below);

vii.     the Leasehold Mortgage will be duly recorded and properly indexed in the Office of the Recorder of Deeds of Berks County, Pennsylvania (the "Recording Office") within 6 months of the date thereof, and all applicable recording fees with respect thereto will be paid; and

viii.     none of the Opinion Parties is listed on the specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, Department of the Treasury ("OFAC") pursuant to Executive Order 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable law relating to anti-terrorism (collectively, "Designated Persons Lists"), or is owned or controlled by, or acts for or on behalf of, any Person on such Designated Persons Lists or any other Person who has been determined by competent authority to be subject to any prohibition contained in any such laws.

Based upon and subject to the foregoing, and subject to the other limitations, qualifications, exceptions and assumptions set forth herein, and having considered such questions of law as we have deemed necessary as a basis for the opinions expressed below, we are of the opinion that:

1.     Each Opinion Party is a limited liability company validly existing and in good standing under the laws of the State of Delaware. Each Opinion Party has the limited liability company power and authority to execute, deliver and perform its obligations under the Transaction Documents to which such Opinion Party is a party.  Each Opinion Party is qualified to do business in the Commonwealth of Pennsylvania. In rendering the opinions set forth in the first and third sentence of this Paragraph 1, we have with your permission relied solely on certificates of government officials attached on Schedule 1.

2.     The execution and delivery by each Opinion Party of the Transaction Documents to which it is a party and the performance by such Opinion Party of its obligations thereunder have been duly authorized by all requisite limited liability company action on the part of such Opinion Party under the DLLCA.

3.     Each Transaction Document has been duly executed and delivered by each Opinion Party party thereto.  Each Transaction Document constitutes the legal, valid and binding obligation of each Opinion Party party thereto, enforceable against such Opinion Party in accordance with its terms.

4.     (a) The execution and delivery by each Opinion Party of the Transaction Documents (other than the Account Control Agreement, which is addressed in clause (b)) to which it is a party, and the performance by such Opinion Party of its obligations thereunder, do not (i) violate any Applicable

Law of the Commonwealth of Pennsylvania, the State of Delaware or of the United States of America or (ii) violate the certificate of formation or operating agreement of such Opinion Party; and (b) the execution and delivery by the Borrower of the Account Control Agreement, and the performance by the Borrower of its obligations thereunder, do not (i) violate any Applicable Law of the State of California or of the United States of America or (ii) violate the certificate of formation or operating agreement of the Borrower.

5.      (a) Other than those filings and recordings required to give public notice of, perfect and maintain the liens and security interests created by or provided for in the Transaction Documents (excluding the Account Control Agreement, which is addressed in clause (b)), no Governmental Approval under any Applicable Law of the Commonwealth of Pennsylvania or of the United States of America, which has not been obtained or taken, is required to be obtained by any Opinion Party for the execution, delivery or performance by or the enforceability against such Opinion Party of any of the Transaction Documents to which it is a party; and (b) other than those filings and recordings required to give public notice of, perfect and maintain the liens and security interests created by or provided for in the Account Control Agreement, no Governmental Approval under any Applicable Law of the State of California or of the United States of America, which has not been obtained or taken, is required to be obtained by the Borrower for the execution, delivery or performance by or the enforceability against the Borrower of the Account Control Agreement.

6.      The form of the Leasehold Mortgage complies with the formal requisites necessary to constitute an open-end mortgage as defined in 42 Pa.C.S. §8143, and the Leasehold Mortgage is in appropriate form for recording in the Recording Office, and creates and will constitute a valid and enforceable Lien in favor of the Trustee upon the Borrower's estate in the Mortgaged Property to the extent the Property constitutes real property or fixtures, or an interest in real property or fixtures, under Pennsylvania law.  No other recordation or filing is required to preserve the validity of such Lien.

7.      The provisions of the Pledge and Security Agreement are effective to create in favor of the Trustee a valid security interest in each of the Borrower's and the Guarantor's rights in their respective Article 9 Collateral as security for the Secured Obligations (as defined in the Pledge and Security Agreement).

8.      The filing of the Financing Statements in the Filing Office is effective to perfect the Trustee's security interest in the Article 9 Collateral of the Borrower and of the Guarantor, in each case to the extent a security interest therein can be perfected by the filing of a financing statement in the Filing Office.

9.      The provisions of the Loan Agreement, the Pledge and Security Agreement and the Account Control Agreement are effective to create in favor of the Trustee a valid security interest in the Borrower's rights in the Blocked Deposit Accounts (as defined in the Account Control Agreement) as

security for the Secured Obligations (as defined in the Pledge and Security Agreement).

10.    The provisions of the Account Control Agreement are effective to give the Trustee "control" (as defined in Section 9104 of the CA-UCC) over each Blocked Deposit Account (as defined in the Account Control Agreement).

We advise you that, to our knowledge, there are no lawsuits pending against any Opinion Party nor, to our knowledge, has any Opinion Party received any overt written threat of any lawsuits, in each case that question the validity or enforceability of any of the Transaction Documents against any Opinion Party party thereto or that seek to enjoin the consummation of the transactions contemplated thereby.

We have, for purposes of making the statements set forth in clauses (1) and (2) of this paragraph, reviewed the information appearing in the Applicable Sections (as defined below) of the Offering Memoranda but, with your permission, we are not passing upon or assuming responsibility for the accuracy, completeness or fairness of the information in the Applicable Sections or elsewhere in the Offering Memoranda and have made no independent check or verification thereof and we have assumed that all such information is true, complete and correct. Subject to the foregoing and based solely on our review of the Applicable Sections of the Offering Memoranda, no facts have come to our attention that have caused us to believe that:

(1)    the statements in the Applicable Sections of the Preliminary Offering Memorandum (solely insofar as such statements describe the Opinion Parties), as of its date, included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; or

(2)    the statements in the Applicable Sections of the Final Offering Memorandum (solely insofar as such statements describe the Opinion Parties), as of its date or as of the date hereof, included or include an untrue statement of a material fact or omitted or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading;

except in each case that we express no belief and make no statement with respect to financial statements and schedules and other financial, operating, numerical or statistical data or projections included in or omitted from the Preliminary Offering Memorandum or the Final Limited Offering Memorandum or any information regarding the Facility or the financing for the Facility.  "Applicable Sections" means the information appearing in the Preliminary Offering Memorandum or Final Limited Offering Memorandum, as the case may be, under the captions "THE BORROWER AND THE GUARANTOR" and "RISK FACTORS," in the second, third and fourth paragraphs under the caption "THE PROJECT AND THE APPLICATION OF BOND PROCEEDS," and in Appendix A (other than the information in Appendix A appearing under the captions "CARBONLITE RECYCLING PROCESS," "THE PROJECT" AND "FINANCIAL SUMMARY").

Qualifications, Limitations and Exceptions

(1)     The opinions expressed herein are subject to the following qualifications, limitations and exceptions:

(2)     (A)     Enforcement of the Transaction Documents may be limited by (i) bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other similar laws relating to or affecting the enforcement of creditors' rights generally, and (ii) general principles of equity (regardless of whether considered in a proceeding in equity or at law), including, without limitation, the possible unavailability of specific performance, injunctive relief or any other equitable remedy, and concepts of materiality, reasonableness, good faith and fair dealing.

(B)     The enforceability of provisions in the Transaction Documents to the effect that certain terms thereof may not be waived or modified except in writing may be limited under certain circumstances.

(C)     We express no opinion as to (i) the enforceability of any rights to indemnification or contribution provided for in any of the Transaction Documents which may be deemed violative of public policy, (ii) any rights of setoff or similar rights provided in the Account Control Agreement, the Leasehold Mortgage or the Pledge and Security Agreement (iii) application of any federal or state securities, anti-trust or tax laws.

(D)     Except to the extent set forth in Paragraph 4 and 5 above, we express no opinion concerning the applicability or absence of conflict with any statute, rule, regulation, judgment, order, writ or decree of any Governmental Authority.

(3)     (E)     We express no opinion as to the enforceability of any of the Transaction Documents to the extent any party thereto fails to obtain and keep in full force and effect all governmental authorizations, approvals, consents, permits and licenses required to be obtained and maintained by it in connection with performance of its obligations or enforcement of its rights thereunder.

(F)     Certain of the remedial provisions set forth in the Leasehold Mortgage may be limited or rendered unenforceable by applicable laws and interpretations, but in our opinion such laws and interpretations do not, subject to the other qualifications, limitations and exceptions set forth in this opinion letter, make the remedies generally afforded by such instruments, when considered in their entirety, inadequate for the practical realization by the Trustee and the Issuer of the principal benefits or security intended to be provided thereby (except for the economic consequence of procedural or other delay).

(G)     With respect to the enforceability of the Guaranty, we note that is contains provisions which purport to waive certain rights and defenses which the Guarantor might otherwise have with respect to, among other things, amendments and modifications of the Transaction Documents, notice of default or the election of remedies by the Trustee

following a default by the Borrower under the Loan Agreement or the other Transaction Documents to which it is a party. Although we believe that such provisions are generally enforceable, we advise you that certain waivers and other provisions in the Guaranty may be further limited or rendered unenforceable by applicable law and interpretations, but in our opinion, such laws and interpretations do not, subject to the other qualifications, limitations and exceptions set forth in this opinion letter, render the Guaranty invalid as a whole or preclude judicial enforcement of the Guaranty upon a material default by the Guarantor thereunder.

(H)     The enforceability of the Leasehold Mortgage is subject to applicable laws of the Commonwealth of Pennsylvania regarding the manner of exercising remedies. In this connection, we call to your attention the provisions of the Pennsylvania Deficiency Judgment Act, 42 Pa.C.S. §8103, which provides that a judgment creditor who buys in real property at an execution sale must, within six months after the sale, petition the court to fix the fair market value of the property if the creditor seeks to collect a deficiency balance due. Failure to so petition the court will fully discharge the debtor, obligor, guarantor, surety and any other person liable directly or indirectly to the judgment creditor for payment of the debt and any owner of the property affected thereby. It is important that care be taken at the time of the foreclosure on any mortgaged property to insure that remedies against or recovery from other collateral given to secure the indebtedness secured by the Leasehold Mortgage will not be lost as a result of failure to comply with the Pennsylvania Deficiency Judgment Act. The Pennsylvania Deficiency Judgment Act applies when any real property located in Pennsylvania is foreclosed upon, whether such property is the mortgaged property or other real property of the Borrower or Guarantor or whether such real property is only one of several parcels that constitute the mortgaged property. Failure to comply with the Pennsylvania Deficiency Judgment Act may also affect a subsequent foreclosure or enforcement of remedies with respect to personal property or other non-real estate collateral, or with respect to any real property collateral located outside of Pennsylvania.

(I)     Enforcement of the Transaction Documents by the Issuer or Trustee with respect to the rights of the debtor thereunder against other persons under assigned leases and contracts may be subject to the terms of agreements between such debtor and such other persons, the rights of such persons and any claims or defenses of such persons against such debtor.

(J)     We express no opinion as to the effect on the opinions expressed herein of (i) the compliance or non-compliance of the Trustee or Issuer with any state, federal or other laws applicable to it or (ii) the legal or regulatory status or nature of the business of the Issuer or any Trustee.

(K)     We express no opinion as to any document, instrument or agreement referred to in any of the Transaction Documents or incorporated therein by reference other than the Transaction Documents, nor do we express any opinion as to the effect on the

matters set forth herein of any amendment, modification, supplement, extension or renewal of or to any of the Transaction Documents after the date hereof.

(4)    (L)    With respect to the opinions expressed in paragraphs 3 and 4 above, we express no opinion as to the applicability to the Transaction of Section 911(b) of the Pennsylvania Crimes Code (the "*Crimes Code*"), Act of December 6, 1972, P.L. 1482, No. 334, as amended, 18 Pa.C.S. §911(b), which prohibits the use or investment of income derived from a pattern of "racketeering activity" in the establishment or operation of any enterprise.  "Racketeering activity," as defined in the Crimes Code, includes the collection of money or other property in full or partial satisfaction of a debt which arose as the result of the lending of money or other property at a rate of interest exceeding 25% per annum "when not otherwise authorized by law".

(M)    Except as provided in Paragraphs 6 through 10 above, we express no opinion as to the creation, validity or perfection of any lien or security interest.

(N)    Except as provided in Paragraph 6 above, the opinions expressed in paragraph 6 are subject to the following:

(i)    We have assumed, without investigation or inquiry, that (a) the description of the Mortgaged Property contained in the Leasehold Mortgage accurately describes the property intended to be covered thereby, and (b) the Borrower holds good right, title and interest in and to the Mortgaged Property.

(ii)    We express no opinion as to (a) the existence or ownership of, or legal or equitable title to, any property, (b) whether the property described in and referred to in the Leasehold Mortgage is real or personal property or whether any provision therein purporting to make such property fixtures is effective, (c) whether any provision of any Transaction Document purporting to assign or transfer any license or permit issued by any Governmental Authority is effective, (d) the effectiveness of any assignment of leases or rents under the Leasehold Mortgage as a present, absolute assignment thereof rather than as a conditional assignment thereof for security purposes, (e) the priority of the interest of any Person in any property or interest in property.  We understand that with respect to the Mortgaged Property and the creation and priority of the Lien of the Leasehold Mortgage, you will be relying upon the title insurance policy issued to you by First American Title Insurance Company dated the Closing Date.

(O)    The opinions expressed in Paragraphs 7 and 8, above are subject to the following:

(i)    We have assumed that the Article 9 Collateral does not include as-extracted collateral, farm products or timber to be cut, as such terms are used in the PA-UCC;

(ii)    We have assumed that the Borrower has sufficient rights in the Article 9 Collateral for the security interest of the Trustee therein to attach. We express no opinion with respect to (a) the existence of, any rights in or title to, or legal or equitable ownership of, any property, or (b) the priority of any security interest.

(iii)    Such opinions are limited to Article 9 of the PA-UCC and therefore such opinions do not address (a) laws of jurisdictions other than Pennsylvania, and laws of Pennsylvania other than Article 9 of the PA-UCC, and (b) collateral of a type not subject as original collateral to Article 9 of the PA-UCC.  We note that Section 9301 of the PA-UCC provides that (I) except as otherwise provided therein in the case of a possessory interest in collateral, while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral, and (II) while collateral is located in a jurisdiction, the local law of that jurisdiction governs (A) perfection, the effect of perfection or nonperfection, and the priority of a possessory security interest in such collateral, (B) perfection of a security interest in goods by filing a fixture filing, and (C) the effect of perfection or nonperfection and the priority of a nonpossessory security interest in such collateral.

(iv)    We call to your attention the fact that the validity and perfection of the security interests created under the Pledge and Security Agreement may be affected by various subsequent events as set forth in the PA-UCC.  Without limiting the generality of the foregoing, such events may include matters of the type described in Section 9506 of the PA-UCC with respect to changes in name, structure and identity of the debtor, Sections 9301 and 9316 of the PA-UCC with respect to changes in the location of the collateral and the location of the debtor, and Section 9515 of the PA-UCC with respect to the duration of the effectiveness of filing; a purchaser of collateral may take the same free of a security interest under certain circumstances as described in Sections 9317, 9320, 9321 and 9338 of the PA-UCC; a security interest in goods which are an accession to, or commingled or processed with, other goods, is subject to Sections 9335 and 9336 of the PA-UCC; and a security interest in proceeds is subject to Section 9315 of the PA-UCC.  In addition, actions taken by a secured party (*e.g.,* releasing collateral or terminating the Financing Statements) may affect the validity or perfection of a security interest.   To the extent that any Collateral is subject to agreements containing provisions that prohibit, restrict or condition assignment, such prohibitions, restrictions or conditions are subject to Sections 9-406, 9-407, 9-408 and 9-409 of the PA-UCC, and we express no opinion as to the effect thereof on any account, lease, instrument, chattel paper, payment intangible, healthcare receivable or letter of credit right.

(v)     Without limiting the generality of the preceding paragraph, we call to your attention the following.  In general, under Section 9515 of the PA-UCC, a financing statement is effective for a period of five years from the date of filing.  The effectiveness of a filed financing statement lapses upon the expiration of such period unless a continuation statement is filed prior to such lapse in accordance with the PA-UCC.  Upon such lapse the security interest in question would, in general, become unperfected.  In general, a continuation statement may be filed within six months prior to the expiration of such five year period.  Upon timely filing of a continuation statement in accordance with the PA-UCC, the effectiveness of the original financing statement is continued for five years after the last date on which the filing was effective, whereupon such filing would lapse in the same manner unless another continuation is filed prior to such lapse.  Succeeding continuation statements may be filed in the same way to continue the effectiveness of the financing statement.

(vi)     In the case of any after-acquired property which becomes collateral after the date hereof, Section 552 of the Federal Bankruptcy Code limits the extent to which any property acquired by a debtor after the commencement of a case under the Federal Bankruptcy Code may be subject to a security interest arising from a security agreement entered into by such debtor before the commencement of such case.

(P)     The opinions expressed in Paragraphs 9 and 10 above are subject to the following:

(i)     We have assumed that the Depository Bank is a Person that is engaged in the business of banking and is acting in that capacity as the named depository bank in the Account Control Agreement.  We have further assumed that the Depository's jurisdiction as defined in Section 9304(b) of the CA-UCC is the State of California.

(ii)     We have assumed that the Borrower has sufficient rights in the Deposit Account for the security interest of the Issuer and Trustee therein to attach.  We express no opinion with respect to (a) the existence of, any rights in or title to, or legal or equitable ownership of, any property, or (b) the priority of any security interest.

(iii)     Such opinion is limited to the CA-UCC, and therefore such opinion does not address laws of jurisdictions other than California, or the laws of California other than the CA-UCC.

(iv)     We express no opinion except to the extent that the Deposit Account constitutes a "deposit account" within the meaning of Section 9-102(a)(29) of the CA- UCC maintained with the Depository Bank.

Knowledge Qualification

The phrase "*to our knowledge*" or words of similar import, as used in this opinion letter, means the conscious awareness of facts, after such inquiry of representatives of the Opinion Parties as we have deemed appropriate in the circumstances, but otherwise without independent investigation, by any of the lawyers in this firm who have devoted substantive legal attention to representation of any of the Opinion Parties in connection with the transactions contemplated by the Transaction Documents.

The opinions in this letter are limited to matters involving the Applicable Laws of the United States of America, the DLLCA, the laws of the Commonwealth of Pennsylvania, the DE-UCC and, solely insofar as concerns the Account Control Agreement, the Applicable Laws of the State of California.

The opinions in this letter are limited to the matters set forth herein, no opinion may be inferred or is implied beyond the matters expressly stated herein, and the opinions contained herein must be read in conjunction with the assumptions, qualifications, limitations and exceptions set forth in this letter. This opinion letter is delivered as of the date hereof and is based on the facts and circumstances existing as of the date hereof and upon the current state of the law. We undertake no obligation to update or supplement this opinion to advise you of any changes in facts or laws subsequent to the date hereof.

This opinion letter is provided to you by us in our capacity as special counsel to the Borrower and the Opinion Parties, and may not be relied upon by you for any purpose other than in connection with the transactions contemplated by the Loan Agreement and the Transaction Documents or by any other Person. No copies of this opinion may be delivered or furnished to any other party, provided that this opinion may be provided to purchasers (and subsequent holders) of the Bonds, and to any party to a Transaction Document. No portions of this opinion be quoted, circulated or referred to in any other document without our prior written consent, except that copies of this opinion may be provided to any regulatory agency having supervisory authority over any party to any of the Transaction Documents or any Bond purchaser or to any court or like entity in connection with the enforcement or protection of the rights or remedies of the Trustee under any of the Loan Documents.

Very truly yours,

SCHEDULE 1

<u>Certificates of Formation, Good Standing and Registration</u>
(Attached)

B-1

4129-8071-8114.2

EXHIBIT A

<u>UCC Financing Statement - Borrower</u>
(Attached)

4129-8071-8114.2

EXHIBIT B

UCC Financing Statement – Guarantor

(Attached)

B-3

**Exhibit C**

**[Form of Opinion of Issuer's Counsel]**

[To be updated]

[CLOSING DATE]

UMB Bank, N.A., as Trustee
Minneapolis, Minnesota

Ballard Spahr LLP, as Co-Bond Counsel
Philadelphia, Pennsylvania

Westhoff, Cone & Holmstedt, as Underwriter
Walnut Creek, California

Turner Law, P.C., as Co-Bond Counsel
Philadelphia, Pennsylvania

Re:     Pennsylvania Economic Development Financing Authority Solid Waste Disposal
        Revenue Bonds (CarbonLite P, LLC Project) Series 2020

Ladies and Gentlemen:

The Office of Chief Counsel of the Pennsylvania Department of Community and Economic Development, which agency is responsible for providing staff services to Pennsylvania Economic Development Financing Authority (the "Authority"), a public body corporate and politic and a public instrumentality of the Commonwealth of Pennsylvania, has participated in the proceedings relating to the authorization and issuance of the Authority's Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020, in the aggregate principal amount of $25,000,000 (the "Bonds").

The Bonds are being issued under and pursuant to the Pennsylvania Economic Development Financing Law (Act No. 1 02, approved August 23, 1 967, P.L. 251, as amended, including the amendments effected by Act No. 48, approved August 1 0, 1987, P.L. 273, Act No. 74, approved December 17, 1993, P.L. 490, and Act No. 44, approved July 2, 2013, P.L. 251) (the "Act"), a certain Indenture of Trust, dated as of June 1, 2019 (the "Original Indenture"), as amended and supplemented by the First Supplemental Indenture of Trust, dated as of [CLOSING MONTH] 1, 2020 (the "First Supplemental Indenture" and, together with the Original Indenture, the "Indenture"), each between the Issuer and UMB Bank, N.A., as trustee (the "Trustee") and resolution of the Authority adopted on [POS DATE] (the "Resolution") authorizing the issuance of the Bonds.

The Bonds are being issued for the purpose of providing financing for a certain project (the "Project") as more fully described in the Loan Agreement (hereafter defined), for the benefit of CarbonLite P, LLC, a Delaware limited liability company (the "Borrower"). The Project has been authorized and approved by the _____ for financing by the Authority pursuant to the Act.

The Authority and the Borrower have entered into a Loan Agreement, dated as of June 1, 2019 (the "Original Loan Agreement"), as amended by the First Amendment to Loan

C-1

Agreement, dated as of [CLOSING MONTH] 1, 2020 (the "First Amendment to Loan Agreement" and, together with the Original Loan Agreement, the "Loan Agreement") providing, among other things, for a loan in the principal amount of the Bonds to pay costs of the Project and for the repayment of such loan by the Borrower in such amounts and at such times as are required to pay the interest on and the principal of the Bonds when due. Pursuant to the Indenture, the Authority has assigned to the Trustee all its rights, title and interest in, to and under the Loan Agreement (except as otherwise provided therein).

The Authority has entered into an Bond Purchase Agreement with Westhoff, Cone & Holmstedt (the "Underwriter"), the Guarantor (as defined below) and the Borrower dated [PRICING DATE] (the "Bond Purchase Agreement") providing for the offering and sale of the Bonds, and pursuant thereto the Authority has authorized the use of a Preliminary Limited Offering Memorandum dated [POS DATE] (the "Preliminary Limited Offering Memorandum") and a Limited Offering Memorandum dated [PRICING DATE], in connection with the offering and sale of the Bonds (the "Limited Offering Memorandum"). The Indenture, the Loan Agreement and the Bond Purchase Agreement are sometimes referred to herein collectively as the "Authority Documents".

As further security for the Bonds, CarbonLite P Holdings, LLC, a Delaware limited liability company, which wholly-owns the Borrower (the "Original Guarantor") and PinnPack P, LLC, a Delaware limited liability company, which is a wholly-owned subsidiary of the Borrower ("PinnPack P" and, together with the Original Guarantor, the "Guarantor"), will execute an Amended and Restated Guaranty Agreement (as amended and restated, the "Guaranty"), dated as of [CLOSING MONTH] 1, 2020, amending and restating the Guaranty Agreement dated as of June 1, 2019, in favor of the Trustee, whereby the Guarantor will guarantee payments on the Bonds and the payment obligations of the Borrower under the Loan Agreement.

In the course of serving as counsel to the Authority, the Office of Chief Counsel has examined the Authority Documents, and such legislation, proceedings, certificates, records, approvals, resolutions and other documents as have been deemed necessary for the purposes of this opinion.

The Office of Chief Counsel has assumed and relied upon the truth, completeness, authority and accuracy of all documents, certificates and instruments examined and the authenticity of all signatures thereon other than those of the Authority.

The Office of Chief Counsel has also assumed that each of the documents referred to herein are, where appropriate, duly authorized and executed by and valid and legally binding obligations of, and enforceable in accordance with their terms against all parties thereto other than the Authority and that the actions required to be taken or consents required to be obtained by such parties have been taken and obtained. In rendering this opinion, the Office of Chief Counsel has also assumed that such parties have acted in full compliance with the terms of all applicable laws, regulations and orders.

As to questions of fact material to this opinion, the Office of Chief Counsel has relied upon certificates and representations of officers and representatives of the Authority or of

other public officials, without independent investigation.

The Office of Chief Counsel has not made any independent investigation in rendering this opinion other than the examination described above. This opinion is therefore qualified in all respects by the scope of that examination.

The Office of Chief Counsel's opinions are specifically limited to the present internal laws of the Commonwealth of Pennsylvania ("Commonwealth") and no opinion is expressed as to the effect the laws of any other jurisdiction may have upon the subject matter of the opinions expressed herein under conflict of laws principles or otherwise.

Based upon the foregoing, and subject to the limitations, assumptions, qualifications and exceptions set forth herein, the Office of Chief Counsel is of the opinion that:

1.     The Authority is a public body corporate and politic and a public instrumentality of the Commonwealth, organized and existing under the Act. Under the Act, and by the Resolution, the Authority has full power and authority to undertake the financing of the Project, to execute, deliver and perform its obligations under the Authority Documents and to issue and deliver the Bonds.

2.     The Resolution has been duly adopted by the Authority in compliance with the Pennsylvania Sunshine Act of October 15, 1998, P.L. 729, No. 93 (65 P.S. § 701 et seq.) The Resolution complies in all respects with the procedural rules of the Authority and the requirements of Pennsylvania law, constitutes the legal, valid and binding act of the Authority and remains in full force and effect on the date hereof.

3.     The Authority has duly authorized the execution and issuance of the Bonds and the execution and delivery of the Authority Documents. The Bonds have been duly and validly executed and delivered by the Authority and the Authority Documents have each been duly and validly executed and delivered by the Authority and the Bonds and each of the Authority Documents are valid and binding agreements of the Authority, enforceable against the Authority in accordance with their respective terms.

4.     The directors and officers of the Authority identified in the Authority's General Certificate delivered at the closing for the issuance of the Bonds have been duly elected or appointed and are qualified to serve as such.  To the best of our knowledge, no director or officer of the Authority has any financial interest, direct or indirect, in the Borrower or the Project or the financing thereof.

5.     The Authority Documents and the Bonds have been duly authorized, executed and delivered by the Authority and, assuming due authorization, execution and delivery by the other parties thereto, constitute legal, valid and binding obligations of the Authority enforceable in accordance with their respective terms, except as enforcement may be limited by general principles of equity, regardless of whether applied in proceedings in equity or at law, or by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws affecting the enforcement of creditors' rights generally.

6.     The execution and the issuance by the Authority of the Bonds, the execution and

C-3

delivery by the Authority of the Authority Documents and performance by the Authority of the Authority's obligations under the Bonds and the Authority Documents, do not conflict with or constitute on the part of the Authority a violation of, breach of or default under any existing constitutional provision or statute of the Commonwealth applicable to the Authority, or any indenture, mortgage, deed of trust, resolution, note agreement or other agreement or instrument to which the Authority is a party or by which the Authority is bound and which is known to the Office of Chief Counsel, or any order, rule, regulation, judgment or decree of any court, governmental agency or body of the Commonwealth having jurisdiction over the Authority or any of its activities or property. In rendering the opinion set forth in this paragraph, we have relied without independent investigation on the representations of the Borrower that the Project will be located in Pennsylvania and will not be used in whole or in part for illegal activities.

7.      There is no action, suit, proceeding, inquiry or investigation, at law or in equity, before or by any court, public board or body, pending or threatened against the Authority, challenging or contesting the powers of the Authority, the authorization of any directors or officers of the Authority to act in their respective capacities, or the issuance of the Bonds, or in which an unfavorable decision, ruling or order would affect in any way or adversely affect the validity or enforceability of the Authority Documents, the performance by the Authority of any of its obligations thereunder, or the issuance or delivery of the Bonds.

8.      Except for any approval, consent or authorization required under the securities or blue sky laws of any jurisdiction in connection with the purchase and distribution of the Bonds, as to which no opinion is expressed, no additional or further approval, consent or authorization of any governmental or public agency or authority not already obtained is required by the Authority in connection with the issuance or delivery of the Bonds or the entering into and performance of its obligation under the Authority Documents.

9.      The Authority has approved the distribution of the Preliminary Limited Offering Memorandum and the Limited Offering Memorandum by the Underwriter in connection with the offering of the Bonds.

10.      The information contained in the Preliminary Limited Offering Memorandum and the Limited Offering Memorandum under the headings "THE ISSUER" and "LITIGATION" (as it pertains to the Authority) has been reviewed and nothing has come to our attention which would lead us to believe that such information contains any untrue statement of a material fact or omits to state a material fact which is required to be stated therein or which is necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading in any material respect. Except as set forth in this paragraph, no opinion is expressed with respect to the adequacy or accuracy of the Preliminary Limited Offering Memorandum or the Limited Offering Memorandum or other information pertaining to the offering for sale of the Bonds.

The opinions expressed herein are subject in all respects to the following qualifications: (a) no opinion is rendered as to the availability of equitable remedies including,

but not limited to, specific performance and injunctive relief, whether enforceability is considered in a proceeding in equity or at law; (b) no opinion is rendered as to the effect of bankruptcy, reorganization, insolvency, fraudulent conveyance, moratorium and other similar laws or legal principles affecting creditors' rights or remedies(c) no opinion is rendered as to the creation, perfection or priority of any lien or security interest; (d) no opinion is rendered with respect to any "blue sky" or other securities laws of the Commonwealth or of other jurisdictions; and (e) no opinion is rendered with regard to any federal income tax law or regulation or any state tax law or regulation of the Commonwealth or of other jurisdictions.

No opinion is expressed as to the validity or enforceability of any provisions of the Authority Documents: (a) allowing any person or entity to institute judicial or non-judicial proceedings or to exercise any other rights, without notice to the person or entity against whom enforcement is sought; (b) waiving any right or defense of any person or entity; (c) providing or implying the availability of self-help in any particular event or circumstances; (d) relating to court costs or legal fees which may be properly chargeable or recoverable in any judicial proceedings; and (e) relating to indemnification.

We call your attention to the fact that the Bonds are special and limited obligations of the Authority, payable solely from the payments derived by the Authority under the Loan Agreement. The Bonds are not obligations or liabilities of the Commonwealth or any political subdivision thereof nor do the Bonds pledge the credit of the Commonwealth or any political subdivision thereof nor do the Bonds pledge the credit of the Authority (other than to the limited extent described above). The Authority has no taxing power.

This opinion is given as of the date hereof. No opinion is expressed as to any matter not set forth in the numbered paragraphs herein. We make no undertaking to supplement this opinion if facts or circumstances hereafter come to our attention or changes in law occur after the date hereof. This opinion is rendered solely in connection with the original delivery and payment for the Bonds on the date hereof and may not be relied upon for any other purpose. This opinion may not be relied upon by any other person, including any purchaser of the Bonds from the Underwriter or otherwise or for any other purpose, nor may this opinion be distributed, quoted or disclosed to any person, firm or entity without the Office of Chief Counsel's prior written consent in each instance.

The opinions herein expressed are issued by the Pennsylvania Department of Community and Economic Development Office of Chief Counsel, a division of the Commonwealth of Pennsylvania Office of General Counsel, each of which is an executive agency of the Commonwealth of Pennsylvania and not by any individual attorney therein either individually or as an employee of the Commonwealth of Pennsylvania.

OFFICE OF CHIEF COUNSEL, DCED

**Exhibit D**

**[Form of Investor Letter]**

Pennsylvania Economic Development Financing Authority
Harrisburg, Pennsylvania

Re:     Pennsylvania Economic Development Financing Authority
        Solid Waste Disposal Revenue Bonds
        (CarbonLite P, LLC Project) Series 2020

Ladies and Gentlemen,

The undersigned, on behalf of the purchaser (the "Purchasers" and each a "Purchaser") of the above-referenced bonds in the aggregate principal amount of $25,000,000, hereby makes the following representations upon which you may rely:

1.      The undersigned acknowledges that the Bonds were issued for the purpose of assisting in the financing of all or a portion of the cost of acquiring, constructing, rehabilitation, renovating, installing, improving and/or equipping of solid waste disposal facilities in the City of Reading, Pennsylvania (the "Project"), as more particularly described in that certain Preliminary Limited Offering Memorandum, dated [POS DATE] (the "Preliminary Limited Offering Memorandum") and Limited Offering Memorandum, dated [PRICING DATE] (the "Limited Offering Memorandum").  The undersigned further acknowledges that the Bonds are secured by an Indenture of Trust dated as of June 1, 2019 (the "Original Indenture"), as amended and supplemented by the First Supplemental Indenture of Trust, dated as of [CLOSING MONTH] 1, 2020 (the "First Supplemental Indenture" and, together with the Original Indenture, the "Indenture") which creates a security interest in the trust estate under the Indenture for the benefit of the holders and owners of the Bonds, and a Loan Agreement dated as of June 1, 2019 (the "Original Loan Agreement"), as amended by the First Amendment to Loan Agreement, dated as of [CLOSING MONTH] 1, 2020 (the "First Amendment to Loan Agreement" and, together with the Original Loan Agreement, the "Loan Agreement"), between Pennsylvania Economic Development Financing Authority (the "Issuer") and CarbonLite P, LLC (the "Borrower"), as each document may be duly amended or supplemented from time to time in accordance with its terms.

2.      The Purchaser has authority to purchase the Bonds and to execute this letter and any other instruments and documents required to be executed by the Purchaser in connection with the purchase of the Bonds.

3.      The Purchaser is a Qualified Institutional Buyer, a financial institution or other accredited investor as defined in the Securities Act of 1933, Regulation D, 17 Code Federal Regulations Section 230.501(a).  The Purchaser has sufficient knowledge and experience in financial and business matters, including purchase and ownership of tax-exempt municipal

<div align="center">C-1</div>

obligations similar to the Bonds, and is capable of evaluating the risks and merits of its purchase of the Bonds and can bear the economic risk of purchasing the Bonds.

4.      The Bonds are being acquired by the Purchaser for investment and not with a view to, or for resale in connection with, any distribution of the Bonds, and, subject to the further provisions of this paragraph 4, the Purchaser (or an affiliate) intends to hold the Bonds for its own account (subject to its rights to sell, pledge, transfer, convey, hypothecate, mortgage, or dispose of such Bonds at a future date in accordance with the Indenture and applicable law) and does not intend at this time to dispose of all or any part of the Bonds.  Although the Purchaser does not intend at this time to dispose of all or any part of the Bonds (other than to an affiliate), the Purchaser retains the right to sell and transfer the Bonds, in accordance with terms and conditions of the Indenture and applicable law.  The Purchaser understands that it may need to bear the risks of this investment for an indefinite time, since any sale prior to maturity may not be possible.

5.      Notwithstanding the foregoing, the Bonds may be transferred to a trustee, other fiduciary or custodian of a trust or other organizational entity the ownership interests in which are to be distributed through the sale of (a)(i) investment grade securities that are registered under the Securities Act and/or (ii) investment grade securities in transactions that are exempt from the registration requirements of the Securities Act and (b) non-investment grade securities in transactions that are exempt from the registration requirements of the Securities Act to Qualified Institutional Buyers in increments equal to the Authorized Denominations; provided that any prospectus relating to the investment grade securities and/or private placement memorandum or similar disclosure document relating to any non-investment grade securities will, unless approved in advance by the Issuer, disclose no more regarding the Issuer than its name and status as a public instrumentality and body corporate and politic of the Commonwealth of Pennsylvania created and existing under the laws of the Commonwealth of Pennsylvania and that the Bonds are special limited obligations of the Issuer secured solely by the Revenues as described in the Indenture.

6.      The Purchaser understands that the Bonds are not registered under the 1933 Act and that such registration is not legally required as of the date hereof; and further understands that the Bonds (a) are not being registered or otherwise qualified for sale under the "Blue Sky" laws and regulations of any state, (b) will not be listed in any stock or other securities exchange, (c) will not carry a rating from any rating service and (d) will be delivered in a form which may not be readily marketable.

7.      The Purchaser acknowledges that the Bonds, together with interest thereon, are special, limited obligations payable solely from amounts paid to the Issuer by the Borrower pursuant to the terms of the Bonds, the Loan Agreement, the Indenture and the Guaranty Agreement and any other amounts held in any fund or account established pursuant to the Indenture (other than the Rebate Fund) and that notwithstanding anything to the contrary contained in the Bonds or the Indenture, the Issuer shall not be required to use any other moneys or assets of the Issuer to pay any portion of the Project, or make any other payment or advance any other monies or be liable for any other costs or expenses in connection with the Project, or the Bonds, except from amounts paid to the Issuer by the Borrower pursuant to the Loan Agreement, the Indenture and the Guaranty Agreement.  The Purchaser further understands that

C-2

the Bonds are not secured by any pledge of any moneys received or to be received from taxation by the Issuer (which has no taxing power), the Commonwealth of Pennsylvania or any political corporation, subdivision or agency thereof; that the Bonds will never represent or constitute a general obligation, moral obligation, or a pledge of the faith and credit of the Issuer, the Commonwealth of Pennsylvania, or any political corporation, subdivision or agency thereof; and that the liability of the Issuer with respect to the Bonds is subject to further limitations set forth in the Bonds, the Loan Agreement, and the Indenture.

8.      The Purchaser acknowledges and agrees that it has not relied upon the Issuer or any of its members, employees, officers or agents for any information in connection with the Purchaser's purchase of the Bonds.

9.      The undersigned is a duly appointed, qualified, and acting representative of the Purchaser, is authorized to make the certifications, representations and warranties contained herein on behalf of the Purchaser and is authorized to execute and deliver this letter.

*[Balance of page intentionally left blank.]*

Capitalized terms used herein and not otherwise defined have the meanings given such terms in the Indenture.

[PURCHASER]
By: _____


_____
[Name]
[Title]
[Address]
[Phone Number]

4129-8071-8114.2

**Exhibit E**

**[FORM OF CERTIFICATE OF THE UNDERWRITER]**

This Certificate is furnished by Westhoff, Cone & Holmstedt (the "Underwriter") in connection with the sale and issuance by the Pennsylvania Economic Development Financing Authority (the "Issuer") of its $25,000,000 aggregate principal amount of Pennsylvania Economic Development Financing Authority Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020 (the "2020 Bonds") issued [CLOSING DATE].  In connection with the sale of the 2020 Bonds, the Underwriter hereby certifies and represents the following, based upon information available to us:

As of [PRICING DATE], the date on which the bond purchase agreement for the 2020 Bonds was executed (the "Sale Date"), the Underwriter offered all of the 2020 Bonds to the general public (excluding bond houses, brokers or similar persons or organizations acting in the capacity of underwriters or wholesalers) (the "Public") in a bona fide public offering at the prices listed for each maturity on [Schedule A hereto] [the cover page of the Limited Offering Memorandum for the 2020 Bonds dated [PRICING DATE]] (the "Initial Offering Prices"), and based on our assessment of the then prevailing market conditions, the Underwriter reasonably expected that the first prices at which at least 10% of each maturity of the 2020 Bonds would be sold by the Underwriters to the Public were prices not higher than, or, in the case of obligations sold on a yield basis, at yields not lower than, the Initial Offering Prices [except for the 2019 Bonds with the following maturities: _____].

The Underwriter had no reason to believe that any of the Initial Offering Prices of the 2020 Bonds exceeded the expected fair market value of the 2020 Bonds as of the Sale Date.

We understand that the foregoing information will be relied upon by the Issuer and the CarbonLite P, LLC (the "Borrower") with respect to certain of the representations set forth in the Tax Agreement and by Ballard Spahr LLP, in connection with rendering its opinion to the Infrastructure Bank that the interest on the 2020 Bonds is excludable from gross income of the owners thereof for federal income tax purposes. The undersigned is certifying only as to facts in existence on the date hereof. Nothing herein represents the undersigned's interpretation of any laws; in particular the regulations under the Internal Revenue Code of 1986, as amended, or the application of any laws of these facts. The certifications contained herein are not necessarily based on personal knowledge, but may instead be based on either inquiry deemed adequate by the undersigned or institutional knowledge (or both) regarding the matters set forth herein. Although certain information furnished in this Certificate has been derived from other purchasers, bond houses and brokers and cannot be independently verified by us, we have no reason to believe it to be untrue in any material respect.

Dated: _____, 2020

Westhoff, Cone & Holmstedt,

4129-8071-8114.2

By: _____
                    Principal

D-2

RS DRAFT 3/20/20

FIRST SUPPLEMENTAL INDENTURE OF TRUST

between

PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY

and

UMB BANK, N.A.,
as Trustee

Dated as of [_____] 1, 2020

Relating to

$[_____]
PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY
SOLID WASTE DISPOSAL REVENUE BONDS
(CARBONLITE P, LLC PROJECT)
SERIES 2020

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ...................................................................................................3

Section 1.01.  Defined Terms ...........................................................................................3
Section 1.02.  Amended Definitions .................................................................................4

ARTICLE II AUTHORIZATION AND TERMS OF SERIES 2020 BONDS ............................9

Section 2.01.  Authorization, Designation, and Issuance of Series 2020 Bonds ............9
Section 2.02.  Interest Rate and Maturities of Series 2020 Bonds..................................9
Section 2.03.  Redemption of Series 2020 Bonds..........................................................10
Section 2.04.  Delivery of Series 2020 Bonds ...............................................................12

ARTICLE III AMENDMENTS TO ORIGINAL INDENTURE RELATING TO BONDS ........12

Section 3.01.  Issuance of Bonds ...................................................................................12
Section 3.02.  Application of Proceeds of Bonds ...........................................................12
Section 3.03.  Project Fund ............................................................................................13
Section 3.04.  Costs of Issuance Fund ...........................................................................17
Section 3.05.  Deposits to Revenue Fund; Allocation of Revenues ...............................18
Section 3.06.  Form of Bond; Exhibit A .........................................................................19

ARTICLE IV ADDITIONAL BONDS .................................................................................19

Section 4.01.  Incorporation of Additional Bonds .........................................................19

ARTICLE V MISCELLANEOUS .......................................................................................21

Section 5.01.  Confirmation of Original Indenture ........................................................21
Section 5.02.  Supplement Generally; Conflicts.............................................................21
Section 5.03.  Parties Interested Herein ........................................................................21
Section 5.04.  Titles, Headings, Captions, Etc................................................................22
Section 5.05.  Severability ..............................................................................................22
Section 5.06.  Notices to Trustee ...................................................................................22
Section 5.07.  Governing Law ........................................................................................22
Section 5.08.  Execution in Counterparts.......................................................................22

Exhibit A – Form of Bond ................................................................................. A-1

## FIRST SUPPLEMENTAL INDENTURE OF TRUST

THIS FIRST SUPPLEMENTAL INDENTURE OF TRUST, dated as of [_____] 1, 2020 (this "First Supplemental Indenture"), is made by and between the PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY (the "Issuer"), a public instrumentality of the Commonwealth of Pennsylvania (the "Commonwealth") and a public body corporate and politic organized and existing under the Pennsylvania Economic Development Financing Law, as amended (as defined herein, the "Act"), and UMB BANK, N.A., a national banking association organized and existing under and by virtue of the laws of the United States of America, having a Corporate Trust Office in Minneapolis, Minnesota, and being qualified to accept and administer the trusts hereby created (the "Trustee").

W I T N E S S E T H:

WHEREAS, the Issuer is empowered by the provisions of the Act to enter into agreements providing for the financing of the acquisition, construction and equipping of industrial, commercial and specialized enterprises for the public for purposes of alleviating unemployment, maintaining employment at a high level and encouraging economic development in the Commonwealth within the meaning of the Act, including solid waste disposal and recycling facilities; and

WHEREAS, in furtherance of its purposes under the Act, the Issuer issued, on July 10, 2019, its Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2019 in the aggregate principal amount of $61,800,000 (the "Series 2019 Bonds") pursuant to an Indenture of Trust dated as of June 1, 2019 (the "Original Indenture" as supplemented by this First Supplemental Indenture, together, the "Indenture") between the Issuer and the Trustee, to (i) finance all or a portion of the cost of acquiring, constructing, rehabilitating, renovating, installing, improving and/or equipping of certain solid waste disposal and recycling facilities (the "Project"), as more particularly described in Exhibit A to the Original Loan Agreement (defined below); (ii) fund capitalized interest on the Series 2019 Bonds; (iii) fund a reserve fund for the Series 2019 Bonds; and (iv) pay a portion of the costs of issuance of the Series 2019 Bonds; and

WHEREAS, the Issuer loaned the proceeds of the Series 2019 Bonds to CarbonLite P, LLC (the "Borrower") pursuant to a Loan Agreement dated as of June 1, 2019 (the "Original Loan Agreement") between the Issuer and the Borrower; and

WHEREAS, pursuant to the Original Loan Agreement, the Borrower delivered to the Issuer a promissory note corresponding to the Series 2019 Bonds (the "Series 2019 Note"), dated July 10, 2019, evidencing its obligation to pay all amounts due under the Original Loan Agreement; and

WHEREAS, the timely payment of the principal of and premium, if any, and interest on the Series 2019 Bonds and the obligations of the Borrower under the Original Loan Agreement are guaranteed by CarbonLite P Holdings LLC (the "Original Guarantor") pursuant to a Guaranty Agreement dated as of June 1, 2019 (the "Original Guaranty"), by the Original Guarantor in favor of the Trustee; and

WHEREAS, it has been determined that provision should be made for the issuance of an additional series of revenue bonds of the Issuer ("Additional Bonds") ranking on a parity with all other Outstanding Bonds under the Indenture and of equal dignity as to the lien on the Revenues and other assets pledged or assigned under the Indenture (the Series 2019 Bonds and all such Additional Bonds hereafter issued from time to time being collectively called the "Bonds"), upon the terms and subject to the conditions herein set forth; and

WHEREAS, it has been determined that the Original Indenture should be supplemented and amended to provide for, inter alia, the issuance of Additional Bonds issued on a parity with the 2019 Bonds and any other Outstanding Bonds issued under the Indenture; and

WHEREAS, in accordance with Article IX of the Original Indenture, the written consent of a majority of the Holders of the 2019 Bonds of this First Supplemental Indenture and the amendments to the Original Indenture contained herein has been obtained and delivered to the Trustee; and

WHEREAS, at the request of the Borrower, the Issuer has determined to issue $[_____] aggregate principal amount of its Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020 (the "Series 2020 Bonds") as a series of Additional Bonds for the purpose of (i) financing a portion of the costs of the Project through the reimbursement to the Borrower of certain costs of the Project previously funded with the Borrower's equity; (ii) PinnPack P, LLC., a Delaware limited liability company ("Pinnpack") in developing a thermoforming PET processing facility (the "Thermoforming Facility") that will utilize a portion of the post-consumer resin output of the Project to produce food grade plastic containers for use by businesses engaged in various food industries; (iii) funding capitalized interest on the Series 2020 Bonds]; (iv) funding a deposit to an account within the Debt Service Reserve Fund relating to the Series 2020 Bonds; and (v) paying a portion of the costs of issuance of the Series 2020 Bonds; and

WHEREAS, the Issuer has agreed to loan the proceeds of the Series 2020 Bonds to the Borrower under the Original Loan Agreement, as amended by a First Amendment to Loan Agreement of even date herewith (the "First Amendment to Loan Agreement," and together with the Original Loan Agreement and as further amended and supplemented from time to time, the "Loan Agreement"), and the Borrower has agreed to execute and deliver its promissory note, dated the date of issuance of the Series 2020 Bonds (the "Series 2020 Note"), providing for payments at such times and in such amounts as will be required to enable the Issuer to pay the principal of, premium, if any, and interest on the Series 2020 Bonds, as and when the same become due; and

WHEREAS, in consideration for the granting by the requisite holders of the Series 2019 Bonds of their consent to (i) the execution and delivery of this First Supplemental Indenture and the First Amendment to Loan Agreement and (ii) the issuance and delivery by the Issuer of the Series 2020 Bonds as Additional Bonds, Borrower will cause Pinnpack to grant to the Trustee a first priority lien on its revenues and all of the property, plant and equipment owned by Pinnpack and used in the Thermoforming Facility, as well as a mortgage on Pinnpack's leasehold rights in the property on which the Thermoforming Facility is located; and

WHEREAS, the timely payment of the principal of and premium, if any, and interest on the Series 2020 Bonds and the obligations of the Borrower under the Loan Agreement will be guaranteed by the Original Guarantor and Pinnpack (each a "Guarantor" and collectively the "Guarantors") pursuant to the Original Guaranty, as amended and restated by the Amended and Restated Guaranty Agreement of even date herewith (the "Amended and Restated Guaranty," and together with the Original Guaranty and as further amended and supplemented from time to time, the "Parent Guaranty"), by the Guarantor in favor of the Trustee and by the additional Guaranty Agreement of even date herewith executed by Pinnpack ("Subsidiary Guaranty", and together with the Parent Guaranty, collectively, the "Guarantees"); and

WHEREAS, in order to provide for the authentication and delivery of the Series 2020 Bonds, to establish and declare the terms and conditions upon which the Series 2020 Bonds are to be issued and secured and to secure the payment of the principal thereof, premium, if any, and interest thereon on a parity with the Series 2019 Bonds, the Issuer has authorized the execution and delivery of this First Supplemental Indenture and the First Amendment to Loan Agreement; and

WHEREAS, the Series 2020 Bonds and the authentication certificates are to be substantially in the form of Exhibit A hereto, with such necessary or appropriate variations, omissions and insertions as permitted or required by the Indenture; and

WHEREAS, all acts and proceedings required by law necessary to make the Series 2020 Bonds, when executed by the Issuer, authenticated and delivered by the Trustee and duly issued, the valid, binding and legal limited obligations of the Issuer, and to constitute the Indenture a valid, binding and legal instrument for the security of the Series 2020 Bonds in accordance with its terms, have been done and performed, and the execution and delivery of the Indenture have been in all respects duly authorized; and

WHEREAS, the Trustee has accepted the trusts created by the Indenture, and in evidence thereof has joined in the execution hereof; and

WHEREAS, each Owner of the Series 2020 Bonds, by its purchase thereof, will be deemed to have consented to the execution and delivery of this First Supplemental Indenture.

NOW THEREFORE, THIS FIRST SUPPLEMENTAL INDENTURE WITNESSETH:

It is declared that all Series 2020 Bonds issued hereunder are to be issued, authenticated and delivered, and that all the Revenues and other assets assigned by the Issuer hereby and by the Indenture are to be dealt with and disposed of under, upon and subject to, the terms, conditions, stipulations, covenants, agreements, obligations, trusts, uses and purposes provided in the Indenture.  The Issuer has agreed and covenanted, and agrees and covenants with the Trustee and with each and all Owners, as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01.    Defined Terms.  All terms which are defined in the Original Indenture are incorporated by reference into this First Supplemental Indenture and shall have the same

meanings respectively in this First Supplemental Indenture as such terms are given in the Original Indenture unless expressly amended under Section 1.02 below or the context hereof indicates otherwise. Those words and terms with initial capitalization, where rules of grammar do not otherwise require capitalization, not expressly defined and used herein, but which are otherwise defined terms under the Loan Agreement, shall have the meanings assigned to them in the Loan Agreement.

Section 1.02.    Amended Definitions. The meanings of the following terms defined in the Original Indenture are hereby amended and restated, or added as new defined terms, as applicable, to read as follows:

Account Control Agreement

"Account Control Agreement" means, individually and collectively, (i) that certain Deposit Account Control Agreement dated as of June 1, 2019, as amended by that certain First Amendment to Deposit Account Control Agreement dated as of [_____], 2020, among the Borrower, the Trustee and Pacific Western Bank, as depository bank, (ii) that certain Deposit Account Control Agreement dated as of [_____], 2020 among PinnPack, the Trustee and Pacific Western Bank, as depository bank, and (iii) any other similar agreement between a depository institution, the Borrower and the Trustee whereby the Trustee is granted the right of control over funds or bank accounts of the Borrower following the occurrence of an Event of Default, each as amended, modified or supplemented from time to time.

Additional Bonds

"Additional Bonds" means any Bonds issued pursuant to Section 2.12 of the Indenture.

Bonds

"Bonds" or "Bond" means, collectively and individually, the Series 2019 Bonds, the Series 2020 Bonds and any Additional Bonds, authorized by, and at any time Outstanding pursuant to, this Indenture.

Bond Payment Date

"Bond Payment Date" means, (i) with respect to the Series 2019 Bonds, each June 1 and December 1, beginning with December 1, 2019, (ii) with respect to the Series 2020 Bonds, each June 1 and December 1, beginning with June 1, 2020, and (iii) with respect to any other Additional Bonds, the dates specified in a Supplemental Indenture relating thereto.

[Change in Control

"Change in Control" means (i) any sale or other disposition by the Borrower of all or substantially all of its assets, (ii) any combination or consolidation with or merger by the Borrower into another entity, (iii) any consolidation or merger into the Borrower such that the Borrower is not the resulting or surviving entity; (iv) any sale, transfer or disposition of a majority of the equity or membership interests in the Borrower, the Guarantor or CarbonLite Holdings, LLC in either a single transaction or a related series of transactions; (v) any dissolution

or liquidation of the Borrower, the Guarantor or CarbonLite Holdings, LLC and/or (vi) any combination, consolidation or merger by the Borrower, the Guarantor or CarbonLite Holdings, LLC into or with another entity, whereby a majority of the equity or membership interests in the resulting entity is not controlled by the same persons who controlled a majority of the equity or membership interests in the Borrower, the Guarantor or CarbonLite Holdings, LLC immediately before such transaction. NOTWITHSTANDING THE FOREGOING, IN THE EVENT BORROWER SELLS ALL THE SHARES OF PINNPACK, OR PINNPACK SELLS ALL OR SUBSTANTIALLY ALL OF ITS ASSETS, THE SAME SHALL NOT BE DEEMED A "CHANGE IN CONTROL", EXCEPT THAT CONCURRENTLY WITH THE COMPLETION OF SUCH SALE, (I) BORROWER SHALL DEPOSIT WITH TRUSTEE THE SUM OF [$10,000,000], (II) UPON SUCH DEPOSIT, PINNPACK SHALL BE RELEASED FROM ITS GUARANTY OF THE OBLIGATIONS OF BORROWER, THE TRUSTEE SHALL RELEASE THE SHARES OF PINNPACK FROM PLEDGE AND TRUSTEE SHALL RELEASE AND TERMINATE TRUSTEE'S SECURITY INTEREST IN PINNPACK'S ASSETS.

<u>Date of Delivery</u>

"Date of Delivery" means, (i) with respect to the Series 2019 Bonds, July 10, 2019, the date of initial issuance and delivery of the Series 2019 Bonds, (ii) with respect to the Series 2020 Bonds, [_____], 2020, the date of initial issuance and delivery of the Series 2020 Bonds, and (iii) with respect to any other Additional Bonds, the date of initial issuance and delivery of such Additional Bonds as specified in a Supplemental Indenture relating thereto.

<u>Debt Service</u>

"Debt Service" means:

(i) with respect to the Series 2019 Bonds:

 (a) Scheduled sinking fund payments, to be due semi-annually on each June 1 and December 1, commencing December 1, 2021 as set forth in Section 4.01 of the Original Indenture,

 (b) Interest due and payable on each Bond Payment Date,

 (c) Principal due and payable thereon (whether at maturity, by redemption or otherwise), and

(ii) with respect to the Series 2020 Bonds:

 (a) Scheduled sinking fund payments, to be due semi-annually on each June 1 and December 1, commencing [_____ 1, 20__], as set forth in Section 2.04(a) of this First Supplemental Indenture,

 (b) Interest due and payable on each Bond Payment Date,

 (c) Principal due and payable thereon (whether at maturity, by redemption or otherwise), and

(iii)    with respect to any other Additional Bonds:  the payment provisions with respect to interest, redemption (optional or mandatory) and principal specified in any Supplemental Indenture relating to such Additional Bonds.

## Gross Revenues

The definition of "Gross Revenues" shall be amended to include the words "on a consolidated basis" after the words "….charges, issues and income received for, received by or derived from, the Borrower…" appearing in the first sentence.

## Interest Payment Date

"Interest Payment Date" means, (i) with respect to the Series 2019 Bonds, June 1 and December 1 of each year, commencing December 1, 2019, (ii) with respect to the Series 2020 Bonds, June 1 and December 1 of each year, commencing June 1, 2020, and (iii) with respect to any other Additional Bonds, the dates specified in a Supplemental Indenture relating thereto.

## Leasehold Mortgage

"Leasehold Mortgage" means, collectively, (i) that certain Open-End Leasehold Mortgage, Security Agreement, Assignment of Rent and Leases, and Fixture Filing, dated as of June 1, 2019, but effective as of July 10, 2019, as amended by that certain First Amendment to Open-End Leasehold Mortgage, Security Agreement, Assignment of Rent and Leases, and Fixture Filing dated as of [_____], 2020, but effective as of [_____], 2020, by the Borrower in favor of the Trustee, and (ii) the Open-End Leasehold Mortgage, Security Agreement, Assignment of Rent and Leases, and Fixture Filing, dated as of [_____], 2020, but effective as of [_____], 2020, by PinnPack in favor of the Trustee, each as amended, modified or supplemented from time to time.

## NDA

"NDA" means, collectively, (i) that certain Non-Disturbance and Access Agreement dated as of June 1, 2019, as amended by that certain First Amendment to Non-Disturbance and Access Agreement dated as of [_____], 2020, by and among the Trustee, the Borrower and the Reading Lessor, and (ii) that certain Non-Disturbance and Access Agreement dated as of [_____], 2020, by and among the Trustee, PinnPack and the Pinnpack Lessor, each as amended, modified or supplemented from time to time.

## Note

"Note" means, collectively, the Series 2019 Note, the Series 2020 Note and any other promissory note issued pursuant to the Loan Agreement, from the Borrower to the Issuer and assigned to the Trustee for the benefit of the Bondholders.

## Permitted Indebtedness

"Permitted Indebtedness" means (i) indebtedness incurred under the Loan Agreement (including the Bonds), (ii) Non-Recourse Indebtedness, (iii) Short-Term Indebtedness, (iv)

Subordinate Debt, (v) reimbursement obligations of the Borrower to any bank or other financial institution which issues a letter of credit at the request of the Borrower solely as security to Landlord under the Lease, and (vi) Indebtedness used to finance, and secured by a Lien solely against, assets or property acquired with proceeds of such financing; the aggregate outstanding amount all of which at any time does not exceed [$8,500,000].[1]

Pledge and Security Agreement

"Pledge and Security Agreement" means, collectively, (i) that certain Amended and Restated Pledge and Security Agreement dated as of [_____], 2020, executed by the Borrower and PinnPack in favor of the Trustee, as amended, modified or supplemented from time to time, and (ii) that certain Pledge and Security Agreement dated as of [     ], 2020 executed by Pinnpack Borrower in favor of the Trustee, as amended, modified or supplemented from time to time.

Principal Payment Date

"Principal Payment Date" means, (i) with respect to the Series 2019 Bonds, June 1 and December 1 of each year, commencing December 1, 2021, (ii) with respect to the Series 2020 Bonds, June 1 and December 1 of each year, commencing [_____ 1, 20__], and (iii) with respect to any other Additional Bonds, the dates specified in a Supplemental Indenture relating thereto.

Reserve Requirement

"Reserve Requirement" means, as of the date of calculation and with respect to each Series, an amount equal to the least of (i) Maximum Annual Debt Service, (ii) one hundred twenty five percent (125%) of the average annual debt service on the Bonds and any Parity Debt, and (iii) ten percent (10%) of the original principal amount of the Bonds and any Parity Debt. Initially, the Reserve Requirement with respect to the Series 2019 Bonds equals $[_____] and the Reserve Requirement with respect to the Series 2020 Bonds equals $[_____].

Series

"Series" means all Bonds designated as being of the same series initially delivered as part of a simultaneous transaction evidencing a borrowing authorized by this Indenture, and any Bonds thereafter authenticated and delivered in lieu thereof or in exchange therefor.

Series 2019 Bonds

"Series 2019 Bonds" means the $61,800,000 Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2019.

Series 2019 Note

---

[1] NTD: 10% of total amount of Bonds.

"Series 2019 Note" means the promissory note corresponding to the Series 2019 Bonds, dated July 10, 2019, by the Borrower in favor of the Issuer, issued pursuant to the Loan Agreement, and any amendment or supplement thereto or substitution therefor.

Series 2020 Bonds

"Series 2020 Bonds" means the $[_____] Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020.

Series 2020 Note

"Series 2020 Note" means the promissory note of the Borrower corresponding to the Series 2020 Bonds, substantially in the form attached to the First Amendment to Loan Agreement as Exhibit A, issued pursuant to the Loan Agreement and delivered to the Issuer by the Borrower, and any amendment or supplement thereto or substitution therefor.

SNDA

"SNDA" means, individually and collectively, (i) that certain Subordination, Non-Disturbance and Attornment Agreement dated as of [_____], 2019, as amended by that certain First Amendment to Subordination, Non-Disturbance and Attornment Agreement dated as of [_____], 2020, by Lessor's lender, if any, the Lessor, the Borrower and the Trustee, and (ii) that certain Subordination, Non-Disturbance and Attornment Agreement dated as of [_____], 2020, by and among the Lessor, PinnPack and the Trustee, each as amended, modified or supplemented from time to time.

Supplemental Indenture

"Supplemental Indenture" means any indenture hereafter duly authorized and entered into between the Issuer and the Trustee, supplementing, modifying or amending this Indenture, or authorizing the issuance of Additional Bonds hereunder; but only if and to the extent that such Supplemental Indenture is specifically authorized hereunder.

Tax Certificate

"Tax Certificate" means (i) with respect to the Series 2019 Bonds, the Tax Exemption Certificate and Agreement dated July 10, 2019, between the Borrower and the Issuer, (ii) with respect to the Series 2020 Bonds, the Tax Exemption Certificate and Agreement dated [_____], 2020, between the Borrower and the Issuer, and (iii) with respect to any other Additional Bonds, any Tax Exemption Certificate and Agreement delivered in connection with such Additional Bonds.

## ARTICLE II
## AUTHORIZATION AND TERMS OF SERIES 2020 BONDS

Section 2.01.        Authorization, Designation, and Issuance of Series 2020 Bonds.

Section 2.01 of the Original Indenture is hereby amended and restated in its entirety as follows:

SECTION 2.01        Authorization of Bonds.  Bonds shall be issued hereunder in order to obtain moneys to carry out the purposes of the Act for the benefit of the Issuer and the Borrower.  The Series 2019 Bonds are designated as "Pennsylvania Economic Development Financing Authority Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project), Series 2019" and the Series 2020 Bonds are designated as "Pennsylvania Economic Development Financing Authority Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project), Series 2020".  Additional Bonds may further be issued as provided in Section 2.12 hereof.  This Indenture constitutes a continuing agreement with the Holders from time to time of the Bonds to secure the full payment of the principal (or redemption price) of, premium if any, and interest on all such Bonds subject to the covenants, provisions and conditions herein contained.

There is hereby authorized to be issued under the Indenture and secured thereby the Series 2020 Bonds in the total aggregate principal amount of $[_____].  The Issuer shall issue, sell and deliver the Series 2020 Bonds for the purpose of financing costs of the Project.  The execution of this First Supplemental Indenture by the Issuer has been heretofore authorized, ratified and confirmed.

The Series 2020 Bonds shall constitute Additional Bonds payable from the Revenues and other assets pledged hereunder and under the Indenture and secured under the Indenture equally and on a parity with all other Outstanding Bonds.  All of the requirements set forth in Section 2.12 of the Indenture for the issuance of Additional Bonds have been met.

Section 2.02.        Interest Rate and Maturities of Series 2020 Bonds.

Section 2.03(B) of the Original Indenture is hereby amended and restated in its entirety as follows:

(B)        (i) The Series 2019 Bonds maturing on June 1, 2026 shall bear interest at the rate per annum of 5.25% and the Series 2019 Bonds maturing on June 1, 2036 shall bear interest at the rate per annum of 5.75%; (ii) the Series 2020 Bonds maturing on [_____ 1, 20__] shall bear interest at the rate per annum of [____]% [and the Series 2020 Bonds maturing on [_____ 1, 20__] shall bear interest at the rate per annum of [____]%]; and (iii) any Additional Bonds issued hereafter shall bear interest at the rate or rates specified in any Supplemental Indenture relating to such Additional Bonds; provided that in each case, on and after

the occurrence of an Event of Default under Section 7.01, the Bonds shall bear interest at the Post-Default Rate during the continuation of such Event of Default. Notwithstanding anything to the contrary contained herein, the interest rate on the Bonds shall not exceed the Maximum Legal Rate.

Section 2.03.      Redemption of Series 2020 Bonds.

The Series 2020 Bonds are subject to redemption prior to stated maturity as provided in Section 4.01 of the Original Indenture, except with respect to Section 4.01(1) [and Section 4.01(6)], which redemption provisions shall apply as follows:

(a)      **Sinking Fund Redemption**. References to the "Bonds" in Section 4.01(1) of the Original Indenture shall hereinafter mean the Series 2019 Bonds. The Series 2020 Bonds shall be subject to sinking fund redemption as provided below:

The Series 2020 Bonds [maturing on [_____, 20__]] shall be subject to semi-annual mandatory sinking fund redemption on each mandatory sinking fund redemption date and in the respective principal amounts as set forth in the following schedule, at a redemption price equal to 100% of the principal amount thereof to be redeemed (without premium), together with interest accrued thereon to the date fixed for redemption.

| Redemption Date | Principal Amount |
| --- | --- |
| | $ |

\*

_____
\* Final Maturity

In the event of a partial redemption pursuant to Section 4.01(5), (6) and (7) of the Indenture, the Borrower shall provide the Trustee with a revised sinking fund schedule giving effect to the redemption so completed on a pro-rata basis (i.e. each remaining sinking fund redemption amount shall be reduced by a like percentage as closely as possible, in Authorized Denominations, after giving effect to any partial redemption).

(b)      **Optional Redemption**. References to the "Bonds" in Section 4.01(6) of the Original Indenture shall hereinafter mean the Series 2019 Bonds. The Series 2020 Bonds shall be subject to optional redemption as provided below:

On any date on and after [_____, 20__], the Series 2020 Bonds may be redeemed at the direction of the Borrower, in whole or in part, at a redemption price expressed as a percentage of the principal amount of the Series 2020 Bonds to be redeemed, plus accrued interest thereon to the date of redemption as follows:

| Redemption Date | Redemption Price |
|---|---|
| [_____ through _____] | [____]% |
| [_____ through _____] | [____]% |
| [_____ through _____] | [____]% |
| [_____ and thereafter] | [100]% |

(c)    **Special Optional Redemption**. Up to [    ] percent ([ %]) of the outstanding Series 2020 Bonds, may be redeemed at the direction of the Borrower, at a redemption price of 100% of the principal amount of the Series 2020 Bonds to be redeemed, plus accrued interest thereon through the date of redemption as follows:

(i)    At any time, Borrower may provide written notice to Trustee ("Special Optional Redemption Notice") that Borrower proposes to cause all of Borrower's equity ownership in Pinnpack, or the assets and liabilities of Pinnpack (other than the obligations of Pinnpack under its Guaranty), to be sold or otherwise transferred to a third party and requesting Trustee to call the requisite percentage of the Series 2020 Bonds for redemption pursuant to this Section 2.03(c) and specifying the proposed Redemption Date therefor (which shall be no earlier than 35 days after the date the Special Optional Redemption Notice is provided to Trustee, nor more than 65 days after the such Optional Redemption Notice is provided to Trustee). Such Special Optional Redemption Notice shall be accompanied by deposit with the Trustee, in immediately available funds, of the redemption price for the Series 2020 Bonds to be redeemed and accrued but unpaid interest thereon through the proposed redemption date. The Special Optional Redemption Notice, once given, shall be absolute and not-cancelable.

(ii)    Effective upon Borrower's providing to Trustee the Special Optional Redemption Notice, and deposit with the Trustee of the aggregate redemption price and accrued interest through the proposed Redemption Date, (A) all of Pinnpack's obligations under this Indenture, under the Loan Agreement, under its Guaranty and under the Pledge and Security Agreement executed by Pinnpack in favor of Trustee, shall cease, and Pinnpack shall be release form any and all liability with respect to the Bonds (including the Series 2019 Bonds), (C) all security interests in Pinnpack's assets created in favor of Trustee shall be automatically released and terminated, without any action required of Trustee, and (D) Pinnpack's Gross Revenue realized from and after such date shall cease to be included in the term "Gross Revenue". Borrower, or any Person authorized by Borrower, may thereafter file one or more releases or terminations of security interests (UCC-3s) with respect to Pinnpack, and Trustee shall, upon written request of Borrower, promptly execute and deliver to Borrower for recordation, in customary form suitable for recording, an instrument that causes the release, termination or discharge of the Leasehold Mortgage that encumbers the Thermoforming Facility and any other assets owned by Pinnpack.

Section 2.04.     Delivery of Series 2020 Bonds.

Upon the execution and delivery of this First Supplemental Indenture and satisfaction of the conditions established in the Bond Purchase Contract for delivery of the Series 2020 Bonds, the Issuer shall execute the Series 2020 Bonds and deliver them to the Trustee.  Thereupon, the Trustee, upon order of the Borrower, shall authenticate the Series 2020 Bonds and deliver them to the Persons designated by the Purchaser.

Before the Trustee authenticates, delivers or retains, as applicable, any Series 2020 Bond, the Trustee shall have received:

(a)     original executed counterparts of this First Supplemental Indenture, the First Amendment to Loan Agreement, the Amended and Restated Guaranty, the Series 2020 Note, the Pledge and Security Agreement, and each Leasehold Mortgage, NDA, SNDA and Tax Certificate relating to the Series 2020 Bonds;

(b)     an opinion of Bond Counsel dated the Date of Delivery of the Series 2020 Bonds pursuant to Sections 9.02 and 9.05 of the Indenture; and

(c)     all of the items set forth in Section 2.12 of the Indenture.

## ARTICLE III
## AMENDMENTS TO ORIGINAL INDENTURE RELATING TO BONDS

Section 3.01.     Issuance of Bonds.

Section 3.01 of the Original Indenture is hereby amended and restated in its entirety as follows:

SECTION 3.01     Issuance of Bonds.

At any time after the execution and delivery of this Indenture or from time to time thereafter, upon the execution of the Bonds by the Issuer and delivery thereof to the Trustee, as hereinabove provided, and without any further action on the part of the Issuer, the Trustee shall authenticate upon Request of the Issuer, and deliver such Bonds in the aggregate principal amount set forth in the Indenture or Supplemental Indenture related thereto.

The Trustee shall deliver the Series 2019 Bonds in an aggregate principal amount not exceeding $61,800,000 and the Series 2020 Bonds in an aggregate principal amount not exceeding $[_____].

Section 3.02.     Application of Proceeds of Bonds.

Section 3.02 of the Original Indenture is hereby amended and restated in its entirety as follows:

SECTION 3.02      Application of Proceeds of Bonds.

The purchase price of the Series 2020 Bonds ($[_____]), (consisting of the par amount of the Series 2020 Bonds of $[_____], [plus/minus] $[_____] equal to [net] original issue [premium/discount], less underwriter's discount of $[_____]) shall be deposited with the Trustee, who shall forthwith deposit such proceeds as follows:

     (a)      The Trustee shall transfer the sum of $[_____] to the Series 2020 subaccount of the Proceeds Account within the Costs of Issuance Fund;

     (b)      The Trustee shall transfer the sum of $[_____] to the Series 2020 subaccount of the Tax-Exempt Subaccount within the Project Fund;

     (c)      The Trustee shall transfer the sum of $[_____] to the Series 2020 subaccount of the Capitalized Interest Account within the Project Fund; and

     (d)      The Trustee shall transfer the sum of $[_____] to the Debt Service Reserve Fund.

The proceeds of Additional Bonds shall be deposited in trust with the Trustee in the Project Fund and, as needed, in the Debt Service Reserve Fund and Costs of Issuance Fund, in each case as set forth in the Supplemental Indenture delivered in connection with such Additional Bonds.

Section 3.03.      Project Fund.

Section 3.03 of the Original Indenture is hereby amended and restated in its entirety as follows:

SECTION 3.03      Project Fund.

The Trustee shall establish the CarbonLite P, LLC Project Fund (the "Project Fund") and, within the Project Fund, a separate account designated as the CarbonLite P, LLC Capitalized Interest Account (the "Capitalized Interest Account"), to the credit of which proceeds of the Bonds will be deposited and applied to the payment of the Costs of the Project.  Within such Capitalized Interest Account, the Trustee shall establish a separate subaccount for each Series or sub-Series of Bonds, as applicable.

The Trustee shall also create separate accounts in the Project Fund designated as the Tax-Exempt Subaccount (the "Tax-Exempt Subaccount") and the Equity Subaccount (the "Equity Subaccount"), and

therein, a separate subaccount for each Series or sub-Series of Bonds, as applicable.  The Tax-Exempt Subaccount and Equity Subaccount will be funded as provided in Section 3.02.  The moneys in each subaccount of the Project Fund shall be held by the Trustee in trust and applied to the payment of the Costs of the Project and, with respect to the Equity Subaccount, the payment of the Operating and Working Capital Costs, including lease payments and lease deposits, in the manner set forth below.

Before each payment is made from the Project Fund (including any account established therein) by the Trustee, there shall be filed with the Trustee a sequentially numbered Requisition of the Borrower conforming with the requirements of this Section and Section 3.3 of the Agreement, and in the form attached hereto as Exhibit B, stating with respect to each payment to be made:

      (i)       the requisition number;

      (ii)      the name and address of the Person to whom payment is due;

      (iii)     the purpose for which such payment is to be made;

      (iv)     the amount to be paid;

      (v)      that each obligation mentioned therein has been properly incurred and is a proper charge against the Project Fund;

      (vi)     that none of the items for which payment is requested has been previously paid or reimbursed from the Project Fund;

      (vii)    that each item for which payment is requested is or was necessary in connection with the acquisition, construction, installation, equipping or financing of the Project or, with respect to any payment from the Equity Subaccount, the operation of the Project;

      (viii)   with respect to any payment from the Tax-Exempt Subaccount, that at least 97.0% of the amount requisitioned, together with all amounts requisitioned to date, have in the aggregate been used to pay for or to reimburse the Borrower for expenditures properly allocable to Costs of the Project pursuant to the Tax Certificate (excluding Costs of Issuance); and

      (ix)     that an invoice evidencing each item for payment is attached thereto, including invoices for costs previously paid and for which reimbursement is being requested by the Borrower, of Costs of the Project or Operating and Working Capital Costs due and payable, or previously paid and for which reimbursement is being requested.

Each such Requisition of the Borrower shall be sufficient evidence of the facts stated therein, and the Trustee may conclusively rely upon and shall have no duty to confirm the accuracy of such facts. Upon receipt of each such Requisition of the Borrower, signed by an Authorized Representative of the Borrower and accompanied by an invoice covering each item for payment of Costs of the Project or Operating and Working Capital Costs, the Trustee shall thereupon disburse moneys in the Project Fund to pay the amount set forth therein as directed by the terms thereof.

Upon the receipt by the Trustee of a certificate conforming with the requirements of Section 3.3 of the Agreement, and after payment of costs payable from the Project Fund or provision having been made for payment of such costs not yet due by retaining such costs in the Project Fund or otherwise as directed in such certificate, the Trustee shall transfer any remaining balance in the relevant Series subaccount of the Tax-Exempt Subaccount within the Project Fund into the relevant Series subaccount of the Surplus Account within the Revenue Fund, which account and subaccounts the Trustee shall establish and hold in trust. In the alternative, the Borrower may submit to the Trustee a certificate, stating that its plans for the Project have changed and that it has determined to use a portion of unspent proceeds in the Project Fund to redeem Bonds. Upon receipt of either of the foregoing certificates, the Trustee shall arrange for the identified amount of unspent proceeds in the relevant Series subaccount of the Tax-Exempt Subaccount within the Project Fund to be returned to the Trustee for deposit in the relevant Series subaccount of the Surplus Account. The moneys in any Surplus Account shall be used and applied (subject to Section 5.03) at the written direction of the Borrower (unless some other application of such moneys permitted by the Indenture and the Loan Agreement is requested by the Borrower and would not, in the opinion of Bond Counsel, cause interest on the Bonds to become no longer Tax-exempt) to redeem Bonds in Authorized Denominations, to the maximum degree permissible, and at the earliest possible dates at which the Bonds can be redeemed pursuant to Section 4.01 of this Indenture. Notwithstanding Section 5.05 hereof, the moneys in the Surplus Account shall be invested at the written instruction of the Borrower at a yield no higher than the yield on the Outstanding Bonds (unless in the opinion of Bond Counsel, addressed and delivered to the Issuer and the Trustee, investment at a higher yield would not cause interest on the Bonds to become no longer Tax-exempt) and all such investment income shall be deposited in the Surplus Account and expended or reinvested as provided above.

In the event of redemption of all of a Series of Bonds pursuant to Section 4.01 hereof or an Event of Default which causes acceleration of any Series of Bonds, any moneys then remaining in the relevant Series subaccount of the Tax-Exempt Subaccount within the Project Fund relating to such Series of Bonds shall be transferred to the relevant Series subaccount of

the Surplus Account within the Revenue Fund, and all moneys in the Revenue Fund relating to such Series of Bonds shall be used to redeem such Series of Bonds.

Moneys in the Series 2019 subaccount of the Capitalized Interest Account shall be transferred by the Trustee on the 25th day of each month, commencing July 25, 2019, to the Series 2019 subaccount of the Interest Account within the Revenue Fund in the following amounts to pay interest due and payable on the Series 2019 Bonds on each Interest Payment Date with respect to the Series 2019 Bonds to and including June 1, 2021, in accordance with the following schedule:

| Date of Transfer from Capitalized Interest Account | Transfer Amount from Capitalized Interest Account |
|---|---|
| 7/25/2019 | 272,664.63 |
| 8/25/2019 | 272,664.63 |
| 9/25/2019 | 272,664.63 |
| 10/25/2019 | 272,664.63 |
| 11/25/2019 | 272,664.63 |
| 12/25/2019 | 290,068.75 |
| 1/25/2020 | 290,068.75 |
| 2/25/2020 | 290,068.75 |
| 3/25/2020 | 290,068.75 |
| 4/25/2020 | 290,068.75 |
| 5/25/2020 | 290,068.75 |
| 6/25/2020 | 290,068.75 |
| 7/25/2020 | 290,068.75 |
| 8/25/2020 | 290,068.75 |
| 9/25/2020 | 290,068.75 |
| 10/25/2020 | 290,068.75 |
| 11/25/2020 | 290,068.75 |
| 12/25/2020 | 290,068.75 |
| 1/25/2021 | 87,020.60 |

Moneys in the Series 2020 subaccount of the Capitalized Interest Account shall be transferred by the Trustee on the 25th day of each month, commencing [_____], 2020, to the Series 2020 subaccount of the Interest Account within the Revenue Fund in the following amounts to pay interest due and payable on the Series 2020 Bonds on each Interest Payment Date with respect to the Series 2020 Bonds to and including [_____, 20__], in accordance with the following schedule:

| Date of Transfer from Capitalized Interest Account | Transfer Amount from Capitalized Interest Account |
| --- | --- |
| | |

Section 3.04.        Costs of Issuance Fund.

Section 3.04 of the Original Indenture is hereby amended and restated in its entirety as follows:

SECTION 3.04        Costs of Issuance Fund.

The Trustee shall establish the Costs of Issuance Fund (the "Costs of Issuance Fund"). The Trustee shall also create separate accounts in the Costs of Issuance Fund designated the "Proceeds Account" and the "Borrower Subaccount" which will be funded as provided in Section 3.02. The Trustee shall further establish within the Proceeds Account and Borrower Subaccount, as applicable, a separate subaccount for each Series and sub-Series of Bonds. The moneys in each account and subaccount of the Costs of Issuance Fund shall be held by the Trustee in trust and applied to the payment of Costs of Issuance for the relevant Series of Bonds, upon a sequentially numbered Requisition of the Borrower filed with the Trustee, in the form attached hereto as Exhibit C, together with invoices required by Section 3.1 of the Agreement, signed by an Authorized Representative of the Borrower. Each Requisition of the Borrower shall be sufficient evidence to the Trustee of the facts stated therein and the Trustee may conclusively rely upon and shall have no duty to confirm the accuracy of such facts. All payments from the Costs of Issuance Fund shall be reflected in the Trustee's regular accounting statements. Any

amounts remaining in a Proceeds Account of the Costs of Issuance Fund six months following the Date of Delivery of the relevant Series of Bonds shall be transferred to relevant Series subaccount of the Tax-Exempt Subaccount within the Project Fund for such Series of Bonds.   Any amounts remaining in the Borrower Subaccount of the Costs of Issuance Fund three months following the Date of Delivery of the relevant Series of Bonds shall be transferred to the Borrower.  Upon such transfers with respect to all Series of Bonds Outstanding, the Trustee shall close the Costs of Issuance Fund.

Section 3.05.        Deposits to Revenue Fund; Allocation of Revenues.

Section 5.02 of the Original Indenture is hereby amended and restated in its entirety as follows:

SECTION 5.02        Deposits to Revenue Fund; Allocation of Revenues.

The Trustee shall establish, maintain and hold in trust a separate fund designated as the "Revenue Fund" and accounts therein designated the "Interest Account," "Principal Account," "Redemption Account," and the "Debt Service Reserve Fund."  The Trustee shall further establish within the Interest Account, Principal Account and Redemption Account, a separate subaccount for each Series or sub-Series of Bonds, as applicable. On the first Business Day of every calendar month (to the extent not paid from the Capitalized Interest Account), the Trustee shall transfer from the Revenue Fund and deposit into the respective Series subaccount within the following respective accounts (each of which the Trustee is hereby directed to establish and maintain within the Revenue Fund), the following amounts, in the following order of priority, the requirements of each such account (including the making up of any deficiencies in any such account resulting from lack of Revenues sufficient to make any earlier required deposit) at the time of deposit to be satisfied before any transfer is made to any account subsequent in priority:

First:  (i) with respect to the Series 2019 Bonds, an amount equal to one-sixth of the aggregate amount of interest becoming due and payable on the Series 2019 Bonds on the next succeeding Bond Payment Date with respect to the Series 2019 Bonds or date of redemption of all Series 2019 Bonds then Outstanding to the Series 2019 subaccount of the Interest Account; (ii) with respect to the Series 2020 Bonds, an amount equal to one-sixth of the aggregate amount of interest becoming due and payable on the Series 2020 Bonds on the next succeeding Bond Payment Date with respect to the Series 2020 Bonds or date of redemption of all Series 2020 Bonds then Outstanding to the Series 2020 subaccount of the Interest Account; and (iii) with respect to any Additional Bonds issued hereafter, an amount equal to one-sixth of the aggregate amount of interest becoming due and payable on such Series of Bonds on the next succeeding

Bond Payment Date or date of redemption of all such Series of Bonds then Outstanding to the applicable subaccount of the Interest Account for such Series of Bonds.

Second:  (i) with respect to the Series 2019 Bonds, an amount equal to one-sixth of the aggregate amount of principal due on the Series 2019 Bonds on the Bond Payment Date with respect to the Series 2019 Bonds paid by the Borrower and designated as or attributable to principal on the Series 2019 Bonds in the most recent Loan Repayment to the Series 2019 subaccount of the Principal Account; (ii) with respect to the Series 2020 Bonds, an amount equal to one-sixth of the aggregate amount of principal due on the Series 2020 Bonds on the Bond Payment Date with respect to the Series 2020 Bonds paid by the Borrower and designated as or attributable to principal on the Series 2020 Bonds in the most recent Loan Repayment to the Series 2020 subaccount of the Principal Account; and (iii) with respect to any Additional Bonds issued hereafter, an amount equal to one-sixth of the aggregate amount of principal due on such Series of Bonds on the Bond Payment Date paid by the Borrower and designated as or attributable to principal on such Series of Bonds in the most recent Loan Repayment to the applicable subaccount of the Principal Account for such Series of Bonds.

Third:  to the relevant Series subaccount of the Redemption Account, the aggregate amount of principal and premium, if any, next coming due on the relevant Series of Bonds by acceleration or by redemption permitted or required under Article IV hereof, or any portion thereof paid by the Borrower.

Fourth:  to relevant Series subaccounts of the Debt Service Reserve Fund, to restore such account or subaccount to the applicable Reserve Requirement, if required, in three equal installments.

Section 3.06.    Form of Bond; Exhibit A.

The form of Bond attached as Exhibit A to the Original Indenture is hereby amended and restated and shall be replaced in its entirety with the form of Bond attached hereto as Exhibit A. Any references in the Original Indenture to such form of Bond or Exhibit A to Indenture shall mean the form of Bond attached hereto as Exhibit A.

## ARTICLE IV
## ADDITIONAL BONDS

Section 4.01.    Incorporation of Additional Bonds.

There is hereby created a new Section 2.12, which shall be added as the last section of Article II of the Original Indenture and shall read as follows:

SECTION 2.12      Additional Bonds.

Conditioned upon the receipt by the Trustee of the documents and other items listed below and compliance by the Borrower with all conditions set forth in Section 5.18(d) of the Loan Agreement, the Issuer shall deliver Additional Bonds from time to time to finance Costs of the Project and Costs of Issuance (to the extent permitted under this Indenture, the Loan Agreement and the Tax Certificate) to the extent the Bonds Outstanding are insufficient for the payment of same. Each Series of Additional Bonds shall be delivered pursuant to and evidenced by a Supplemental Indenture.

Any Supplemental Indenture pursuant to which Additional Bonds are issued shall specify the following:

(a)      The designation of such Series of Bonds;

(b)      The application of proceeds of such Series of Bonds, including amounts to be deposited with the Trustee in the respective Funds established pursuant to this Indenture;

(c)      The maturity date or dates, Date of Delivery and the aggregate principal amount of such Series of Bonds of each maturity;

(d)      The interest rate and Interest Payment Dates of such Series of Bonds;

(e)      The Principal Payment Dates of such Series of Bonds; and

(f)      The redemption dates and premiums and any additional provisions relating to such Series of Bonds as shall be approved in writing by the Issuer and the Borrower and permitted by the Act.

Each Series of Additional Bonds shall be on a parity and equally and ratably secured under this Indenture as to Loan Repayments made by the Borrower under the Loan Agreement with the Bonds previously delivered, without preference, priority or distinction of any Bonds over any other Bonds. All such Additional Bonds shall be in substantially the same form as set forth in Section 2.02 of this Indenture, provided that the principal amount referenced in such Section of the Original Indenture shall hereinafter be deemed to mean the principal amount of the Additional Bonds then being issued. The Trustee shall authenticate and deliver such Additional Bonds, but only upon receipt by the Trustee of the following:

(a)      The purchase price for such Series of Bonds as set forth in the Supplemental Indenture relating thereto for the account of the Issuer;

(b)      An original executed counterpart of the Supplemental Indenture relating to such Series of Bonds;

(c)      An executed copy of the Bond Purchase Contract relating to such Series of Bonds;

(d)      A new Bond with an appropriate Series designation in an amount equal to the principal amount of such Bonds then being delivered;

(e)      A new Note in an amount equal to the principal amount of such Series of Bonds then being delivered;

(f)      An Opinion of Counsel to the Issuer to the effect that the Supplemental Indenture has been duly authorized, executed and delivered by the Issuer and is enforceable against the Issuer, subject to customary equity and bankruptcy exceptions;

(g)      An Approving Opinion; and

(h)      Such other items or documents as reasonably requested or required by the Issuer and Bond Counsel provided the Issuer or Bond Counsel provides the Trustee with a list of such items.

## ARTICLE V
## MISCELLANEOUS

Section 5.01.      <u>Confirmation of Original Indenture</u>.      Except as amended and supplemented hereby, the Original Indenture, is hereby confirmed and reaffirmed in all particulars.  The Original Indenture, as amended and supplemented, shall be read, taken and construed as one and the same instrument, notwithstanding the date and time of execution and delivery of each such instrument.  Without limiting the generality of the foregoing, all representations, covenants, agreements, obligations and rights contained in the Original Indenture, as amended and supplemented herein, and all security for the same are and shall be for the equal and ratable benefit and security of the holders of all Bonds (including Outstanding Series 2019 Bonds and Series 2020 Bonds) issued and Outstanding under the Indenture. Anything in the Original Indenture, or herein to the contrary notwithstanding, all recitals, definitions and provisions contained in this First Supplemental Indenture shall take precedence over the recitals, definitions and provisions of the Original Indenture, to the extent of any conflict.  Terms used herein and not defined herein shall have the meanings set forth in the Original Indenture.

Section 5.02.      <u>Supplement Generally; Conflicts</u>.      Except for terms and provisions contained in the Original Indenture that are expressly amended as set forth herein, the terms and provisions contained in this First Supplemental Indenture are supplemental to the Original Indenture.  To the extent that any provision in the Original Indenture conflicts with a provision in this First Supplemental Indenture, the provision contained in this First Supplemental Indenture shall control; otherwise, all provisions contained in the Original Indenture shall apply to this First Supplemental Indenture.

Section 5.03.      <u>Parties Interested Herein</u>.      With the exception of rights conferred expressly in the Indenture, nothing expressed or mentioned in or to be implied from this First

Supplemental Indenture or the Bonds is intended or shall be construed to give to any Person other than the parties hereto, the Paying Agent, the Borrower and the Owners of the Bonds any legal or equitable right, remedy, power or claim under or with respect to the Indenture or any covenants, agreements, conditions and provisions contained therein.  The Indenture and all of those covenants, agreements, conditions and provisions are intended to be, and are, for the sole and exclusive benefit of the parties hereto, the Borrower, the Paying Agent, the Owners of the Bonds, as provided therein.

Section 5.04.    <u>Titles, Headings, Captions, Etc.</u>  The titles, captions and headings of the articles, Sections and subdivisions of this First Supplemental Indenture have been inserted for convenience of reference only and will in no way modify or restrict any of the terms or provisions hereof.

Section 5.05.    <u>Severability</u>.  In case any Section or provision of this First Supplemental Indenture, or any covenant, agreement, stipulation, obligation, act or action, or part thereof, made, assumed, entered into or taken under the Indenture, or any application thereof, is held to be illegal or invalid for any reason, or is inoperable at any time, that illegality, invalidity or inoperability shall not affect the remainder thereof or any other Section or provision of this First Supplemental Indenture or any other covenant, agreement stipulation, obligation, act or action, or part thereof, made, assumed, entered into or taken under this First Supplemental Indenture, all of which shall be construed and enforced at the time as if the illegal, invalid or inoperable portion were not contained therein.

Any illegality, invalidity or inoperability shall not affect any legal, valid or operable Section, provision, covenant, agreement, stipulation, obligation, act, action, part or application, all of which shall be deemed to be effective, operative, made, assumed, entered into or taken in the manner and to the full extent permitted by law from time to time.

Section 5.06.    <u>Notices to Trustee</u>.  All demands, notices, approvals, consents, requests and other communications for the Trustee as relating to the Series 2020 Bonds shall be in writing and shall be deemed to have been given when delivered in person or mailed by first class, registered or certified mail, postage prepaid, or when sent by telecopy, addressed to the Trustee at UMB Bank, N.A., Corporate Trust & Escrow Services, 120 South Sixth Street, Suite 1400, Minneapolis, MN 55402, Attention: Katie Carlson.

Section 5.07.    <u>Governing Law</u>.  This First Supplemental Indenture shall be construed in accordance with and governed by the Constitution and laws of the Commonwealth applicable to contracts made and performed in the Commonwealth.

Section 5.08.    <u>Execution in Counterparts</u>.  This First Supplemental Indenture may be executed in several counterparts, each of which will be an original and all of which will constitute but one and the same instrument.

[Remainder of page intentionally left blank]

DMEAST #39795115 v422

IN WITNESS WHEREOF, the Pennsylvania Economic Development Financing Authority has caused this First Supplemental Indenture to be executed in its name and attested by its duly authorized officers, and UMB Bank, N.A., in token of its acceptance of the trusts created hereunder, has caused this First Supplemental Indenture to be signed in its corporate name by one of the officers thereunto duly authorized, all as of the day and year first above written.

PENNSYLVANIA ECONOMIC DEVELOPMENT
FINANCING AUTHORITY, as Issuer

By:_____
        Executive Director

ATTEST:

By: _____
        (Assistant) Secretary

UMB BANK, N.A., as Trustee

By:_____
        Authorized Officer

*(Signature Page to First Supplemental Indenture of Trust)*

The Borrower hereby consents to the foregoing First Supplemental Indenture as of the date first written above.

<div style="margin-left:45%">

CARBONLITE P, LLC,
a Delaware Limited Liability Company


By _____
    Leon Farahnik
    Chief Executive Officer

</div>

<u>EXHIBIT A</u>

FORM OF BOND

See attached.

(Form of Bond)

*Unless this bond is presented by an authorized representative of The Depository Trust Company, a New York corporation ("DTC"), to the Trustee or its agent for registration of transfer, exchange or payment, and any bond issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the registered owner hereof, Cede & Co., has an interest herein.*

No. R-__                                                                                          $[_____]

## UNITED STATES OF AMERICA
## PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY
### Solid Waste Disposal Revenue Bond
### (CarbonLite P, LLC Project)
### Series [2019][2020]

| Maturity Date | Dated Date | Interest Rate | CUSIP |
|---|---|---|---|
| | | % | |

REGISTERED OWNER:    CEDE & CO.

PRINCIPAL AMOUNT:    _____ DOLLARS

The Pennsylvania Economic Development Financing Authority (the "Issuer"), a public instrumentality of the Commonwealth of Pennsylvania (the "Commonwealth") and a public body corporate and politic organized and existing under the Pennsylvania Economic Development Financing Law, as amended (the "Act"), for value received, hereby promises to pay (but only out of Revenues as hereinafter provided) to the registered owner identified above or registered assigns, on the maturity date set forth above, the principal sum set forth above and to pay (but only out of Revenues as hereinafter provided) interest thereon from the interest payment date to which interest has been paid or, if this Bond is authenticated on or before [_____, 20__], from the Date of Delivery specified above, until payment of such principal sum shall be discharged as provided in the Indenture hereinafter mentioned, and to pay (but only out of Revenues as hereinafter provided) interest on overdue principal at the rate borne by this Bond plus 3.00% (the "Post-Default Rate") on the date on which such principal or interest became due and payable, except as the provisions hereinafter set forth with respect to redemption prior to maturity or purchase may become applicable hereto.  Interest shall be computed at the interest rate per annum set forth above, payable on [June 1] and [December 1] in each year (each, an "Interest Payment Date"), commencing on [_____, 20__], based on a 360-day year of

twelve 30-day months.  The principal of and premium, if any, on this Bond are payable at final maturity, acceleration or redemption in lawful money of the United States of America upon surrender hereof at the Corporate Trust Office of UMB Bank, N.A., as Trustee, or its successor in trust (the "Trustee").  Interest payments on this Bond shall be made to the Person appearing on the bond registration books of the Trustee, as bond registrar (the "Bond Registrar"), as the Bondholder thereof on the applicable Record Date, which is the date as of the close of business on the fifteenth day of the calendar month preceding any Interest Payment Date (the "Record Date"), and shall be paid (i) by check mailed on the Interest Payment Date to such Bondholder's address as it appears on the registration books or at such other address as has been furnished to the Bond Registrar as provided below, in writing by such Bondholder not later than the Record Date or (ii) upon written request, at least three Business Days prior to the applicable Record Date of the Bondholder of Bonds aggregating not less than $1,000,000 in principal amount, by wire transfer in immediately available funds at an account maintained in the United States at such wire address as such Bondholder shall specify in its written notice; except, in each case, that, if and to the extent that there shall be a default in the payment of the interest due on such Interest Payment Date, such defaulted interest rate shall be the Post-Default Rate and such defaulted interest shall be paid to the Bondholder in whose name any such Bonds are registered at the close of business on the fifth Business Day next preceding the date of payment of such defaulted interest.

This Bond is one of a duly authorized issue of bonds of the Issuer designated as "Pennsylvania Economic Development Financing Authority Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project), Series [2019][2020]," issued pursuant to the Act and issued under and secured by the Indenture hereinafter mentioned.  The Bonds are limited obligations of the Issuer and, as and to the extent set forth in the Indenture, are payable solely from, and secured by a pledge of and lien on, the Revenues (as defined in the Indenture).  Proceeds from the sale of the Bonds will be loaned by the Issuer to CarbonLite P, LLC, a Delaware limited liability company (the "Borrower"), under the terms of a Loan Agreement, dated as of June 1, 2019, between the Issuer and the Borrower, as amended, modified or supplemented from time to time (the "Agreement").  The Borrower's obligations under the Agreement will be further evidenced by the Borrower's execution and issuance of one or more promissory notes (the "Note"), dated the Date of Delivery, in an amount equal to the aggregate principal amount of the Bonds.  The Bonds are issued under and secured by and entitled to the benefits of an Indenture of Trust, dated as of June 1, 2019, between the Issuer and the Trustee, as amended, modified or supplemented from time to time (the "Indenture"), and the Revenues pledged to the Bonds thereunder, and there shall be no other recourse against the Issuer or any property now or hereafter owned by it.

Reference is hereby made to the Indenture and any Supplemental Indentures for a description of the rights thereunder of the registered Bondholders of the Bonds, of the nature and extent of the security, of the rights, duties and immunities of the Trustee and of the rights and obligations of the Issuer thereunder, to all of the provisions of which Indenture and of the Agreement the Holder of this Bond, by acceptance hereof, assents and agrees.

All terms not herein defined shall have the meanings ascribed to them in the Indenture.

The Bonds are issuable as fully registered bonds without coupons in Authorized Denominations of $100,000 or any integral multiple of $5,000 in excess of thereof.  Subject to the limitations and upon payment of the charges, if any, provided in the Indenture, Bonds may be exchanged at the Corporate Trust Office of the Trustee for a like aggregate principal amount of Bonds of other Authorized Denominations.

This Bond is transferable by the Bondholder hereof, in person, or by its duly authorized attorney, but only in the manner, subject to the limitations and upon payment of the charges provided in the Indenture, and upon surrender and cancellation of this Bond.  Upon such transfer a new fully registered Bond or Bonds, in an Authorized Denomination or Denominations, for the same aggregate principal amount, will be issued to the transferee in exchange therefor.  The Issuer and the Trustee may treat the Bondholder hereof as the absolute Bondholder hereof for all purposes, and the Issuer and the Trustee shall not be affected by any notice to the contrary.

**THIS BOND AND THE ISSUE OF WHICH IT IS A PART AND THE PREMIUM, IF ANY, AND INTEREST HEREON ARE LIMITED OBLIGATIONS OF THE ISSUER PAYABLE SOLELY FROM THE REVENUES AND RECEIPTS DERIVED FROM THE AGREEMENT PURSUANT TO THE AGREEMENT, INCLUDING PAYMENTS RECEIVED THEREUNDER, WHICH PAYMENTS, REVENUES AND RECEIPTS HAVE BEEN PLEDGED AND ASSIGNED TO THE TRUSTEE TO SECURE PAYMENT OF THE BONDS.  THE BONDS, THE PREMIUM, IF ANY, AND THE INTEREST THEREON SHALL NOT BE DEEMED TO CONSTITUTE A DEBT OR A PLEDGE OF THE FAITH AND CREDIT OF THE COMMONWEALTH OF PENNSYLVANIA OR ANY POLITICAL SUBDIVISION THEREOF, INCLUDING THE ISSUER.   NEITHER THE COMMONWEALTH OF PENNSYLVANIA NOR ANY POLITICAL SUBDIVISION THEREOF, SHALL BE OBLIGATED TO PAY THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST ON THE BONDS OR OTHER COSTS INCIDENT THERETO.  THE ISSUER SHALL NOT BE OGLIGATED TO PAY THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST ON THE BONDS OR OTHER COSTS INCIDENT THERETO EXCEPT FROM THE REVENUES AND RECEIPTS PLEDGED THEREFOR, AND NEITHER THE FAITH AND CREDIT NOR THE TAXING POWER OF THE COMMONWEALTH OF PENNSYLVANIA OR ANY POLITICAL SUBDIVISION OF THE COMMONWEALTH OF PENNSYLVANIA, NOR THE FAITH AND CREDIT OF THE ISSUER, IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST ON THE BONDS OR OTHER COSTS INCIDENT THERETO.  THE ISSUER HAS NO TAXING POWER.**

No past, present or future officer, member, director, commissioner, employee or agent of the Issuer shall be personally liable on the Bonds; and no covenant, agreement or obligation contained therein shall be deemed to be a covenant, agreement or obligation of any present or future officer, member, director, commissioner, employee or agent of the Issuer in his individual capacity.  The Issuer has no taxing power.

The Bonds are subject to redemption as set forth in the Indenture.

The Holder of this Bond shall have no right to institute any suit, action or proceeding at law or in equity, for the protection or enforcement of any right or remedy under the Indenture, except as provided in the Indenture.

No recourse shall be had for the payment of the principal of, premium, if any, or interest on any of the Bonds or for any claim based thereon or upon any obligation, covenant or agreement in the Indenture contained, against any past, present or future member, director, officer, employee or agent of the Issuer, or through the Issuer, or any successor to the Issuer, under any rule of law or equity, statute or constitution or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such member, director, officer, employee or agent as such is hereby expressly waived and released as a condition of and in consideration for the execution of the Indenture and the issuance of any of the Bonds.

The Indenture contains provisions permitting the Issuer and the Holders of a majority in aggregate principal amount of all Bonds then Outstanding to execute Supplemental Indentures, to modify or amend the Indenture from time to time by a Supplemental Indenture; provided, however, that no such modification or amendment shall (1) extend the fixed maturity of any Bond, or reduce the amount of principal thereof, or extend the time of payment, or change the method of computing the rate of interest thereon, or extend the time of payment of interest thereon, without the consent of the Holder of each Bond so affected, or (2) reduce the aforesaid percentage of Bonds the consent of the Holders of which is required to effect any such modification or amendment, or permit the creation of any lien on the Revenues and other assets pledged under the Indenture prior to or on a parity with the lien created by the Indenture, or deprive the Holders of the Bonds of the lien created by the Indenture on such Revenues and other assets (except as expressly provided in the Indenture), without the consent of the Holders of all Bonds then Outstanding.  Under certain circumstances described in the Indenture, the Trustee and the Issuer may enter into a Supplemental Indenture without consent of Holders.

The Indenture prescribes the manner in which it may be discharged and after which the Bonds shall no longer be secured by or entitled to the benefits of the Indenture, except for the purposes of payment of the principal of and premium, if any, and interest on the Bonds as the same become due and payable, including a provision that under certain circumstances the Bonds shall be deemed to be paid if certain securities, as defined in the Indenture, maturing as to principal and interest in such amounts and at such times as to insure the availability of sufficient moneys to pay the principal of, premium, if any, and interest on such Bonds and all necessary and proper fees, compensation and expenses of the Trustee shall have been deposited with the Trustee.

No member or officer of the Issuer, nor any individual executing this Bond, shall in any event be subject to any personal liability or accountability by reason of the issuance of the Bonds.

All of the acts and proceedings required by law to have happened and to have been performed precedent to and in the issuance of this Bond do exist, have happened and have been performed in due time, form and manner as required by the Constitution and statutes of the Commonwealth.

This Bond shall not be entitled to any benefit under the Indenture, or become valid or obligatory for any purpose, until the certificate of authentication hereon endorsed shall have been manually signed by the Trustee.

In witness whereof, the Pennsylvania Economic Development Financing Authority has caused this Bond to be executed in its name and on its behalf by the manual or facsimile signature of its Executive Director, its seal to be impressed or imprinted thereon and attested by the manual or facsimile signature of its Assistant Secretary, all as of the above date.

PENNSYLVANIA ECONOMIC DEVELOPMENT
FINANCING AUTHORITY, as Issuer

By: _____

   Executive Director

(SEAL)

ATTEST:

By: _____

   Assistant Secretary

A-7

[FORM OF TRUSTEE'S CERTIFICATE OF AUTHENTICATION]

Dated: _____

      This is one of the Bonds described in the within mentioned Indenture.

                                UMB BANK, N.A., as Trustee

                              By _____
                                               Authorized Signature

      Unless this Bond is presented by an authorized representative of The Depository Trust Company, a New York corporation ("DTC"), to Issuer or its agent for registration of transfer, exchange, or payment, and any Bond issued upon such registration of transfer is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the registered owner hereof Cede & Co., has an interest herein.

[FORM OF ASSIGNMENT]

For value received the undersigned do(es) hereby sell, assign and transfer unto _____ [name, address and tax i.d. number of transferee] the within mentioned Registered Bond and do(es) hereby irrevocably constitute and appoint _____ attorney, to register the transfer of the same on the books of the Trustee with full power of substitution in the premises.

Dated: _____ , _____

Note:  The signature(s) to this Assignment must correspond with the name(s) as written on the face of the within Registered Bond in every particular, without alteration or enlargement or any change whatsoever.

Note:  Signature(s) must be guaranteed by a guarantor institution participating in the Securities Transfer Agents Medallion Program or in such other guarantee program acceptable to the Trustee.

**CONTINUING DISCLOSURE AGREEMENT**

Pennsylvania Economic Development Financing Authority
Solid Waste Disposal Revenue Bonds
(CarbonLite P, LLC Project), Series 2020

[Closing Date]

This Continuing Disclosure Agreement (the "Disclosure Agreement") is executed and delivered by CarbonLite P, LLC (the "Borrower"), CarbonLite P Holdings, LLC (the "Original Guarantor"), PinnPack P, LLC ("PinnPack P" and, together with the Original Guarantor, the "Guarantor") and UMB Bank, N.A., as dissemination agent (the "Dissemination Agent"), in connection with the issuance of the above-named bonds (the "Bonds"). The Bonds are being issued pursuant to the Indenture of Trust, dated as of June 1, 2019 (the "Original Indenture"), as amended and supplemented by a First Supplemental Indenture of Trust, dated as of [CLOSING MONTH] 1, 2020 (the "First Supplemental Indenture" and, together with the Original Indenture, the "Indenture") by and between the Pennsylvania Economic Development Financing Authority (the "Authority") and UMB Bank, N.A., as Trustee. The Borrower, Guarantor and Dissemination Agent covenant and agree as follows:

SECTION 1.    Purpose of the Disclosure Agreement. This Disclosure Agreement is being executed and delivered by the Borrower, the Guarantor and the Dissemination Agent for the benefit of the Holders and Beneficial Owners of the Bonds and in order to assist the Participating Underwriter in complying with Securities and Exchange Commission's Rule 15c2-12(b)(5).

SECTION 2.    Definitions. In addition to the definitions set forth in the Indenture, which apply to any capitalized term used in this Disclosure Agreement unless otherwise defined in this Section, the following capitalized terms shall have the following meanings:

"Annual Report" shall mean any Annual Report provided by (i) the Borrower pursuant to, and as described in, Section 3(a) of this Disclosure Agreement and (ii) the Guarantor pursuant to, and as described in, Section 4(b)(1) of this Disclosure Agreement.

"Beneficial Owner" shall mean any person who has or shares the power, directly or indirectly, to make investment decisions concerning ownership of any Bonds (including persons holding Bonds through nominees, depositories or other intermediaries).

"Dissemination Agent" shall mean UMB Bank, N.A., acting in its capacity as Dissemination Agent hereunder, or such other officer or employee as the Borrower shall designate in writing to the Trustee and the Dissemination Agent from time to time.

"Financial Obligation" shall mean, for purposes of the Listed Events set out in Section 5(a)(10) and Section (5)(b)(8), a (i) debt obligation; (ii) derivative instrument entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation; or (iii) guarantee of (i) or (ii). The term "Financial Obligation" shall not include municipal securities (as defined in the Securities Exchange Act of 1934, as amended) as to which a final official statement (as defined in the Rule) has been provided to the MSRB consistent with the Rule.

"Holder" shall mean the person in whose name any Bond shall be registered.

"Listed Events" shall mean any of the events listed in Section 5(a) or 5(b) of this Disclosure Agreement.

"Loan Agreement" shall have the meaning given to such term in the Indenture.

"MSRB" shall mean the Municipal Securities Rulemaking Board or any other entity designated or authorized by the Securities and Exchange Commission to receive reports pursuant to the Rule. Until otherwise designated by the MSRB or the Securities and Exchange Commission, filings with the MSRB are to be made through the Electronic Municipal Market Access (EMMA) website of the MSRB, currently located at http://emma.msrb.org.

"Participating Underwriter" shall mean the original underwriter of the Bonds which, if not exempt, would be required to comply with the Rule in connection with the offering of the Bonds.

"Progress Reports" shall have the meaning ascribed thereto in Section 4(a)(5) of this Disclosure Agreement.

"Quarterly Report" shall mean any Quarterly Report provided by the Borrower pursuant to, and as described in, Section 3(b) of this Disclosure Agreement.

"Rule" shall mean Rule 15c2-12(b)(5) adopted by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as the same may be amended from time to time.

SECTION 3.        Provision of Annual Reports and Quarterly Reports.

(a)        Annual Report.  The Borrower shall, or shall cause the Dissemination Agent not later than 150 days after the end of the Borrower's Fiscal Year, commencing with the report for the Fiscal Year ending December 31, 20__, to provide to the MSRB an Annual Report which is consistent with the requirements of Section 4(a)(1) of this Disclosure Agreement.  If the Borrower's Fiscal Year changes, the Borrower shall give notice of such change in a filing with the MSRB.  The Annual Report shall be submitted on a standard form in use by industry participants or other appropriate form and shall identify the Bonds by name and CUSIP number.

(1)        Not later than fifteen (15) Business Days prior to the date specified in subsection (a) for providing the Annual Report to the MSRB, the Borrower shall provide the Annual Report to the Dissemination Agent (if other than the Borrower).  If the Borrower is unable to provide to the MSRB an Annual Report by the date required in subsection (a) above, the Borrower shall, or shall cause the Dissemination Agent to, in a timely manner, send to the MSRB a notice in substantially the form attached as Exhibit A.

(2)        The Dissemination Agent shall (if the Dissemination Agent is other than the Borrower) file a report with the Borrower certifying that the Annual Report has been provided pursuant to this Disclosure Agreement, stating the date it was provided to the MSRB.

(b)        Quarterly Report.  The Borrower shall, or shall cause the Dissemination Agent not later than 45 days after the end of each fiscal quarterly period to provide to the MSRB a Quarterly Report which is consistent with the requirements of Section 4(a)(2) and 4(a)(3) of this Disclosure Agreement.

(c)        Other Borrower Reports.  The Borrower shall, or shall cause the Dissemination Agent to, provide to the MSRB a report or reports which are consistent with the requirements of Sections 4(a)(4), 4(a)(5) and 4(a)(6) of this Disclosure Agreement.

(d)        Guarantor Reports.  The Guarantor shall, or shall cause the Dissemination Agent to, provide to the MSRB a report or reports which are consistent with the requirements of Section 4(b) of this Disclosure Agreement.

SECTION 4.        Reporting Requirements.

(a)        The Borrower shall provide:

(1)        Within 150 days after the end of the Borrower's Fiscal Year, the Borrower's Audited Financial Statements, including an opinion letter and management letter from the auditor;

(2)        Within 45 days after the end of each quarterly period of each Fiscal Year, commencing with the quarterly period ended _____, 20__, and within 45 days after the end of the Borrower's Fiscal Year, commencing with Fiscal Year ending December 31, 20__, the Borrower's unaudited financial information (presented on a stand-alone basis), such information consisting of (i) an income statement, balance sheet and statement of operations (including changes in cash position) for the preceding quarterly period and, solely with respect to the information due within 45 days after the end of the Borrower's Fiscal

Year, for the preceding annual period, and (ii) calculations of the Borrower's Days Cash on Hand Requirement (as defined in the Loan Agreement) and Debt Service Coverage Ratio, each presented on a basis substantially consistent with the format of the Guarantor's audited financial statements and in a form reasonably ascertainable to the Holders, provided that the Quarterly Report for the period ending on or before _____, 20__ need not include the items required by clause (ii) above;

        (3)      Within 45 days after the end of each quarterly period of each Fiscal Year, commencing with the quarterly period ending _____, 20__, a report from the Borrower consisting of:

        (a)      a report from the Borrower of the volume of pcrPET bales and pcrPET flake received, and the volume of pcrPET pellets produced and sold (by weight, including type – clear or green) during such quarterly period;

        (b)      a report from the Borrower providing the identity of its feedstock suppliers, the estimated monthly pounds of pcrPET supplied by each supplier during such quarterly period, and the expiration date and renewal status of any such contracts with feedstock suppliers;

        (c)      a report from the Borrower providing the identity of the parties with whom the Borrower has executed or received tentative output contracts, the volume of pcrPET to be purchased per month pursuant to such contracts, and the term of such contracts, including the expiration date and renewal status;

        (d)      the Borrower's budget-to-actual report for such quarterly period;

        (e)      together with a report showing aged accounts receivable as of the end of such quarterly period, on a 30/60/90 day basis.

        (4)      Not later than January 15 of each Fiscal Year, the Borrower's annual budget for such Fiscal Year commencing with the budget for Fiscal Year 20__;

        (5)      Prior to the Completion Date and by the 15th day of the subsequent month during which the Project is under construction commencing with the month ending _____, 20__, Progress Reports from the Borrower with respect to the construction, equipping, installation and completion of the Project and with respect to the Lessor's construction of the building on the site subject to the Lease, which shall include the following information as of the end of the reporting period:

        (i)      brief description of construction activity for applicable reporting period, including:

        (A)      construction work performed on site during reporting period,

        (B)      status of procurement of equipment,

        (C)      material issues with vendor performance (including delivery issues, performance problems or material cost overruns);

        (ii)      adherence to expected construction timeline (including estimated number of days ahead or behind);

        (iii)      adherence to expected construction budget (including material work order, dollar or percentage deviation from budget); and

        (iv)      if applicable, brief narrative description of the reasons behind any material delays indicated in Subsection (5)(ii) and (5)(iii) above; and

(6)    Promptly upon sending or receipt, copies of any material correspondence between the Borrower and any governmental entity regarding compliance with Environmental Regulations, potential material violations of state or local law, or other material correspondence relating to the Borrower's construction of or operations of the Facility.

The Borrower's audited financial statements, if required or permitted by GAAP, may be in the form of consolidated statements within the audited financial statements of the Guarantor.  If at any time the Borrower's financial statements are no longer included within the consolidated audited financial statements of the Guarantor, the Borrower shall separately provide audited financial statements for the Borrower's fiscal year.

(b)    If the Guarantor has no operational cashflow, any financial information will be incorporated into the Borrower's financial data. If the Guarantor has financial operations, it shall provide:

(1)    Within 150 days of each Fiscal Year end commencing with the year ended December 31, 20__, the Guarantor's audited financial statements (presented on a stand-alone basis); and

(2)    Within 45 days after the end of each fiscal quarterly period of each Fiscal Year, commencing with the fiscal quarterly period ended _____, 20__, unaudited financial information of the Guarantor presented on a stand-alone basis and on a basis substantially consistent with the format of the Guarantor's audited financial statements and in a form reasonably ascertainable to the Holders.

(c)    Investor Calls.  The Borrower will make, and will cause the Guarantor to make, its appropriate officers available for investor calls quarterly at a mutually agreeable time through _____, 20__, and after such time, upon no less than 10 days' prior written request of the holders of twenty-five percent (25%) in aggregate principal amount of Bonds, which request may be delivered by the Trustee, so long as such calls are no more often than quarterly during each year; provided, however, that if a Loan Event Default (as defined in the Loan Agreement) or an event of default under the Guaranty Agreement has occurred and is continuing, the Borrower and Guarantor shall be available for monthly calls at the discretion of the Trustee or the Holders of twenty-five (25%) in aggregate principal amount of Bonds. Notice of any investor calls under this Section shall be provided to all Holders, the Trustee and the MSRB no later than five (5) days prior to such call.

SECTION 5.    Reporting of Significant Events.

(a)    The Borrower shall give, or cause to be given, notice of the occurrence of any of the following events with respect to the Bonds in a timely manner not later than ten (10) Business Days of the occurrence of the event:

(1)    Principal and interest payment delinquencies;

(2)    Unscheduled draws on debt service reserves reflecting financial difficulties;

(3)    Unscheduled draws on credit enhancements reflecting financial difficulties;

(4)    Substitution of credit or liquidity providers, or their failure to perform;

(5)    Adverse tax opinions or issuance by the Internal Revenue Service of proposed or final determination of taxability or of a Notice of Proposed Issue (IRS Form 5701 TEB);

(6)    Tender offers;

(7)    Defeasances;

(8)    Rating changes;

(9)    Bankruptcy, insolvency, receivership or similar event of the obligated person; or

(10)    Default, event of acceleration, termination event, modification of terms, or other similar events under the terms of a Financial Obligation of the obligated person, any of which reflect financial difficulties.

(11)    Any Change in Control under the Indenture.

Note: for the purposes of the event identified in subparagraph (9), the event is considered to occur when any of the following occur:  the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the obligated person, or if such jurisdiction has been assumed by leaving the existing governmental body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the obligated person.

(b)    The Borrower shall give, or cause to be given, notice of the occurrence of any of the following events with respect to the Bonds, if material, in a timely manner not later than ten (10) Business Days after the occurrence of the event:

(1)    Unless described in Section 5(a)(5), other material notices or determinations by the Internal Revenue Service with respect to the tax status of the Bonds or other material events affecting the tax status of the Bonds;

(2)    Modifications to rights of Bondholders;

(3)    Optional, unscheduled or contingent Bond calls;

(4)    Release, substitution, or sale of property securing repayment of the Bonds;

(5)    Non-payment related defaults;

(6)    The consummation of a merger, consolidation, or acquisition involving an obligated person or the sale of all or substantially all of the assets of the obligated person, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms;

(7)    Appointment of a successor or additional trustee or the change of name of a trustee; or

(8)    Incurrence of a Financial Obligation of the obligated person, or agreement to covenants, events of default, remedies, priority rights, or other similar terms of a Financial Obligation of the obligated person, any of which affect security holders.

(c)    Whenever the Borrower obtains knowledge of the occurrence of a Listed Event described in Section 5(b) above, the Borrower shall determine if such event would be material under applicable federal securities laws.

(d)    Upon occurrence of a Listed Event described in Section 5(a) above, or determines that knowledge of a Listed Event described in Section 5(b) above would be material under applicable federal securities laws, the Borrower shall within ten (10) Business Days of occurrence file a notice of such occurrence with the MSRB. Notwithstanding the foregoing, notice of the Listed Event described in Section 5(b)(3) above need not be given under this subsection any earlier than the notice (if any) of the underlying event is given to Holders of affected Bonds pursuant to the Indenture.

(e)    The Borrower intends to comply with the Listed Events described in Section 5(a)(10) and Section 5(b)(8), and the definition of "Financial Obligation" in Section 1, with reference to the Rule, any other applicable

federal securities laws and the guidance provided by the Commission in Release No. 34-83885 dated August 20, 2018 (the "2018 Release"), and any further amendments or written guidance provided by the Commission or its staff with respect the amendments to the Rule effected by the 2018 Release.

SECTION 6.    Format for Filings with MSRB. Any report or filing with the MSRB pursuant to this Disclosure Agreement must be submitted in electronic format, accompanied by such identifying information as is prescribed by the MSRB.

SECTION 7.    Termination of Reporting Obligation. The Borrower's and the Guarantor's obligations under this Disclosure Agreement shall terminate upon the legal defeasance, prior redemption or payment in full of all of the Bonds.  If such termination occurs prior to the final maturity of the Bonds, the Borrower shall give notice of such termination in a filing with the MSRB.

SECTION 8.    Dissemination Agent. The Borrower may, from time to time, appoint or engage a Dissemination Agent to assist it in carrying out its obligations under this Disclosure Agreement, and may discharge any such Dissemination Agent, with or without appointing a successor Dissemination Agent. The Dissemination Agent shall not be responsible in any manner for the content of any notice or report prepared by the Borrower pursuant to this Disclosure Agreement. The initial Dissemination Agent shall be the Trustee.

SECTION 9.    Amendment; Waiver. Notwithstanding any other provision of this Disclosure Agreement, the Borrower, the Guarantor and the Dissemination Agent may amend this Disclosure Agreement, and any provision of this Disclosure Agreement may be waived, provided that the following conditions are satisfied:

(a)    if the amendment or waiver relates to the above provisions of Sections 3(a), 4, or 5(a) or (b), it may only be made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature or status of an obligated person with respect to the Bonds, or the type of business conducted;

(b)    the undertaking, as amended or taking into account such waiver, would, in the opinion of nationally recognized bond counsel, have complied with the requirements of the Rule at the time of the original issuance of the Bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances;

(c)    The amendment or waiver does not, in the opinion of nationally recognized bond counsel, materially impair the interests of the Holders or Beneficial Owners of the Bonds; and

(d)    the amendment or waiver is permitted by the Rule.

In the event of any amendment or waiver of a provision of this Disclosure Agreement, the Borrower shall describe such amendment in the next Annual Report, and shall include, as applicable, a narrative explanation of the reason for the amendment or waiver and its impact on the type (or in the case of a change of accounting principles, on the presentation) of financial information or operating data being presented by the Borrower. In addition, if the amendment relates to the accounting principles to be followed in preparing financial statements, (i) notice of such change shall be given in a filing with the MSRB, and (ii) the Annual Report for the year in which the change is made should present a comparison (in narrative form and also, if feasible, in quantitative form) between the financial statements as prepared on the basis of the new accounting principles and those prepared on the basis of the former accounting principles.

SECTION 10.    Additional Information. Nothing in this Disclosure Agreement shall be deemed to prevent the Borrower from disseminating any other information, using the means of dissemination set forth in this Disclosure Agreement or any other means of communication, or including any other information in any Annual Report or notice required to be filed pursuant to this Disclosure Agreement, in addition to that which is required by this Disclosure Agreement. If the Borrower chooses to include any information in any Annual Report or notice in addition to that which is specifically required by this Disclosure Agreement, the Borrower shall have no obligation under this

Disclosure Agreement to update such information or include it in any future Annual Report or notice of occurrence of a Listed Event or any other event required to be reported.

SECTION 11.     <u>Default</u>. In the event of a failure of the Borrower, the Guarantor or the Dissemination Agent to comply with any provision of this Disclosure Agreement, any Holder or Beneficial Owner of the Bonds may take such actions as may be necessary and appropriate, including seeking mandate or specific performance by court order, to cause the Borrower, the Guarantor or the Dissemination Agent to comply with its obligations under this Disclosure Agreement. The sole remedy under this Disclosure Agreement in the event of any failure of the Borrower, the Guarantor or the Dissemination Agent to comply with this Disclosure Agreement shall be an action to compel performance.

SECTION 12.     <u>Beneficiaries</u>. This Disclosure Agreement shall inure solely to the benefit of the Borrower, the Guarantor, the Dissemination Agent, the Participating Underwriter and Holders and Beneficial Owners from time to time of the Bonds, and shall create no rights in any other person or entity.

SECTION 13.     <u>Duties and Liabilities of Dissemination Agent</u>. The Dissemination Agent shall have only such duties as are specifically set forth in this Disclosure Agreement, and, to the extent permitted by law, the Borrower agrees to indemnify and save the Dissemination Agent, its officers, directors, employees and agents, harmless against any loss, expense and liabilities which it may incur arising out of or in the exercise or performance of its powers and duties hereunder, including the costs and expenses (including attorneys' fees) of defending against any claim of liability, but excluding claims and liabilities due to the Dissemination Agent's negligence or willful misconduct. The obligations of the Borrower under this Section shall survive resignation or removal of the Dissemination Agent and payment of the Bonds.  The Borrower shall pay the fees, charges and expenses of the Dissemination Agent in connection with its administration of this Disclosure Agreement.

Dated as of the date first set forth above.

**CARBONLITE P, LLC**

By: _____
      Name: Leon Farahnik
      Title: Chief Executive Officer

**CARBONLITE P HOLDINGS, LLC**

By: _____
      Name: Leon Farahnik
      Title: Chief Executive Officer

**PINNPACK P, LLC**

By: _____
      Name: Leon Farahnik
      Title: Chief Executive Officer

**UMB BANK, N.A.**, as Dissemination Agent

By: _____
      Authorized Officer

**SIGNATURE PAGE TO CONTINUING DISCLOSURE AGREEMENT**

**EXHIBIT A**

FORM OF NOTICE TO THE MUNICIPAL SECURITIES RULEMAKING BOARD
OF FAILURE TO FILE ANNUAL REPORT

Name of Bond Issue:    Pennsylvania Economic Development Financing Authority
Solid Waste Disposal Revenue Bonds
(CarbonLite P, LLC Project),
Series 2020

Name of Borrower:    CarbonLite P, LLC

Date of Issuance:    _____, 2020

NOTICE IS HEREBY GIVEN that the Borrower has not provided an Annual Report with respect to the above-named Bonds as required by the Continuing Disclosure Agreement of the Borrower, dated the Date of Issuance. [The Borrower anticipates that the Annual Report will be filed by _____.]

Dated: _____, 20_____.

**CARBONLITE P, LLC**

By:    _____[to be signed only if filed]_____

# AMENDED AND
# RESTATED
# PLEDGE AND SECURITY
# AGREEMENT

This AMENDED AND RESTATED PLEDGE AND SECURITY AGREEMENT ("*Security Agreement*") dated as of  March __, 2020, is entered into by and among CARBONLITE P, LLC, a Delaware limited liability company ("*Borrower*"), CARBONLITE P HOLDINGS, LLC, a Delaware limited liability company ("*Holdings*") and PINNPACK P, LLC, a Delaware limited liability company and wholly owned subsidiary of Borrower ("*Pinnpack*" and together with Holdings, the "*Guarantors*") and UMB BANK, NA as Trustee (the "*Bank*") pursuant to that certain Indenture dated as of June 1,  2019 ("*Indenture*") relating to $61,800,000 Pennsylvania Economic Development Financing Authority Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project), Series 2018 (the "*Bonds*"). The Borrower and Guarantors are collectively referred to herein as "*Grantor*".

Initially capitalized terms used in this Security Agreement have the meanings ascribed to such terms in **Annex 1**.  All initially capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Indenture.

# R E C I T A L S

A.      Borrower, Holdings, and Bank previously entered into that certain Pledge and Security Agreement, dated as of June 1, 2019 (the "*Original Security Agreement*") in connection with that certain Loan Agreement with PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY (the "*Issuer*"), dated as of June 1, 2019 (the "*Original Loan Agreement*") pursuant to which Issuer would lend to Borrower the gross proceeds from issuance of the Bonds pursuant to the Indenture;

B.      In connection with the Original Loan Agreement, Borrower and Holdings entered into the Original Security Agreement and granted to the Issuer a security interest in special assets as collateral security for the performance of all of the Secured Obligations (as defined therein);

C.      The Original Loan Agreement is being amended by that certain Amendment No.1 to Credit Agreement and Waiver, dated as of the date hereof (the "*Loan Amendment*");

D.      To secure Borrower and Holdings' obligations under the Loan Agreement, Borrower and Holdings entered into the Original Security Agreement, granting to Bank, for the benefit of the holders of the Bonds, a lien and security interest in and to all of the collateral described in the Original Security Agreement.

E.      The Indenture is being amended by that certain [Supplemental Indenture], dated as of the date hereof (the "*Supplemental Indenture*"), relating to $25,000,000 [Pennsylvania Economic Development Financing Authority Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project), Series 2020] (the "*Additional Bonds*").

US_ACTIVE-151993803.6

F.      Pursuant to that certain Guaranty Agreement, dated as of June 1, 2019 (as may be amended or restated from time to time, the "*Guaranty*"), Holdings unconditionally agreed to guarantee the obligations of the Borrower under the Loan Agreement;

G.      Pursuant to that certain Guaranty Agreement, dated as of the date hereof (as may be amended or restated from time to time, the "*Pinnpack Guaranty*"), Pinnpack has unconditionally agreed to guarantee the obligations of the Borrower under the Loan Agreement and Loan Amendment; and

H.      In connection with the Loan Amendment and Supplemental Indenture, Borrower, Holdings, and Bank desire to amend and restate the Original Security Agreement to add Pinnpack, a newly formed wholly owned subsidiary of Borrower, to be a Guarantor;

I.      Each Grantor agrees to enter into this Security Agreement and to grant to the Bank,for the benefit of the holders of the Bonds and Additional Bonds, as collateral security for the performance by Borrower and Guarantors of all of the Secured Obligations (as defined herein);

J.      This Security Agreement is for the express benefit of Issuer and Bank, in its capacity as Trustee under the Indenture.

**A G R E E M E N T**

NOW, THEREFORE, in consideration of the mutual promises, covenants, conditions, representations, and warranties hereinafter set forth, and for other good and valuable consideration, the parties hereto agree as follows:

1.      *Creation of Security Interest*.  Each Grantor hereby grants to Bank a continuing security interest in all of its presently existing and hereafter acquired or arising Collateral in order to secure the prompt payment and performance of all of the Secured Obligations.  Each Grantor acknowledges and affirms that such security interest in the Collateral has attached to all Collateral without further act on the part of Bank or such Grantor.  By its signature hereto, each Grantor hereby consents to the foregoing grant of collateral security for the Secured Obligations. IN THE EVENT BORROWER SELLS ALL THE SHARES OF PINNPACK, OR PINNPACK SELLS ALL OR SUBSTANTIALLY ALL OF ITS ASSETS, CONCURRENTLY WITH THE COMPLETION OF SUCH SALE, BORROWER SHALL DEPOSIT WITH TRUSTEE THE SUM OF [$10,000,000]. UPON SUCH DEPOSIT, PINNPACK SHALL BE RELEASED FROM ITS GUARANTY OF THE OBLIGATIONS OF BORROWER, THE TRUSTEE SHALL RELEASE THE SHARES OF PINNPACK FROM PLEDGE AND TRUSTEE SHALL RELEASE AND TERMINATE TRUSTEE'S SECURITY INTEREST IN PINNPACK'S ASSETS.

2.      *Further Assurances*.

2.1      Each Grantor hereby authorizes Bank to file, all financing statements, continuation financing statements, amendments, fixture filings and all other filings and recordings, with respect to the Collateral or any part thereof and amendments thereto that contain information

required, useful, convenient or appropriate to perfect the security interest granted pursuant to this Security Agreement, describing the Collateral as described in this Agreement or as Bank may otherwise determine is necessary, advisable or prudent to ensure the perfection of such security interests, including, with respect to any Grantor, describing the Collateral as "all assets" or "all property" or words of similar import. Grantor hereby irrevocably makes, constitutes, and appoints Bank (and Bank's officers, employees, or agents) as Grantor's true and lawful attorney with power to sign the name of such Grantor on any of the above-described documents or on any other similar documents which need to be executed, recorded, or filed, and to do any and all things necessary in the name and on behalf of Grantor in order to perfect, or continue the perfection of, Bank's security interests in the Collateral.  Grantor agrees that neither Bank, nor any of its designees or attorneys-in-fact, will be liable for any act of commission or omission, or for any error of judgment or mistake of fact or law with respect to the exercise of the power of attorney granted under this Section 2.1, other than as a result of its or their gross negligence or willful misconduct.  **THE POWER OF ATTORNEY GRANTED UNDER THIS SECTION 2.1 IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE UNTIL ALL OF THE SECURED OBLIGATIONS HAVE BEEN PAID IN FULL IN CASH, THE INDENTURE AND LOAN AGREEMENT TERMINATED, AND ALL OF GRANTOR'S DUTIES HEREUNDER AND THEREUNDER HAVE BEEN DISCHARGED IN FULL.**

2.2     Without limiting the generality of the foregoing Section 2.1 or any of the provisions of the Loan Agreement, promptly upon Bank's request, Grantor shall : (i) mark conspicuously Grantor's books and records with a legend, in form and substance reasonably satisfactory to Bank, indicating that the Collateral is subject to the security interest granted hereby; (ii) mark all Chattel Paper with a conspicuous legend indicating Bank's security interest therein and otherwise in form and substance reasonably satisfactory to Bank; and (iii) appear in and defend any action or proceeding which may affect Grantor's title to, or the security interest of Bank in, any of the Collateral.

2.3     With respect to the Negotiable Collateral (other than drafts received in the ordinary course of business so long as no Loan Default Event is continuing), Grantor shall, promptly upon reasonable request by Bank, endorse (where appropriate) and assign the Negotiable Collateral over to Bank, and deliver to Bank actual physical possession of the Negotiable Collateral together with such undated powers, or other relevant document of transfer, endorsed in blank as shall be reasonably requested by Bank, all in form and substance reasonably satisfactory to Bank.

2.4     *Borrower Interests.*

(a)     Neither Borrower nor Guarantors shall consent to the amendment of the Operating Agreement which modify the ownership structure of Holdings and its subsidiaries, or creates any additional ownership interests in Borrower or Holdings, in each case without the written consent of Bank (which consent the Bank shall not be obligated to provide absent the written direction of the Holders of a majority of the aggregate principal amount of the Outstanding Bonds and Additional Bonds).

(b)      Holdings shall at all times be the sole owner of 100% of the Borrower Interests.  The Borrower shall not issue any Borrower Interests to any person other than Holdings until the Bonds and Additional Bonds are no longer Outstanding.

(c)      Without the prior written consent of Bank (which consent the Bank shall not be obligated to provide absent the written direction of the Holders of a majority of the aggregate principal amount of the Outstanding Bonds and Additional Bonds), Guarantors will not vote to enable, or take any other action to permit, Borrower to issue any limited liability company or other beneficial interests or to any issue any other securities convertible into or granting the right to purchase or exchange limited liability company or other beneficial interests in Borrower, nor permit Borrower to have any new interest in Pinnpack.

(d)      To the extent not already delivered to Bank, Holdings shall deliver to Bank (i) simultaneously with the execution and delivery of this Agreement, all original certificates representing the Borrower Interests (each of which certificates shall constitute a "security certificate" (as defined in the UCC)), and (ii) promptly upon the receipt thereof by or on behalf of Grantor, all other certificates and instruments constituting Collateral.  Prior to delivery to Bank, all such certificates and instruments constituting Borrower Interests shall be held in trust by Grantor for the benefit of Bank pursuant hereto.  To the extent not already delivered to Bank, Borrower shall deliver to Bank (i) simultaneously with the execution and delivery of this Agreement, all original certificates representing the Pinnpack Interests (each of which certificates shall constitute a "security certificate" (as defined in the UCC)), and (ii) promptly upon the receipt thereof by or on behalf of Grantor, all other certificates and instruments constituting Collateral. Prior to delivery to Bank, all such certificates and instruments constituting Borrower Interests shall be held in trust by Grantor for the benefit of Bank pursuant hereto.  All such certificates shall be delivered in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment in blank, substantially in the form provided in **Schedule 3** attached hereto with, if Bank so requests, which original certificate(s) shall be held by Bank.

(e)      If Holdings shall, as a result of its ownership of the Borrower Interests, become entitled to receive or shall receive any limited liability company certificate (including, without limitation, any certificate representing a dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights, whether in addition to, in substitution of, as a conversion of, or in exchange for any interest in or shares or certificates of the Borrower Interests, or otherwise in respect thereof, Holdings shall accept the same as the agent of Bank, hold the same in trust for Bank and deliver the same forthwith to Bank in the exact form received, duly endorsed by Holdings to Bank together with an undated transfer power covering such certificate duly executed in blank by Holdings, to be held by Bank, subject to the terms hereof, as additional collateral security for the Secured Obligations.

(f)      If Borrower shall, as a result of its ownership of the Pinnpack Interests, become entitled to receive or shall receive any limited liability company certificate (including, without limitation, any certificate representing a dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in

connection with any reorganization), option or rights, whether in addition to, in substitution of, as a conversion of, or in exchange for any interest in or shares or certificates of the Pinnpack Interests, or otherwise in respect thereof, Borrower shall accept the same as the agent of Bank, hold the same in trust for Bank and deliver the same forthwith to Bank in the exact form received, duly endorsed by Borrower to Bank together with an undated transfer power covering such certificate duly executed in blank by Borrower, to be held by Bank, subject to the terms hereof, as additional collateral security for the Secured Obligations.

2.5     Borrower and Guarantors shall deliver to Bank a duly executed control agreement in form and substance reasonably satisfactory to Bank with respect to all Deposit Accounts, electronic Chattel Paper and Investment Property, before opening such Deposit Account or within five Business Days of acquiring electronic Chattel Paper or Investment Property.

2.6     In the event Grantor acquires or forms a Subsidiary, Grantor shall cause 100% of the issued and outstanding Ownership Interests of each such Subsidiary to be subject at all times to a first priority, perfected lien in favor of Bank.  In addition, promptly upon Bank's request, Grantor shall enter into such amendments to this Security Agreement as are reasonably requested by Bank to facilitate the pledge of such Ownership Interests.

3.     *Performance of Obligations*.

3.1     Anything herein to the contrary notwithstanding, (i)  the Grantor shall remain liable under the contracts and agreements included in the Collateral, to perform all of the duties and obligations thereunder to the same extent as if this Security Agreement had not been executed, (ii) the exercise by Bank of any of the rights hereunder shall not release any Grantor from any of its duties or obligations under such contracts and agreements included in the Collateral, and (iii) to the extent allowed under applicable law, Bank shall not have any obligation or liability under such contracts and agreements included in the Collateral by reason of this Security Agreement, nor shall Bank be obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder. Until an Event of Default shall occur and be continuing, except as otherwise provided in this Security Agreement, the Loan Agreement, or any other Borrower Loan Document (as defined in the Loan Agreement), Grantor shall have the right to possession and enjoyment of the Collateral for the purpose of conducting the ordinary course of their business, subject to and upon the terms hereof and of the Loan Agreement.  Without limiting the generality of the foregoing, it is the intention of the parties hereto that record and beneficial ownership of any Pledged Interests, including, without limitation, all of Grantor's voting, consensual, and dividend or distribution rights (except as set forth in Section 3.2 below), shall remain with the Grantor until the occurrence of and during the continuation of an Loan Default Event and until Bank shall notify the Grantor of Bank's exercise of voting, consensual, and/or dividend rights with respect to the Pledged Interests pursuant to Section 3.3 hereof.

3.2     Each Grantor shall be entitled to receive and retain (or dividend or distribute to its parent company) any and all dividends and/or distributions paid in respect of Ownership Interests which were distributed in accordance with the Loan Agreement; *provided*, *however*, that

any and all distributions paid or payable other than in cash in respect of, and any and all additional shares or instruments or other property received, receivable, or otherwise distributed in respect of, or in exchange for the Ownership Interests shall become and remain part of the Collateral without any further action by any Party, including:

(a)     All distributions paid or payable in cash in respect of any Ownership Interests in connection with a partial or total liquidation or dissolution, merger, consolidation of any Ownership Interests, or any exchange of stock, conveyance of assets, or similar corporate reorganization;

(b)     All cash paid with respect to, payable, or otherwise distributed on redemption of, or in exchange for, any Ownership Interests, and

(c)     after the occurrence and during the continuance of a Loan Default Event, and upon the election of Bank, all distributions in respect of any Ownership Interests (including cash dividends other than those described in clauses (a) and (b) above), shall be forthwith deposited by Grantor in the Deposit Account which is the subject of the Deposit Account Control Agreement and until so deposited, shall, if received by Grantor, be received in trust for the benefit of Bank, be segregated from the other property or funds of Grantor.

3.3     *Voting Rights*.

(a)     Upon the occurrence and during the continuation of Loan Default Event, (i) Bank may, at its option, and with 5 business days' prior notice to Grantor, and in addition to all rights and remedies available to Bank under any other agreement, at law, in equity, or otherwise, exercise all voting rights, and all other ownership or consensual rights in respect of any Pledged Interests owned by Grantor, but under no circumstances is Bank obligated by the terms of this Security Agreement to exercise such rights, and (ii) if Bank duly exercises its right to vote any of such Pledged Interests, Grantor hereby appoints Bank, Grantor's true and lawful attorney-in-fact and irrevocable proxy to vote such Pledged Interests in any manner Bank deems advisable for or against all matters submitted or which may be submitted to a vote of shareholders, partners or members, as the case may be. The power-of-attorney granted hereby is coupled with an interest and shall be irrevocable until the Secured Obligations have been paid in cash, in full.

(b)     For so long as Grantor shall have the right to vote the Pledged Interests owned by it, Grantor covenants and agrees that it will not, without the prior written consent of Bank, vote or take any consensual action with respect to such Pledged Interests which would reasonably be expected to materially and adversely affect the rights of Bank or which could have the effect of materially impairing the value of the Pledged Interests or that would reasonably be expected to materially and adversely affect the rights and remedies of Bank or Issuer under the Loan Agreement or the Indenture.

3.4     *Intercreditor Agreement*. Bank agrees that upon request of a Grantor made at a time that there exists no Event of Default, that Bank will, without need for consent of holders of the Bonds or Additional Bonds, enter into an Intercreditor Agreement substantially in the form attached to the Indenture ("*Intercreditor Agreement*").

4.    *Representations and Warranties*.  In order to induce Issuer to enter into the Loan Amendment and Supplemental Indenture and to make available the proceeds of the issuance of the Bonds and Additional Bonds to Borrower, in addition to the representations and warranties of Borrower set forth in the other documents which are incorporated herein by express reference, each Grantor represents and warrants to Issuer and to the Bank that, on the date hereof:

4.1    *Legal Name; State of Organization; Location of Chief Executive Office and Collateral; FEIN*.  Such Grantor's exact legal name, state of organization, FEIN and charter or organizational identification number is accurately set forth in Section 4.1 of **Schedule 1**.  Grantor's chief executive office is located at the address set forth in **Schedule 1**, and all other locations where such Grantor conducts business or Collateral is kept are set forth in Section 4.1 of **Schedule 1**. Such Grantor will not, without the prior written consent of Bank (which consent the Bank shall not be obligated to provide absent the written direction of the Holders of a majority of the aggregate principal amount of the Outstanding Bonds and Additional Bonds), (i) change either of its names, entity types or ownership structures or (ii) reorganize or reincorporate under the laws of another jurisdiction.

4.2    *Trade Names and Trade Styles*.  All trade names and trade styles under which such Grantor presently conduct its business operations are set forth in Section 4.2 of **Schedule 1**, and, except as set forth in Section 4.2 of **Schedule 1**, Grantor has not, at any time during the five years preceding the date of this Security Agreement: (i) been known as or used any other corporate, trade or fictitious name; (ii) changed its name; (iii) been the surviving or resulting corporation in a merger or consolidation; or (iv) acquired through asset purchase or otherwise any business of any person.

4.3    *Enforceability; Priority of Security Interest.*  (i) This Security Agreement creates a security interest which is enforceable against the Collateral in which such Grantor now has rights and will create a security interest which is enforceable against the Collateral in which Grantor hereafter acquires rights at the time such Grantor acquires any such rights, and (ii) Bank has a perfected security interest (to the fullest extent perfection can be obtained by filing, notification to third persons, possession or control) and a first priority security interest in the Collateral in which such Grantor now has rights (subject only to Permitted Liens), and will have a perfected and first priority security interest (to the fullest extent perfection can be obtained by filing, notification to third persons, possession or control) in the Collateral in which Grantor hereafter acquires rights at the time such Grantor acquires any such rights (subject only to Permitted Liens), in each case securing the payment and performance of the Secured Obligations.

4.4    *Other Financing Statements*. Other than financing statements in favor of Bank and financing statements filed in connection with Permitted Liens, to the knowledge of Grantor, no effective financing statement naming such Grantor as debtor, assignor, grantor, mortgagor, pledgor or the like and covering all or any part of the Collateral is on file in any filing or recording office in any jurisdiction.

4.5     *Equipment*.

(a)     None of the Equipment or other Collateral is affixed to real property, except the items of Collateral listed on **Schedule 2**, if any. Each Grantor may from time to time supplement **Schedule 2** by written notice to Bank, in which event such Grantor shall supply Bank with all information and documentation necessary to make all fixture filings required to perfect and protect the priority of Bank's security interest in all such Collateral which may be fixtures as against all persons having an interest in the premises to which such property may be affixed.

(b)     None of the Equipment is leased from or leased to any third person, except as set forth in Section 4.5 of **Schedule 1**.

4.6     *Deposit Accounts*.  The names and addresses of all financial institutions at which each Grantor maintains its Deposit Accounts, and the account numbers and account names of all such Deposit Accounts, are set forth in **Schedule 1**.

4.7     *Investment Property*.  No Grantor presently owns, holds or is in possession, of any Investment Property.

4.8     *Loan Agreement Representations*. Each Grantor makes the representations and warranties set forth in Section 2.2 of the Loan Agreement as they relate to such Grantor or to the Loan Documents to which such Grantor is a party, each of which is hereby incorporated herein by reference, and the Issuer and the Bank shall be entitled to rely on each of them as if they were fully set forth herein, provided that each reference in each such representation and warranty to the Borrower's knowledge shall, for the purposes of this Section 4.8, be deemed to be a reference to such Grantors' knowledge.

5.     *Covenants*.  In addition to the covenants of each Grantor set forth in the Loan Agreement and other documents expressly incorporated herein by reference, Grantor agrees that from the Closing Date and thereafter until the payment, performance and satisfaction in full, in cash, of the Secured Obligations:

5.1     *Defense of Collateral*. Such Grantor shall appear in and defend any action, suit or proceeding which may affect its title to or right or interest in, or Bank's right or interest in, any Collateral.

5.2     *Compliance with Laws, Etc.*  Such Grantor shall comply with all laws, regulations and ordinances, and all policies of insurance, relating to the possession, operation, maintenance and control of the Collateral.

5.3     *Location of Collateral.*  Each Grantor shall keep the tangible Collateral only at the locations identified on Section 4.1 of **Schedule 1**.

5.4     *Change in Name, Trade Name, Trade Style or FEIN*.  No Grantor shall change its legal name, trade names, trade styles or FEIN, or add any new trade names or trade

styles from those listed on **Schedule 1**, except upon giving at least thirty (30) days advance written notice thereof and delivering such documents as may be required by the Loan Agreement.

5.5     *Maintenance of Records.*  Each Grantor shall keep separate, accurate and complete books and records, disclosing Bank's security interest hereunder.

5.6     *Disposition of Collateral*. Each Grantor shall not surrender or lose possession of, sell, lease, rent, license, or otherwise dispose of or transfer any of the Collateral or any right or interest therein, except as permitted under the Loan Agreement.

5.7     *Investment Related Property*.

(a)     If any Grantor shall receive or become entitled to receive any Pledged Interests after the date hereof, it shall promptly (and in any event within 5 business days of receipt thereof) deliver to Bank a duly executed document which identify such Pledged Interests and make the same subject to this Agreement;

(b)     Except as otherwise permitted under the Loan Agreement, all sums of money and any property paid or distributed in respect of the Investment Property which are received by any Grantor shall be held by such Grantor in trust for the benefit of Bank segregated from such Grantor's other property, and such Grantor shall deliver it forthwith to Bank in the exact form received;

(c)     Each Grantor shall promptly deliver to Bank a copy of each material notice or other material written communication received by it in respect of any Pledged Interests;

(d)     Each Grantor shall not make or consent to any amendment or other modification or waiver with respect to any Pledged Interests, or enter into any agreement or permit to exist any restriction with respect to any Pledged Interests, to the extent prohibited by the Loan Agreement or the Indenture; and

(e)     Each Grantor agrees that it will cooperate with Bank in obtaining all necessary approvals and making all necessary filings under federal, state, local, or foreign law in connection with Bank's Lien on the Investment Property or any sale or transfer thereof.

5.8     *Delivery of Securities and Chattel Paper*.  Each Grantor will (a) deliver to the Bank immediately upon execution of this Security Agreement the originals of all Chattel Paper, and Securities constituting Collateral owned by it (if any then exist) and having a value in excess of $100,000, (b) hold in trust for the Bank upon receipt and immediately thereafter deliver to the Bank any Chattel Paper or  Securities constituting Collateral having a value in excess of $100,000, (c) upon the Bank's request, following the occurrence and during the continuance of an Event of Default, deliver to the Bank (and thereafter hold in trust for the Bank upon receipt and immediately deliver to the Bank) any Securities and Chattel Paper evidencing or constituting Collateral and having a value in excess of $100,000.

5.9     *Commercial Tort Claims*.  Each Grantor shall promptly, and in any event within ten (10) Business Days after the same is acquired by it, notify the Bank of any commercial tort claim (as defined in the UCC) acquired by it which is reasonably expected to be material to the business of the Grantor and, unless the Bank otherwise consents, Grantor shall enter into an amendment to this Security Agreement, granting to Bank a first priority security interest in such commercial tort claim.

6.     *Events of Default*.  An event of default ("*Event of Default*") shall exist under the terms of this Security Agreement (i) upon the occurrence of an Event of Default under the terms of the Indenture, Loan Agreement or Guaranty; or (ii) upon the failure by any Grantor to observe and perform any covenant, condition or agreement on its part required to be observed or performed by this Security Agreement, which continues for a period of fifteen (15) days after written notice delivered to the Grantors by the Bank and which notice shall specify such failure and request that it be remedied..

7.     *Rights and Remedies*.

7.1     During the continuance of an Event of Default, Bank, without notice or demand, may do any one or more of the following, all of which are authorized by each Grantor:

(a)     exercise (i) those rights and remedies provided in this Security Agreement or the Loan Agreement; or (ii) any rights and remedies without limitation available to a secured party under the UCC (whether or not the UCC applies to the affected Collateral) or under any other applicable law (including, without limitation, any law governing the exercise of a bank's right of setoff or bankers' lien) when a debtor is in default under a security agreement;

(b)     Without notice to or demand upon any Grantor, make such payments and do such acts as Bank considers necessary or reasonable to protect its security interests in the Collateral.  Each Grantor agrees to assemble the Collateral if Bank so requires, and to make the Collateral available to Bank as Bank may designate.  Each Grantor authorizes Bank to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any encumbrance, charge, or Lien that in Bank's reasonably determination appears to conflict with its security interests and to pay all expenses incurred in connection therewith.  With respect to any of owned or leased premises of a Grantor, such Grantor hereby grants Bank a license to enter into possession of such premises and to occupy the same, without charge, in order to exercise any of Bank's rights or remedies provided herein, at law, in equity, or otherwise;

(c)     Without notice to any Grantor (such notice being expressly waived), and without constituting a retention of any collateral in satisfaction of an obligation), set off and apply to the Secured Obligations any and all (i) balances and Deposit Accounts of each Grantor held by Bank or Issuer, or (ii) indebtedness at any time owing to or for the credit or the account of a Grantor held by Bank, including without limitation exercise any rights or remedies under any applicable Deposit Account Control Agreement;

(d)     Hold, as cash collateral, any and all balances and Deposit Accounts of any Grantor held by Bank, to secure the full and final repayment of all of the Secured Obligations;

(e)     Store, finish, maintain, repair, prepare for sale, advertise for sale, and sell (in the manner provided for herein) and ship the Collateral.  Bank is hereby granted an irrevocable license or other right to use, without charge, Grantor's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, URLs, domain names and advertising matter, or any property of a similar nature, and to the extent it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral;

(f)     Sell the Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including any Grantor's premises) as Bank determines is commercially reasonable.  Bank shall have no obligation to clean-up or otherwise prepare the Collateral for sale.  It is not necessary that the Collateral be present at any such sale;

(g)     Bank shall give notice of the disposition of the Collateral as follows:

(i)     Bank shall give each Grantor and each holder of a security interest in the Collateral who has filed with Bank a written request for notice, a notice in writing of the time and place of public sale, or, if the sale is a private sale or some other disposition other than a public sale is to be made of the Collateral, then the time on or after which the private sale or other disposition is to be made;

(ii)     The notice shall be personally delivered or mailed, postage prepaid, to each Grantor as provided in Section 9.1 of the Loan Agreement, at least 10 days before the date fixed for the sale, or at least 10 days before the date on or after which the private sale or other disposition is to be made; no notice needs to be given prior to the disposition of any portion of the Collateral that is perishable or threatens to decline speedily in value or that is of a type customarily sold on a recognized market.  Notice to persons other than Grantor claiming an interest in the Collateral shall be sent to such addresses as they have furnished to Bank;

(iii)     If the sale is to be a public sale, Bank also shall give notice of the time and place by publishing a notice one time at least 10 days before the date of the sale in a newspaper of general circulation in the county in which the sale is to be held;

(h)     Bank may credit bid and purchase at any public sale;

(i)     Each Grantor agrees that Bank shall be under no obligation to accept any noncash proceeds in connection with any sale or disposition of Collateral unless failure to do so would be commercially unreasonable.  If Bank agrees in its sole discretion to accept noncash proceeds (unless the failure to do so would be commercially unreasonable), Bank may ascribe any commercially reasonable value to such proceeds.  Without limiting the foregoing, Bank may apply a commercially reasonable discount factor in determining the present value of proceeds to be

received in the future or may elect to apply proceeds to be received in the future only as and when such proceeds are actually received in cash by Bank;

(j)     The following shall be the basis for any finder of fact's determination of the value of any Collateral which is the subject matter of a disposition giving rise to a calculation of any surplus or deficiency under Section 9-615(f) of the UCC: (i) the Collateral which is the subject matter of the disposition shall be valued in an "as is" condition as of the date of the disposition, without any assumption or expectation that such Collateral will be repaired or improved in any manner; (ii) the valuation shall be based upon an assumption that the transferee of such Collateral desires a resale of the Collateral for cash promptly (but no later than 30 days) following the disposition; (iii) all reasonable closing costs customarily borne by the seller in commercial sales transactions relating to property similar to such Collateral shall be deducted including, without limitation, brokerage commissions, tax prorations, attorney's fees, whether in-house or outside counsel is used, and marketing costs; (iv) the value of the Collateral which is the subject matter of the disposition shall be further discounted to account for any estimated holding costs associated with maintaining such Collateral pending sale (to the extent not accounted for in (iii) above), and other maintenance, operational and ownership expenses; and (v) any expert opinion testimony given or considered in connection with a determination of the value of such Collateral must be given by persons having at least 5 years' experience in appraising property similar to the Collateral and who have conducted and prepared a complete written appraisal of such Collateral taking into consideration the factors set forth above. The "value" of any such Collateral shall be a factor in determining the amount of proceeds which would have been realized in a disposition to a transferee other than a secured party, a person related to a secured party or a secondary obligor under Section 9-615(f) of the UCC; and

(k)     Notwithstanding any provision hereof to the contrary, Bank shall be entitled to register on the books of the appropriate Grantor, the equity interests held by Bank as Collateral Security in the name of the Bank or its designee (if not already so registered), upon providing ten (10) Business Days' notice to the applicable Grantor commencing on the date on which notice of such intention to exercise any of such rights shall have been given by Bank to the appropriate Grantor, which notice may, at Bank's option, be included within any notice furnished by Bank to Borrower under the Loan Agreement.

7.2     Bank shall have no obligation to attempt to satisfy the Secured Obligations by collecting any portion of the Collateral which includes a claim for payment, and Bank may release, modify or waive any Collateral provided as security for the Secured Obligations or any portion thereof, all without affecting Bank's rights against each Grantor. Each Grantor waives any right it may have to require Bank to pursue any third person for any of the Secured Obligations.

7.3     Bank may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral, and Bank's compliance therewith will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

7.4     Bank may sell the Collateral without giving any warranties as to the Collateral. Bank may specifically disclaim any warranties of title, fitness for a particular purpose

or the like. This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

7.5    If Bank sells any of the Collateral upon credit, the applicable Grantor will be credited only with payments actually made by the purchaser, received by Bank and applied to the indebtedness of the purchaser. In the event that the purchaser fails to pay for the Collateral, Bank may resell the Collateral and the applicable Grantor will be credited with the proceeds of such sale.

7.6    Bank shall be under no obligation to marshal any assets in favor of any Grantor, or against or in payment of the Secured Obligations or any other obligation owed to Bank by any Grantor or any other person.

7.7    Upon the exercise by Bank of any power, right, privilege, or remedy pursuant to this Security Agreement which requires any consent, approval, registration, qualification, or authorization of any governmental authority, each Grantor agrees to execute and deliver, or will cause the execution and delivery of, all applications, certificates, instruments, assignments, and other documents and papers that Bank or any purchaser of the Collateral may be required to obtain for such governmental consent, approval, registration, qualification, or authorization.

7.8    The rights and remedies of Bank and/or Issuer under this Security Agreement, the Loan Agreement, the Indenture, and all other agreements contemplated hereby and thereby shall be cumulative. Bank shall have all other rights and remedies not inconsistent herewith as provided under the UCC, by law, or in equity. No exercise by Bank of any one right or remedy shall be deemed an election of remedies, and no waiver by Bank of any default on Grantor's part shall be deemed a continuing waiver of any further defaults. No delay by Bank shall constitute a waiver, election or acquiescence with respect to any right or remedy.

7.9    All Proceeds of Collateral and any other amounts received by Bank as payment on the Secured Obligations following an Event of Default and exercise by Bank of its rights and remedies shall be applied as follows:

(a)    first, to pay any Expenses due to Bank until paid in full,

(b)    second, as provided in the Indenture, and

(c)    third, to the applicable Grantor or such other person entitled thereto under applicable law.

7.10    Grantor's Obligations Upon Event of Default. Upon the request of the Bank after the occurrence and during the continuation of an Event of Default, each Grantor will:

(a)    assemble and make available to the Bank the Collateral and any books and records relating thereto at any place or places specified by the Bank, whether at the Facility, the Grantor's premises or elsewhere; and

(b)     permit the Bank, by the Bank's representatives and agents, to enter, occupy and use any premises where all or any part of the Collateral, or the books and records relating thereto, or both, are located, to take possession of all or any part of the Collateral or the books and records relating thereto, or both, to remove all or any part of the Collateral or the books and records relating thereto, or both, and to conduct sales of the Collateral, without any obligation to pay the Grantor for such use and occupancy.

8.     *Bank Not Liable*.  Bank shall not otherwise be liable or responsible in any way or manner for:  (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion or from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other person whomsoever.  Each Grantor shall bear the risk of loss or damage of the Collateral; *provided*, *however*, that Bank shall be liable for any such loss or damage arising out of Bank's gross negligence or willful misconduct.

9.     *Notices*.  All notices or demands by any party hereto to the other party and relating to this Security Agreement shall be made in the manner and to the addresses set forth in Section 8.1 of the Loan Agreement, except that notice to any Grantor shall be sent to Borrower.

10.     *General Provisions*.

(a)     *Successors and Assigns*.  This Security Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each Grantor and Bank; *provided, however*, that no Grantor may assign this Security Agreement nor delegate any of their duties hereunder without Bank's prior written consent, which such consent shall not be unreasonably withheld, and any prohibited assignment or delegation shall be absolutely void.  No consent by Bank to an assignment by any Grantor shall release such Grantor from the Secured Obligations.

(b)     *Exhibits and Schedules*.  All of the exhibits and schedules attached hereto shall be deemed incorporated by reference.

(c)     *No Presumption Against Any Party*.  Neither this Security Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Bank or the Grantors, whether under any rule of construction or otherwise.  On the contrary, this Security Agreement has been reviewed by each of the parties and their counsel and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

(d)     *Amendments and Waivers*.  Any provision of this Security Agreement, the Loan Agreement or any other document to which the Grantors are a party may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by the party asserted to be bound thereby, and then such amendment or waiver shall be effective only in the specific instance and specific purpose for which given.

(e)      *Counterparts; Integration; Effectiveness*.  This Security Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  This Security Agreement constitutes the entire agreement and understanding among the parties hereto and supersedes any and all prior agreements and understandings, oral or written, relating to the subject matter hereof.  This Security Agreement shall become effective when executed by each of the parties hereto and delivered to Bank.

(f)      *Severability*.   The provisions of this Security Agreement are severable.  The invalidity, in whole or in part, of any provision of this Security Agreement shall not affect the validity or enforceability of any other of its provisions.  If one or more provisions hereof shall be declared invalid or unenforceable, the remaining provisions shall remain in full force and effect and shall be construed in the broadest possible manner to effectuate the purposes hereof.

(g)      *Further Documentation*.      In the event any Grantor intends to enter into an agreement with a lender to provide Short Term Indebtedness and in connection therewith to grant a Lien to such lender (or an Administrative Agent for the lenders) in Shared Collateral, Bank and such Grantor agree to enter into the Intercreditor Agreement in substantially the form set forth in the Indenture and such other customary documentation, that is consistent with the Intercreditor Agreement, as may be reasonably requested by such lender, and which is in form and substance reasonably satisfactory to Bank.  Bank shall be entitled to rely on an opinion of counsel as to whether any Intercreditor Agreement proposed by such Grantor is substantially in the form set forth in the Indenture.

11.      *Termination*.   Upon the payment, performance and satisfaction in full of the Secured Obligations, Bank shall, at any Grantor's expense, upon the written request of any Grantor, execute and deliver to the Grantor a proper instrument or instruments acknowledging the release and termination of the security interests created by this Security Agreement and shall authorize the Grantor to file the appropriate termination statements evidencing the same, and shall duly assign and deliver to the applicable Grantor such of the Collateral as may be in the possession of the Bank.

12.      *CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; CLASS ACTION WAIVER*.

(a)      THE VALIDITY OF THIS SECURITY AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, WITHOUT REGARD FOR PRINCIPLES OF CONFLICTS OF LAWS.

(b)     THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS SECURITY AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN BERKS COUNTY, (OR THE EASTERN DISTRICT OF PENNSYLVANIA) COMMONWEALTH OF PENNSYLVANIA, *PROVIDED*, *HOWEVER*, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT BANK'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE BANK ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.  GRANTOR AND BANK WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF *FORUM NON CONVENIENS* OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION.

(c)     EACH PARTY HERETO HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS SECURITY AGREEMENT OR ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS.  EACH PARTY HERETO REPRESENTS THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, A COPY OF THIS SECURITY AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

13.     *Obligations Absolute*.  Each Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description. All obligations of each Grantor hereunder shall be absolute and unconditional irrespective of:

(a)     any illegality or lack of validity or enforceability of any Secured Obligation or the Indenture, Loan Agreement, the Guaranty Agreement, or any related agreement or instrument;

(b)     any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations or any other obligation of any party under the Borrower Loan Documents, or any rescission, waiver, amendment or other modification of any Borrower Loan Document, the Guaranty Agreement or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

(c)     any taking, exchange, substitution, release, impairment or non-perfection of any Collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for the Secured Obligations;

(d)     any manner of sale, disposition or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations;

(e)     any default, failure or delay, willful or otherwise, in the performance of the Secured Obligations;

(f)     any change, restructuring or termination of the corporate structure, ownership or existence of any Grantor or any of its Subsidiaries or any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Grantor or its assets or any resulting release or discharge of any Secured Obligations;

(g)     the failure of any other Person to execute or deliver this Agreement, any Joinder Agreement or any other agreement or the release or reduction of liability of any Grantor or other grantor or surety with respect to the Secured Obligations;

(h)     the failure of any Secured Party to assert any claim or demand or to exercise or enforce any right or remedy under the provisions of any Borrower Loan Document or otherwise;

(i)     any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, any Grantor against the Issuer or Bank or any other financing participant; or

(j)     any other circumstance (including, without limitation, any statute of limitations) or manner of administering the Loans or any existence of or reliance on any representation by any financing participant that might vary the risk of any Grantor or otherwise operate as a defense available to, or a legal or equitable discharge of, any Grantor or any other guarantor or surety.

*   *   *

*[remainder of this page intentionally left blank]*

IN WITNESS WHEREOF, the parties have executed this Security Agreement as of the date first set forth above.

Borrower:                          **CARBONLITE P,  LLC,**
                                   a Delaware limited liability company

                                   By:_____
                                   Name:_____
                                   Title:_____

Bank:                              **UMB BANK, NA**

                                   By_____
                                   Name:_____
                                   Title:_____

Guarantors:                        **CARBONLITE P HOLDINGS, LLC**,
                                   a Delaware limited liability company

                                   By:_____
                                   Name:_____
                                   Title:_____

                                   **PINNPACK P,  LLC,**
                                   a Delaware limited liability company

                                   By:_____
                                   Name:_____
                                   Title:_____

Annex 1 to Security Agreement

Definitions and Construction

1.    Definitions.  The following terms, as used in this Security Agreement, shall have the following meanings:

"*Accounts*" means any and all of each Grantor's presently existing and hereafter arising accounts (as defined in the UCC).

"*Bank*" has the meaning assigned to such term in the Preamble.

"*Borrower*" is defined in the Preamble.

"*Borrower Interests*" means any membership interest in the Borrower of whatever type or any options, warrants, calls or commitments of any such character whatsoever relating to ownership or equity in the Borrower and any indebtedness or other security convertible into any ownership interest or equity in the Borrower.

"*Operating Agreement*" means the Limited Liability Company Agreement  of Borrower dated May 23, 2018, as amended by First Amendment dated as of May 31, 2019, and as the same may be further amended, restated, supplemented and otherwise modified from time to time in accordance with Section 2.4 hereof.

"*Chattel Paper*" means all of each Grantor's presently existing and hereafter acquired or created chattel paper (as defined in the UCC).

"*Collateral*" means the following of each Grantor, collectively: (i) any and all Accounts, Payment Intangibles, Inventory, Chattel Paper, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Goods, Instruments, Investment Property, Negotiable Collateral, Ownership Interests, copyrights, patents and trademarks (and all licenses thereof), commercial tort claims (as defined in the UCC), and all accession to, substitutions for and replacements, proceeds, insurance proceeds and products of the foregoing, together with all books and records, operational manuals or like documents relating to the activities of each Grantor at the Facility, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto, and any General Intangibles at any time evidencing or relating to any of the foregoing, in each case whether now existing or hereafter acquired or created , and (ii) any cash, cash equivalents, money or other assets of any Grantor that now or hereafter come into the possession, custody, or control of Bank and any Proceeds or products of any of the foregoing, or any portion thereof.

"*Deposit Account*" means all of each Grantor's presently existing and hereafter acquired or arising deposit accounts (as defined in the UCC).

"*Documents*" means all of each Grantor's presently existing and hereafter acquired or arising documents (as defined in the UCC).

"*Equipment*" means any and all of each Grantor's presently existing and hereafter acquired equipment (as defined in the UCC), wherever located, and all Fixtures (as defined in the UCC).

"*Event of Default*" has the meaning defined in Section 6.

"*Expenses*" has the meaning of "*Expenses*" under the Loan Agreement and shall also mean: any and all reasonable costs or expenses required to be paid by Grantor under this Security Agreement which are paid or advanced by Bank; all reasonable costs and expenses of Bank (and Issuer), including their respective reasonable attorneys' fees and expenses (including reasonable attorneys' fees incurred pursuant to proceedings arising under the Bankruptcy Code), incurred or expended to correct any default or enforce any provision of this Security Agreement, or in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, irrespective of whether a sale is consummated; and all reasonable costs and expenses of suit incurred or expended by Bank and/or Issuer, including its reasonable attorneys' fees and expenses (including reasonable attorneys' fees incurred pursuant to proceedings arising under the Bankruptcy Code) in enforcing or defending this Security Agreement, irrespective of whether suit is brought.

"*FEIN*" means Federal Employer Identification Number.

"*Fixtures*" has the meaning set forth in the UCC.

"*General Intangibles*" has the meaning set forth in the UCC.

"*Goods*" has the meaning set forth in the UCC.

"*Grantor*" has the meaning assigned to such term in the Preamble.

"*Guarantors*" has the meaning assigned to such term in the Preamble.

"*Indenture*" has the meaning assigned to such term in the Preamble.

"*Instruments*" means any and all of Grantor's presently existing and hereafter acquired or arising instruments (as defined in the UCC).

"*Intercreditor Agreement*" has the meaning assigned to such term in Section 3.4.

"*Inventory*" has the meaning set forth in the UCC.

"*Investment Property*" means any and all of each Grantor's presently existing and hereafter acquired (i) investment property (as defined in the UCC), and (ii) all of the following regardless of whether classified as investment property under the UCC: all Pledged Interests.

"*Issuer*" is defined in the Recitals.

"*Loan Agreement*" is defined in the Recitals.

"*Loan Documents*" means the Loan Agreement, Loan Amendment, Indenture, Supplemental Indenture, Pinnpack Guaranty, Guaranty, and any other related document.

"*Negotiable Collateral*" means any and all of each Grantor's presently existing and hereafter acquired or arising letters of credit, letter of credit rights, advises of credit, certificates of deposit, notes, drafts, money, cash, cash equivalents, Instruments, Documents and tangible Chattel Paper.

"*Ownership Interests*" means all of each Grantor's shares of stock, partnership interests, limited liability company interests, any evidence of ownership of an equity interest in any Subsidiary, including without limitation the Borrower Interests.

"*Payment Intangibles*" has the meaning set forth in the UCC.

"*Pinnpack*" is defined in the Preamble.

"*Pinnpack Interests*" means any membership interest in Pinnpack of whatever type or any options, warrants, calls or commitments of any such character whatsoever relating to ownership or equity in the Borrower and any indebtedness or other security convertible into any ownership interest or equity in the Borrower.

"*Pledged Interests*" means all of Grantor's right, title and interest in and to all of the Ownership Interests now or hereafter owned by Grantor, regardless of class or designation, including, without limitation, in each subsidiary company of Grantor, and all substitutions therefor and replacements thereof, all Proceeds thereof and all rights relating thereto, including, without limitation, any certificates representing the Ownership Interests, the right to request after the occurrence and during the continuation of an Event of Default that such Ownership Interests be registered in the name of Bank or any of its nominees, the right to receive any certificates representing any of the Ownership Interests and the right to require that such certificates be delivered to Bank together with undated powers or assignments of investment securities with respect thereto, duly endorsed in blank by Grantor.

"*Proceeds*" means whatever is receivable or received from or upon the sale, lease, license, collection, use, exchange or other disposition, whether voluntary or involuntary, of any Collateral, including "proceeds" as defined in the UCC, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to or for the account of Grantor from time to time with respect to any of the Collateral, any and all payments (in any form whatsoever) made or due and payable to Grantor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any Governmental Authority (or any person acting under color of Governmental Authority), any and all other amounts from time to time paid or payable under or in connection with any of the Collateral or for or on account of any damage or injury to or conversion of any Collateral by any person, any and all other tangible or intangible property received upon the sale or disposition of Collateral, and all proceeds of proceeds.

"*Rights to Payment*" means all Accounts and any and all rights and claims to the

payment or receipt of money or other forms of consideration of any kind in, to and under all electronic Chattel Paper, Negotiable Collateral and Proceeds thereof.

"*Secured Obligations*" means, collectively, (i) the obligation to make "Loan Repayments" as defined in the Loan Agreement and/or the Indenture, all other obligations of any Grantor arising under the Indenture, Loan Agreement or the Guaranty Agreement, and (ii) any and all debts, liabilities, obligations, or undertakings owing by any Grantor to Bank or Issuer arising under, advanced pursuant to, or evidenced by this Security Agreement, whether direct or indirect, absolute or contingent, matured or unmatured, due or to become due, voluntary or involuntary, whether now existing or hereafter arising, and including all interest not paid when due and all Expenses which Grantor is required to pay or reimburse pursuant to this Security Agreement, the Indenture, the Loan Agreement or the Guaranty Agreement.

"*Security Agreement*" shall mean this Security Agreement, as amended or restated from time to time.

"*Shared Collateral*" means the "ABL Priority Collateral" as defined in the Intercreditor Agreement, if any.

"*Subsidiary*" means any entity a majority of whose voting equity interests are owned by Grantor.

"*UCC*" means the Uniform Commercial Code as in effect in the Commonwealth of Pennsylvania.

2.      <u>Construction</u>.  Unless the context of this Security Agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the part includes the whole, "including" is not limiting, and "or" has the inclusive meaning represented by the phrase "and/or." References in this Security Agreement to "determination" by Bank include reasonable estimates (absent manifest error) by Bank (in the case of quantitative determinations) and reasonable beliefs (absent manifest error) by Bank (in the case of qualitative determinations). The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Security Agreement refer to this Security Agreement as a whole and not to any particular provision of this Security Agreement. Article, section, subsection, exhibit, and schedule references are to this Security Agreement unless otherwise specified.

**SCHEDULE 1**

Section 4.1 – Legal Name; State of Organization; Location of Chief Executive Office and Collateral; FEIN

| Grantor | State of Organization | FEIN | Organizational ID # | Locations |
|---|---|---|---|---|
| CarbonLite P, LLC | Delaware | 83-0825453 | 6896653 | 10250 Constellation Blvd, Suite 2820<br><br>Los Angeles CA 90067 |
| Pinnpack P, LLC | Delaware | [ ] | 7814798 | [ ] |

## SCHEDULE 1

Section 4.2 – Trade Names and Styles; Fictitious Business Names

None.

## SCHEDULE 1

Section 4.5 – Equipment

None

**SCHEDULE 1**

Section 4.6 – Deposit Accounts

| Grantor | Name of Depository | Address | Account Number | Account Name |
|---|---|---|---|---|
| CarbonLite P, LLC | Pacific Western Bank | 9320 Wilshire Boulevard Suite 105 Beverly Hills, CA 90212 | | |
| Pinnpack P, LLC | [  ] | [  ] | | |

3

## SCHEDULE 2

## Fixtures

All "fixtures" as defined by Pennsylvania law

## SCHEDULE 3

### Form of Irrevocable Transfer Power (Carbonlite P, LLC)

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers to _____ _____ the following equity interest in CARBONLITE P, LLC, a Delaware limited liability company.

Certificate No.                    No. of Units/Interests


and irrevocably appoints: _____

its agent and attorney-in-fact to transfer all or any part of such equity interest and to take all necessary and appropriate action to effect any such transfer.  The agent and attorney-in-fact may substitute and appoint one or more persons to act for it.  The effectiveness of a transfer pursuant to this transfer power shall be subject to any and all transfer restrictions referenced on the face of the certificates evidencing such interest or in the operating agreement of the subject limited liability company, to the extent they may from time to time exist.

Date: _____

Witness by:

_____

_____

**CARBONLITE P HOLDINGS, LLC**, a Delaware limited liability company


By:_____
    Name:
    Title:

1

**Form of Irrevocable Transfer Power (Pinnpack P, LLC)**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers to _____ _____ the following equity interest in PINNPACK P, LLC, a Delaware limited liability company.

Certificate No.                    No. of Units/Interests

and irrevocably appoints: _____

its agent and attorney-in-fact to transfer all or any part of such equity interest and to take all necessary and appropriate action to effect any such transfer. The agent and attorney-in-fact may substitute and appoint one or more persons to act for it. The effectiveness of a transfer pursuant to this transfer power shall be subject to any and all transfer restrictions referenced on the face of the certificates evidencing such interest or in the operating agreement of the subject limited liability company, to the extent they may from time to time exist.

Date: _____

Witness by:

_____

_____

**CARBONLITE P, LLC**, a Delaware limited liability company

By:_____
    Name:
    Title:

1

# CALIFORNIA NOTARY ACKNOWLEDGEMENT

## (CARBONLITE P, LLC)

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____

On _____ before me, _____ (insert name and title of the officer), personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____.        (Seal)

*Acknowledgement*
*to Amended and Restated Pledge and Security Agreement*

# CALIFORNIA NOTARY ACKNOWLEDGEMENT

## (PINNPACK P, LLC)

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____

On _____ before me, _____ (insert name and title of the officer), personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____.        (Seal)

*Acknowledgement*
*to Amended and Restated Pledge and Security Agreement*

# MINNESOTA NOTARY ACKNOWLEDGEMENT

## UMB BANK, NA

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF MINNESOTA

COUNTY OF _____

This instrument was acknowledged before me _____ (date) by
_____ (name of signatory) as
_____ (type of authority, e.g., officer, trustee, etc.) of
_____ (name of party on behalf of whom the instrument was executed).


Notary Public

Signature: _____

Printed Name: _____

My Commission Expires:_____

Acting in the County of: _____


(Seal)

# CALIFORNIA NOTARY ACKNOWLEDGEMENT

### CARBONLITE P HOLDINGS, LLC

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____

On _____ before me, _____ (insert name and title of the officer), personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____.    (Seal)

*Acknowledgement*
*to Amended and Restated Pledge and Security Agreement*

**SCHEDULE 1**

**NEW SCHEDULE 1.01(c)**

**SCHEDULE 1.01(c)**
**TO**
**CREDIT AGREEMENT**

**Shareholder Notes**

1.  7% Notes

| Date | Name | Loan Amount |
|---|---|---|
| **FIRST BATCH:** | | |
| 11/27/2012 | Ebrahim Simhaee | $500,000 |
| 12/14/2012 | Behrooz Broukhim, MD, Inc. Defined Pension Plan & Trust | $250,000 |
| 12/17/2012 | RAM 2 GP, A General Partnership | $350,000 |
| 1/2/2013 | Morad M. Hariri Family Trust | $1,000,000 |
| 1/4/2013 | George & Soheila Daneshgar Family Living Trust Dtd. 3/14/2003 | $500,000 |
| 1/11/2013 | Ebrahim Simhaee | $100,000 |
| 1/14/2013 | Kambiz Hakim | $500,000 |
| | **SUBTOTAL:** | **$3,200,000** |
| **SECOND BATCH:** | | |
| 5/1/2013 | Morad M. Hariri Family Trust | $300,000 |
| 5/1/2013 | Kamran H. Broukhim MD DBPP | $150,000 |
| 5/1/2013 | Hariri Family 2012 Irrevocable Trust | $120,000 |
| 5/1/2013 | Max-California Associates | $100,000 |
| 5/21/2013 | Benjamin Broukhim, MD, Inc. | $120,000 |
| 5/1/2013 | Bijan Daneshgar | $100,000 |
| 5/1/2013 | Bijan Nahai | $60,000 |
| 5/1/2013 | Farhad (David) Hekmat | $60,000 |
| 5/1/2013 | Farshid Hekmat | $60,000 |
| 5/1/2013 | KRT Trust | $70,000 |
| 5/1/2013 | The Brian G. Trust, Sassan Ohebsion Trustee | $30,000 |
| 5/1/2013 | The Theodore G. Trust, Sassan Ohebsion Trustee | $30,000 |
| | **SUBTOTAL:** | **$1,200,000** |
| | **GRAND TOTAL:** | **$4,400,000** |

2.  10% Notes

| Date | Name | Loan Amount |
|---|---|---|
| **FIRST BATCH:** | | |

| 9/30/2011 | HPC Industries, LLC | $1,435,551 |
|---|---|---|
| 9/30/2011 | CLI Mason, LLC | $1,233,198 |
| 9/30/2011 | George Daneshgar, Trustee of The George & Soheila Daneshgar Family Living Trust dtd 3/14/2003 | $424,516 |
| 9/30/2011 | Joseph and Shiva Daneshgar, Trustees of the Joseph and Shiva Daneshgar Family Living Trust | $424,949 |
| 9/30/2011 | Bahman Farahnik, Trustee of the 1996 Bahman Farahnik & Raheleh Farahnik Revocable Trust | $38,532 |
| 9/30/2011 | Sassan Ohebsion, Trustee of The Brian G. Trust | $48,592 |
| 9/30/2011 | Sassan Ohebsion, Trustee of The Theodore G. Trust | $48,592 |
| 9/30/2011 | Kambiz Hakim | $188,718 |
| 9/30/2011 | Halimi Capital LLC | $242,808 |
| 9/30/2011 | Morad Hariri, Trustee of the MoradM. Hariri Family Trust | $151,148 |
| 9/30/2011 | ANMH Investments LLC | $64,832 |
| 9/30/2011 | Marvin Liebman & Simone Liebman as trustees of the Liebman Family Trust dated 10-20-10 | $19,420 |
| 9/30/2011 | Iraj Maroofian, Trustee of the Iraj and Shirin Maroofian 2008 Trust | $27,262 |
| 9/30/2011 | David Pourbaba | $53,963 |
| 9/30/2011 | Max-California Associates, a California General Partnership | $259,202 |
| 9/30/2011 | Kamiar Torbati, Trustee of the KRT Trust Dated 5/21/07 | $80,791 |
| 9/30/2011 | Gita Torbati, Trustee of the GED Trust Dated May 11, 2010 | $53,963 |
| 9/30/2011 | AAEE Ldd. Partnership | $53,963 |
| 9/30/2011 | Richard Zirkler | $150,000 |
| | **SUBTOTAL:** | **$5,000,000** |
| **SECOND BATCH:** | | |
| 1/15/2012 | HPC Industries, LLC | $1,435,550 |
| 1/15/2012 | CLI Mason, LLC | $1,233,198 |
| 1/15/2012 | George Daneshgar, Trustee of The George & Soheila Daneshgar Family Living Trust dtd 3/14/2003 | $94,000 |
| 1/15/2012 | Joseph and Shiva Daneshgar, Trustees of the Joseph and Shiva Daneshgar Family Living Trust | $94,000 |
| 1/15/2012 | Sassan Ohebsion, Trustee of The Brian G. Trust | $94,840 |
| 1/15/2012 | Sassan Ohebsion, Trustee of The Theodore G. Trust | $94,840 |
| 1/15/2012 | Kambiz Hakim | $188,718 |
| 1/15/2012 | Halimi Capital LLC | $242,808 |
| 1/15/2012 | Morad Hariri | $151,148 |
| 1/15/2012 | ANMH Investments LLC | $64,832 |
| 1/15/2012 | Marvin Liebman & Simone Liebman as trustees of the Liebman Family Trust dated 10-20-10 | $19,420 |

| | | |
|---|---|---|
| 1/15/2012 | Iraj Maroofian | $27,262 |
| 1/15/2012 | Max-California Associates, CA General Partnership | $920,667 |
| 1/15/2012 | Kamiar Torbati, Trustee of the KRT Trust Dated 5/21/07 | $80,791 |
| 1/15/2012 | Gita Torbati, Trustee of the GED Trust Dated May 11, 2010 | $107,926 |
| 1/15/2012 | Rick Zirkler | $150,000 |
| | **SUBTOTAL:** | **$5,000,000** |
| | **GRAND TOTAL:** | **$10,000,000** |

3. Additional Subordinated Notes

| Date | Name | Loan Amount |
|---|---|---|
| 2/06/20 | Windmill Realty Advisors, Inc. | $1,000,000 |
| 2/06/20 | KRT Trust | $2,000,000 |
| 2/06/20 | Emil Halimi | $3,000,000 |
| | **GRAND TOTAL:** | **$6,000,000** |