## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CL H WINDDOWN LLC, *et al.*,[1] | Case No. 21-10527 (JTD) |
| Debtors. | (Jointly Administered) |
| BAHRAM NOUR-OMID, an individual, and LEARNICON LLC, a Delaware limited liability company, | |
| Plaintiffs, | |
| v. | Adversary Pro. No. 21-50317 (JTD) |
| CL H WINDDOWN, LLC, a Delaware limited liability company, LF INVESTMENT HOLDINGS, LLC, a Delaware limited liability company, LEON FARAHNIK, an individual, KIM JEFFERY, an individual, FARAMARZ YOUSEFZADEH, an individual, ORION ENERGY CREDIT OPPORTUNITIES FUND II, L.P., a Delaware limited partnership, ORION ENERGY CREDIT OPPORTUNITIES FUND II PV, L.P., a Delaware limited partnership, ORION ENERGY CREDIT OPPORTUNITIES FUND II GPFA, L.P., a Delaware limited partnership, FORCE TEN PARTNERS, LLC, a Delaware limited liability company, BRIAN WEISS, an individual, and DOES 1 through 50, inclusive, | |
| Defendants. | |

### PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: CL H Winddown LLC (8957); CL I Winddown LLC (3596); CL PH Winddown LLC (8957); CL PA Winddown LLC (5453); CL PIH Winddown LLC (8957); CL PP Winddown LLC (8957); CL RH Winddown LLC (8957); CL Sub Winddown LLC (8957); CL R Winddown LLC (3727); PP PA Winddown LLC (8322); and PSS Winddown LLC (9948). The address of the Debtors' corporate headquarters is 10250 Constellation Blvd., Los Angeles, CA 90067.

## TABLE OF CONTENTS

**Page**

TABLE OF CITATIONS ........................................................................................... iii

INDEX OF BRIEFS CITED .................................................................................... viii

NATURE AND STAGE OF THE PROCEEDING ...................................................... 1

INTRODUCTION ....................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

ARGUMENT ............................................................................................................... 7

I.       Plaintiffs Adequately Allege Injury-in-Fact and Have Article III Standing ...................... 7

II.      The FAC Adequately States Claims Against Each of the Defendants ............................ 15

         A.      Nour-Omid States a Claim for Breach of Fiduciary Duty Against Farahnik, Weiss, and the Director Defendants ........................................................................ 15

         B.      Nour-Omid States a Claim for Aiding and Abetting Breach of Fiduciary Duty Against CarbonLite and Orion ............................................................................... 18

         C.      Plaintiffs State a Claim for Fraud Based on Concealment ................................... 19

                 1.       The FAC Alleges a Duty to Disclose ......................................................... 19

                 2.       The Credit Agreement Does Not Negate Defendants' Duty to Disclose .................................................................................................... 21

                 3.       The FAC Alleges Farahnik Acted with Intent to Defraud ......................... 22

                 4.       The FAC Alleges Reliance and Damages .................................................. 22

                 5.       The Fraud Claim Is Alleged With Sufficient Particularity ........................ 23

         D.      Plaintiffs Also State a Claim for Negligent Misrepresentation ............................ 24

         E.      Nour-Omid States a Claim for Breach of the Operating Agreement Against Farahnik and the Director Defendants ................................................................... 25

                 1.       All the Elements of a Breach of Contract Claim Are Satisfied ................ 25

                 2.       Defendants Mischaracterize the "Knowledge" Provision of a Later Executed Contract to Try to Prematurely Dispute Plaintiffs' Claims ....... 28

F.     The FAC States a Claim For Breach of Contract Under the Personal Guaranty Against Farahnik ................................................................................................. 31

G.     The FAC States a Claim for Breach of Implied-in-Fact Contract Against CarbonLite and Orion .......................................................................................... 33

1.     The FAC Pleads an Enforceable Agreement ............................................. 33

2.     The Implied Contract Is Not Subsumed by a Written Agreement ........... 35

3.     Plaintiffs Plead Breach and Damages ....................................................... 36

H.     The FAC States a Claim for Tortious Interference with Contractual Relations Against CarbonLite, Orion, and the Director Defendants ................................... 37

I.     The FAC States a Claim For Tortious Interference with Economic Relations Against CarbonLite, Orion, and the Director Defendants ................................... 39

J.     The FAC States a Claim for Declaratory Relief .................................................. 41

III.     The General Release in the Forbearance Agreement Does Not Bar Plaintiffs' Claims ... 41

IV.     The Claims Asserted in the FAC Are Procedurally Proper and Should Not Be Dismissed ................................................................................................................ 44

V.     There Is No Reason to Stay this Adversary Proceeding ................................................... 46

CONCLUSION ................................................................................................................ 46

# TABLE OF CITATIONS[2]

**Page(s)**

**Cases**

*Alliance Mortg. Co. v. Rothwell*,
    10 Cal. 4th 1226 (1995) ...........................................................................................23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................................15

*In re AxisTel Comms., Inc.*,
    312 B.R. 258 (Bankr. D. Del. 2004) ...................................................................14, 46

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................................15

*Boschma v. Home Loan Center, Inc.*,
    198 Cal. App. 4th 230 (2011) ..............................................................................19, 22

*In re Burlington Coat Factory Secs. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)....................................................................................28

*Bushkin, Gaimes, Gaines, Jonas & Stream v. Garber*,
    677 F. Supp. 744 (1988) ...........................................................................................41

*In re CarbonLite Holdings LLC, et al.*,
    Case No. 21-bk-10527-JTD .......................................................................................1

*Caron v. Andrew*,
    133 Cal. App. 2d 412 (1955) ....................................................................................34

*Christopher v. Harbury*,
    536 U.S. 403 (2002)...................................................................................................15

*In re Clinton Street Food Corp.*,
    254 B.R. 523 (S.D.N.Y. 2000)..................................................................................43

*CML V, LLC v. Bax*,
    28 A.3d 1037 (Del. 2011) .........................................................................................17

*Constitution Party of Pa. v. Aichele*,
    757 F.3d 347 (3d Cir. 2014).......................................................................................7

---

[2] All emphases in this brief are added and internal citations and alterations omitted unless stated otherwise. All capitalized terms shall have the definitions given to them in the First Amended Complaint unless stated otherwise.

*CTF Hotel Holdings, Inc. v. Marriott Int'l, Inc.*,
    381 F.3d 131 (3d Cir. 2004)..................................................................30

*Danvers Motor Co. v. Ford Motor Co.*,
    423 F.3d 286 (3d Cir. 2005) (Alito, J.) ...................................................7

*Daytree at Cortland Square, Inc. v. Walsh*,
    332 F. Supp. 3d 610 (E.D.N.Y. 2018) ...................................................33

*DG & A Mgmt. Servs. LLC v. Secs. Indus. Ass'n Compliance & Legal Div.*
    52 A.D.3d 922 (N.Y. App. Div. 2008) ...................................................36

*In re FAH Liquidation Corp.*,
    581 B.R. 98 (Bankr. D. Del. 2017) .........................................................16

*In re Forever 21, Inc.*,
    623 B.R. 53 (Bankr. D. Del. 2020) ..................................................44, 45

*Forman v. Davis*,
    371 U.S. 178 (1962)..............................................................................14

*In re Global Indus. Techs., Inc.*,
    645 F.3d 201 (3d Cir. 2011)................................................................7, 8

*Integrated Healthcare Holdings Inc. v. Fitzgibbons*,
    140 Cal. App. 4th 515 (2006) ...............................................................38

*In re Intel Corp. Microprocessor Antitrust Litig.*,
    496 F. Supp. 2d 404 (D. Del. 2007).......................................................15

*Johnson v. Lebanese Am. Univ.*,
    84 A.D.3d 427 (N.Y. App. Div. 2011) ...................................................43

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ..................................................................40, 41

*Ladenburg Thalmann Co. v. Imaging Diagnostic Sys.*,
    176 F. Supp. 2d 199 (S.D.N.Y. 2001)...................................................42

*Lance Camper Mfg. Corp. v. Republic Indemnity Co.*,
    44 Cal. App. 4th 194 (1996) .................................................................35

*Lazar v. Super. Ct.*,
    12 Cal. 4th 631 (1996) ..........................................................................23

*LiMandri v. Judkins*,
    52 Cal. App. 4th 326 (1997) ...........................................................39, 40

*Littman v. John,*
    54 A.D.3d 14 (N.Y. App. Div. 2008) ...................................................41

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)...........................................................................7

*Milton Roy Co. v. Bausch & Lomb Inc.,*
    418 F. Supp. 975 (D. Del. 1976).......................................................22

*OCM Principal Opps. Fund, L.P. v. CIBC World Markets Corp.,*
    157 Cal. App. 4th 835 (2007) ...........................................................24

*Overstock.com, Inc. v. Gradient Analytics, Inc.,*
    151 Cal. App. 4th 688 (2007) .....................................................39, 40

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.,*
    50 Cal. 3d 1118 (1990) ...................................................................39

*In re Penn Centr. Transp. Co.,*
    831 F.2d 1221, 1228-30 (3d Cir. 1997) ...........................................36

*In re PennySaver USA Publ'g, LLC,*
    587 B.R. 445 (Bankr. D. Del. 2018) ..........................................15, 16

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,*
    998 F.2d 1192 (3d Cir. 1993)...........................................................28

*Petroleum Enhancer, LLC v. Woodward*
    690 F.3d 757, 769 (6th Cir. 2012)...................................................17

*Phillips v. Cnty. of Allegheny,*
    515 F.3d 224 (3d Cir. 2008).............................................................46

*Quelimane Co. v. Stewart Title Guar. Co.,*
    19 Cal. 4th 26 (1998) ...............................................37, 38, 39, 40

*Roberts v. Ball, Hunt, Hart, Brown & Baerwitz,*
    57 Cal. App. 3d 104 (1976) .......................................................24, 25

*In re RS Legacy Corp.,*
    2017 WL 3837294 (Bankr. D. Del. Aug. 31, 2017) .........................46

*In re Shorenstein Hays-Nederlander Theatres LLC Appeals,*
    213 A.3d 39 (Del. 2019) ..................................................................30

*Silva v. Providence Hosp. of Oakland,*
    14 Cal. 2d 762 (1939) ....................................................................34

*In re Skyler Ridge*,
    80 B.R. 500 (C.D. Cal. 1987) .................................................................13

*Stanziale v. MILK072011 LLC (In re Golden Guernsey Dairy)*
    548 B.R. 410, 413 (Bankr. D. Del. 2015 .................................................16

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) .................................................................22

*The Pitt News v. Fisher*,
    215 F.3d 354 (3d Cir. 2000)......................................................................7

*Toll Bros., Inc. v. Township of Readington*,
    555 F.3d 131 (3d Cir. 2009)......................................................................8

*In re Troll Comm's, LLC*,
    385 B.R. 110 (Bankr. D. Del. 2008) .......................................................18

*U.S. v. Students Challenging Regulatory Agency Procedures*,
    412 U.S. 669 (1973).................................................................................7

*In re Urban Communicators PCS Ltd. P'ship*,
    2008 WL 2986382 (Bankr. S.D.N.Y. July 31, 2008) .............................13

*VLIW Tech., LLC v. Hewlett-Packard Co.*,
    840 A.2d 606 (Del. 2003) .................................................................25, 33

*Walker v. Am. Nat'l Ins. Co.*
    2018 WL 1993383 (N.D. Cal. Apr. 27, 2018) ........................................35

*Warner Const. Corp. v. L.A.*,
    2 Cal. 3d 285 (1970) ...............................................................................19

*West Run Student Housing Assoc. v. Huntington Nat'l Bank*,
    712 F.3d 165 (3d Cir. 2013)......................................................................1

*Wilson v. Residential Cap. (In re Residential Cap.)*,
    2014 WL 3057111 (Bankr. S.D.N.Y. July 7, 2014) ..............................46

*Zackiva Comm's Corp. v. Horowitz*,
    826 F. Supp. 86 (S.D.N.Y. 1993) ...........................................................41

**Statutes**

11 U.S.C. § 101 .........................................................................................8

11 U.S.C. § 502 .........................................................................................8

11 U.S.C. § 1109(b) ..................................................................................8

Cal. Civ. Proc. Code §§ 1566, 1567 ................................................................................35

Cal. Civ. Proc. Code § 1621 ...........................................................................................34

Del. C. § 18-1101(c) .......................................................................................................16

**Other Authorities**

Fed. R. Bankr. P. 3001, et seq.........................................................................................44

Fed. R. Bankr. P. 3007(b) ...............................................................................................44

Fed. R. Bankr. P. 7001 ...............................................................................................44, 45

Fed. R. Bankr. P. 7012(b) ...............................................................................................15

Fed. R. Bankr. P. 7015 .....................................................................................................1

Fed. R. Bankr. P. 7042 ...............................................................................................45, 46

Fed. R. Civ. P. 15(a) ........................................................................................................1

Fed. R. Civ. P. 42............................................................................................................45

Fed. R. Civ. P. 12(b)(6)..............................................................................................15, 22

# INDEX OF BRIEFS CITED[3]

1. Orion's Memorandum of Law in Support of Motion to Dismiss (Dkt. 6)

2. CarbonLite's Memorandum of Law in Support of Motion to Dismiss or, Alternatively, to Stay (Dkt. 11)

3. Director Defendants' (Jeffery and Yousefzadeh) Opening Brief in Support of Motion to Dismiss or, Alternatively, to Stay (Dkt. 13)

4. Farahnik/LFIH's Motion to Dismiss (Dkt. 14)

5. Weiss/Force 10's Joinder to the Motions to Dismiss of All Parties (Dkt. 22)

6. CarbonLite's Supplemental Motion to Dismiss (Dkt. 30)

7. Director Defendants' (Jeffery and Yousefzadeh) Supplemental Brief in Support of Motion to Dismiss or, Alternatively, to Stay (Dkt. 35)

8. Farahnik/LFIH's Supplemental Motion to Dismiss (Dkt. 46)

9. Orion's Supplemental Motion to Dismiss (Dkt. 52)

10. Weiss/Force 10's Joinder to the Supplemental Motions filed by Co-Defendants (Dkt. 53)

[3] Plaintiffs provide this list of Defendants' briefs with corresponding docket numbers that are cited in Plaintiffs' memorandum for the Court's convenience.

Plaintiffs Bahram Nour-Omid and Learnicon LLC (collectively, "Plaintiffs"), by and through their undersigned counsel, hereby file this omnibus memorandum of law in opposition to the motions to dismiss and supplemental motions to dismiss of Defendants CarbonLite Holdings LLC (the "Debtor" or "CarbonLite"), Kim Jeffery and Faramarz Yousefzadeh (collectively, the "Director Defendants"), Leon Farahnik and LF Investment Holdings, LLC ("LF Investment" or "LFIH"), Brian Weiss and Force 10 Partners, LLC ("Force 10"), and Orion Energy Credit Opportunities Fund II, L.P., Orion Energy Credit Opportunities Fund II PV, L.P., and Orion Energy Credit Opportunities Fund II GPFA, L.P. (collectively, "Orion").

## NATURE AND STAGE OF THE PROCEEDING

On March 8, 2021, CarbonLite filed a Chapter 11 Voluntary Petition in this Court initiating bankruptcy proceedings.  (*In re CarbonLite Holdings LLC, et al.*, Case No. 21-bk-10527-JTD.)   On April 12, 2021, Plaintiffs filed their Original Complaint initiating this adversary proceeding.  (Dkt. 1.)  On June 9, 2021, Plaintiffs filed their First Amended Complaint to add additional factual information (Dkt. 24), and this is the operative complaint in this matter.[4]

## INTRODUCTION

This case is about the knowing and intentional exploitation of Plaintiffs' willingness to pay $5,250,000 to save CarbonLite from the harsh consequences of failing to repay its senior secured lender, Orion.  Plaintiffs financed the purchase of a tranche of loans from Orion to CarbonLite (the Tranche B Loans) through a convoluted corporate transaction that was executed

---

[4] As the Court knows, after the defendants filed motions to dismiss Plaintiffs' Original Complaint, Plaintiffs filed their First Amended Complaint ("FAC"), as was their right under Fed. R. Civ. P. 15(a) (made applicable by Fed. R. Bankr. P. 7015).  The Third Circuit recognizes that "the amended complaint supersedes the original and renders it of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading" (which the FAC does not do).  *West Run Student Housing Assoc. v. Huntington Nat'l Bank*, 712 F.3d 165, 171 (3d Cir. 2013). Indeed, "[p]laintiffs routinely amend complaints to correct factual inadequacies in response to a motion to dismiss." *Id.* at 172.

on the eve of the Tranche B Loans being due.   Defendant Leon Farahnik (CarbonLite's Chairman and CEO) wrote to CarbonLite's Board of Directors the week before the transaction closed that they should "unanimously approve the deal and appreciate the help that [Plaintiff] Nour-Omid is providing to the company."   CarbonLite's counsel Moshe Kupietzky has submitted a declaration to this Court stating that "completion of the transaction before October 24, 2020 would greatly benefit CarbonLite by avoiding the harsh consequences set forth in Amendment No. 2" to the Credit Agreement.   The Director Defendants have acknowledged that the October 2020 transaction was a "substantial benefit" to the Debtor.

What did Plaintiffs receive for the "help" and "great" and "substantial" benefit they provided to CarbonLite in October 2020?   They received the unilateral and wrongful elimination of their interest in the Tranche B Loans less than four months later through a forbearance agreement and new amendment to the Credit Agreement negotiated and executed by the Defendants.   Every defendant knew that Plaintiffs had paid the money on behalf of Farahnik and LFIH to purchase the Tranche B Loans.   Every defendant knew that the Forbearance Agreement eliminated the payment priorities for the Tranche B Loans on which Plaintiffs had relied to pay the $5,250,000.   And every defendant knew that with CarbonLite's impending bankruptcy, by virtue of the Forbearance Agreement that was never discussed in advance with Plaintiffs, Plaintiffs' interest in the Tranche B Loans would be relegated so far out of the money that it would be rendered worthless.

Now, every defendant argues that *it* is not to blame for Plaintiffs' loss.   Orion claims that this "is a matter between Plaintiffs, on the one hand, and Farahnik and LF Investment, on the other; the Orion Funds are not involved."   The Director Defendants claim that they "owed no duty (fiduciary or contractual) to Plaintiffs" and that the Forbearance Agreement that "Plaintiffs

now complain about … was approved by Orion." CarbonLite claims that its "obligations … are to Orion alone" and that it too has no fiduciary or contractual relationship with Plaintiffs. And Farahnik and LFIH, and Weiss and Force 10, join the various arguments of the other Defendants. So, at bottom, Plaintiffs paid $5,250,000 in cash to directly benefit CarbonLite (at a time when plaintiff Nour-Omid sat on the Board), then had their interest subordinated to over $85,000,000 without their knowledge or consent, and, according to Defendants, none of the parties who orchestrated the deal (from which Plaintiffs were excluded) are to blame. This cannot be so.

Defendants' motions to dismiss should be denied. As shown below, Plaintiffs have standing as they have adequately alleged injury-in-fact for pleading purposes and easily satisfy the other requirements of Article III standing. Plaintiffs have stated claims for relief against each of the Defendants as the FAC includes well-pleaded factual allegations that support each cause of action. The General Release in the Forbearance Agreement is not applicable on its face, and Plaintiffs allege that the Forbearance Agreement was procured through fraud in any event. As a result of Plaintiffs never being informed of the contents of the Forbearance Agreement or the effect it would have on their interest in the Tranche B Loans, Plaintiffs were foreclosed from enforcing or even protecting their rights. Finally, none of Plaintiffs' claims are procedurally improper under the applicable rules, and there is no reason to stay this adversary proceeding.

## STATEMENT OF FACTS

Pursuant to the Credit Agreement and its Amendments, Orion is the original lender to CarbonLite of (A) $80,000,000 in Tranche A Loans, (B) $5,250,000 in Tranche B Loans, and (C) at least $5,484,035.34 in Tranche C Loans. (FAC ¶ 23.) After being extended $80,000,000 in principal amount of Tranche A Loans, CarbonLite faced much more onerous terms from Orion in connection with the Tranche B Loans. Among other things, CarbonLite had 45 days to repay the Tranche B Loans in full or it would have faced severe consequences, including a

mandatory premium of $1,050,000 (the Minimum Return) and additional returns that increased over time, warrants for 2% of CarbonLite's equity, and a second lien on a CarbonLite facility in Dallas.  (*Id.* ¶ 24.)  The 45-day deadline was October 24, 2020.  (*Id.*)

Prior to the expiration of the 45-day period, in order to avoid these severe consequences, Orion and CarbonLite discussed having another investor "step into" the Tranche B obligation and setting up the transaction as a "participation," or sale of the Tranche B Loans.  (FAC ¶ 25.) As the FAC details, with email excerpts, that investor was to be plaintiff Nour-Omid, who was a Director of CarbonLite at the time.  (*Id.* ¶¶ 26-39.)  Throughout the parties' discussions, it was clear that their intent was that plaintiff Learnicon (Nour-Omid's entity) would purchase the Tranche B Loans from Orion and replace it as the lender, that the Tranche B Loans would have payment priority over the Tranche A Loans in multiple scenarios, that this payment priority *would not be amended without Nour-Omid's approval*, that CarbonLite would move toward executing deals that would trigger repayment of the Tranche B Loans (including an equity raise and a sale of PinnPack), and that CarbonLite's counsel Mr. Kupietzky would prepare all the relevant documents to effectuate the transaction.  (*Id.*)

At the last minute, however, defendants Orion, CarbonLite, and Farahnik devised a plan whereby a new entity formed and controlled by Farahnik, defendant LFIH, would "purchase" the Tranche B Loans from Orion, while Plaintiffs would provide the funds for the transaction.  (FAC ¶ 40.)  Specifically, the plan was that Learnicon would "loan" the funds to LFIH, to be secured by a note, and LFIH would then use those funds to "purchase" the participation in the Tranche B Loans from Orion.  Instead of Learnicon, LFIH would be the record holder of the participation, while Plaintiffs would be the "beneficial holders."  (*Id.*)  The FAC explains how the transaction was ultimately structured and attaches as Exhibit 1 the October 23, 2020 package of Closing

Documents that includes the agreements and documents that were executed to carry out the transaction.  (*Id.* ¶¶ 40-44 & Ex. 1.)  The FAC also makes clear that all Defendants knew that Plaintiffs paid the money for the participation purchase, which was wired directly from Plaintiffs to Orion.  (*See, e.g., id.* ¶ 45 (Orion was informed that "the cash will come from [Nour-Omid's] personal account … advanced on behalf of his wholly owned entity Learnicon, LLC"), ¶ 51 (CarbonLite's Board was informed that "100% of the financing for LF Investment Holdings' purchase of the Participation is being provided by a company wholly owned by Dr. Bahram Nour-Omid [i.e., Learnicon]" and "LF Investment Holdings will not retain any of the economic benefits from its ownership of the Participation, which is being pledged to Dr. Nour-Omid's company"); *see also id.* ¶¶ 47-50.)

*Less than four months later*—and the reason this adversary proceeding was brought— Plaintiffs' interest in the Tranche B Loans was rendered worthless.  Specifically, on or about February 8, 2021, CarbonLite and Orion entered into the Forbearance Agreement/Amendment No. 5 to the Credit Agreement (the Forbearance Agreement), pursuant to which Orion agreed to issue a new tranche of loans (Tranche C) to CarbonLite in the amount of $2,800,000.[5]  (FAC ¶ 60.)  Unbeknownst to Plaintiffs, the Forbearance Agreement unilaterally and completely eviscerated the payment priorities the Tranche B Loans had over the Tranche A Loans and subordinated the Tranche B Loans to both the Tranche A *and* Tranche C Loans.  (*Id.* ¶ 61.) Farahnik signed the Forbearance Agreement on behalf of CarbonLite and its subsidiaries. Farahnik also signed a "Consent" to the Forbearance Agreement on behalf of LFIH (the record holder of the participation in the Tranche B Loans at the time, even though all parties knew that

---

[5] The Tranche C Loans were later increased by Amendment No. 6 in the amount of $2,684,035.34, making the total Tranche C Commitments equal to $5,484,035.34.  (FAC ¶ 23.)

Plaintiffs were the true holders). (*Id.* ¶ 62.) LFIH received no consideration for its signature. (*Id.*) In addition, the Director Defendants (Jeffery and Yousefzadeh) signed a "Unanimous Written Consent" to the Forbearance Agreement. (*Id.* ¶ 63.)

It is true that Nour-Omid was still a member of CarbonLite's Board at the time the Forbearance Agreement was executed. But, critically, Nour-Omid was excluded from the negotiation of the Forbearance Agreement, did not see the agreement until around February 25, 2021, and was never prior to then informed of its contents—including specifically that it had subordinated the Tranche B Loans (and thereby wiped out Plaintiffs' interests). (FAC ¶¶ 65-67, 70.) Although some Defendants initially attempted to hide behind the argument that "Plaintiffs do not allege any contractual provision entitling Nour-Omid or Learnicon to a consent right with respect to the Forbearance Agreement" (*e.g.*, Orion's Mem. at 9), Plaintiffs address this issue in the FAC by demonstrating that they were expressly promised—and relied on—the fact that the loans' payment priorities would not be amended without their approval. (FAC ¶¶ 28-30, 55.)

On or about February 16, 2021 (i.e., *after* the Forbearance Agreement had been executed), LFIH and Learnicon, through their principals Farahnik and Nour-Omid, respectively, entered into a Participation Purchase Agreement under which LFIH sold the interest in the Participation Agreement with Orion (and all rights to the Tranche B Loans) directly to Learnicon. (FAC ¶¶ 68-69.[6]) At no time in connection with entering into this agreement did LFIH or Farahnik inform Learnicon or Nour-Omid that the Forbearance Agreement had subordinated the Tranche B Loans. (*Id.*)

---

[6] Orion incorrectly assumes that the referenced agreement is an "Assignment and Assumption" document dated February 17, 2021. (Orion's Mem. at 12.) It is not.

**ARGUMENT**

I.     **Plaintiffs Adequately Allege Injury-in-Fact and Have Article III Standing**

As an initial matter, certain of the Defendants argue that Plaintiffs' complaint should be dismissed because Plaintiffs lack Article III standing since they allegedly have not suffered injury-in-fact or damages.  This argument is incorrect, as explained below.

The requirements of Article III standing are well known.  They are: (1) "injury-in-fact," which is an invasion of a legally protected interest that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Danvers Motor Co. v. Ford Motor Co.*, 423 F.3d 286, 290-91 (3d Cir. 2005) (Alito, J.) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Injury-in-fact requires only an "identifiable trifle" of injury or "a personal stake in the outcome of the litigation."  *U.S. v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973); *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 210 (3d Cir. 2011). The injury-in-fact requirement is "very generous."  *Danvers Motor Co.*, 432 F.3d at 294.  As then-Third Circuit Judge Alito put it, "[i]njury-in-fact is not Mount Everest."  *Id.*; *see also The Pitt News v. Fisher*, 215 F.3d 354, 360 (3d Cir. 2000) (merits and standing are different inquiries; "[t]o demonstrate its standing to sue, a plaintiff must only *allege* that they have suffered sufficient injury to comply with Article III's 'case or controversy' requirement") (emphasis in original).  Significantly, at the motion to dismiss stage, "general factual allegations of injury resulting from the defendant's conduct" are sufficient.  *Lujan*, 504 U.S. at 560.

A causal connection exists if the injury is "fairly traceable" to the defendant's conduct. *Global Indus. Techs.*, 645 F.3d at 211-12; *Constitution Party of Pa. v. Aichele*, 757 F.3d 347,

366 (3d Cir. 2014) ("Causation in the context of standing is not the same as proximate causation from tort law, and the Supreme Court has cautioned against wrongly equating injury fairly traceable to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation."). Redressability is "closely related to traceability, and the two prongs often overlap." *Toll Bros., Inc. v. Township of Readington*, 555 F.3d 131, 142 (3d Cir. 2009). "The difference is that while traceability looks backward (did the defendants cause the harm?), redressability looks forward (will a favorable decision alleviate the harm?)." *Id.* (citing *Lujan*, 504 U.S. at 560-61).[7]

Defendants' primary argument regarding standing is expressed by CarbonLite, which asserts that Plaintiffs cannot show any damages (and therefore injury-in-fact) because the Tranche B Loans are too far out of the money, particularly following the sale of the Debtor's California assets, including PinnPack, in bankruptcy. The crux of this argument is that the Tranche A Loans effectively "always had payment priority" over the Tranche B Loans, so the fact that the sale of the Debtor's assets are insufficient to repay the Tranche A Loans necessarily means that the Tranche B Loans would never have been repaid, and Plaintiffs would not have recovered any damages. (*See, e.g.*, Debtor's Mem. at ¶ 23 ("Plaintiffs have suffered no damages because the Tranche B Loans were always (and continue to be) subordinated to the Tranche A Loans under the circumstances here. Put simply, the Tranche B Loans are out of the money…."); Dir. Defs.' Mem. at 2 ("Plaintiffs suffered no damages … because CarbonLite

---

[7] Standing in bankruptcy cases is also governed by the terms of 11 U.S.C. § 1109(b), which provides that "[a] party in interest, including … a creditor … may raise and may appear and be heard *on any issue* in a case under this chapter." *Global Indus. Techs.*, 645 F.3d at 210 (citing 11 U.S.C. § 1109(b)). Plaintiffs have filed proofs of claim in the Chapter 11 proceeding, which are *prima facie* valid pursuant to 11 U.S.C. § 502, and are creditors of the Debtors, and therefore parties in interest. *See* 11 U.S.C. § 101; *Global Indus. Techs.*, 645 F.3d at 210 (a party in interest is "anyone who has a legally protected interest that could be affected by a bankruptcy proceeding"). While

expects that the Tranche A debt, which always had payment priority ahead of the Tranche B debt, will not be paid in full as a result of CarbonLite's sale process.").)  This argument miscomprehends the express circumstances under which the Tranche B Loans had payment priority over the Tranche A Loans and fails to account for multiple avenues to damages resulting from Plaintiffs' injury.

It is flatly wrong for Defendants to say that the Tranche A Loans "always had payment priority" over the Tranche B Loans, or even that the Tranche B Loans had priority in only "limited" or "narrow" circumstances.  To the contrary, in paying $5,250,000 for the Tranche B Loans, Plaintiffs relied on terms that included at least *three* scenarios in which the Tranche B Loans would have priority: (1) proceeds from an equity raise; (2) proceeds from the sale of PinnPack; and (3) a personal guaranty from Farahnik.  (FAC ¶¶ 30, 33-34, 55.)  Amendment No. 3 memorialized the Tranche B Loans' payment priority in multiple sections.  As to the sale of PinnPack specifically, Amendment No. 3 confirmed Tranche B's priority in the event of a "Qualified PinnPack Sale," which it defined as "a direct or indirect sale of the Pinnpack Facility in accordance with and upon terms approved in writing by the Administrative Agent [Orion] (in its sole and absolute discretion), including, without limitation, as to process, valuation, amount and form of consideration and application of proceeds; provided that, without limiting the generality of the foregoing, the Administrative Agent shall not be required to consider or approve any proposed sale of the Pinnpack Facility that yields proceeds (net of any fees, expenses and amounts proposed to be retained by the Loan Parties) of less than $25,000,000.00." (FAC, Ex. 1 (Amend. No. 3) at § 2(a).)  Amendment No. 3 further provided that "[a]ny partial

this action is an adversary proceeding, section 1109(b) "has been construed to create a broad right of participation in Chapter 11 cases," *id.*, and further supports Plaintiffs' standing in addition to the Article III requirements.

9

prepayments of the Loans [meaning Tranche A *and* Tranche B] pursuant to <u>Section 2.05(b)(iii)</u> (solely to the extent relating to a Qualified PinnPack Sale), <u>Section 2.05(b)(vi)</u> or <u>Section 2.05(b)(vii)</u> shall be applied (1) *first*, on a *pro rata* basis to the Tranche B Obligations of each Tranche B Lender and (2) *second*, on a *pro rata* basis to the Tranche A Obligations of each Lender or as otherwise directed by the Administrative Agent." (*Id.* at § 2(e) (all emphases in original).) As relevant here, Section 2.05(b)(vi) discussed CarbonLite's prepayment obligation in the event of an equity raise. (*See* FAC ¶ 57 n.7.)

Thus, prior to the Forbearance Agreement (which completely eliminated Tranche B's payment priority), Tranche B indisputably had priority over Tranche A—as confirmed in Amendment No. 3—at a minimum in any proceeds received from an equity raise or the sale of PinnPack. Regarding the equity raise, the FAC expressly alleges that between the negotiation of the Tranche B transaction in October 2020 and the execution of the Forbearance Agreement on or about February 8, 2021, CarbonLite never made commercially reasonable efforts towards an equity raise, as it had contractually committed to do. (FAC ¶ 74; *see also* Amend. No. 2, Ex. A at § 5.21(g) (requiring CarbonLite to "use commercially reasonable efforts to raise Additional Equity Raise Amounts … on or prior to the Tranche B Maturity Date").) Stated differently, Plaintiffs allege that CarbonLite never attempted to satisfy one of the express conditions that would have immediately paid the Tranche B Loans ahead of the Tranche A Loans *prior* to executing the Forbearance Agreement and ultimately filing for bankruptcy. This breach alone—putting aside the other implications of the Forbearance Agreement (which are discussed below)—is a sufficient allegation of injury-in-fact to satisfy Article III's standing requirement.

Regarding the sale of PinnPack, Defendants misread the definition of Qualified PinnPack Sale in the Credit Agreement. It does *not* mean a sale of PinnPack of at least $25 million. (*See*

Debtor's Mem. at ¶ 5 (defining "Qualified PinnPack Sale" as "a sale of the PinnPack facility for *$25 million or more* approved by Orion"), ¶ 19 ("If, as expected, there are insufficient proceeds from [the Debtor's asset] sales to even come close to repaying the Tranche A Loans, and there is no Qualified PinnPack Sale *in excess of $25 million* and no equity investment, then the Tranche B Loans are out of the money.").)  The contract states that Orion need not "*consider or approve* any proposed sale of the PinnPack Facility that yields proceeds … of less than $25,000,000." (Amend. No. 3 at § 2(a).)  But if Orion does consider and approve a sale of the PinnPack Facility—in any amount—it is a Qualified PinnPack Sale under the express terms of the contract. (*See id.*)  Indeed, the amount could be $1; as long as it is "a direct or indirect sale of the Pinnpack Facility" that is approved by Orion, it is a Qualified PinnPack Sale.[8]

As demonstrated in the FAC, the Forbearance Agreement struck (*viz.* deleted) the notion of a Qualified PinnPack Sale altogether.  (*See* FAC ¶ 61 & Ex. 2 at Ex. A (the redlined Credit Agreement), pp. 28, 43-45 (e.g., striking the term "Qualified PinnPack Sale"; striking Tranche "B" in favor of "A/C").)  This ensured that the Tranche B Loans—which previously had priority over the Tranche A Loans in the event of a PinnPack sale—would never be repaid, as they were now subordinated to over $85,000,000 in both Tranche A *and* Tranche C Loans.  The striking of "Qualified PinnPack Sale," and the resulting elimination of Tranche B's priority in the event of a PinnPack sale (in any amount) approved by Orion, caused a concrete, particularized, and actual injury to Plaintiffs.  Rather than being paid *first* from the sale of PinnPack—which was the agreement that Plaintiffs bargained for when they paid $5,250,000 in cash for the Tranche B

---

[8] In point of fact, as the Court knows, on June 22, 2021, Pinnpack Capital Holdings LLC, a company formed by Pinnpack's Chief Operating Officer Ira Maroofian, acquired all of the assets and business of PinnPack in exchange for payments aggregating approximately $12,000,000. The purchase was approved by the Court and *expressly approved by all of the Defendants, including Orion*.  It was, in essence, a Qualified PinnPack Sale.

Loans—Plaintiffs would be paid *last*, after more than $85,000,000 combined.  At the time of the Forbearance Agreement, Defendants knew that this would never happen, as part of the negotiation process was the preparation for CarbonLite to file for bankruptcy.  (*See* FAC ¶ 67.) Now that PinnPack has been sold—in bankruptcy, *on terms approved by Orion*—Tranche B's lack of priority in those funds cements Plaintiffs' injury.  In other words, but for the improper subordination of Plaintiffs' interest, Plaintiffs stood to be repaid *first* from the sale of PinnPack.

To the extent Defendants argue that Plaintiffs would have recovered no damages even in the absence of the Forbearance Agreement because of CarbonLite's declared default, this argument fails for at least three reasons.  First, it does not address Plaintiffs' allegation that CarbonLite failed to make commercially reasonable efforts towards an equity raise *prior* to the Forbearance Agreement, which was one of the other express circumstances in which the Tranche B Loans had priority.  Again, this breach alone caused injury-in-fact to Plaintiffs.

Second, it ignores the fact that Plaintiffs would have retained their right to protect their interest in a pre-bankruptcy sale of PinnPack.  Specifically, rather than waiting for the PinnPack assets to be sold in bankruptcy for less than full value, Learnicon would have had every incentive to purchase PinnPack itself at effectively a $5,250,000 discount.  Any such sale approved by Orion would have been a Qualified PinnPack Sale within the meaning of Amendment No. 3 (the status quo prior to the Forbearance Agreement), which would have *directly* resulted in the Tranche B Loans being repaid and Plaintiffs being made whole.  But Plaintiffs' ability to preserve that right was snatched away when Orion agreed to issue a new tranche of loans to CarbonLite (Tranche C) with higher priority and the parties deleted the term "Qualified PinnPack Sale" and all of the clauses describing *mandatory* loan prepayments that would have paid the Tranche B Loans first.  (*See* FAC, Ex. 2 at Ex. A, pp. 28, 43-45.)  Indeed, if these

prepayments would not have come to pass in any event (as Plaintiffs expect Defendants will try to argue on reply), there would have been no reason to strike them from the Credit Agreement. The fact that they were struck demonstrates that they would have come to pass (in fact, a Qualified PinnPack Sale already has) and that Plaintiffs would have been made whole.

Third, there is case law that supports the enforcement of prepayment provisions in a default or bankruptcy scenario such as the one here.   For example, in *In re Urban Communicators PCS Ltd. P'ship*, 2008 WL 2986382 (Bankr. S.D.N.Y. July 31, 2008), the court enforced a payment priority under a mandatory prepayment provision that would not have applied after the debtor's bankruptcy filing.  The court noted that "[i]f the same [ ] sales took place before bankruptcy they would have been Mandatory Prepayment events.  Though the Court presumably would have had the power to defer mandatory prepayments after the bankruptcy filing, it would be ***inconsistent with the spirit, if not also the letter***, of the Note Purchase Agreement to apply the proceeds of prepayments actually made in any manner other than in accordance with the parties' previous agreement on this exact point.**"**  *Id.* at *2.  In another case, *In re Skyler Ridge*, 80 B.R. 500 (C.D. Cal. 1987), the court rejected the debtor's argument that the filing of a bankruptcy petition accelerated a creditor's debt and automatically eliminated its rights under a prepayment provision.  The court explained that under the debtor's argument, "[a] debtor, under such a rule, could *always* avoid the effect of a prepayment premium clause by filing a bankruptcy case.  ***Neither the Bankruptcy Code nor case law compels so drastic a result***.  No bankruptcy policy compels the invalidation of a properly drawn prepayment premium clause in all cases."  *Id.* at 507-08.

Here, if the same sale of PinnPack had occurred before CarbonLite's bankruptcy, it would have been a mandatory prepayment event under Amendment No. 3 that would have

directly paid off the Tranche B Loans (i.e., paying Plaintiffs).  (*See* Amend. No. 3, §§ 2(a), (c), (d), (e).)  It would be inconsistent with both the spirit *and* the letter of the parties' agreement to apply the proceeds of the sale of PinnPack in any other manner.  Furthermore, to not pay Plaintiffs from those sales proceeds would be the type of drastic result condemned by the *Skyler Bridge* court: because CarbonLite filed for bankruptcy a mere few months after Plaintiffs directly benefited it with a $5,250,000 cash payment (which benefit all of the parties have expressly acknowledged), CarbonLite can avoid paying off the Tranche B Loans and leave Plaintiffs with ***nothing***.  The Court cannot countenance such a result.[9]

None of the Defendants seriously challenge the other two requirements of Article III standing: causal connection and redressability.  These requirements are easily met here because Plaintiffs' injury is "fairly traceable" to Defendants' conduct of improperly subordinating the Tranche B Loans and breaching their obligations to Plaintiffs, and a favorable decision from the Court will result in Defendants paying damages to Plaintiffs to make them whole.

Plaintiffs have done more than show an "identifiable trifle" of injury or "a personal stake in the outcome of the litigation," as required by U.S. Supreme Court and Third Circuit precedent. Plaintiffs have standing, and deserve the opportunity to have their case heard on the merits.

---

[9] If necessary, Plaintiffs can also state a claim for fraudulent inducement relating to their agreement to pay for the Tranche B participation based on express terms such as the Credit Agreement and related documents being left largely unchanged and their payment priority not being amended without their approval.  These terms are already included in the FAC (e.g., ¶ 55), but if the Court needs additional allegations definitively demonstrating an injury based on fraudulent inducement, Plaintiffs can assert such allegations.  *See In re AxisTel Comms., Inc.*, 312 B.R. 258, 260 (Bankr. D. Del. 2004) ("leave to amend pleadings 'shall be freely given when justice so requires'") (quoting Fed. R. Civ. P. 15(a)); *Forman v. Davis*, 371 U.S. 178, 182 (1962).

## II.    The FAC Adequately States Claims Against Each of the Defendants[10]

When reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) (made applicable by Federal Rule of Bankruptcy Procedure 7012(b)), the court must accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff.  *See Christopher v. Harbury*, 536 U.S. 403, 406 (2002).  "The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case."  *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 407 (D. Del. 2007) (citing *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir.1993)).

To survive a motion to dismiss, a complaint need only plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although the plausibility standard asks for more than a sheer possibility, it "is not akin to a probability requirement[.]"  *Id.*

### A.    Nour-Omid States a Claim for Breach of Fiduciary Duty Against Farahnik, Weiss, and the Director Defendants

Under Delaware law, a claim for breach of fiduciary duty survives a motion to dismiss if there are "sufficient facts to support a plausible claim of both (1) the existence of a fiduciary duty, and (2) that the fiduciary breached that duty."  *In re PennySaver USA Publ'g, LLC*, 587 B.R. 445, 463-64 (Bankr. D. Del. 2018).  Absent a contrary provision in the LLC agreement, managers and members of a Delaware LLC "owe traditional fiduciary duties of loyalty and care

---

[10] Several of the motions to dismiss apply the incorrect state's law to Plaintiffs' claims.  For example, Orion baldly states that "[n]early all of Plaintiffs' alleged claims are governed by New York law" simply because the Credit Agreement contains a New York choice-of-law provision.  (Orion Mem. at 14.)  The correct state's law that applies to each cause of action is alleged in the FAC under each cause of action.

15

to each other and to the company." *In re FAH Liquidation Corp.,* 581 B.R. 98, 112 (Bankr. D. Del. 2017); *see also* 6. Del. C. § 18-1101(c) (providing that any fiduciary duties owed may be modified by the LLC agreement); *PennySaver*, 587 B.R. at 464 (noting that "the Delaware Chancery Court has found consistently a default rule that the manager or director of the LLC owes fiduciary duties to fellow LLC members and the LLC").

The FAC alleges that the Director Defendants, Farahnik, and Weiss each "owed a fiduciary duty to plaintiff Nour-Omid by virtue of their position and relationship with CarbonLite and each other (i.e., Farahnik, Jeffery, Yousefzadeh, and Nour-Omid were all directors of CarbonLite during the relevant period, Farahnik was also the Chief Executive Officer of CarbonLite, and Weiss was the Chief Restructuring Officer of CarbonLite)." (FAC ¶ 78 (incorporated into the breach of fiduciary duty claim), ¶ 95.)  Nour-Omid was also business partners with Farahnik "by virtue of the Note, Note Purchase Agreement, and Participation Purchase Agreement." (*Id.* ¶ 78.)

Defendants incorrectly suggest that fiduciary duties can *only* be owed to CarbonLite. (*See* Dir. Defs.' Mem. at 16.)  Nothing in the CarbonLite Operating Agreement serves to limit Defendants' fiduciary duties in this way.  Under the applicable law cited above, the Director Defendants, Farahnik, and Weiss owe duties of loyalty and care to CarbonLite *and* to Nour-Omid.  *See, e.g., FAH Liquidation Corp.*, 581 B.R. at 112.  The cases cited by Defendants do not establish that duties cannot be owed to both the LLC and to fellow directors.  In *Stanziale v. MILK072011 LLC (In re Golden Guernsey Dairy)*, where defendants sought to dismiss a breach of fiduciary duty claim relating to a duty owed to the debtor LLC, the court did not address or reject duties owed between directors.  *See Stanziale*, 548 B.R. 410, 413 (Bankr. D. Del. 2015). Defendants' other cited case, *Petroleum Enhancer, LLC v. Woodward*, applied Michigan law to a

Michigan corporation and, thus, is wholly inapplicable to the instant matter concerning Delaware law and a Delaware LLC. *Petroleum Enhancer*, 690 F.3d 757, 769 (6th Cir. 2012); *see also CML V, LLC v. Bax*, 28 A.3d 1037, 1043 (Del. 2011) ("LLCs and corporations are different; investors can choose to invest in an LLC, which offers one bundle of rights, or in a corporation, which offers an entirely separate bundle of rights.").

The Director Defendants' argument that Learnicon cannot recover because it is a "creditor of a creditor" (Dir. Defs.' Mem. at 16) is inconsequential.  Nour-Omid, not Learnicon, is asserting this cause of action against the Director Defendants.

Any reliance on the Operating Agreement's exculpatory provision fails because the alleged conduct falls squarely within an explicit exception.  Section 3.5 of the Operating Agreement provides that a Director "shall not be liable to … any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, gross negligence, willful misconduct, or material breach of this Agreement."  (FAC, Ex. 3 at § 3.5.)  As discussed below, the FAC states claims for fraud, negligent misrepresentation, willful misconduct, and material breach.  (*See infra*, Section II(C), (D), (E), (H), (I).)

Defendants do not contest that Plaintiffs have adequately alleged a breach.  (*See* Dir. Defs.' Mem. at 16-17; Farahnik/LFIH's Mem. at ¶¶ 9-10; Weiss/Force 10's Mem. at ¶¶ 12-13.)  Nor can they.  Plaintiffs allege the named Defendants breached their duty to Nour-Omid "by taking advantage of his commitment to finance the Tranche B Loans to CarbonLite, by negotiating and executing the Forbearance Agreement without regard for and to the severe detriment of his rights and interests, by subordinating the Tranche B Loans without his knowledge or consent, and by later negotiating and executing Amendment No. 6 to the Credit Agreement which even further subordinated the Tranche B Loans, all while knowing that

17

CarbonLite would be imminently filing for Chapter 11 bankruptcy and that it would be extremely unlikely that the Tranche B Loans would ever be repaid." (FAC ¶ 96.)

Finally, any challenge to damages fails for the reasons discussed above in Section I. CarbonLite's further contention that any damages stem from Nour-Omid's role as a principal of Learnicon rather than a director of CarbonLite is uncompelling. Nour-Omid was owed fiduciary duties because he was a director, he relied on his fellow directors because of that relationship, and he was approached to finance the Tranche B transaction because he was a director. (*See* FAC ¶¶ 26, 59.)

### B.     Nour-Omid States a Claim for Aiding and Abetting Breach of Fiduciary Duty Against CarbonLite and Orion

To state a claim for aiding and abetting breach of fiduciary duty, a plaintiff must allege: "(1) the existence of a fiduciary relationship; (2) a breach of that relationship; and (3) knowing participation by the defendant in the fiduciary's breach." *In re Troll Comm's, LLC*, 385 B.R. 110, 120 (Bankr. D. Del. 2008).

As discussed above, Plaintiffs have pled a fiduciary relationship and a breach of that relationship by the Director Defendants, Farahnik, and Weiss.

Plaintiffs have also pled knowing participation in the breach by Orion and CarbonLite. (*See* FAC ¶¶ 106, 70, 72.) Orion asserts that there is no allegation that it "knowingly participated in any underlying breach." (Orion's Mem. at 2, 19.) This is false because the FAC alleges that "Orion was aware that plaintiff Nour-Omid had financed the purchase of the Tranche B Loans and, *in negotiating and executing* the Forbearance Agreement (and later Amendment No. 6), knowingly harmed his interests therein." (FAC ¶ 106; *see also id. ¶* 45 (alleging members of Orion were informed via email that the Tranche B funds would come from Nour-

18

Omid's personal account); ¶ 40 (alleging Orion helped form the plan for LFIH to become the record holder of the Tranche B participation).)

CarbonLite incorrectly focuses on whether a fiduciary duty was owed to Learnicon. (Debtor's Mem. at ¶ 38.)  Again, the breach of fiduciary duty claim is asserted by Nour-Omid. Plaintiffs have demonstrated that there was an underlying fiduciary relationship between the Director Defendants, Farahnik, and Weiss, and Nour-Omid.  Thus, CarbonLite's argument fails.

### C.    Plaintiffs State a Claim for Fraud Based on Concealment

Under California law, the elements of a cause of action for fraud based on concealment are: (1) concealment or suppression of a material fact; (2) a duty to disclose; (3) the defendant intentionally concealed or suppressed the material fact with the intent to defraud; (4) the plaintiff was unaware of the fact and would have acted differently if he knew (i.e., reliance); and (5) resulting damages.  *Boschma v. Home Loan Center, Inc.*, 198 Cal. App. 4th 230, 248 *(*2011). The FAC satisfies each of these elements.

#### 1.    The FAC Alleges a Duty to Disclose

As discussed above, the FAC alleges that Farahnik, Weiss, and the Director Defendants owed a fiduciary duty to Nour-Omid.  Accordingly, they owed a duty to disclose material facts.

Even in the absence of a fiduciary relationship, "a cause of action for non-disclosure may still arise when (1) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead; (2) the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff; [or] (3) the defendant actively conceals discovery from the plaintiff." *Warner Const. Corp. v. L.A.,* 2 Cal. 3d 285, 294 (1970).

Assuming arguendo that no fiduciary relationship exists (it does), the named Defendants still owed a duty to disclose.  The FAC alleges that the named Defendants failed to disclose facts

that materially qualified their representations and rendered those representations misleading. (FAC ¶ 79.)  In October 2020, Plaintiffs agreed to finance the $5,250,000 Tranche B transaction in reliance on material terms.[11]  (*Id*. ¶ 55.)  Thereafter, Defendants made multiple representations regarding the Forbearance Agreement but failed to qualify those statements with the fact that material Tranche B terms had been eliminated.  (*See id*. ¶ 59 (alleging the proposed terms as to the subordination of Tranche B were not disclosed at the February 2, 2021 board meeting), ¶ 67 (alleging the elimination of material terms as to the Tranche B participation was not disclosed at the February 10, 2021 board meeting), ¶ 68 (same in connection with the Participation Purchase Agreement).)  These statements were likely to mislead Plaintiffs and therefore give rise to a claim for non-disclosure.

Moreover, the FAC alleges that the elimination of material rights as to the Tranche B interest "was known to each of the defendants named herein, and each of them knew this fact was not known or reasonably discoverable by Plaintiffs."  (FAC ¶ 79.)  Director Defendants were given the "authority to negotiate and finalize the forbearance agreement and to authorize defendant Farahnik to execute and deliver the forbearance agreement on CarbonLite's behalf." (*Id*. ¶ 59.)  Plaintiffs, however, were excluded from the Forbearance Agreement discussions, never saw the Forbearance Agreement before it was executed, and were not informed of its contents.  (*Id.* ¶ 65.)  The terms of the Forbearance Agreement were therefore known to the named Defendants and not reasonably discoverable by Plaintiffs.

---

[11] Plaintiffs' prior reliance on certain key terms illustrates why the subsequent failure to disclose their elimination was misleading.  For this reason, **Farahnik/LFIH's contention that any facts prior to execution of the Forbearance Agreement are immaterial is incorrect.**  (*See* Farahnik/LFIH's Suppl. Mem. at ¶ 4.)

### 2. The Credit Agreement Does Not Negate Defendants' Duty to Disclose

Citing Section 10.04(f) of the Credit Agreement, which provides that a Lender (such as Orion) may sell participations to its rights and obligations under the Agreement provided that CarbonLite "continue[s] to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and other Financing Documents," the Director Defendants argue that they owed no duty to inform Plaintiffs of "*anything* relating to the Credit Agreement (or other Financing Documents) or the forbearance thereunder." (Dir. Defs.' Mem. at 19-20.) Defendants read section 10.04(f) as if to say that, notwithstanding their fiduciary duty to Nour-Omid, they were required to negotiate Nour-Omid's rights away with Orion in a vacuum and could not have disclosed anything to anyone. This is not the case. First, the cited provision explicitly acknowledges further down from the language Defendants quote that any participation agreement may provide that the Lender must seek the participant's consent prior to agreeing to any amendment, modification, or waiver. (*See* Credit Agmt., § 10.04(f).) The FAC expressly alleges that this was one of the material terms presented to Plaintiffs and on which they relied in agreeing to pay $5,250,000 for the Tranche B participation. (FAC ¶¶ 28-30, 55.) The FAC effectively alleges that the ultimate right of approval as to any Tranche B amendment belonged to Plaintiffs—and all of the Defendants knew (or should have known) it. (*Id.* ¶¶ 28-39, 47-48.) Moreover, section 10.04(f) does not prevent Defendants from disclosing key terms or override any duties owed to the CarbonLite Board, of which Nour-Omid was a member. Indeed, the FAC alleges that the Director Defendants presented a summary of "key elements" of the Forbearance Agreement to the Board at a special meeting on February 10, 2021, but failed to disclose that the Forbearance Agreement subordinated the Tranche B Loans and eliminated material rights associated therewith. (*Id.* ¶ 67.)

### 3.    The FAC Alleges Farahnik Acted with Intent to Defraud

Farahnik contends that an intent to defraud cannot plausibly be inferred because if he personally guaranteed the Tranche B Loans, he "would potentially face personal exposure under a guaranty the debt [ ] subordinated." (Farahnik/LFIH's Mem. at 5, ¶ 4.) Farahnik's reasoning is inappropriate on a motion to dismiss where "the benefit of reasonable inferences" is given to the plaintiff. *See Milton Roy Co. v. Bausch & Lomb Inc.*, 418 F. Supp. 975, 978 (D. Del. 1976). Furthermore, given that Farahnik is refusing to pay on the guaranty and is now arguing that the guaranty was "cancelled" through the later executed Participation Purchase Agreement (*see* Farahnik/LFIH's Suppl. Mem. at ¶ 7), it is not unreasonable to infer that Farahnik never intended to pay or that he did not take the risk of personal exposure seriously. *See Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).").

### 4.    The FAC Alleges Reliance and Damages

"Reliance can be proved in a fraudulent omission case by establishing that 'had the omitted information been disclosed, the plaintiff would have been aware of it and behaved differently.'" *Boschma*, 198 Cal. App. 4th at 250-51 (citing *Mirkin v. Wasserman*, 5 Cal.4th 1082, 1093 (1993)).

The FAC alleges that had Plaintiffs been aware of the subordination of the Tranche B Loans and the elimination of their rights therein, they would have acted differently. Specifically, the FAC alleges that "Plaintiffs would have objected to the Forbearance Agreement and the subordination of the Tranche B Loans and/or insisted on additional security or guarantees to protect their rights and interest therein." (FAC ¶ 82.)

The Director Defendants and Weiss argue that under the terms of the Credit Agreement, any reliance was unreasonable.  (*See* Dir. Defs.' Mem. at 20; Weiss/Force 10's Mem. at ¶ 9.)  As discussed above, the Credit Agreement does not negate Defendants' duty to disclose.  Moreover, this argument is inappropriate because "[e]xcept in the rare case where undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact."  *Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995).  The FAC added detailed allegations to the Original Complaint showing the terms the parties expressly discussed and agreed to and that Plaintiffs relied on to their detriment.  (*See* FAC ¶¶ 25-39.)  Rather than address these additional allegations, the Director Defendants and Weiss rested on their superficial argument that reliance was not "reasonable" or "justified."  This argument fails.

### 5.    The Fraud Claim Is Alleged With Sufficient Particularity

Despite the addition of 34 paragraphs of factual allegations, Farahnik/LFIH maintained their argument that Plaintiffs have not pled fraud with sufficient particularity.  (*See* Farahnik/LFIH's Mem. at 4, ¶ 2.)  The FAC pleads the "how, when where, to whom, and by what means" fraudulent representations were made.  *Lazar v. Super. Ct.*, 12 Cal. 4th 631, 645 (1996).  Plaintiffs identify specific email communications and include screenshots indicating exactly what was said, to whom, and when.  (*See* FAC ¶¶ 26-28, 31-33, 35-36, 38.)  Plaintiffs also specifically allege Board meetings where misrepresentations were made (*id*. ¶¶ 50, 54, 58, 67) and that material terms of the Forbearance Agreement were concealed (*id*. ¶¶ 61, 66, 67, 69).  Plaintiffs' fraud claim is pled with more than adequate particularity.

LFIH specifically further argues that the allegations are insufficient as to it because it is not a "CarbonLite board member or capable of email or oral communication without human agency."  (*See* Farahnik/LFIH's Mem. at 5, ¶ 3.)  The FAC alleges that the human agent was,

and could only be, Farahnik.  LFIH is a holding company that was created for the sole purpose of carrying out the transactions that harmed Plaintiffs.  (FAC ¶ 4.)  It is dominated and controlled by Farahnik, who is the sole member of HPC Industries, LLC, "which in turn is the sole member of LFIH."  (*Id.* ¶ 5.)  The FAC expressly states that "Farahnik is effectively the owner, principal, and sole decision-maker of both HPC Industries and LFIH" and thus authorized to speak on its behalf.  (*Id.*)  To be sure, there is no other person.

For all these reasons, Plaintiffs have adequately alleged a cause of action for fraud against the named Defendants.

### D.    Plaintiffs Also State a Claim for Negligent Misrepresentation

As to Plaintiffs' claim for negligent misrepresentation, the named Defendants largely reassert the same challenges made to Plaintiffs' fraud claim.  These challenges fail for the reasons discussed above.

Defendants LFIH and Farahnik further contend that Plaintiffs have failed to allege an affirmative representation.  This argument is immaterial because Plaintiffs allege misleading half-truths.

Under California law, misleading half-truths are sufficient to state a claim for negligent misrepresentation.  *See OCM Principal Opps. Fund, L.P. v. CIBC World Markets Corp.*, 157 Cal. App. 4th 835, 854 (2007) ("when the defendant purports to convey the 'whole truth' about a subject, 'misleading half-truths' about the subject may constitute positive assertions for the purpose of negligent misrepresentation") (citing *Randi W. v. Muroc Joint Unified School Dist.*, 14 Cal. 4th 1066, 1081-84 (1997)); *see also Roberts v. Ball, Hunt, Hart, Brown & Baerwitz*, 57 Cal. App. 3d 104, 111 (1976) ("Half the truth is often as misleading as outright falsehood").

Plaintiffs allege that certain representations regarding the elements and conditions of the Forbearance Agreement were made "at CarbonLite board meetings and through email and oral

communications between approximately October 2020 and February 2021." (FAC ¶ 88.)  "At no time did any of these [named] defendants represent to Plaintiffs that the Forbearance Agreement subordinated the Tranche B Loans and eliminated material rights associated therewith." (*Id.*) Additionally, at the February 10, 2021 board meeting, defendant Yousefzadeh presented a summary of the Forbearance Agreement's "key elements," but left out the key elements pertaining to the Tranche B Loans. (*Id.* ¶ 67.)  None of the other defendants corrected this. (*Id.*) Accordingly, Plaintiffs have alleged misleading half-truths sufficient to maintain a claim for negligent misrepresentation.

### E.     Nour-Omid States a Claim for Breach of the Operating Agreement Against Farahnik and the Director Defendants

#### 1.     All the Elements of a Breach of Contract Claim Are Satisfied

"In order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: [1] the existence of the contract, whether express or implied; [2] the breach of an obligation imposed by that contract; and [3] the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).  The FAC satisfies each of these elements. (*See* FAC ¶¶ 113, 118-119, 123-124.)

Defendants under this cause of action argue that plaintiff Nour-Omid fails to state a claim for relief under the Operating Agreement because (1) the Forbearance Agreement was not a transaction with an Affiliate or Related Party and did not need to be approved by a Super Majority Vote, and (2) Nour-Omid suffered no damages from the Forbearance Agreement. (*See* Dir. Defs.' Suppl. Mem. at 4-5; Farahnik/LFIH's Suppl. Mem. at ¶ 3.)  Both arguments are refuted by the express allegations of the FAC.

As to the first argument, the FAC cites section 3.6(i) of the Operating Agreement, which states, in relevant part, that "[a] Director, Member, officer, or any Affiliate or … Related Party

… may *directly or indirectly* engage in any transaction … with the Company; provided, however that in each case …" (ii) the "material facts" of the transaction be disclosed to the Board of Directors, and (iii) to the extent applicable, the transaction be approved pursuant to Section 3.3(a)(vi) (specifying the requirement for Super Majority Vote approval).  (*See* FAC ¶¶ 115, 114 & Ex. 3.)   The Forbearance Agreement was indisputably a transaction in which a Director, Member, officer, or any Affiliate or Related Party (in this case, Farahnik and his entity LFIH) at the very least "indirectly engage[d]" in a transaction with the Company.   As explained, the Forbearance Agreement fundamentally affected the rights and priorities of the Tranche B Loans (the participation in which was officially held at the time by Farahnik/LFIH, for the benefit of Nour-Omid/Learnicon) to the Tranche A and Tranche C Loans.   As such, Farahnik and LFIH executed a written Consent to the Forbearance Agreement.   (*Id.* ¶ 62.)   As Orion concedes, the Forbearance Agreement "*specifically required* [LFIH], as a participant in the Tranche B Loans, to approve the Forbearance Agreement."  (Orion's Mem. at 9 (citing Forbearance Agmt. § 6(e).)  Thus, there is no plausible argument that Farahnik/LFIH did not "*directly or indirectly*" engage in the transaction.

The FAC alleges that the material facts of the Forbearance Agreement were not properly disclosed to the Board of Directors (including Nour-Omid) *and* that the transaction was not approved by a Supermajority Vote of the Board of Directors.  (FAC ¶¶ 119, 118; *see also* ¶¶ 59, 78-79 (incorporated into the claim).)  This is a clear-cut and straightforward allegation of breach of contract, in multiple ways, and more than enough to survive an attack on the pleadings.  None of the Defendants even address the alleged breach via failure to disclose material facts.

The named Defendants' attempt to contrast the Forbearance Agreement/Amendment No. 5 to Amendment No. 3 with regard to the need for Super Majority Vote approval also fails.  (*See*

Dir. Defs'. Suppl. Mem. at 4.)  Under the Defendants' own argument, if Amendment No. 3 was a transaction that required Super Majority Vote approval because (i) execution and delivery of LFIH's (an Affiliate or Related Party) Participation Agreement was a condition of the Third Amendment and (ii) the agreement gave LFIH certain approval rights (*see id.*), this logic extends to the Forbearance Agreement/Amendment No. 5 because (i) LFIH's consent was also a condition of the Forbearance Agreement/Amendment No. 5 (*see* Forbearance Agmt. § 6(e)) and (ii) LFIH exercised its approval rights through signing the written Consent.  In other words, LFIH's involvement in the Forbearance Agreement was contractually *required* by its involvement in Amendment No. 3 and the Participation Agreement, making it effectively a necessary party to the contract.  Defendants' argument is an attempt to have it both ways.  They cannot argue that Amendment No. 3 was a transaction that required Super Majority Vote Approval by virtue of LFIH's involvement (even though it was not a direct party to the agreement) but the Forbearance Agreement/Amendment No. 5 was not such a transaction because LFIH was not a direct party to the agreement.  (*See* Dir. Defs.' Suppl. Mem. at 5; Farahnik/LFIH's Suppl. Mem. at ¶ 3.)

As to Defendants' second argument (that Nour-Omid suffered no damages from the Forbearance Agreement), this is already addressed in Section I above.  Here, Defendants' argument is an attempted "gotcha": they contend that it was Learnicon (not Nour-Omid) that had the economic interest in the participation in the Tranche B Loans, but Nour-Omid (not Learnicon) was the party to the Operating Agreement.  (*See* Dir. Defs.' Suppl. Mem. at 5.)  This discrepancy is immaterial for purposes of the complaint, because the FAC expressly alleges that the cash for the participation came from Nour-Omid, and was advanced on behalf of Learnicon.

(FAC ¶ 45; *see also* ¶ 70 (explaining that Plaintiffs wired the funds directly to Orion, who accepted them).)

Because all the elements of a breach of contract claim are satisfied, Defendants' motion as to this claim should be denied.

### 2.    Defendants Mischaracterize the "Knowledge" Provision of a Later Executed Contract to Try to Prematurely Dispute Plaintiffs' Claims

Defendants also argue that all of Plaintiffs' claims (including the breach of contract claim) fail because Plaintiffs supposedly "concede" that they had a copy of the Forbearance Agreement/Amendment No. 5 when Learnicon purchased LFIH's participation interest.  (Dir. Defs.' Suppl. Mem. at 6(B); Farahnik/LFIH's Suppl. Mem. at ¶ 3; *see also* Debtor's Mem. at ¶ 16 & Suppl. Mem. at 3-4; Orion's Suppl. Mem. at 3 (asserting same).)  This argument, which relies on a "knowledge" provision in the later executed Participation Purchase Agreement, both improperly cites a contract on which none of Plaintiffs' claims are based (and certainly not Nour-Omid's breach of contract claim) and patently mischaracterizes the language of that contract.

On a motion to dismiss, "courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  An exception is that courts may consider a document attached as an exhibit to a motion to dismiss if the document is indisputably authentic and the plaintiff's claims are *based on the document. Id.*  A complaint is "based" on an extrinsic document if the document is "integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  Here, Plaintiffs' claims are not "based" on the referenced Participation Purchase Agreement.  The FAC refers to this agreement, which was executed about a week *after* the Forbearance Agreement, simply to demonstrate that while Farahnik/LFIH were the record

holders of the Tranche B interest for much of the period at issue, Nour-Omid/Learnicon—who were always the beneficial holders of the interest in any event—are *now* also the record holders pursuant to the Participation Purchase Agreement. (FAC ¶ 68.) The Participation Purchase Agreement does not form the basis of any of Plaintiffs' claims, it is not integral to any of Plaintiffs' claims, and it is not explicitly relied upon for any of Plaintiffs' claims. This is acutely so in the case of the instant breach of contract claim, which is brought by Nour-Omid only (who, under Defendants' logic, is not a party to the Participation Purchase Agreement; Learnicon is) and deals specifically with breach of the Operating Agreement vis-à-vis execution of the Forbearance Agreement.

Even if the Court were to consider the Participation Purchase Agreement at this stage, it does not invalidate Plaintiffs' claims, as Defendants suggest. Section 3(b) of the Participation Purchase Agreement, titled "Knowledge" (there are two "section 3(b)s" in the contract, which raises a factual dispute at the outset), states that the "Purchaser [Learnicon] has received copies of the Participation Agreement [referring to the October 23, 2020 Participation Agreement], the Credit Agreement and all other documents relating thereto and is aware that the Borrowers under the Credit Agreement are in default, that the Agent [Orion] has entered into a Forbearance Agreement with the Borrowers and that pursuant to the Forbearance Agreement the Borrowers are preparing to file for Chapter 11." (Debtor's Suppl. Mem, Ex. B at § 3(b).) The section continues, "Purchaser is knowledgeable the [sic] business affairs and financial condition of CarbonLite … and has acquired sufficient information about CarbonLite to reach an informed and knowledgeable decision to purchase the Participation." (*Id.*) This provision does *not* say that Learnicon, or Nour-Omid for that matter, had a copy of the Forbearance Agreement as of February 16, 2021. It expressly states that Learnicon had "received copies" of (1) the October

23, 2020 Participation Agreement, (2) the Credit Agreement, and (3) all other documents *relating thereto* (i.e., to the October 23, 2020 Participation Agreement and Credit Agreement) and then states that Learnicon "is aware" that Orion "has *entered into* a Forbearance Agreement with the Borrowers …."  Thus, there is a clear distinction between what documents Learnicon received copies of (the October 23, 2020 Participation Agreement, the Credit Agreement, and documents relating thereto) and what Learnicon was aware of (that Orion and CarbonLite had entered into a Forbearance Agreement).

The Forbearance Agreement is not mentioned in the first clause (among the documents Learnicon received copies of), but *is* mentioned in the second clause (among the information Learnicon is simply aware of).  Under straightforward rules of contract interpretation, one cannot infer that the Forbearance Agreement was included in the "all other documents" phrase of the first clause and assume Learnicon received a copy of it along with the Participation Agreement and Credit Agreement.  The "other documents" plainly relate to the October 23, 2020 transaction, four months *prior* to the Forbearance Agreement.  The second clause confirms that Learnicon did not receive a copy of the Forbearance Agreement because it expressly states only that Learnicon "is aware" that Orion "entered into a Forbearance Agreement."  To infer receipt of the Forbearance Agreement in the first clause would be to render the explicit reference to it in the second clause nugatory.  *See CTF Hotel Holdings, Inc. v. Marriott Int'l, Inc.*, 381 F.3d 131, 137 (3d Cir. 2004) ("When interpreting contracts, we are required to read contract language in a way that allows all the language to be read together, reconciling conflicts in the language without rendering any of it nugatory if possible."); *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 56 (Del. 2019) (Delaware courts interpret contracts "as a whole and … give each provision and term effect, so as not to render any part of the contract mere surplusage"

and "will not read a contract to render a provision or term meaningless or illusory"). Defendants' interpretation of the language is misleading and improper.

The allegations of the FAC are consistent with the contract's language. The FAC alleges that as of the date of the Participation Purchase Agreement, February 16, 2021, "Plaintiffs knew that CarbonLite and Orion had entered into the Forbearance Agreement, but, critically, they were not aware of the Forbearance Agreement's terms." (FAC ¶ 69.) "Neither Dr. Nour-Omid nor Learnicon had received a copy of the Forbearance Agreement or been made aware of its contents at that point" and did not receive a copy of the Forbearance Agreement until approximately one week later, "on or around February 25, 2021." (*Id.* ¶¶ 69-70.) It is simply inaccurate—not to mention an improper factual dispute—for Defendants to argue that Plaintiffs had received a copy of the Forbearance Agreement and were aware of its terms at any earlier point.

The final sentence of the "Knowledge" provision, stating that Learnicon had acquired sufficient information to reach an informed and knowledgeable decision to purchase the participation, does not change the analysis. Again, this relates to a later transaction between Learnicon and LFIH that aligned the record ownership of the Tranche B interest in Learnicon with the beneficial ownership it always had. The FAC also expressly alleges that Farahnik/LFIH failed to disclose material facts to Nour-Omid/Learnicon in connection with this agreement (FAC ¶ 68), which, if proven true, would support fraudulent inducement on the merits.

Thus, the notion that the "Knowledge" provision of the Participation Purchase Agreement invalidates Defendants' claims is incorrect.

F.    **The FAC States a Claim For Breach of Contract Under the Personal Guaranty Against Farahnik**

There is perhaps no more straightforward cause of action that should survive a motion to dismiss than Farahnik's breach of his personal guaranty of the Tranche B interest. Indeed, none

31

of Defendants' arguments regarding damages, reliance, or any other purported defects in the FAC have any bearing on this cause of action.  Farahnik's motion to dismiss this claim is disingenuous at best and intentionally dishonest at worst.

Contrary to Farahnik's insinuation, the personal guaranty at issue was plainly reduced to writing and a valid agreement.  (*See* Farahnik/LFIH's Suppl. Mem. at ¶¶ 5-6.)  The personal guaranty was first memorialized in Amendment No. 2 to the Credit Agreement, where it was termed the "Unconditional Guaranty" and defined as "that certain Unconditional Continuing Guaranty *of all Tranche B Obligations*, made and entered into as of the Amendment No. 2 Effective Date, *by Leon Faranik* in favor of the Collateral Agent for the benefit of the Tranche B Lenders."  (Amend. No. 2, Art. I (Definitions).)  Proceeds from the "collection, sale or other realization of all or any part of the Unconditional Guaranty" were to be applied *in all instances* to the Tranche B Obligations.  (*Id.* at § 7.02 (Application of Proceeds).)

Under the October 23, 2020 Participation Agreement that was attached to Amendment No. 3, the "Participation" in the Tranche B Loans was defined as "the purchase of the Tranche B Loan, *and the sole and exclusive benefit of the Unconditional Continuing Guaranty of all Tranche B Obligations dated September 9, 2020 executed by Leon Farahnik*."  (Amend. No. 3, Ex. B at § A (Definitions).)  As alleged in the FAC, this Participation was pledged to Nour-Omid/Learnicon by Farahnik and was part of the Note issued to Learnicon that was secured by LFIH's interest in the Participation, publicly recorded in Delaware.  (FAC ¶¶ 40-41, 43-44, 51 & Ex. 1.)  Coming full circle, under the Participation Purchase Agreement (which, again, is referenced in the FAC simply to demonstrate that Nour-Omid/Learnicon eventually became the record holders—in addition to the beneficial holders—of the Participation), the "Seller [LFIH] agree[d] to sell and transfer to Purchaser [Learnicon] *all right, title and interest of Seller in, and*

*under the [October 23, 2020] Participation Agreement*, and all rights in the Tranche B Loan."
(*See* Debtor's Suppl. Mem., Ex. B at § 1(a).[12])  Thus, Farahnik executed an "Unconditional

Continuing Guaranty of all Tranche B Obligations," pledged it to Plaintiffs in connection with

Amendment No. 3 and the Tranche B transaction, and then sold it outright to Learnicon.

The fact that Plaintiffs do not have the September 9, 2020 document in their possession

and therefore could not attach it to their complaint does not defeat their cause of action.  This is

what discovery is for.  *See VLIW Tech.*, 840 A.2d at 611 ("In alleging a breach of contract, a

plaintiff need not plead specific facts to state an actionable claim.  Rather, a complaint for breach

of contract is sufficient if it contains a short and plain statement of the claim."); *Daytree at*

*Cortland Square, Inc. v. Walsh*, 332 F. Supp. 3d 610, 637 (E.D.N.Y. 2018) (plaintiffs alleging

breach of contract under New York law not required to attach a copy of the contract to the

complaint; they were required only to "disclose sufficient information to permit the defendants to

have a fair understanding of what the plaintiff is complaining about and to know whether there is

a legal basis for recovery'").  The FAC alleges the existence of the contract (the personal

guaranty), Farahnik's breach of that contract, and damages.  These allegations are sufficient at

the pleading stage to state a claim for relief.

**G.    The FAC States a Claim for Breach of Implied-in-Fact Contract Against
       CarbonLite and Orion**

**1.    The FAC Pleads an Enforceable Agreement**

An implied in-fact contract is based on the conduct of the parties.  Cal. Civ. Proc. Code §

1621.  Like an express contract, an implied in fact contract requires an ascertained agreement of

---

[12] Farahnik's alternative argument, that the Participation Purchase Agreement "cancelled" the Note and therefore "perforce extinguish[ed] the guaranty," is illogical and contrary to the express terms of the agreement.  The agreement expressly states that LFIH transferred "all right, title and interest," *including the Participation* (which

the parties. *Silva v. Providence Hosp. of Oakland*, 14 Cal. 2d 762, 773 (1939). "[T]he existence of an implied contract is usually a question of fact." *Caron v. Andrew*, 133 Cal. App. 2d 412, 416 (1955).

The FAC pleads an enforceable implied-in-fact agreement. Plaintiffs allege that after CarbonLite and Orion discussed the idea of having another investor step into the Tranche B obligation, Farahnik, on behalf of CarbonLite, approached Nour-Omid to be that investor. (*See* FAC ¶¶ 25-27.) All three parties then discussed the terms of Plaintiffs' purchase, including that Tranche B would have payment priority in multiple scenarios and Nour-Omid would have a right of approval for any amendments to this priority. (*Id.* ¶¶ 28-38.) "[A]t the last minute, Orion, CarbonLite, CarbonLite's counsel Mr. Kupietzky, and Mr. Farahnik devised a plan whereby a new entity formed and controlled by Mr. Farahnik, LFIH, would 'purchase' the Tranche B Loans from Orion while Plaintiffs would provide the funds for the transaction"; importantly, however, Plaintiffs would retain the agreed upon Tranche B rights. (*Id.* ¶ 40.) In reliance on these promises, Nour-Omid wired $5,250,000 in cash directly to Orion, who accepted the funds. (*Id.* ¶ 70.) All the elements of an enforceable agreement exist.

Any attempt to rely on LFIH's role as the record holder of the Tranche B interest to negate Plaintiffs' allegations of an implied contract is unavailing. The FAC explicitly addresses why LFIH, and not Plaintiffs, executed Amendment No. 3—LFIH was merely a holding company created for the sole purpose of being the "record holder" as a matter of 'form over substance' that would be 'easier' for everyone." (*Id.* ¶ 40.)

---

includes the Unconditional Continuing Guaranty), to Learnicon. There is no implication whatsoever in the agreement, or anywhere, that the legal "cancellation" of the Note literally "cancels" the personal guaranty.

### 2.      The Implied Contract Is Not Subsumed by a Written Agreement

A claim for an implied contract "cannot lie where there exists *between the parties* a valid express contract covering *the same subject matter*." *Lance Camper Mfg. Corp. v. Republic Indemnity Co.*, 44 Cal. App. 4th 194, 203 (1996). There was no written agreement between the parties to this cause of action, Plaintiffs, Orion, and CarbonLite. Orion previously conceded this point in opposing Plaintiffs' claim for breach of the covenant of good faith and fair dealing. (*See* Orion's Mem. at 7 ("[T]here is no contractual relationship between Plaintiffs, on the one hand, and the Orion Funds, on the other….").) In fact, Orion and CarbonLite helped ensure that this was the case—this was the direct result of LFIH becoming the contracting party to the October 23, 2020 Participation Agreement. (*See* FAC ¶ 40.) They cannot now argue that because they entered into a written agreement with a different party (LFIH, created for the very purpose of entering into that agreement), there can be no implied agreement with Plaintiffs.

Furthermore, to the extent Orion is referring to the Forbearance Agreement, the FAC pleads facts showing that it was procured by fraud and therefore invalid. (*See supra* Section II(C); *see also* FAC ¶ 85 (requesting the Forbearance Agreement be rescinded or voided); Cal. Civ. Proc. Code §§ 1566, 1567 (consent obtained by fraud is voidable).)

Each of the three cases cited by Orion is distinguishable. In *Walker v. Am. Nat'l Ins. Co.,* the court found that plaintiffs' claim for an implied contract was precluded as a matter of law because there was a valid contract *between the parties*. *Walker*, 2018 WL 1993383, at *4 (N.D. Cal. Apr. 27, 2018). The court noted that plaintiffs' claim for breach of an implied contract was identical to its claim for breach of written contract. *Id*. Here, there is no written agreement between Plaintiffs, CarbonLite, and Orion or identical breach of contract claims. Plaintiffs' written breach of contract claims relate to the Operating Agreement and Farahnik's personal

guaranty.  None of the breaches asserted in the implied contract claim could be or are asserted under those contracts.

*DG & A Mgmt. Servs. LLC v. Secs. Indus. Ass'n Compliance & Legal Div.* is a New York case that is inapplicable here because Plaintiffs' implied contract claim is governed by California law.  *See DG & A*, 52 A.D.3d 922, 922–23 (N.Y. App. Div. 2008).  Regardless, it is factually distinguishable.  In *DG & A*, the New York appellate court affirmed the dismissal of a breach of implied contract claim where "documentary evidence" showed that the parties would have memorialized any agreement between them.  *Id.*  The parties had a lengthy history of entering into one to two-year written contracts similar to the disputed implied contract.  *See id.*  Here, there is no such documentary evidence or history.

Finally, in *In re Penn Centr. Transp. Co.*, the Third Circuit rejected Penn Central Transportation Company's argument that an implied contract to continue rail operations existed alongside several written government contracts.  *Penn Cent. Transp. Co.*, 831 F.2d 1221, 1228-30 (3d Cir. 1997).  In a fact-specific ruling (not on a motion to dismiss), the Third Circuit observed that there was "no factual basis for finding" an implied contract, that no government official had the authority to enter into an implied contract, and that no implied contract could be found where Penn Central entered into heavily negotiated written agreements with the government concerning the exact same subject.  *Id.*  Moreover, no such agreement could exist under the requirements for congressional funding.  *Id.*  None of these facts are present here.

### 3.      Plaintiffs Plead Breach and Damages

Finally, Plaintiffs plead breach and damages.  (*See* FAC ¶¶ 136-137.)  In challenging this allegation, Orion raises similar arguments made by CarbonLite with respect to Plaintiffs' standing.  (*See* Orion's Suppl. Mem. at 7.)  For the reasons discussed above, Plaintiffs have alleged damages.  (*See supra*, Section I.)

**H.    The FAC States a Claim for Tortious Interference with Contractual Relations Against CarbonLite, Orion, and the Director Defendants**

CarbonLite summarily asserts that the FAC still fails to plead any of the requisite elements for intentional interference with contractual relations.  (*See* Debtor's Suppl. Mem. at 2; Debtor's Mem. at ¶ 45.)  Incorrectly citing New York law, Orion and the Director Defendants contend that there are no allegations of procuring a breach, a breach of the contract itself, or unjustified interference.  (*See* Orion's Mem. at 28-29; Dir. Defs.' Mem. at 24-25.)  The Director Defendants also challenge damages.  (*See id.* at 26.)  Defendants' arguments are without merit, as each required element of intentional interference with contractual relations is pled.

The elements of intentional interference with contractual relations are: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."  *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55 (1998) (citing *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990)).

First, the FAC alleges that Orion and CarbonLite knew of multiple contacts between Plaintiffs and "defendants LFIH and Farahnik, including the Note Purchase Agreement, the Security Agreement, and the Participation Purchase Agreement."  (FAC ¶¶ 140-141.)  CarbonLite contends that it is "not clear from the Complaint" whether Plaintiffs were party to any contracts when the Forbearance Agreement was executed.  (Debtor's Mem. at ¶ 45.)  The contracts have been clearly alleged and attached to the FAC.  (*See* FAC, Ex. 1.)  The named Defendants not only knew of the contracts, but they were directly involved in the transaction.  (*See id*. ¶¶ 40-41.)  This plan was formed months prior to the Forbearance Agreement.  (*Id*.)  Any attempt to distance CarbonLite from LFIH fails, as Plaintiffs plead facts showing

CarbonLite was involved in the creation of LFIH (its counsel prepared all the necessary documents) and was the initial member of LFIH, and CarbonLite's CEO, Farahnik, was the principal and sole decision maker of LFIH and HPC. (*Id*. ¶¶ 5, 40, 42.)

Second, Plaintiffs allege that the named Defendants intentionally disrupted their contracts with LFIH/Farahnik. Culpable intent is inferred from conduct "substantially certain" to interfere with the contract. *Integrated Healthcare Holdings Inc. v. Fitzgibbons*, 140 Cal. App. 4th 515, 533 (2006). As part of the plan devised by Orion, CarbonLite, and others, Plaintiffs entered into agreements with LFIH/Farahnik to "secure and protect Plaintiffs' rights and interest in the Tranche B Loans." (FAC ¶ 140; *see also id*. ¶ 40.) Defendants later subordinated the Tranche B Loans and eliminated material rights associated therewith, "making it virtually impossible that the Tranche B Loans would ever be repaid." (*Id*. ¶ 143.) Defendants knew that Plaintiffs' contracts were meant to protect their rights and interests in the Tranche B Loans and "substantially devalued" those rights and interests "to the point of being practically worthless." (*Id*. ¶ 70.) As such, Plaintiff have pled intentional disruption.

Orion and the Director Defendants' arguments premised on New York law fail. These Defendants incorrectly focus on whether there is an alleged breach of Plaintiffs' contracts with LFIH/Farahnik. Under California law, Plaintiffs are not required specifically to allege a breach. The tort requires an allegation of an "actual breach *or disruption* of the contractual relationship." *Quelimane,* 19 Cal. 4th at 55. As discussed above, Plaintiffs have alleged a disruption.

These Defendants also cite New York law to challenge whether the alleged interference is improper or unjustified. (Orion's Mem. at 23; Dir. Defs.' Mem. at 25.) Under California law, claims for interference with a *prospective* contract require an allegation of wrongfulness apart from the interference itself. *See LiMandri v. Judkins*, 52 Cal. App. 4th 326, 342 (1997). Claims

for interference with an existing contract require no such allegation. *See Quelimane,* 19 Cal. 4th at 55; *LiMandri,* 52 Cal. App. 4th at 342. But, in any event, this is not a case where the allegations of "tortious conduct are distinct from or only tangentially related to the conduct constituting the actual interference." *LiMandri*, 52 Cal. App. 4th at 342. As discussed above, the interference gives raise to several other causes of action, including fraud and breach of fiduciary duty. (*See supra*, Section II(A)-(D).)

I.      **The FAC States a Claim For Tortious Interference with Economic Relations Against CarbonLite, Orion, and the Director Defendants**

Here, too, CarbonLite summarily asserts that Plaintiffs fail to plead the required elements for intentional interference with economic relations. (*See* Debtor Mem. at ¶¶ 44-45.) And incorrectly citing New York law, Orion and the Director Defendants argue that inapplicable elements and standards have not been met. Each of these arguments fails, as Plaintiffs have pled the requisite elements.

Intentional interference with prospective economic relations requires "an economic relationship between the plaintiff and a third party, with a probability of future economic benefit to the plaintiff." *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 713 (2007). "The tort of interference with prospective economic advantage protects the same interest in stable economic relationships as does the tort of interference with contract, though interference with prospective advantage does not require proof of a legally binding contract." *Pac. Gas & Elec. Co.*, 50 Cal. 3d at 1126. Like intentional interference with a contractual relationship, Plaintiffs must allege: (1) knowledge of the relationship; (2) intentional acts designed to disrupt the relationship; (3) disruption of the relationship; and (4) economic harm proximately caused by defendant's conduct. *See Overstock.com*, 151 Cal. App. 4th at 713; *see also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1152-57 (2003) (discussing

and comparing the elements of interference with economic relations and contractual relations);
*Quelimane Co.*, 19 Cal. 4th at 55.  Further, the disruption must be wrongful, i.e., "proscribed by
some constitutional, statutory, regulatory, common law, or other determinable legal standard."
*Korea Supply*, 29 Cal. 4th at 1158-59.

Plaintiffs plead an existing relationship with LFIH and Farahnik "that should have and
would have resulted in an economic benefit to Plaintiffs."  (FAC ¶ 149.)   Specifically, "[i]n
exchange for their commitment to finance the Tranche B Loans, Plaintiffs were supposed to
receive repayment of the loans + accrued interest + certain milestone fees.  The expected
economic benefit was greater than $5,250,000." (*Id*.)   The remaining elements of knowledge,
intentional acts, disruption, and damages overlap with the claim for interference with a
contractual relationship.  (*See immediately above*.)

Orion incorrectly asserts that Plaintiffs must allege a "prospective business relationship"
and can only claim interference with contractual relations.  (Orion's Mem. at 25.)  Plaintiffs are
required to, and did, allege an *existing* business relationship with a probability of *future*
economic benefit.  *See Overstock.com*, 151 Cal. App. 4th at 713.  No allegation of a prospective
relationship is required.  Moreover, the existence of Plaintiffs' contracts with LFIH and Farahnik
does not preclude Plaintiffs' claim here.  "The tort of interference with an advantageous
relationship, or with a contract, does not … disintegrate because it relates to a contract not
written or an advantageous relation not articulated into a contract."  *LiMandri*, 52 Cal. App. 4th
at 349.  "The great weight of authority is that the tort of interference with contract is merely a
species of the broader tort of interference with prospective economic advantage."   *Id*.
Accordingly, Plaintiffs' claim does not fail for lack of a prospective business relationship or a
written agreement.

Incorrectly citing New York law, Orion and the Director Defendants contend that Plaintiffs fail to allege that Defendants acted solely out of malice. (*See* Orion's Mem. at 25-26; Dir. Defs.' Mem. at 33-34.) Defendants do not cite any case law showing that this is applicable under California law. California law requires an allegation that the interference is independently wrongful, meaning that it is prohibited by a "determinable legal standard." *Korea Supply*, 29 Cal. 4th at 1158-59. Plaintiffs have alleged facts showing the named Defendants "acted in bad faith, breached (or aided and abetted the breach of) fiduciary duties, and defrauded Plaintiffs by knowingly subordinating the Tranche B Loans and eliminating material rights associated therewith in disregard of Plaintiffs' rights and interest therein." (FAC ¶ 151.)

    **J.**    **The FAC States a Claim for Declaratory Relief**

Orion, Weiss/Force 10, and Farahnik/LFIH contend that because all of Plaintiffs' other claims fail, the tenth cause of action for declaratory relief fails. (*See* Orion's Mem. at 27; Weiss/Force 10's Mem. at 7; Farahnik/LFIH's Mem. at ¶ 5.) For all the reasons discussed above, this argument does not hold water and should be rejected.

**III.**    <u>**The General Release in the Forbearance Agreement Does Not Bar Plaintiffs' Claims**</u>

Orion argues that the General Release in the Forbearance Agreement bars each of the Plaintiffs' claims against Orion. (Orion's Mem. at 15.) This argument fails for multiple reasons.

First, as a threshold matter, a general release obtained through fraudulent inducement or fraudulent concealment is voidable. *See Littman v. John*, 54 A.D.3d 14, 17 (N.Y. App. Div. 2008). "[A] general release will not insulate a defendant from allegations of breach of fiduciary duty, where defendants have not fully disclosed alleged wrongdoing or a conflict of interest." *Zackiva Comm's Corp. v. Horowitz,* 826 F. Supp. 86, 90-91 (S.D.N.Y. 1993); *see also Bushkin, Gaimes, Gaines, Jonas & Stream v. Garber*, 677 F. Supp. 744, 776 (1988) ("[T]he 'ritualistic' language of releases will not bar claims if the release was the result of fraud or mutual

mistake.")).  "Under relevant New York case law, mere allegations of fraud in the inducement of a release warrant denial of a motion to dismiss that is grounded on a release."  *Ladenburg Thalmann Co. v. Imaging Diagnostic Sys.*, 176 F. Supp. 2d 199, 205 (S.D.N.Y. 2001).  The FAC alleges that the Forbearance Agreement, including the release, was entered into through fraud and material facts about it concealed from Plaintiffs.  (*See* FAC ¶¶ 58-67, 70, 74-75.)  As such, the General Release cannot provide a basis for dismissing Plaintiffs' claims.

Second, even assuming the general release was not obtained through fraud, Plaintiffs do not fall within the scope of the release.  In the release, CarbonLite released claims "on behalf itself *and its* agents, representatives, officers, directors, advisors, employees, subsidiaries, affiliates, successors and assigns …."  (FAC, Ex. 2 at § 7(a).)  Orion attempts to stretch this language to Learnicon by arguing that purchasing the Tranche B participation after-the-fact made Learnicon a "successor to a CarbonLite affiliate."  (Orion's Mem. at 2.)  This attenuated argument fails on its face—Learnicon (Nour-Omid's entity) has no corporate relationship to LFIH (Farahnik's entity), and, in any event, the release expressly encompasses *CarbonLite's* affiliates and *CarbonLite's* successors.  Even if LFIH were considered an affiliate of CarbonLite (not Farahnik),[13] Learnicon is not an affiliate of CarbonLite or a successor to CarbonLite.

Furthermore, even if the release did extend to CarbonLite's affiliate's successors (it does not), Learnicon is not LFIH's "successor."  In support of this argument, Orion cites to Black's Law Dictionary's definition of a successor corporation as one that, "through amalgamation, consolidation, or other assumption of interest, is vested with the rights and duties of an earlier corporation."  (Orion's Mem. at 18.)  The "Assignment Agreement" Orion references (which is not mentioned anywhere in the FAC) only transferred rights as to the Tranche B Loans and the

Participation Agreement, not *all* of LFIH's rights and duties.   Learnicon and LFIH remain separate entities.   Recognizing this, Orion frames Learnicon as a successor "for purposes of the General Release."   (*Id.* at 18.)   The General Release, however, does not refer to any limited or qualified form of successor.   (*See* FAC, Ex. 2 at § 7.)   Thus, even if the General Release could extend to an affiliate's successor, Learnicon would still not be within its scope.

As to Nour-Omid, Orion relies on his status as a CarbonLite director to argue that CarbonLite released any claims he may have.   CarbonLite did not have authority to release Nour-Omid's claims, and it certainly had no authority to release Learnicon's claims.   Nour-Omid, along with the rest of the CarbonLite Board, gave the Finance Committee "authority to negotiate and finalize the forbearance agreement with Orion … on *CarbonLite's* behalf."   (FAC ¶ 59.)   No authority was given on behalf of Nour-Omid personally or Learnicon.

Finally, even if the General Release did extend to Plaintiffs (it did not, for all the reasons stated above), it would still be unenforceable because Plaintiffs' claims were unknown at the time, and the release was not "fairly and knowingly made."   *Johnson v. Lebanese Am. Univ.*, 84 A.D.3d 427, 430 (N.Y. App. Div. 2011).   "Even the most broadly drawn general release cannot necessarily be taken at face value."   *In re Clinton Street Food Corp.*, 254 B.R. 523, 534 (S.D.N.Y. 2000).

Plaintiffs allege sufficient facts to show that the release of their claims was not fairly and knowingly made.   At the time of the negotiation and execution of the General Release, Plaintiffs were unaware that "the Forbearance Agreement subordinated the Tranche B Loans to both the Tranche A *and* Tranche C Loans and eliminated material rights associated with the Tranche B Loans, including its payment priorities."   (FAC ¶ 66.)   Plaintiffs further allege that these facts

---

[13] This would raise serious alter ego issues, which Orion likely does not mean to suggest.

were concealed at special board meetings (*id.* ¶¶ 55, 67) and Plaintiffs were "shut out of the negotiation and execution of the Forbearance Agreement (*id*. ¶ 135). Furthermore, Nour-Omid's approval was not sought even though Orion previously represented it would be. (*Id.* ¶ 65.) Thus, even if the General Release encompassed Plaintiffs, it could not bar their unknown claims.

## IV.    The Claims Asserted in the FAC Are Procedurally Proper and Should Not Be Dismissed

CarbonLite argues that the FAC is procedurally improper because it asserts pre-petition monetary claims against the Debtor, which should be adjudicated through the claims allowance process. (Debtor's Mem. at ¶ 29.) According to the Debtor, Bankruptcy Rule 7001 does not confer on a creditor the right to sue debtors for prepetition claims. (*Id.* at ¶ 30.)

Courts in the Third Circuit have "disagree[d] with the suggestion that there is a *per se* rule against resolving a pre-petition claim for damages in the adversary process." *In re Forever 21, Inc.*, 623 B.R. 53, 59 (Bankr. D. Del. 2020). Nothing in the express language of Rule 7001 suggests such a prohibition; instead, Rule 7001 simply lists claims that *must* be prosecuted as adversary proceedings and does not contain an exhaustive list of controversies that *may* be resolved by adversary proceedings. While the Comment to Rule 7001 notes that proofs of claim and objections thereto are governed by the claims allowance process in Rules 3001, *et seq.*, it also states that when an objection to a claim is joined with a demand for relief of the kind specified in Rule 7001, it *must* be brought as an adversary proceeding. *See* Fed. R. Bankr. P. 3007(b) ("A party in interest shall not include a demand for relief of a kind specified in Rule 7001 in an objection to the allowance of a claim, but may include the objection in an adversary proceeding.").

Further, Rule 7001(10) provides that actions which are removed from other courts are adversary proceedings. Removed actions typically assert pre-petition claims against the debtor.

Nonetheless, they are resolved in the adversary proceeding, not in the claims resolution process. *See Forever 21*, 623 B.R. at 60.

Even if Rule 7001 were interpreted to require that an action fit into one of its categories in order to warrant an adversary proceeding, all claims for relief asserted in the FAC, with the exception of only the tenth cause of action for declaratory relief, seek monetary damages based on a variety of legal theories and thus fit comfortably within Rule 7001(1) as "a proceeding to recover money or property." Nothing in the express language of Rule 7001(1) prohibits the assertion of such pre-petition damages claims *against a debtor*. *See Forever 21*, 623 B.R. at 60. Meanwhile, the FAC also raises claims against non-debtor defendants, which properly fit within Rule 7001(1) because they cannot be asserted by the filing of a proof of claim in the Debtor's bankruptcy case. *Id.* Because the claims against the Debtor are based on the same facts and issues of law that support the claims against the remaining defendants, they should be heard together in this adversary proceeding pursuant to Rule 7042.[14]

Plaintiffs' tenth cause of action seeks declaratory relief, and the FAC's prayer for relief includes a request for rescission or other appropriate equitable relief nullifying or voiding the Forbearance Agreement and the amendment of the Tranche B payment priority. Rule 7001(7) expressly requires Plaintiffs to bring such pre-petition claims for "equitable relief" by adversary proceedings. Further, and as CarbonLite readily admits (*see* Debtor's Mem. at ¶ 31), Plaintiffs' requests for equitable relief are based upon the same set of facts and issues of law that support the remaining causes of action, and thus all of Plaintiffs' claims for relief should be consolidated under Rule 7042 and heard together in this adversary proceeding. *See, e.g., In re RS Legacy*

---

[14] Fed. R. Civ. P. 42, made applicable in adversary proceedings by Fed. R. Bankr. P. 7042, allows the Court to consolidate matters that involve a common question of law or fact.

*Corp.*, 2017 WL 3837294, at *3 (Bankr. D. Del. Aug. 31, 2017) (acknowledging that an adversary proceeding may be treated as an informal proof of claim, but dismissing it because it was filed after the bar date); *Wilson v. Residential Cap. (In re Residential Cap.)*, 2014 WL 3057111, at *7 (Bankr. S.D.N.Y. July 7, 2014) (concluding that a pre-petition damages claim included in an adversary proceeding with a request for equitable relief would be treated as an informal proof of claim).

Accordingly, all claims asserted in the FAC are procedurally proper and cannot be dismissed on any procedural grounds.

**V.       There Is No Reason to Stay this Adversary Proceeding**

In moving to dismiss the Original Complaint, CarbonLite, Farahnik/LFIH, and the Director Defendants alternatively requested that the Court stay this matter pending the sale of CarbonLite's assets, including PinnPack.  This request should now be rejected as moot.

**CONCLUSION**

For all the reasons stated above, Plaintiffs respectfully request that the Court deny each of the Defendants' motions to dismiss.  Should the Court find dismissal appropriate for any of Plaintiffs' claims, Plaintiffs respectfully request leave to amend.  *See AxisTel Comms.*, 312 B.R. at 260 ("leave to amend pleadings 'shall be freely given when justice so requires'"); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008) (if a motion to dismiss is granted, courts "must permit a curative amendment, unless such an amendment would be inequitable or futile").

Dated:  July 16, 2021                          BARNES & THORNBURG LLP

                                               */s/  Kevin G. Collins*
                                               Thomas E. Hanson, Jr. (No. 4102)
                                               Kevin G. Collins (No. 5149)
                                               1000 N. West Street, Suite 1500
                                               Wilmington, DE 19801
                                               Telephone:  (302) 300-3447
                                               Facsimile: (302) 300-3456
                                               Email: thanson@btlaw.com
                                                       kcollins@btlaw.com

                                               and

                                               Sanford L. Michelman
                                               smichelman@mrllp.com
                                               Mona Z. Hanna (admitted *pro hac vice*)
                                               mhanna@mrllp.com
                                               Howard I. Camhi (admitted *pro hac vice*)
                                               hcamhi@mrllp.com
                                               Alexander R. Safyan (admitted *pro hac vice*)
                                               asafyan@mrllp.com
                                               MICHELMAN & ROBINSON, LLP
                                               10880 Wilshire Blvd., 19th Floor
                                               Los Angeles, CA 90024
                                               Telephone: (310) 299-5500
                                               Facsimile: (310) 299-5600

                                               *Attorneys for Plaintiffs Bahram Nour-Omid and*
                                               *Learnicon LLC*

47